**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

|  |  |  |
|---|---|---|
| IN RE SPECTRUM BRANDS SECURITIES LITIGATION | ) ) ) ) ) | No. 19-cv-347-jdp |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

Richard A. Rosen, admitted *pro hac vice*
Andrew J. Ehrlich, admitted *pro hac vice*
Adam J. Bernstein, admitted *pro hac vice*
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel.: 212-373-3000
Fax: 212-757-3990
rrosen@paulweiss.com
aehrlich@paulweiss.com
abernstein@paulweiss.com

Matthew D. Lee, WI Bar No. 1061375
FOLEY & LARDNER LLP
150 East Gilman Street, Suite 5000
Madison, WI 53703-1482
Tel.: 608-257-5035
Fax: 608-258-4258
mdlee@foley.com

*Attorneys for Defendants*

**TABLE OF CONTENTS**

                                                                          **Page**

TABLE OF AUTHORITIES ............................................................................. iii

PRELIMINARY STATEMENT ...................................................................... 1

STATEMENT OF FACTS ............................................................................. 5

ARGUMENT ................................................................................................. 13

I.  The Amended Complaint Fails to Allege Facts Giving Rise to a Strong
    Inference that the Defendants Acted with Scienter ............................... 13

    A.  The Anonymous "Confidential Witness" Allegations Do Not Give
        Rise to a Strong Inference of Scienter ...................................... 15

    B.  The Other Allegations in the Amended Complaint Fail to Give
        Rise to a Strong Inference of Scienter, and Spectrum's Conduct
        Refutes Such an Inference ......................................................... 19

II. Statements Cited in the Amended Complaint Are Not Actionable ...................... 23

    A.  The Amended Complaint Fails to Allege that Certain of
        Spectrum's Statements About Its Consolidation Projects Were
        False ....................................................................................... 24

    B.  Certain Statements Regarding the Consolidation Projects are
        Forward-Looking Statements Protected by the PSLRA's Safe
        Harbor ..................................................................................... 27

        1.  Statements Regarding Future Benefits and Progress of the
            HHI and GAC Consolidations Were Forward-Looking
            Statements Accompanied by Meaningful Cautionary
            Language .......................................................................... 28

        2.  The Amended Complaint Fails to Allege that Defendants
            Possessed Actual Knowledge of the Falsity of Any
            Forward-Looking Statement .............................................. 32

    C.  Defendants' Statements About the Consolidations Are Not
        Actionable Opinions .................................................................. 33

    D.  Several of Defendants' Statements About the GAC and HHI
        Consolidations Were Vague and Optimistic Puffery Not
        Actionable Under the Securities Laws ....................................... 39

i

III.    Lead Plaintiffs Cannot Bring Claims on Behalf of Pre-Merger HRG
        Shareholders Against Spectrum Brands Holdings.................................................. 43

        A.      Pre-Merger HRG Shareholders Have No Standing to Sue Spectrum
                Brands Holdings, Inc. for Damage to Their Pre-Merger HRG
                Shares........................................................................................................ 44

        B.      Claims by Pre-Merger HRG Shareholders Against Spectrum
                Should Be Dismissed Because the Statutorily Required PSLRA
                Process Was Not Followed for a Putative Class of HRG
                Shareholders ............................................................................................ 48

IV.     The Section 20(a) Claims Must Be Dismissed for Failure to Plead a
        Primary Violation ................................................................................................ 52

        CONCLUSION.................................................................................................... 52

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*APA Excelsior III LP* v. *Windley*,
    329 F. Supp. 2d 1328 (N.D. Ga. 2004).................................................................46, 47

*Arazie* v. *Mullane*,
    2 F.3d 1456 (7th Cir. 1993) ..........................................................................27

*Asher* v. *Baxter Int'l Inc.*,
    377 F.3d 727 (7th Cir. 2004) .......................................................................31

*Babin* v. *Shchekin*,
    No. 16 C 5722, 2017 WL 403568 (N.D. Ill. Jan. 30, 2017) .......................................25

*In re Biogen Inc. Sec. Litig.*,
    193 F. Supp. 3d 5 (D. Mass. 2016)..................................................................22

*Bodri* v. *GoPro, Inc.*,
    252 F. Supp. 3d 912 (N.D. Cal. 2017)..............................................................22

*Cent. Laborer's Pension Fund* v. *SIRVA, Inc.*,
    2006 WL 2787520 (N.D. Ill. Sept. 22, 2006) .........................................................40

*Blue Chip Stamps* v. *Manor Drug Stores*,
    421 U.S. 723 (1975)..............................................................................passim

*In re Cisco Sys. Inc. Sec Litig.*,
    No. C 11–1568 SBA, 2013 WL 1402788 (N.D. Cal. Mar. 29, 2013) ........................22

*City of Dearborn Heights Act 345 Police & Fire Ret. Syst.* v. *Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) ..................................................................34, 35, 36, 37

*City of Omaha Civilian Emps. Ret. Sys.* v. *CBS Corp.*,
    679 F.3d 64 (2d Cir. 2012) (per curiam) ..........................................................36

*Desai* v. *Gen. Growth Props.*,
    654 F. Supp. 2d 836 (N.D. Ill. 2009).............................................................31

*Dixon* v. *Ladish Co., Inc.*,
    785 F. Supp. 2d 746 (E.D. Wis. 2011) .............................................................26

*Duane & Virginia Lanier Trust* v. *SandRidge Mississippian Trust I*,
    361 F. Supp. 3d 1162 (W.D. Okla. 2019)...........................................................46, 47

*Eisenstadt* v. *Centel Corp.*,
    113 F.3d 738 (7th Cir. 1997) ...................................................................42, 43

*Fait* v. *Regions Fin. Corp.*,
    655 F.3d 105 (2d Cir. 2011) ...................................................................35, 36

*Frankfurt-Trust Inv. Luxemburg AG* v. *United Techs. Corp.*,
    336 F. Supp. 3d 196 (S.D.N.Y. 2018) ..................................................3, 22

*Friedman* v. *Endo Int'l PLC*,
    No. 16-cv-3912 (JMF), 2018 WL 446189 (S.D.N.Y. Jan. 16, 2018)..........38

*Fulton Cty. Emps. Ret. Sys.* v. *MGIC Inv. Corp.*,
    675 F.3d 1047 (7th Cir. 2012) ..........................................................................43

*Garden City Emps.' Ret. Sys.* v. *Anixter Int'l, Inc.*,
    No. 09-cv-5641, 2012 WL 1068761 (N.D. Ill. Mar. 29, 2012) ............15, 21

*In re Guidant Corp. Sec. Litig.*,
    536 F. Supp. 2d 913 (S.D. Ind. 2008) ...........................................................5

*In re Harley-Davidson, Inc. Sec. Litig.*,
    660 F. Supp. 2d 969 (E.D. Wis. 2009) .................................................18, 31

*In re Harman Intern. Indus., Inc. Sec. Litig.*,
    791 F.3d 90 (D.C. Cir. 2015) ............................................................................39

*Harris* v. *Ivax Corp.*,
    182 F.3d 799 (11th Cir. 1999) ....................................................................27, 29

*Henningsen* v. *ADT Corp.*,
    161 F. Supp. 3d 1161 (S.D. Fla. 2015) .........................................................22

*Higginbotham* v. *Baxter Int'l, Inc.*,
    495 F.3d 753 (7th Cir. 2007) ............................................................................14

*In re Int'l Bus. Mach. Corp. Sec. Litig.*,
    163 F.3d 102 (2d Cir. 1998) ............................................................................35

*International Brotherhood of Electrical Workers* v. *Limited Brands, Inc.*,
    788 F. Supp. 2d 609 (S.D. Ohio 2011) .........................................................21

*Izadjoo* v. *Helix Energy Sols. Grp., Inc.*,
    237 F. Supp. 3d 492 (S.D. Tex. 2017)..........................................................22

*Julianello* v. *K-V Pharm. Co.*,
    791 F.3d 915 (8th Cir. 2015) ....................................................................27, 29

*Kaplan* v. *Utilicorp United, Inc.*,
    9 F.3d 405 (5th Cir. 1993) ............................................................................48

*Kipling* v. *Flex Ltd.*,
2019 WL 1472358 (N.D. Cal. Apr. 3, 2019) ........................................................50, 52

*Makor Issues & Rights, Ltd.* v. *Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ............................................................................28, 32

*Martin* v. *Quartermain*,
732 F. App'x 37 (2d Cir. 2018) ................................................................................35

*Mathews* v. *Centex Telemgm't, Inc.*,
No. C–92–1837–CAL, 1994 WL 269734 (N.D. Cal. June 8, 1994) ..........................22

*In re Midway Games, Inc. Sec. Litig.*,
332 F. Supp. 2d 1152 (N.D. Ill. 2004) ......................................................................41

*Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indust. Pension Fund*,
135 S. Ct. 1318 (2015)............................................................................34, 36, 37, 38

*Ontario Public Service Employees Union Pension Trust Fund* v. *Nortel Networks Corp.*,
369 F.3d 27 (2d Cir. 2004) ......................................................................................45

*Pension Tr. Fund for Operating Eng'rs* v. *Kohl's Corp.*,
895 F.3d 933 (7th Cir. 2018) ..............................................................................14, 39

*Perez* v. *Higher One Holdings, Inc.*,
No. 3:14-cv-755(AWT), 2016 WL 6997160 (D. Conn. Sept. 13, 2016)....................34

*Petri* v. *GeaCom, Inc.*,
No. 17-cv-02579, 2018 WL 1695367 (N.D. Ill. Apr. 6, 2018)..................................24

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund* v. *Allscripts-Misys Healthcare Solutions, Inc.*,
778 F. Supp. 2d 858 (N.D. Ill. 2011) ........................................................................42

*Plumbers & Pipefitters Local Union* v. *Zimmer*,
673 F. Supp. 2d 718 (S.D. Ind. 2009).................................................................17, 22

*Plymouth Cty. Retirement Ass'n* v. *Advisory Brd. Co.*,
370 F. Supp. 3d 60 (D.D.C. 2019)............................................................................41

*Premier Capital Mgm't, L.L.C.* v. *Cohen*,
No. 02 C 5368, 2003 WL 21960357 (N.D. Ill. Aug. 15, 2003)..................................25

*Pugh* v. *Tribune Co.*,
521 F.3d 686 (7th Cir. 2008) ..............................................................................5, 52

*Ret. Sys.* v. *Anixter Int'l, Inc.*,
   No. 09–cv–5641, 2012 WL 1068761 (N.D. Ill. Mar. 29, 2012)...................................15

*River Birch Capital* v. *Jack Cooper Holdings Corp.*,
   No. 17-cv-9193, 2019 WL 1099943 (S.D.N.Y. 2019) .................................................38

*Roots Partnership* v. *Lands' End, Inc.*,
   965 F.2d 1411 (7th Cir. 1992) ....................................................................................44

*Sandmire* v. *Alliant Energy Corp.*,
   296 F. Supp. 2d 950 (W.D. Wis. 2003) .......................................................................31

*In re Sanofi-Aventis Sec. Litig.*,
   Nos. 07-cv-10279(GBD), 08-cv-0021(GBD), 2009 WL 3094957
   (S.D.N.Y. Sept. 25, 2009)............................................................................................35

*Searls* v. *Glasser*,
   64 F.3d 1061 (7th Cir. 1995) ................................................................................39, 41

*Sousa* v. *Sonus Networks, Inc.*,
   261 F. Supp. 3d 112 (D. Mass. 2017) ...................................................................19, 39

*SRM Global Master Fund Ltd. P'ship* v. *Bear Stearns Cos. LLC*,
   829 F.3d 173 (2d Cir. 2016) ........................................................................................52

*Takara Tr.* v. *Molex Inc.*,
   229 F.R.D. 577 (N.D. Ill. 2005)...................................................................................51

*Teamster Local 445 Freight Div. Pension Fund* v. *Bombardier Inc.*,
   2005 WL 1322721 (S.D.N.Y. June 1, 2005) ...................................................49, 51, 52

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)................................................................................................5, 14

*In re Tempur Sealy Int'l, Inc. Sec. Litig.*,
   No. 17-cv-2169(LAK), 2019 WL 1368787 (S.D.N.Y. Mar. 26, 2019).......................38

*In re Thoratec Corp. Sec. Litig.*,
   No. C–04–03168, 2006 WL 1305226 (N.D. Cal. May 11, 2006) ...............................22

*In re Tibco Software, Inc.*,
   No. C 05-2146, 2006 WL 1469654 (N.D. Cal. May 25, 2006)...................................22

*Tongue* v. *Sanofi*,
   816 F.3d 199, 206 (2d Cir. 2016) .........................................................................34, 37

*In re Tower Auto. Sec. Litig.*,
   483 F. Supp. 2d 327 (S.D.N.Y. 2007) .........................................................................34

*Tyler* v. *Liz Claiborne, Inc.*,
   814 F. Supp. 2d 323 (S.D.N.Y. 2011) ........................................................................22

*Van Noppen* v. *InnerWorkings, Inc.*,
   136 F. Supp. 3d 922 (N.D. Ill. 2015) ...............................................................39, 41

*Vanleeuwen* v. *Keyuan Petrochems., Inc.*,
   No. CV 11–9495 PSG, 2013 WL 2247394 (C.D. Cal. May 9, 2013) ............49, 51, 52

*W. Pa. Elec. Emps. Pension Trust* v. *Plexus Corp.*,
   No. 07C0582, 2009 WL 604276 (E.D. Wis. Mar. 6, 2009) ................................27, 31

## STATUTES AND RULES

15 U.S.C. § 78u-4(a)(3)(A)(i) ..................................................................................48

15 U.S.C. § 78u-4(b)(1) ...........................................................................................24

15 U.S.C. § 78u-5(i)(1)(A) .......................................................................................27

15 U.S.C. § 78u-5(c)(1) ............................................................................................27

Private Securities Litigation Reform Act of 1995 ......................................passim

Securities Exchange Act of 1934, § 10(b) .................................................passim

Securities Exchange Act of 1934, § 20(a) ...........................................................48, 52

Securities Exchange Commission Rule 10b-5.................................14, 24, 44, 45

## OTHER AUTHORITIES

H.R. Conf. Rep. No. 104-369, at 32 (1995).........................................................49

Defendants Spectrum Brands Holdings, Inc., Spectrum Brands Legacy, Inc., HRG Group, Inc. ("HRG"), Andreas R. Rouvé, David M. Maura, and Douglas L. Martin (collectively, "Defendants," and Rouvé, Maura and Martin, the "Individual Defendants") respectfully submit this Memorandum of Law in support of their motion to dismiss Lead Plaintiffs' Amended Complaint for Violations of the Federal Securities Laws (the "Amended Complaint") under Fed. R. Civ. P. 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

## PRELIMINARY STATEMENT

Spectrum is a leading manufacturer of consumer and household goods headquartered in Middleton, Wisconsin. Its well-known brands include Remington, Black & Decker, Kwikset locks, Baldwin hardware, and dozens more. In 2016, Spectrum announced two major initiatives to improve and simplify its supply chain, manufacturing and distribution: for two of its key business units, it adopted a plan to combine distribution facilities. These were very significant efforts that (1) involved combining several facilities around the country in Spectrum's Global Auto Care ("GAC") unit into a brand-new location in Dayton, Ohio, and (2) for Spectrum's Hardware and Home Improvement ("HHI") unit, combining east coast and west coast distribution centers into a centrally located Edgerton, Kansas facility. These initiatives, when completed, although not without cost and risk, were projected to enhance the Company's efficiency, and thus its profitability.

Both initiatives were ultimately completed, and ultimately resulted in benefits to shareholders. However, the projects took longer than anticipated to complete, and the new facilities encountered operational challenges as they came online. The gravamen of the Amended Complaint is that when Spectrum and the Individual Defendants

told the market their goals for the projects—and later, when they described problems as "short term," "transitional," and "transitory"—they violated the securities laws. This claim does not hold water, for any number of reasons.

Notably, Lead Plaintiffs fail to plead scienter, which is dispositive of the Amended Complaint. Their effort to bootstrap ordinary operational challenges into a claim of securities fraud is largely predicated on recruitment of anonymous former employees, so-called "confidential witnesses," who are quoted at great length in the Amended Complaint. Notwithstanding their length, the "confidential witness" allegations do not contain specific facts giving rise to a strong inference of scienter on the part of Spectrum and the Individual Defendants. This is so for two basic and fundamental reasons. *One*, the Amended Complaint nowhere in fact alleges that the information possessed by these low-level and middle management employees (just one of whom allegedly worked at corporate headquarters, and most of whom were with the Company for less than a year) was in fact in the possession of senior management. The Amended Complaint does gymnastics to suggest that senior management "must have known" the facts, but it is all sheer speculation. *Two*, even if senior management was aware of all of the "confidential witness" allegations, none of them suffices to raise an inference that when senior management told the market that the problems were "short term" and "transitory," or that progress was "good," that management did not honestly believe this to be the case.

In addition to these two essential flaws in Lead Plaintiffs' scienter allegations, Spectrum bought back more than $250 million of its own shares during the Class Period, completely refuting the notion it was attempting to mislead the market and improperly inflate its share price. That is because, as courts around the country have

2

acknowledged, it makes "no economic sense for a company to buy back its stock at a price it knows to be inflated." *Frankfurt-Trust Inv. Luxemburg AG* v. *United Techs. Corp.*, 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018).

Wholly apart from Lead Plaintiffs' failure to allege scienter, a number of the statements that Lead Plaintiffs challenge as allegedly false and misleading are simply not actionable, for four different reasons. *First*, some of them are never actually alleged to be false: there are any number of statements about objective facts—fill rates, completion rates, and other quantitative metrics—about which Lead Plaintiffs plead nothing suggesting that the data published to the market was false.

*Second*, a vast number of the challenged statements are protected as forward-looking statements by the "safe harbor" of the PSLRA. Not surprisingly, given the subject matter, many of the statements cited in the Amended Complaint constitute management's expectations of progress and future developments. Because those statements about the future were in all cases accompanied by meaningful cautionary language directly addressing the subject of the statement, they are insulated from liability by the securities laws. The Amended Complaint further fails to adequately plead that Defendants made any alleged misstatement with actual knowledge it was false, which Lead Plaintiffs must allege to void the protections of the "safe harbor."

*Third*, a number of the statements are not actionable statements of opinion about the progress of the consolidations. To assert a claim over a statement of opinion, a plaintiff must plead objective and *subjective* falsity—i.e., not only that the statement turned out not to be true, but that the speaker did not honestly believe it when made. Even if senior management knew the information in the possession of the confidential witnesses

3

(which is pure conjecture), that information does not support an inference that the speakers did not believe their statements of optimism about the future of the project.

*Fourth*, many of the statements are such vague statements of optimism that they are immaterial as a matter of law.  Under established precedent, statements such as "we are making good progress" are such general expressions of optimism – "puffery" – that courts have held that no reasonable investor could rely on them.

The Amended Complaint features an additional significant flaw:

For the first time in the Amended Complaint, Lead Plaintiffs purport to assert claims on behalf of a class of shareholders of HRG—a company different from Spectrum, whose shares were traded on the New York Stock Exchange under a ticker (NYSE:  HRG) different from that of Spectrum (NYSE:  SPB)—for alleged damage to their *HRG* shares by virtue of *Spectrum's* alleged misstatements.  Under black-letter law, HRG shareholders lack standing to assert such claims, because they did not purchase or sell *Spectrum* shares.   It makes no difference that statements by Spectrum might conceivably affect the value of HRG shares; numerous courts have rejected precisely this argument, given the narrow private right of action endorsed by the United States Supreme Court in the seminal *Blue Chip Stamps* case.  Because the HRG shareholders do not challenge any statements by HRG, their claims against Spectrum should be dismissed for lack of standing.

In any event, Lead Plaintiffs failed entirely to follow the statutorily required process to give notice to HRG shareholders that these Lead Plaintiffs sought to pursue their rights.  Lead Plaintiffs did not assert claims on behalf of HRG shareholders until they filed the Amended Complaint in this action—long after the PSLRA-mandated lead plaintiff

appointment process had concluded. HRG shareholders thus were not given their statutorily required opportunity to apply for lead plaintiff status. Lead Plaintiffs did not apply to pursue claims on behalf of HRG shareholders, and this Court's order appointing them was limited strictly to claims on behalf of *Spectrum* shareholders. Claims on behalf of HRG shareholders should therefore be dismissed.

**STATEMENT OF FACTS**

**Spectrum's Business**

Spectrum[1] is a "diversified global branded consumer products company," with its principal executive offices located in Middleton, Wisconsin. (Rosen Decl. Ex. 18, at 18; Am. Compl. ¶ 23.)[2] During the Class Period, Spectrum was organized into "five vertically integrated, product-focused segments": (i) Global Batteries and Appliances ("GBA"), (ii) Hardware & Home Improvement, (iii) Global Pet Supplies ("PET"), (iv) Home and Garden ("H&G"), and (v) Global Auto Care. (*See* Rosen Decl. Ex. 12, at 5; Am. Compl. ¶ 31.)

The five business segments sold a variety of products:

- GBA offered battery, small appliance, and personal care products, including consumer batteries, small kitchen appliances, and shaving and grooming products. (Rosen Decl. Ex. 12, at 7.)

- HHI offered security, plumbing, and hardware products, including locks, kitchen and bath faucets, and hinges. (*Id.* at 8.)

---

[1] For purposes of simplicity and consistency, this motion refers to Spectrum Brands Holdings, Inc. and Spectrum Brands Legacy, Inc. as "Spectrum" or the "Company." It does not distinguish between "pre-Merger Spectrum" and "post-Merger Spectrum," except when discussing the Merger itself and the alleged claims of pre-Merger shareholders in HRG (a different company than Spectrum pre-Merger). In that context, we employ the terms "pre-Merger Spectrum" and "post-Merger Spectrum." The distinction is otherwise irrelevant for the analysis set forth herein.

[2] The Court may consider any documents incorporated into the Amended Complaint on a motion to dismiss. *See Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The Court also may take judicial notice of documents in the public record, including filings with the Securities and Exchange Commission. *See Pugh* v. *Tribune Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008); *In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 921 (S.D. Ind. 2008). Citations in the form of "Rosen Decl. Ex. _" refer to exhibits to the Declaration of Richard A. Rosen, dated August 26, 2019.

5

- PET offered aquatic and companion animal products, including consumer and commercial aquarium kits, tanks, specialty pet products, dog and cat clean-up, and small animal food and care products.  (*Id.* at 9.)

- H&G offered controls, household, and repellent products, including outdoor insect and weed control solutions, animal repellents, household pest control solutions, and personal use pesticides.  (*Id.* at 10.)

- GAC offered appearance, performance, and A/C recharge products, including wipes, tire and wheel care products, glass cleaners, leather car products, fuel and oil additives, and do-it-yourself automotive air conditioner recharge products.  (*Id.* at 11.)

**Consolidation of GAC Warehouses**

In the summer of 2016, the Company announced plans to consolidate its U.S. warehouses in the GAC division.  (Rosen Decl. Ex. 5, at 6; Am. Compl. ¶ 33.) Douglas Martin, Executive Vice President and CFO, explained that Spectrum was building a major new manufacturing and logistics facility in Dayton, Ohio.  (Rosen Decl. Ex. 5, at 6)  Spectrum planned to consolidate its two existing distribution centers, one in Garland, Texas and the other in Mentor, Ohio, into the Dayton facility.  (*Id.*)   The consolidation was meant to create new supply chain efficiencies, bring GAC closer to its U.S. customer base, provide more vertical integration, and reduce supply chain cost and complexity.  (*Id.*) The new facility would serve as GAC's center for research and development, manufacturing, and distribution.  (*Id.*; Am. Compl. ¶ 33.)

Spectrum expected to open the Dayton facility in early 2017 and kept investors abreast of the Company's progress throughout the process.  (Am. Compl. ¶ 33.) Spectrum closed its distribution center in Garland, Texas in the first half of 2016.  (Rosen Decl. Ex. 5, at 6; Am. Compl. ¶ 33.)  In January 2017, Spectrum reported that consolidation was on schedule.  In its first quarter earnings call, then-CEO Andreas Rouvé told investors that production had begun on the first line and that it expected to complete the consolidation

within fiscal year 2017.  (Rosen Decl. Ex. 7, at 5; Am. Compl. ¶ 43.)  In May 2017, Rouvé told investors that the Dayton consolidation was on track and that, while the Company thought consolidation would contribute to its bottom line in 2017, it expected that the project would fully deliver cost savings in 2018.  (Am. Compl. ¶ 194.)  In July 2017, Spectrum reported that temporary startup issues at the Dayton facility had negatively impacted GAC's third quarter results, but the consolidation process was still on schedule. (Rosen Decl. Ex. 11, at 6; Am. Compl. ¶¶ 200-01.)  Spectrum echoed its July statements in its fourth quarter filings:  though GAC was experiencing startup inefficiencies due to the complexity of the consolidation, as expected with a project of that magnitude, the Company predicted it would generate cost savings in fiscal year 2018.  (Rosen Decl. Ex. 13, at 5-6; Am. Compl. ¶¶ 219-20.)

Throughout fiscal year 2017, Spectrum maintained a consistent message: consolidation of GAC's operations in the Dayton facility would be completed that year and the Company expected that the execution of that project would deliver cost savings through increased efficiency that were key to long-term growth.  (Rosen Decl. Ex. 13, at 5-6; Am. Compl. ¶¶ 33, 43, 200-01, 217-20.)

In spring 2018, Spectrum learned that the Dayton facility was not operating as efficiently as expected, and informed investors at the first opportunity.  (Rosen Decl. Ex. 17, at 7-8; Am. Compl. ¶ 236.)  In Spectrum's second quarter earnings call, Martin and new CEO David Maura explained in detail the difficulties the Company was experiencing at the Dayton facility.  (*See* Am. Compl. ¶¶ 156-57.)  Spectrum delivered disappointing results in the GAC division principally caused by operating inefficiencies at Dayton that only became apparent as the Company ramped up season production and distribution in

March.  (Rosen Decl. Ex. 17, at 7-8, 12; Am. Compl. ¶¶ 151, 157.)  Martin told investors that because the Dayton facility was unable to run at full efficiency, production and shipping did not meet the Company's targets for the quarter.  (Rosen Decl. Ex. 17, at 7-8, 12; Am. Compl. ¶¶ 151, 157.)  The Company committed itself to taking swift corrective action, including installing new leadership at the Dayton facility.  (Rosen Decl. Ex. 17, at 16-17; Am. Compl. ¶ 155.)

By July 2018, Spectrum managed to improve the situation meaningfully in Dayton.  (Am. Compl. ¶ 169.)  By the end of the third quarter, the Dayton facility shipped its entire March backlog and carried only a modest, normal backlog into the fourth quarter. (Am. Compl. ¶¶ 169, 174; Rosen Decl. Ex. 20, at 6; Rosen Decl. Ex. 21, at 6.)  GAC reported record quarterly net sales in the third quarter of $175.2 million, an increase of 12.5% from the prior year.  (Rosen Decl. Ex. 21, at 7; *accord* Am. Compl. ¶¶ 169, 170, 175.)  By November, Spectrum increased its fill rate at the Dayton facility—the percentage of customer demand that is met through stock immediately available, without backorders or lost sales—to 99%.  (Rosen Decl. Ex. 22, at 11.)

**Sale of GAC**

On November 14, 2018, Spectrum announced that it had entered into an agreement to sell GAC to Energizer Holdings ("Energizer") for consideration valued at $1.25 billion.  (*Id.* at 7; Am. Compl. ¶ 178.)  The transaction value was comprised of $938 million of cash and $313 million of Energizer Holdings equity.  (Rosen Decl. Ex. 22, at 7.)  Maura told investors that the Company took equity in Energizer in part because it believes in the upside of the GAC asset following the consolidation in Dayton.  (*Id.* at 14.)

**Consolidation of HHI Warehouses**

In January 2017, Spectrum announced that it planned to consolidate two distribution centers in its HHI division into one single, centrally located facility by the end of calendar year 2017. (Am. Compl. ¶ 38; Rosen Decl. Ex. 7, at 5.) The initiative would consolidate the Company's various distribution centers into a facility in Edgerton, Kansas. (Am. Compl. ¶ 38; Rosen Decl. Ex. 8, at 7; Rosen Decl. Ex. 10, at 8.) Spectrum expected it would begin fully shipping HHI products out of the Kansas facility by the end of August 2017. (Am. Compl. ¶ 19; Rosen Decl. Ex. 8, at 7.)

Spectrum's announcements regarding the HHI consolidation mirror those regarding its GAC consolidation. In May 2017, the Company reported that consolidation was "on track" and would help reduce expenses and inventory in the back half of 2017 and in 2018. (Am. Compl. ¶ 194; Rosen Decl. Ex. 9, at 6.) In July 2017, the Company reported the Kansas facility was "up and running," but it was experiencing temporary supply chain challenges, which impacted third quarter sales. (Am. Compl. ¶ 202; Rosen Decl. Ex. 11, at 5, 13.)

In November 2017, Spectrum informed investors that while it was making "good progress" on consolidation, estimating the project was 65% complete, it continued to experience supply chain inefficiencies. (Am. Compl. ¶ 218; Rosen Decl. Ex. 13, at 5-6.) The Kansas facility faced startup issues resulting in cost inefficiencies and "higher-than-normal customer backlog." (Am. Compl. ¶ 219; Rosen Decl. Ex. 13, at 8.) The Company reported that it expected to complete consolidation by March 2018. (Am. Compl. ¶ 221; Rosen Decl. Ex. 13, at 5.)

9

In spring 2018, Spectrum again informed investors that the consolidation was not proceeding as smoothly as planned. (Am. Compl. ¶¶ 151-57, 236-37.) Martin explained the timeline of the project. (*Id.* ¶ 157.) In late 2017, Spectrum transferred its service from its west coast distribution center to the Kansas facility; in late January and February 2018, the Company began to move processes from its east coast distribution center to Kansas as well. (Am. Compl. ¶¶ 151, 225; Rosen Decl. Ex. 17, at 12). The operation at the east coast facility was a complex part of the HHI business, so transferring the operations from there into the Kansas facility proved more challenging than expected and caused a backlog. (Am. Compl. ¶ 151; Rosen Decl. Ex. 17, at 12)

In July 2018, Spectrum reported that its backlog in Kansas was markedly reduced. (Am. Compl. ¶ 244.) Not only did the facility reduce the entire backlog created in March, but it also achieved its highest network shipments in the history of the Company. (*Id.* ¶ 247; Rosen Decl. Ex. 21, at 5.) The Company told investors that it expected the order backlog to reach an optimal level by the end of calendar year 2018. (Am. Compl. ¶ 248.) That prediction came to pass: by the end of the fourth quarter of 2018, the customer order backlog returned to normal historic levels. (Rosen Decl. Ex. 22, at 7.)

**Cautionary Language and Risk Disclosures**

Spectrum included robust risk disclosures in all of its public filings to alert investors that actual results may differ materially from its projections. Indeed, Spectrum specifically identified its "ability to successfully implement, achieve and sustain manufacturing and distribution cost efficiencies and improvements, and fully realize cost savings" as a "forward-looking statement[] within the meaning of the Securities Litigation Reform Act of 1995," and indicated that such statements were "subject to a number of risks

and uncertainties that could cause results to differ materially from those anticipated as of the date of this release."  (Rosen Decl. Ex. 12, at 4.)  Spectrum included similar risk disclosures in every public disclosure in which it made forward-looking statements.

**Merger with HRG**

Prior to merging with Spectrum, HRG was a publicly traded company separate and distinct from Spectrum.  HRG traded on the New York Stock Exchange under the ticker symbol "HRG."  HRG and Spectrum had their own separate management teams and each had its own board of directors.  HRG filed its own securities filings with the SEC. Investors could buy and sell HRG shares, and did so, regardless of their ownership of Spectrum shares.  It is certainly true, as the Amended Complaint alleges, that HRG was a holding company and the "majority owner" of Spectrum.  (Am. Compl. at 1 n.1.)  But they were entirely separate companies with different shareholders.

On February 24, 2018, HRG and Spectrum (as well as two acquisition vehicles) entered into a Merger Agreement.  (Rosen Decl. Ex. 18, at 1-2.)  Spectrum believed that a merger with HRG would be advantageous for several reasons, including its expectation that it would be able to take advantage of certain of HRG's tax attributes in connection with a planned divestiture of a Spectrum business segment.  (*Id.* at 111, 124-25.)  HRG believed that a merger with Spectrum would be advantageous because "the ownership of [post-Merger Spectrum] Common Stock [would] be less concentrated," "the market for" its shares would "be more liquid," and "the simplification of the holding company structure [might] increase investor interest[.]"  (*Id.* at 117.)  Pursuant to the Merger Agreement, Spectrum merged into an HRG subsidiary, and became a direct, wholly owned subsidiary of HRG.  (*Id.* at 1; *see also* Am. Compl. ¶ 23.)  HRG, in turn, renamed

11

itself "Spectrum Brands Holdings, Inc." (Rosen Decl. Ex. 18, at 1; Am. Compl. ¶ 23.) It was only after this merger that the two separate publicly traded securities ceased to exist, and the merged company began trading under Spectrum's ticker symbol. (Am. Compl. ¶ 23.)

**Procedural History**

On March 7, 2019, Earl S. Wagner filed the first of the consolidated actions in this District against Spectrum Brands Legacy, Inc. on behalf of a putative class of Spectrum shareholders. (*See* ECF No. 1, No. 19-cv-178-jdp.) That same day, counsel for Mr. Wagner published notice of the action through *Globe Newswire*. The notice set a deadline of May 6, 2019 for Spectrum shareholders to seek Lead Plaintiff status. On April 30, 2019, West Palm Beach Firefighters' Pension Fund filed a separate action in this District against Spectrum Brands Holdings, Inc. that made substantially similar allegations as the Wagner action. (*See* ECF No. 1, No. 19-cv-347-jdp.)

Neither complaint included pre-Merger HRG shareholders as members of the putative class, nor did they name HRG as a defendant. (*See* ECF No. 1, No. 19-cv-178-jdp; ECF No. 1, No. 19-cv-347-jdp.) Nor did the plaintiffs identify transactions in HRG securities on the certification forms attached as exhibits to both complaints. (*See* ECF No. 1, No. 19-cv-178-jdp; ECF No. 1, No. 19-cv-347-jdp.)

On May 6, 2019, the Public School Teachers' Pension and Retirement Fund of Chicago and the Cambridge Retirement System moved for appointment as Lead Plaintiffs, consolidation of the Wagner and West Palm Beach Firefighters' actions, and approval of Bernstein Litowitz Berger & Grossman LLP and Rathje Woodward LLC as class counsel. (*See* Rosen Decl. Ex. 23.) The motion was unopposed. In it, the Lead

Plaintiffs note that Chicago Teachers and Cambridge Retirement have the largest financial interest in the action because they collectively lost $3.5 million "on their investments in [pre-Merger Spectrum]." (*Id.* at 3)   The brief filed in support of the motion defines "Spectrum" as "Spectrum Brands Legacy, Inc. (f/k/a Spectrum Brands Holdings, Inc.)." (Rosen Decl. Ex. 24, at 1.)   It does not mention HRG.   Lead Plaintiffs' declaration in support of the motion states that Chicago Teachers "suffered substantial losses as a result of its investment in the Spectrum Brands Legacy, Inc. f/k/a Spectrum Brands Holdings, Inc. ("Spectrum") securities at issue in this case."   (Rosen Decl. Ex. 26, at 2.)   That declaration, also, does not mention HRG.

On June 12, 2019, the Court granted the motion.  (ECF No. 8, No. 19-cv-347-jdp.)  Based on Lead Plaintiffs' representations above, the Court's Order characterizes Lead Plaintiffs as persons who "purchased securities from defendant Spectrum Brands Legacy, Inc." (*Id.* at 1.)

One month later, on July 12, 2019, Lead Plaintiffs filed the Amended Complaint (ECF No. 14, No. 19-cv-347-jdp.).  The Amended Complaint now names HRG Group, Inc. as a Defendant for the first time and purports to assert claims not only on behalf of pre-Merger Spectrum shareholders, but also on behalf of investors in HRG in the pre-merger period. (Am. Compl. at 1 n.1.)

## ARGUMENT

### I.   The Amended Complaint Fails to Allege Facts Giving Rise to a Strong Inference that the Defendants Acted with Scienter

The Amended Complaint should be dismissed in its entirety because it fails to allege that Defendants acted with scienter.

To state a claim arising under Section 10(b) of the Exchange Act and Rule 10b–5, a plaintiff must allege that the defendants acted with scienter, which is "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham* v. *Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007). The Court's inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) (emphasis in original). A complaint gives rise to a strong inference of scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324). This requires a court to consider whether, taken as a whole, the allegedly false statements were "the result of merely careless mistakes . . . or a reckless indifference to whether the statements were misleading." *Pension Tr. Fund for Operating Eng'rs* v. *Kohl's Corp.*, 895 F.3d 933, 936 (7th Cir. 2018) (quoting *Makor Issues & Rights, Ltd.* v. *Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008)).

Lead Plaintiffs contend that Defendants acted with scienter when making public statements regarding the status of and prospects for the consolidations, which primarily fall into three buckets that: (1) Defendants stated that the GAC Consolidation was "progressing smoothly" and that the HHI Consolidation was "on track" (Am. Compl. ¶¶ 191, 196); (2) starting in or around July 27, 2017, as the new facilities began to come online, Defendants stated that there were "temporary, transitional supply chain challenges" with both the GAC and HHI Consolidations, but that they were "short term" (*id.* ¶ 201);

and (3) after the consolidations were completed, Defendants continued to state falsely that the issues were "transitory" (*id.* ¶ 13.).

Notably, however, Lead Plaintiffs fail to allege that any of these statements were made with an intent to deceive.  Thus, they have failed to plead scienter.

### A.    The Anonymous "Confidential Witness" Allegations Do Not Give Rise to a Strong Inference of Scienter

Lead Plaintiffs attempt to support their allegations of fraudulent intent primarily on the basis of statements by anonymous, "Confidential Witnesses."

The "Confidential Witness" allegations, however, do not suffice to allege that when the Company spoke to the market, those making the statements actually knew facts rendering their statements untrue.  Put differently, simply because some number of junior or middle-management employees at Spectrum facilities now claim they had complaints about racking, backlogs or any number of other issues, it does not follow that when senior management told the market that problems with the consolidations were "short term," "transitory," or "transitional," that this belief was knowingly or recklessly false.

This disconnect is underscored by allegations about the "Confidential Witnesses" themselves.  *See Garden City Emps.' Ret. Sys.* v. *Anixter Int'l, Inc.*, No. 09–cv–5641, 2012 WL 1068761, at *3 (N.D. Ill. Mar. 29, 2012) (noting that the Seventh Circuit has "expressed a healthy skepticism regarding information obtained from confidential sources" as a method to generate a strong inference of scienter).  Notably, almost none of the "Confidential Witnesses" are even alleged to have *actually* interacted with any of the Individual Defendants or other members of senior management.  Any allegations made about the knowledge of senior management is either second-hand at best, or purely inferential because the Confidential Witnesses assert only that they reported

15

information to people who in turn reported up to senior management.  As a consequence, the Amended Complaint's theory of scienter is premised on the assumption that because the "Confidential Witnesses" allegedly identified issues with the Consolidations to middle management, such facts ultimately "must have" been elevated.  Notably, just one of the 18 "Confidential Witnesses" worked at corporate headquarters in Middleton, Wisconsin, where senior management is located.  And eleven of the 18 worked at the Company for only a year or less.

Indeed, the "Confidential Witness" allegations are all second-hand allegations that are vague, and require speculation about the knowledge of others.  For example:

- "Numerous former employees" allegedly claim that "the problems with late shipments and customer fines were well known throughout senior management at the [Edgerton] Center."  (Am. Compl. ¶ 264.)

- "FE 18" claims that reports showing late payments to vendors were presented "by her boss to the C-suite."  (*Id.* ¶ 259.)

- "According to FE 11, [daily reports indicating shipment delays] were available via the Company software used to manage operations, and David Booher, a Senior Vice President who reported to HHI's General Manager, who reported to Defendants Rouvé and Maura, had access to these numbers."  (*Id.* ¶ 124.)

- "FE 3" claims that "the amount of damaged products at the Dayton Center" were identified in PowerPoint presentations given to middle management, and that middle management then had meetings with unidentified "Company executives from Wisconsin headquarters" to discuss the results.  (*Id.* ¶ 260.)

- "FE 8" claims that she "participated in quite a few monthly status meetings" regarding "distribution center issues" with unidentified middle management "from headquarters in Middleton" who "reported directly to Defendants Rouvé and Maura[.]"  (*Id.* ¶ 267.)

These and other similar allegations are predicated on assumptions of what "must have" been known by senior management because something was "well known" or because

16

someone who reported two levels up to senior management "had access" to information. But this is assumption and conjecture—not a specific allegation of facts about the knowledge of senior management that Lead Plaintiffs must assert.[3]

Such attenuated, second-hand allegations are precisely the kinds of allegations that were rejected by another district court in this Circuit, in *Plumbers & Pipefitters Local Union* v. *Zimmer*, 673 F. Supp. 2d 718, 727-28 (S.D. Ind. 2009).  In that case, relating to alleged false statements regarding production at a medical supply company's manufacturing facilities, the plaintiffs argued that a strong inference of scienter could be drawn from confidential witness statements where they "believed the problems were brought to [defendant's] attention by the quality assurance department," or where a witness recalled "hear[ing] about problems at [a production facility] in a management meeting[.]"  *Id.* at 747.  But the court rejected those arguments because they asserted "some second-hand belief that such knowledge existed" while plaintiffs must allege "first-hand actual knowledge."  *Id.*

Even if the knowledge of the information in the "Confidential Witness" allegations *can* be imputed to senior management, that still does not suffice to meet Lead Plaintiffs' burden—because that information does not establish the inference that senior management did not believe their statements about the consolidation when made.  In other words, it is entirely possible that senior management was aware of the information

---

[3]   It bears mention that the "Confidential Witness" allegations themselves are rife with problems.  For instance, "FE 8" is cited in the Amended Complaint for the statement that the Company's July 27, 2017 statement that Edgerton's consolidation was "on schedule" was false, but *she left the Company in May 2017*, and thus lacked personal knowledge about anything happening at the end of July.  (Am. Compl. ¶¶ 40 n.20, 117.)

attributed to the "Confidential Witnesses," and *nevertheless believed their statements of optimism to be true*.

For example, even if Defendants knew that there were "[late] payments to vendors" (Am. Compl. ¶ 259), "a lack of any racking" at the Dayton Center or "boxes of inventory that were crushed or deteriorated" (*id.* ¶ 261), that is not inconsistent with an honest belief that the centers were making "good progress" and that issues facing the centers were "transitory." Similarly, even if the Individual Defendants were aware the centers lacked adequate racking, possession of such information is not inconsistent with a good faith belief that the consolidations "would be totally complete by December 2017." (*Id.* ¶ 197.)

Chief Judge Clevert's decision in *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969 (E.D. Wis. 2009), reached a similar conclusion regarding confidential witness allegations. The plaintiffs there, as here, attempted to satisfy their burden of pleading by pointing to statements from several confidential witnesses that individual defendants monitored daily supplies figures, received biweekly business reports about production levels and inventories, and that one defendant was sent copies of monthly reports about revenues and expenses. *Id.* at 998. The court rejected the plaintiffs' arguments that this was enough to create a strong inference of scienter, holding instead "not only is mere receipt of reports insufficient to establish scienter, the inferential leap required to tie these alleged facts to the conclusion that defendants acted knowingly or recklessly when presenting relevant information to the market is untenable . . . ." *Id.* at 999. The court explained that officers' knowledge of "facts critical to the business's operations" is not enough to establish scienter without "fact-based connections between a

speaker, a statement, and specific, contradictory information presumably known to that speaker at the time the statement was made." *Id.*  Allegations, like these, that are "vague as to when the defendants became aware of facts that should have made them aware of the falseness of their optimistic statements," and which constitute little more than the fact that "defendants closely monitored [their company's] sales, 'were regularly updated'" and received regular reports simply do not support a strong inference of scienter.  *Sousa* v. *Sonus Networks, Inc.*, 261 F. Supp. 3d 112, 120-21 (D. Mass. 2017).

As in *Zimmer*, *Sousa*, and *Harley-Davidson*, Lead Plaintiffs' "Confidential Witness" allegations, though numerous, do not satisfy their pleading burden.

**B.      The Other Allegations in the Amended Complaint Fail to Give Rise to a Strong Inference of Scienter, and Spectrum's Conduct Refutes Such an Inference**

Four additional points on the failure to plead scienter bear mention:

*First*, the Amended Complaint also tries to plead facts giving rise to a strong inference of scienter by alleging that various executives toured facilities.  These allegations do not support an inference of scienter.  For example:

- "According to FE 2, senior leadership toured the Dayton Center in June or July 2017, and it was apparent that the production area was still unfinished and the automated system had not yet been installed."  (Am. Compl. ¶ 210(iii).)

This allegation is completely vague as to who visited the Dayton Center ("senior leadership"), much less what statement, by whom, was later rendered false by virtue of this visit, and why.  Similarly:

- "[A]ccording to FE 4, Defendant Rouvé visited the Dayton Center in 2017 and again in 2018 where many of these problems would have been obvious."  (*Id.* ¶ 261.)

This is both totally vague as to time ("2017" and "2018"), as to what "problems" Rouvé saw that would be "obvious" to him, or why these unspecified "problems" rendered Rouvé's subsequent statements (i.e., that the problems were "transitory" or "transitional") knowingly false when made.

   *Second*, Lead Plaintiffs place emphasis on Maura's alleged statements, in April 2018, indicating that he was "personally responsible for instituting corrections to address the problems at the Dayton Center and the Edgerton Center."  (Am. Compl. ¶ 258.) These statements were made 15 months into the Class Period, when Maura became Spectrum's CEO.  On the basis of these alleged statements, Lead Plaintiffs appear to contend, with no apparent factual basis, that the Court should infer that Maura had complete knowledge many months *earlier* of any purported issues at those facilities, and that *any* subsequent statements are misleading.  Notably, though, Lead Plaintiffs are not alleging what Maura knew or did not know as of April 2018 (or frankly at any other time). Indeed, Lead Plaintiffs do not identify any statements prior to April 2018 that Maura made on this subject.  Moreover, Lead Plaintiffs allege no facts suggesting that Maura did not honestly think the problems with the consolidations were anything other than "transitory" in nature as of April 2018.

   *Third,* the Amended Complaint undermines any inference of scienter by recognizing that Defendants candidly disclosed problems and delays that the Company was experiencing in effectuating the consolidation projects.[4]  For example, in November 2017, Martin stated in an earnings release call that:

> I think that some of the drivers in gross margin this year, from a
> reported basis which is what I will speak to, include the -- some of

---

[4] *See, e.g.*, Am. Compl. ¶¶ 201-06, 213-15, 217-20, 226, 228, 233, 236.

the startup inefficiencies related to those major footprint decisions we made in Dayton, Ohio around Global Auto Care, which as you'll recall, is 5 locations into 1 between manufacturing and distribution sites as well as moving in our R&D facility into a greenfield operation. So you would have an expectation -- and we did have an expectation of some normal startup inefficiencies there, and that had been a little bit of drag on gross margin in the year. And similarly, in Kansas where we're moving 2 DCs into 1, another greenfield operation. And some consolidation and startup inefficiencies in that location as well have had an impact on gross margin this year.

(Rosen Decl. Ex. 13, at 14; Am. Compl. ¶ 220.)  Martin stated in another earnings release call in February 2018 that:

Also impacting profitability in Q1 were costs associated with HHI's continuing work to complete its U.S. distribution center consolidation into a single, new and larger facility in Kansas. This project, which began in April of 2017, has experienced operating startup cost inefficiencies and a higher-than-normal customer backlog which is beginning to ease. HHI's West Coast DC was closed a few months ago and the East Coast facility is expected to be shut down this month. Once completed, the consolidation will result in a more streamlined footprint and lower inventory levels later in 2018 and beyond.

(Rosen Decl. Ex. 15, at 7.)  In *International Brotherhood of Electrical Workers* v. *Limited Brands, Inc.*, a similar case involving allegations that the defendants did not disclose all of the information they had regarding issues with a distribution center, the court found that the scienter allegations were "essentially negated" by the fact that the defendants provided information to their investors concerning the problems at the distribution center from almost the beginning of the class period.  788 F. Supp. 2d 609, 630 (S.D. Ohio 2011).  *See also Garden City Emps.' Ret. Sys.*, 2012 WL 1068761, at *5 (granting motion to dismiss when defendants "disclosed both positive and negative developments over the course of the class period.").  The same holds true here.

*Fourth*, and finally, Spectrum bought back its own shares during the proposed Class Period – conduct that would be completely irrational if management knew that the stock was artificially inflated in value or that the consolidation programs were disasters and would lead to a stock price drop.

In particular, the fact that Spectrum bought back its own shares during the proposed Class Period is inconsistent with any allegation of scienter. Allegations that a defendant possessed scienter while engaging in "substantial share repurchases" are contradictory because "it would make no economic sense for a company to buy back its stock at a price it knows to be inflated." *Frankfurt-Tr. Inv. Luxemburg AG*, 336 F. Supp. 3d at 225. It is well-established in jurisdictions around the nation that a stock buyback program negates an inference of scienter.[5]

Here, Spectrum repurchased more than $250 million of shares during the Class Period. On January 24, 2017, Spectrum authorized a $500 million common stock repurchase program, which was effective for 36 months. (Rosen Decl. Ex. 19, at 49.) From

---

[5] *See, e.g.*, *Izadjoo* v. *Helix Energy Sols. Grp., Inc.*, 237 F. Supp. 3d 492, 518 (S.D. Tex. 2017) (noting "stock repurchase program rebuts a finding of scienter") (citation omitted); *Bodri* v. *GoPro, Inc.*, 252 F. Supp. 3d 912, 933 (N.D. Cal. 2017) (stating stock repurchases "undercut[] a finding of intent"); *In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5, 50 n.22 (D. Mass. 2016) ("[A] share repurchase program, if anything, actually negates an inference of scienter."); *Henningsen* v. *ADT Corp.*, 161 F. Supp. 3d 1161, 1204 (S.D. Fla. 2015) ("[S]tock repurchase programs actually *negate* a finding of scienter.") (citation omitted); *In re Cisco Sys. Inc. Sec Litig.*, No. C 11–1568 SBA, 2013 WL 1402788, at *8 (N.D. Cal. Mar. 29, 2013) (reasoning that defendant's "long-standing stock repurchase program rebuts a finding of scienter, since it is illogical that [defendant] would have been repurchasing its shares had it been aware of facts that would indicate the price would fall"); *Tyler* v. *Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 337-38 (S.D.N.Y. 2011) ("[S]ubstantial share repurchases by a corporate defendant during a class period may negate a finding of scienter."); *Zimmer*, 673 F. Supp. 2d at 749 ("[S]tock repurchase programs actually *negate* a finding of scienter."); *In re Thoratec Corp. Sec. Litig.*, No. C–04–03168, 2006 WL 1305226, at *11 (N.D. Cal. May 11, 2006) (stating that "[i]nflating the price of the stock only to repurchase it at the inflated price does not give rise to a strong inference" of scienter); *In re Tibco Software, Inc.*, No. C 05-2146, 2006 WL 1469654, at *21 (N.D. Cal. May 25, 2006) ("[S]tock repurchase programs actually *negate* a finding of scienter."); *Mathews* v. *Centex Telemgm't, Inc.*, No. C–92–1837–CAL, 1994 WL 269734, at *8 (N.D. Cal. June 8, 1994) ("It would have made no sense to purchase that stock if defendants knew the prices to be inflated.").

22

November 27, 2017 to December 31, 2017, Spectrum repurchased 69,174 shares, at an average price per share of $114.88. (*Id.*) Spectrum again repurchased shares from February 26, 2018 to April 1, 2018. (*Id.*) During this second period, Spectrum repurchased 2,533,000 shares, at an average price per share of $98.71. (*Id.*) Thereafter, on April 26, 2018, Spectrum reauthorized and expanded its stock repurchase program, announcing that the Board of Directors authorized a three-year, $1 billion common stock repurchase program effective immediately. (Rosen Decl. Ex. 16, at 1, Exhibit 99.2.) These stock buybacks occurred during the proposed Class Period, when Lead Plaintiffs allege Defendants made purported false statements with scienter. Lead Plaintiffs' scienter allegations are, as a result, completely untenable—Defendants' conduct is utterly inconsistent with an intent to deceive the market and artificially inflate the share price of the Company.

In summary, because the Amended Complaint fails to plead a strong inference of scienter, it should be dismissed in its entirety.

## II.    Statements Cited in the Amended Complaint Are Not Actionable

The Amended Complaint alleges that more than fifty different statements by Spectrum and/or the Individual Defendants are actionable. But these alleged statements suffer from a variety of legal deficiencies: some are not in fact pleaded to be false; others are protected by the PSLRA safe harbor; others are not actionable statements of opinion; and still others are immaterial, vague statements of "puffery."[6]

---

[6]    Attached as Rosen Decl. Ex. 1 is a chart summarizing Defendants' bases for dismissing claims as to each statement quoted in the Amended Complaint. Lead Plaintiffs discuss alleged false and misleading statements in ¶¶ 186-256 of the Amended Complaint in the section titled "Defendants' False and Misleading Statements and Omissions."

In the following sections, we lay out the each of the arguments for dismissal, with reference to examples of alleged misstatements in the Amended Complaint that demonstrate the legal deficiencies of the statements falling into that category. For the Court's convenience, we then set forth in Exhibit One to this motion a list of all of the statements alleged in the Amended Complaint to be actionable, and the bases of dismissal for each.

**A.      The Amended Complaint Fails to Allege that Certain of Spectrum's Statements About Its Consolidation Projects Were False**

Most fundamentally, the Amended Complaint fails to allege that any number of the statements cited as false and misleading are in fact false, either in whole or in part.

To state a claim under Section 10(b), the PSLRA requires a plaintiff to allege that "the defendant (A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading." 15 U.S.C. § 78u-4(b)(1); *see also* 17 C.F.R. § 240.10b-5(b). The PSLRA commands that the complaint "shall specify each statement alleged to have been misleading, [and] *the reason or reasons why the statement is misleading*." 15 U.S.C. § 78u-4(b)(1)(B) (emphasis added); *Petri* v. *GeaCom, Inc.*, No. 17-cv-02579, 2018 WL 1695367, at *6 (N.D. Ill. Apr. 6, 2018). Where, as here, allegations are made on "information and belief" (Am. Compl. at Introduction), the PSLRA directs that plaintiff "shall state with particularity all facts on which that belief is formed." *Id.*

What Lead Plaintiffs cite as false or misleading statements can generally be categorized into two groups. *First*, Lead Plaintiffs claim that Defendants' statements about

the progress of the completion of the two consolidation projects were false or misleading. For example (with emphasis in the original):

- Martin "touted the progress of both of the distribution centers, stating among other things that the HHI consolidation was "a similar activity [to the GAC consolidation] . . . [W]e are actually receiving product there this week and we'll be fully shipping out of that DC by the end of August. And that will provide additional good productivity for this business and also help serve our customers better."  (Am. Compl. ¶ 190).

- Defendants "claim[ed] that the GAC consolidation was 'progressing smoothly' and that the Edgerton Center was already operational and would be totally complete by December 31, 2017." (Id. ¶ 197)

In each of these statements, Defendants informed investors about the status of the consolidation projects at the time the statement was made.  But the Amended Complaint fails to allege facts that the statements are false.  For instance, there is no basis in the Amended Complaint to dispute the factual assertion that the HHI distribution center in Edgerton was "receiving product" in early March 2017, or that that the Edgerton Center was "operational" in June 2017.

Lead Plaintiffs bear the burden of alleging with particularity not only that each statement was false, but *why* each statement was false.  *See Babin* v. *Shchekin*, No. 16 C 5722, 2017 WL 403568, at *8 (N.D. Ill. Jan. 30, 2017) ("[P]laintiffs must state with particularity the facts—known to the speaker at the time—that render the statement false or misleading.") (citation omitted); s*ee also Premier Capital Mgm't, L.L.C.* v. *Cohen*, No. 02 C 5368, 2003 WL 21960357, at *3 (N.D. Ill. Aug. 15, 2003) (dismissing § 10(b) claims as "woefully deficient under the PSLRA," reasoning, *inter alia*, that plaintiffs "repeatedly fail to provide 'the reason or reasons why [each] statement is misleading'").

Conclusory allegations without specific support are insufficient to meet the heightened pleading standard of the PSLRA.

The second group of alleged false or misleading statements are those made by Defendants about the challenges experienced at the Dayton and Edgerton distribution centers after they were completed. The Amended Complaint alleges that statements about the "temporary" issues at the Dayton and Edgerton centers and the timing around when the projects were "complete" were false or misleading. (*See, e.g.,* Am. Compl. ¶¶ 204, 225.) This too flunks the PSLRA. The issues at both the Dayton and Edgerton centers were in fact temporary—both facilities were running at normal capacity by the end of 2018. (Rosen Decl. Ex. 22, at 7, 9)

Lead Plaintiffs allege that Defendants' statements about the consolidation being "complete" were false because there were startup issues in both Dayton and Edgerton that gave rise to inefficiencies. But their conclusion does not follow from the facts alleged. There is no inconsistency between a statement that the Company had completed the transfer of its distribution operations to the new consolidated facilities and for those facilities nevertheless to be encountering operational growing pains. Accordingly, the Amended Complaint fails to assert, other than with conclusory statements, why the Company's statements on this subject were misleading. *See Dixon* v. *Ladish Co., Inc.*, 785 F. Supp. 2d 746, 749 (E.D. Wis. 2011) (dismissing complaint because plaintiff failed to plead securities fraud claim with particularity required under Private Securities Litigation Reform Act).

**B.**     **Certain Statements Regarding the Consolidation Projects are Forward-Looking Statements Protected by the PSLRA's Safe Harbor**

The PSLRA provides a safe harbor if a forward-looking statement is either: (1) "accompanied by *meaningful cautionary statements* identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or (2) if made by an executive officer of a corporation, the statement was not made "with *actual knowledge* by that officer that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1) (emphasis added). A statement qualifies as forward-looking if its truth or falsity is discernable only after it is made.[7] *Julianello* v. *K-V Pharm. Co.*, 791 F.3d 915, 921 (8th Cir. 2015) ("The critical inquiry in determining whether a statement is forward-looking is whether its veracity can be determined at the time the statement is made . . . ."); *Harris* v. *Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999) ("[A] statement about the state of a company whose truth or falsity is discernible only after it is made necessarily refers only to future performance.").

Under the safe harbor's first prong, meaningful cautionary statements must be tailored to the risks accompanying a projection but need not identify what ultimately goes wrong; clairvoyance is not required. *See W. Pa. Elec. Emps. Pension Trust* v. *Plexus Corp.*, No. 07C0582, 2009 WL 604276, at *8 (E.D. Wis. Mar. 6, 2009) (stating that "cautionary language" must identify "important factors that could cause actual results to differ" but that language need not "identify the particular risk that actually materializes").

---

[7]     Section 78u-5(i)(1)(A) defines a forward-looking statement, in pertinent part, as: "(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items; (B) a statement of the plans and objectives of management for future operations . . . ; (C) a statement of future economic performance . . .; (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C) . . . ."

After all, "predictions of future performance are inevitably inaccurate because things never go exactly as planned." *Arazie* v. *Mullane*, 2 F.3d 1456, 1468 (7th Cir. 1993); *accord Eisenstadt* v. *Centel Corp.*, 113 F.3d 738, 746 (7th Cir. 1997) (business planning is an "inherently uncertain process"). Under the second prong, plaintiffs must plead particular facts giving rise to a strong inference the defendants had *actual knowledge* of the falsity of their statements—mere recklessness is not enough. *Makor Issues & Rights, Ltd.* v. *Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008). The forward-looking statements challenged in a complaint are not actionable if defendants satisfy *either* of the two safe-harbor's prongs.

1.  **Statements Regarding Future Benefits and Progress of the HHI and GAC Consolidations Were Forward-Looking Statements Accompanied by Meaningful Cautionary Language**

A number of the statements Lead Plaintiffs challenge as false were forward-looking statements about the HHI and GAC Consolidations. They concern the future benefits Spectrum anticipated once the consolidations were complete. (*See* Am. Compl. ¶¶ 186, 194, 196, 201, 202, 203, 215, 217, 219, 226, 228, 233, 239, 248.) For example, Lead Plaintiffs allege that the Defendants made the following false statements about the future benefits:

- Lead Plaintiffs allege that Martin made a false statement when he stated that the GAC consolidation will "continue to help [Spectrum] with better managing inventories going forward." (Am. Compl. ¶ 186-87.)

- Lead Plaintiffs allege that Rouvé and Martin made false statements when they remarked, on a July 27, 2017 earnings call, about the anticipated benefits from the consolidations. Rouvé stated the consolidations would "allow [Spectrum] to operate much more efficiently by consolidating our entire U.S. [HHI] distribution in Kansas and our [GAC] manufacturing and distribution in Ohio." (Am. Compl. ¶ 202.) Martin stated that the "Dayton facility consolidation is on schedule and will deliver meaningful cost

28

savings and improved working capital in fiscal 2018." (Am. Compl. ¶ 203.)

- Lead Plaintiffs allege that Defendants made a false statement when stating in its February 8, 2018 earnings call presentation that the "Kansas consolidation will result in a more streamlined footprint and lower inventory levels later in 2018 and beyond." (Am. Compl. ¶ 228-29.)

Other statements Lead Plaintiffs challenge concern the progress being made toward completing the consolidation projects. (*See* Am. Compl. ¶¶ 188, 190, 191, 197, 199, 213, 218, 221, 224, 225, 227.) For example, Lead Plaintiffs allege that the following statements about the progress of the consolidations were false:

- Lead Plaintiffs allege that Rouvé made a false statement when he said that the HHI consolidation in Kansas was "going to be completed in this calendar year." (Am. Compl. ¶ 188.)

- Lead Plaintiffs allege that the Company made a false statement when it stated that the HHI consolidation would be "operation in May 2017 and current sites [would be] fully exited by end of calendar 2017." (Am. Compl. ¶ 191.)

- Lead Plaintiffs allege that Rouvé made a false statement when he said that the HHI consolidation was "moving toward completion in February." (Am. Compl. ¶ 224.)

All these statements are forward-looking because whether the benefits the Company anticipated reaping from the consolidations would materialize can only be determined when the future becomes the present, after the consolidations are completed. *See Julianello*, 791 F.3d at 921; *Harris*, 182 F.3d at 805. Similarly, whether the Company would achieve certain goals and targets for the consolidations are likewise future-oriented, and their truth cannot be determined at the time they were made. These were, at most, "rosy" statements about "an inherently uncertain process." *Eisenstadt*, 113 F.3d at 746.

Notably, both sets of statements were accompanied by robust risk disclosures that warned the market of possible risks associated with the consolidation

29

projects.  For example, the Company provided the following warning regarding forward-looking statements in its 2016 Form 10-K:

> Since these forward-looking statements are based upon our current expectations of future events and projections and are subject to a number of risks and uncertainties, many of which are beyond our control and some of which may change rapidly, actual results or outcomes may differ materially from those expressed or implied herein, and undue reliance should not be placed on these statements.

(Rosen Decl. Ex. 6, at 4.)  Expanding on this warning, the Company highlighted the following risk factors that could alter projections:

- Our ability to successfully implement, achieve and sustain manufacturing and distribution cost efficiencies and improvements, and fully realize anticipated cost savings.

- The impact of expenses resulting from the implementation of new business strategies, divestitures or current and proposed restructuring activities.

- Due to a number of factors, including (i) manufacturing lead-times, (ii) seasonal purchasing patterns and (iii) the potential for material price increases, we may be required to shorten our lead-time for production and more closely anticipate our retailers' and customers' demands, which could in the future require us to carry additional inventories and increase our working capital and related financing requirements. This may increase the cost of warehousing inventory or result in excess inventory becoming difficult to manage, unusable or obsolete.

- We expect to incur one-time costs in connection with integrating our operations, products and personnel and those of businesses we acquire into a combined company, in addition to costs related directly to completing such acquisitions. These costs may include expenditures for:  employee redeployment, relocation or severance; integration of operations and information systems; combination of research and development teams and processes; and reorganization or closures of facilities.

- We may not realize the anticipated benefits of, and synergies from, our business acquisitions and may become responsible for certain liabilities and integration costs as a result.

(Rosen Decl. Ex. 6, at 4, 22, 30, 31; Rosen Decl. Ex. 12, at 4, 21, 29.)  Similar risk disclosures also accompanied the Company's earnings call presentations, 8-Ks, 10-Ks, and 10-Qs.  (*See, e.g.*, Rosen Decl. Ex. 14, at Item 2.02; Rosen Decl. Ex. 10, at 3.)[8]  These risk disclosures were not mere boilerplate; they clearly identified the risks inherent in the consolidations, and these risks were the ones the company ultimately experienced.

This Court has the ability to determine the safe harbor's applicability on a motion to dismiss, given that Spectrum's warnings clearly identified the risks the Company ultimately experienced.   The Seventh Circuit has recognized that there may be circumstances where the record is unclear, on a motion to dismiss, as to whether the cautionary language accompanying a forward-looking statement was "meaningful."  *Asher* v. *Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004).  The District Court in *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 993 (E.D. Wis. 2009), however, reasoned that the Seventh Circuit in *Asher* required greater analysis of the cautionary statements because of the unique fact that the risks from which the company ultimately suffered from were not mentioned in the cautionary statements.  *See id.*; *see also W. Pa. Elec. Emps. Tr.* v. *Plexus Corp.*, No. 07C0582, 2009 WL 604276, at *8 n.7 (E.D. Wis. Mar. 6, 2009) (reasoning that *Asher* required remand to determine whether the cautionary language was "meaningful" but that the "record in the present case is different").  And in *Sandmire* v. *Alliant Energy Corp.*, 296 F. Supp. 2d 950, 957-58 (W.D. Wis. 2003), the District Court rejected the plaintiffs' arguments that the sufficiency of cautionary language raises a fact

---

[8]    Given that these risk disclosures were available during the time that the purportedly misleading statements cited by Lead Plaintiffs were made, the market absorbed them.  *See Desai* v. *Gen. Growth Props.*, 654 F. Supp. 2d 836, 844 (N.D. Ill. 2009) (holding that "cautionary statements contained in SEC filings, so long as they were available when the purportedly misleading statements cited by Plaintiffs were made, were absorbed into the market").

question unresolvable on a motion to dismiss, reasoning that "the PSLRA directs the Courts to consider the effect of the cautionary language on a motion to dismiss."  Because the facts of this case make clear that Spectrum's cautionary language warned of the risks that ultimately came to pass, this Court should, under the PSLRA, enforce the statutory safe harbor on this motion to dismiss.

### 2. The Amended Complaint Fails to Allege that Defendants Possessed Actual Knowledge of the Falsity of Any Forward-Looking Statement

Lead Plaintiffs also entirely fail to allege that Defendants had "actual knowledge" that their projections and forward-looking statements were false at the time they were made—and thus the safe harbor of the PSLRA also protects those statements from attack.  Lead Plaintiffs assert in their Amended Complaint that the safe harbor is inapplicable because "at the time that each [forward-looking] statement was made, the speaker knew the statement was false or misleading and the statement was authorized and approved by an executive officer of Spectrum who knew the statement was false."  (Am. Compl. ¶ 293.)  To satisfy their pleading burden, Lead Plaintiffs must plead sufficient facts to establish a strong inference that the Individual Defendants acted with actual knowledge, and anything less is insufficient.  *Makor Issues*, 513 F.3d at 705 (noting that when plaintiffs challenge forward-looking statements, "the 'strong inference' that must be drawn to avoid dismissal cannot be an inference merely of recklessness" but is one of "actual knowledge").  For the reasons set forth in Section I, *supra*, Lead Plaintiffs' scienter allegations do not establish that the Individual Defendants did not believe their statements to be true when made.

32

C.     **Defendants' Statements About the Consolidations Are Not Actionable Opinions**

In the Amended Complaint, Lead Plaintiffs challenge numerous statements of opinion that cannot support a claim.   There are three general categories of such statements of opinion:

- Optimistic statements about the progress being made on the consolidations, such as that Defendants thought a consolidation project was "progressing smoothly" (Am. Compl. ¶¶ 191, 197) and that it was "in a good shape" (*id.* ¶ 204).[9]

- Statements of Defendants' belief that the consolidation issues were "temporary" and "transitory in nature," such as statements from the July 27, 2017 third quarter press release, earnings call, and investor presentation, that Spectrum "experienced temporary, transitional supply chain challenges" (*id.* ¶¶ 201-02, 206),[10] and similar statements from an April 26, 2018 second quarter press release, earnings call, and investor presentation that Defendants "believe[d] the U.S. facility operating inefficiencies [were] transitory in nature" (*id.* ¶¶ 236-37, 239).[11]

- Various statements that Defendants "would consider this transition to be a fairly normal one with normal startup issues."  (*Id.* ¶ 215).[12]

As we demonstrate below, the statements of opinion that Lead Plaintiffs challenge do not give rise to liability under the Exchange Act.

"An opinion is a belief, a view, or a sentiment which the mind forms of persons or things.  Most important, a statement of fact ('the coffee is hot') expresses

---

[9]    Other statements in this group include: they were "making good progress in clearing the backlog" (*id.* ¶¶ 205, 206, 218, 221); they "would say that one went really well, and the team executed really well" (*id.* ¶ 208); they "achieved significant encouraging progress" (*id.* ¶¶ 245, 251); and they "expect[ed] to complete this project in March 2018." (*id.* ¶ 218.)

[10]   *See also id.* ¶¶ 203-04 (stating that "temporary shipping startup issues" and "temporary operation startup issues" affected GAC and HHI results).

[11]   *See also id.* ¶ 233 (stating that the facilities "did incur temporary inefficiencies"); *id.* ¶¶ 237, 239 (stating that they "believe[d] . . . the adverse margin impact [was] largely behind [them]").

[12]   Other statements include that they "did have an expectation of some normal startup inefficiencies" (*id.* ¶ 220); and that they ended a quarter with "a modest and normal backlog." (*id.* ¶¶ 249, 252.)

certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not." *Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indust. Pension Fund*, 135 S. Ct. 1318, 1325 (2015) (internal quotation marks and citations omitted). In *Omnicare*, the U.S. Supreme Court concluded that statements of opinion are actionable only if: (1) the person or entity expressing the opinion does not actually hold that belief; (2) the person or entity omits information as to how the opinion was formed such that the opinion becomes misleading; or (3) if an opinion contains a false "embedded statement[] of fact." *Id.* at 1326-28. *See City of Dearborn Heights Act 345 Police & Fire Ret. Syst.* v. *Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017) (recognizing three ways that opinion statements are actionable pursuant to *Omnicare*). "Meeting the *Omnicare* standard is no small task for an investor," *Omnicare*, 135 S. Ct. at 1332, and Lead Plaintiffs' allegations do not come close.

As a starting point, it is beyond question that optimistic statements of progress like those challenged here are treated, for purposes of Exchange Act liability, as statements of opinion. *See, e.g.*, *Tongue* v. *Sanofi*, 816 F.3d 199, 206 (2d Cir. 2016) (holding that the statement "I would say I'm actually very satisfied with where the progress is going," is not an actionable opinion); *Perez* v. *Higher One Holdings, Inc.*, No. 3:14-cv-755(AWT), 2016 WL 6997160, at *13 (D. Conn. Sept. 13, 2016) (holding that claims such as "showing good progress" are not actionable opinions). "The hallmark of such statements is that they are not capable of objective verification." *In re Tower Auto. Sec. Litig.*, 483 F.

34

Supp. 2d 327, 336 (S.D.N.Y. 2007).  And, here, statements like "in a good shape" or "significant encouraging progress" are not objectively verifiable.

It is likewise well-established that estimates of future performance are opinion statements.  *See, e.g.*, *In re Int'l Bus. Mach. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (statements regarding an "uncertain future event" are "expressions of optimism or projections about the future," and thus opinions).  As the Second Circuit has held, "[e]stimates, in particular, constitute a well-established species of opinion," *Martin* v. *Quartermain*, 732 F. App'x 37, 40 n.1 (2d Cir. 2018), because they "will vary depending on the particular methodology and assumptions used." *Fait* v. *Regions Fin. Corp.*, 655 F.3d 105, 111 (2d Cir. 2011).  Defendants' statements quoted in the Amended Complaint indicating that they "believe[d] the U.S. facility operating inefficiencies [were] transitory in nature" were estimates of uncertain future events, and, therefore should be assessed as statements of opinion.  (*See* Am. Compl. ¶¶ 160, 236.)

So too are statements such as: the Company "would consider this transition to be a fairly normal one" statements of opinion.  (*See* Am. Compl. ¶ 215.)  The reference for what is "fairly normal" is subjective and involves management's opinion regarding what is standard for such transitions and projects.  *See Dearborn Heights*, 856 F.3d at 613-14; *see also In re Sanofi-Aventis Sec. Litig.*, Nos. 07-cv-10279(GBD), 08-cv-0021(GBD), 2009 WL 3094957, at *5 (S.D.N.Y. Sept. 25, 2009) ("characterizations" of side effects as "relatively mild and self-limiting," based on publicly reported data, "amount[ed] to little more than expressions of opinion which are not actionable misstatements under Rule 10b–5").

None of these opinion statements are actionable, for four reasons.

*First,* and most fundamentally, the Amended Complaint does not plead facts from which it can be inferred that the speakers did not honestly believe the opinions when the statements were made.  *See*, Section I, *supra*.  As demonstrated above, Lead Plaintiffs rely instead on a theory that Defendants *must have known* facts contrary to their statements because of regular reports they received from HHI and GAC management; visits "senior leadership," Rouvé, and Maura made to the plants; and the knowledge of "senior management" at the distribution centers.  (*See, e.g.*, Am. Compl. ¶¶ 258-76.)  However, claims that "defendants were aware of facts that *should* have led them" to act differently are insufficient to establish subjective disbelief.  *City of Omaha Civilian Emps. Ret. Sys.* v. *CBS Corp.*, 679 F.3d 64, 68-69 (2d Cir. 2012) (per curiam); *see also Fait*, 655 F.3d at 110-12 ("clear indications that impairment testing was necessary" were insufficient to establish subjective falsity of "statements regarding goodwill"); *Dearborn* Heights, 856 F.3d at 616-17 (finding "no allegations of subjective falsity" where there were "no allegations" that defendant believed that the asset was impaired, or that required impairment testing had not been performed).

*Second,* Lead Plaintiffs fail to identify "particular (and material) facts going to the basis" for the opinion "whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."  *Omnicare*, 135 S. Ct. at 1332.  Lead Plaintiffs have not alleged what, if any, metrics of progress Defendants relied upon.  Where, as here, Lead Plaintiffs "[fail] to allege the actual assumptions that Defendants relied upon[,] . . . it cannot be plausibly inferred that Defendants intentionally disregarded" the events, circumstances, or challenges relating to

36

the asset. *Dearborn Heights*, 856 F.3d at 618. Nor do Lead Plaintiffs plausibly allege that Defendants misled reasonable investors relying on industry-wide standards and expectations. *Cf. Tongue*, 816 F.3d at 211 (explaining that *Omnicare* "reasonable investor" analysis requires looking at "the context of an allegedly misleading opinion," including expectations among "sophisticated investors" who would be "well accustomed to the 'customs and practices of the relevant industry'"). Lead Plaintiffs point only to vague "industry-wide" metrics. (*See, e.g.*, Am. Compl. ¶ 41 ("A distribution center must also be carefully designed").) But they do not show either that Defendants adopted these metrics as their own or that the reasonable investor would have judged "progress" according to these vague standards. *Tongue*, 816 F.3d at 211-12.

Lead Plaintiffs appear principally to rely on facts they allege are inconsistent with "progress," such as a high scrap rate or the alleged lack of racking. (*See* Am. Compl. ¶¶ 192, 198, 209-11, 222-23, 254-55.) However, without metrics against which to compare these allegations, let alone allegations that Defendants knew of these issues, these allegations fail to make Defendants' opinion statements misleading. *Omnicare*, 135 S. Ct. at 1329 ("a statement of opinion is not misleading just because external facts show the opinion to be incorrect."). Moreover, "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts," and, therefore, "a statement of opinion 'is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.'" *Tongue*, 816 F.3d at 210 (quoting *Omnicare*, 135 S. Ct. at 1329). The Amended Complaint, by citing to the many times that Defendants acknowledged issues with the consolidation projects and adjusted project completion timing (*e.g.*, Am. Compl. ¶¶ 43, 45-46, 49-51, 151, 188, 202, 204), supports a strong

inference that Defendants never disregarded or omitted events that were material to their assumptions.

      *Third*, it is not enough to allege that Defendants' estimates proved wrong. *See In re Tempur Sealy Int'l, Inc. Sec. Litig.*, No. 17-cv-2169(LAK), 2019 WL 1368787, at *4, *13 (S.D.N.Y. Mar. 26, 2019) (CEO's statements that he did not "see much change" in interactions with customer's management were not actionable; while customer later terminated all contracts with the company, plaintiffs failed to allege that "statements of opinion . . . were disbelieved by the defendant [or] rested on a questionable basis"); *River Birch Capital* v. *Jack Cooper Holdings Corp.*, No. 17-cv-9193, 2019 WL 1099943, at *5 (S.D.N.Y. 2019) (opinion that company "believe[d] that the long-term contractual relationships with our customers provide us with revenue visibility and that we will be able to continue to enter into new contracts and modify existing contracts that enhance our long-term profitability" were not misleading, even after loss of large customer, because opinion statements "predated the relevant customer problems by three years and the Complaint alleges no facts suggesting that these issues were or reasonably could have been anticipated at that point") (internal quotation marks omitted).  To the extent Lead Plaintiffs claim Defendants' opinions were misleading because, *inter alia*, the west coast HHI Center allegedly never closed, "problems did not improve through 2018," or a post-statement audit showed "that the inventory system was incorrect,"  (Am. Compl. ¶¶ 10-11, 209-10, 235) that is insufficient to state a claim.

      *Fourth*, and finally, the Amended Complaint does not contain allegations that the Defendants failed to disclose material information regarding "how the speaker has formed [his] opinion."  *Omnicare*, 135 S. Ct. at 1328  *See Friedman* v. *Endo Int'l PLC*,

No. 16-cv-3912 (JMF), 2018 WL 446189, at *5 (S.D.N.Y. Jan. 16, 2018) (dismissing claim and rejecting theory that defendant failed to disclose information informing its opinions); *Sousa* v. *Sonus Networks, Inc.*, 261 F. Supp. 3d 112, 119 (D. Mass. 2017) (rejecting plaintiff's argument that defendant failed to disclose how it formed its opinion).  In fact, the Amended Complaint makes no allegation at all regarding the manner in which Defendants formed their opinions.  For all these reasons, the statements identified above and in Appendix A are not actionable opinions, and claims based on them should be dismissed.

> **D.      Several of Defendants' Statements About the GAC and HHI Consolidations Were Vague and Optimistic Puffery Not Actionable Under the Securities Laws**

Apart from whether a statement is false or misleading, Lead Plaintiffs must also sufficiently allege that Defendants' statements were material to a reasonable investor's decision for the statement to be actionable under the PSLRA.  *Pension Tr. Fund for Operating Engineers* v. *Kohl's Corp.*, 895 F.3d 933, 936 (7th Cir. 2018).  A statement is material if "there is a substantial likelihood that disclosure of the information would have been viewed by the reasonable investor to have significantly altered the total mix of information."  *Searls* v. *Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995).  One type of immaterial statement is puffery, which is a "loosely optimistic" statement "so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker that no reasonable investor could find them important to the total mix of information available."  *See, e.g.*, *Van Noppen* v. *InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 940 (N.D. Ill. 2015); *In re Harman Intern. Indus.*, *Inc. Sec. Litig.*, 791 F.3d 90, 109 (D.C. Cir. 2015) ("'Puffery' refers to one type of immaterial statement: the sort of 'generalized statements of optimism

that are not capable of objective verification.'").  Lead Plaintiffs label as fraudulent several

statements that fit the classic definition of puffery.

      *First*, the statements Lead Plaintiffs challenge about the progress

Defendants made toward completing the consolidation projects constitute puffery.  Lead

Plaintiffs challenge Defendants' vague expressions of optimism that the consolidation

projects were "going well," or "on track," or making "progress," such as the following:

- Rouvé stated, on January 26, 2017, that the GAC team was making "good progress" toward completing the "major simplification of its U.S. production, distribution and R&D footprint by consolidation in Dayton, Ohio."  (Am. Compl. ¶ 186.)

- The Company stated, in several investor meetings in February and March 2017, that the GAC project was "progressing smoothly with completion in FY17."  (Am. Compl. ¶ 191.)

- Martin stated, on May 2, 2017, that the HHI and GAC consolidations were "going well."  (Am. Compl. ¶ 195.)

- The Company stated, in its May 2, 2017 earnings call presentation, that the HHI and GAC consolidations were "on track and will reduce expenses and inventory." (Am. Compl. ¶ 196.)

- Rouvé stated, on February 8, 2018, that the Company "made major progress in [its] key strategic initiatives," while updating the market on the status of the consolidation projects. (Am. Compl. ¶¶ 224-25.)

- Maura stated, on July 26, 2018, that the Company "achieved significant encouraging progress against operating inefficiencies" it was experiencing in GAC and HHI. (Am. Compl. ¶ 245.)

No reasonable investor would have relied on Spectrum's statements about the progress of

the consolidations because they were such vague statements of optimism.  *See Cent.*

*Laborer's Pension Fund* v. *SIRVA, Inc.*, No. 04 C 7644, 2006 WL 2787520, at *14 (N.D.

Ill. Sept. 22, 2006) (holding that individual defendant's statement that company "made

significant progress in broadening [its] services offering and . . . presence" in Europe and

was "building the infrastructure for future growth" are "vague statements of optimism, both

of which are immaterial puffery"); *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152,  (N.D. Ill. 2004) (holding that videogame maker's predictions about its "product development efforts and then-existing portfolio of products [was] immaterial as a matter of law").

    *Second*, Defendants' optimistic statements about the challenges in the GAC and HHI consolidations being "transitory" are likewise puffery.   These statements contained optimistic predictions that the problems were short term and the Company could manage them.

- Martin stated, on July 27, 2017, that the Dayton facility was "functioning better and better every day."  (Am. Compl. ¶ 204.)

- Rouvé stated, on July 27, 2017, that while there was a backlog at the GAC and HHI facilities, the company was "getting better on that." (Am. Compl. ¶ 205.)

- Maura stated, on April 26, 2018, that the company believed that the inefficiencies with the consolidation projects were "transitory in nature and the adverse margin impact from them is temporary." (Am. Compl. ¶ 236.)

- Maura stated, on July 26, 2018, that the inefficiencies at the GAC facility were "indeed largely transitory."  (Am. Compl. ¶ 244.)

These are again optimistic statements that no reasonable investor would rely on because they were so vague and indefinite about when and how the consolidation problems would be resolved.  *See, e.g.*, *Searls*, 64 F.3d at 1066-67 (noting that "indefinite predictions of 'growth' are better described as puffery rather than as material statements of fact"); *Van Noppen*, 136 F. Supp. 3d at 941 (holding that statement that company's products are "going to be . . . large and successful" and that company remained "very confident about the role [a business group] will play in the long term growth of our business" were indefinite prediction and optimistic rhetoric); *Plymouth Cty. Retirement Ass'n* v. *Advisory Brd. Co.*,

370 F. Supp. 3d 60, 81-82 (D.D.C. 2019) (holding company's statements that its integration was "going very well" and company was "making good progress" on integration were puffery).

The third and final category of statements that constitute puffery are statements of enthusiasm about the positive impacts the consolidations had on Spectrum's business.

- While discussing the benefits of the GAC consolidation, Martin stated, on January 26, 2017, that the Company saw a "nice impact in that business." (Am. Compl. ¶ 186.)

- Martin stated, on July 27, 2017, that the GAC consolidation was "in good shape."  (Am. Compl. ¶ 204.)

These statements are also immaterial puffery because they are so vague and lacking in specificity about the positive business gains the Company experienced as the consolidations were underway.  *See Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund* v. *Allscripts-Misys Healthcare Solutions, Inc.*, 778 F. Supp. 2d 858, 872 (N.D. Ill. 2011) (holding that defendants' statements that company was "'confiden[t] in [its] ability to delivery solid results' and was 'in a position to capitalize' on significant market opportunity amount to nothing more than vacuous management speak").

Lead Plaintiffs basically allege that Spectrum's statements were false or misleading because they did not cast a gloomier and more pessimistic portrayal of Spectrum's ability to complete the consolidations.  The securities laws do not require companies to adopt such a self-defeating approach.  *See Eisenstadt*, 113 F.3d at 746-77 (noting it is not securities fraud to adopt a positive picture of the company's status, "investors would have expected no less").  Spectrum disclosed to the market the challenges it faced with both consolidations while also "put[ting] a rosy face on an inherently

42

uncertain process," and in doing so Defendants did not say anything that was so "discordant with reality that would induce a reasonable investor to buy stock at a higher price than it was worth ex ante." *Eisenstadt*, 113 F.3d at 746.  Striking a balance between notifying the market and portraying the company in an optimistic light does not amount to securities fraud.  *See Fulton Cty. Emps. Ret. Sys.* v. *MGIC Inv. Corp.*, 675 F.3d 1047, 1050 (7th Cir. 2012) (holding that "letting investors know about [] trouble without painting too gloomy a picture" is a "balancing act" that "cannot sensibly be described as fraud").  Lead Plaintiffs have, therefore, failed to establish that any of the above statements, and those set forth in Exhibit 1, were anything but immaterial puffery.

### III.   Lead Plaintiffs Cannot Bring Claims on Behalf of Pre-Merger HRG Shareholders Against Spectrum Brands Holdings

In their Amended Complaint, Lead Plaintiffs allege that they represent "purchasers from January 26, 2017 to July 13, 2018, of stock of HRG Group, Inc.,"  (Am. Compl. ¶ 1, n.1), in addition to a putative class of Spectrum shareholders.  This is the first time in the litigation that Lead Plaintiffs have stated an intention to represent shareholders other than holders of Spectrum Legacy Brands, Inc. common stock.   To be clear, what Lead Plaintiffs purport now to do is to represent holders of *an entirely different public company*, HRG Group, Inc., in claims against Spectrum Legacy Brands, Inc.  Prior to the Merger, HRG had separate securities that traded under a separate ticker symbol on the NYSE and made separate filings with the SEC.  Notably, Lead Plaintiffs do not claim that any of pre-Merger HRG's SEC filings contained misrepresentations.

This belated assertion of claims fails for two reasons.  First, because pre-Merger HRG stock purchasers did not purchase or sell Spectrum securities, they do not have standing to sue *Spectrum* for securities fraud.  And, second, even if they did have standing,

the Lead Plaintiffs did not follow the statutorily required process to seek to represent a class including pre-Merger HRG shareholders.  Not surprisingly, then, Lead Plaintiffs were appointed *only* to represent persons who "purchased securities from defendant Spectrum Brands Legacy, Inc."[13]  (ECF No. 8 at 1.)   For both of these reasons, claims asserted on behalf of pre-Merger HRG shareholders should be dismissed.

### A. Pre-Merger HRG Shareholders Have No Standing to Sue Spectrum Brands Holdings, Inc. for Damage to Their Pre-Merger HRG Shares

The pre-Merger HRG shareholders do not allege that pre-Merger HRG made any misstatements in its SEC filings or otherwise.  Instead, they claim to have been injured by statements made in pre-Merger Spectrum SEC filings and related public statements.  But under established law, pre-Merger HRG shareholders lack standing to sue Spectrum for statements made to the market about Spectrum's business prospects.

It has been settled law for decades that to maintain standing to sue under § 10(b) and Rule 10b–5, a party "must be either a purchaser or seller of securities."  *See Blue Chip Stamps* v. *Manor Drug Stores*, 421 U.S. 723, 747, 749 (1975) (limiting "the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates."); *accord Roots Partnership* v. *Lands' End, Inc.*, 965 F.2d 1411, 1420 (7th Cir. 1992).  The Court based its conclusion on a determination that Congress, in enacting § 10(b), had intended only to protect purchasers.  *Blue Chip Stamps*, 421 U.S. at 752-53.  Extending standing to non-purchasers, it reasoned, would not honor this intent.  *Id.* at 754.  It further explained that its standing rule was good policy, because it would prevent vexatious or abusive litigation against public companies.  *Id.* at 739-47.

---

[13]   In an attempt to resolve this dispute short of motion practice, on July 18, 2019, counsel for Defendants raised this issue with liaison counsel for the class, but liaison counsel declined to withdraw these claims.

The *Blue Chip Stamps* Court was particularly concerned that, because non-purchasers tend to rely exclusively on uncorroborated oral testimony, non-purchasers could force companies to settle cases instead of face uncertain liability at trial.  *Id.*

Courts interpreting *Blue Chip Stamps* have gone on to hold that its purchaser-seller rule also bars holders of securities other than the securities issued by the company alleged to have made misrepresentations from bringing suit and claiming harm to these other securities.  The Second Circuit, for instance, has addressed this question directly, in a ruling squarely applicable here.  In *Ontario Public Service Employees Union Pension Trust Fund* v. *Nortel Networks Corp.*, the court rejected an argument that a purchaser of "securities of a company that had a business relationship with the misrepresenter" could sue the company alleged to have made misrepresentations because its stock was indirectly affected by the alleged misrepresentations.  369 F.3d 27, 32, 34 (2d Cir. 2004).  In that case, Nortel Networks had announced it was acquiring a portion of the business of JDS Uniphase in exchange for Nortel stock.  *Id.* at 29.  When Nortel announced the pending transaction, JDS stock increased in value.  *Id.*  When Nortel later announced positive revenue and earnings projections, JDS stock increased even further in value.  *Id.*  A few days after the deal was consummated, however, Nortel revised its revenue projections downward which led to a plunge in the value of its stock and JDS's stock.  *Id.*

JDS investors sued Nortel, claiming Nortel's misstatements affected the value of their stock, but the district court dismissed their claims for lack of standing because they had not purchased Nortel securities.  *Id.* at 30.  On appeal, the Second Circuit affirmed, holding that "[s]tockholders do not have standing to sue under Section 10(b) and Rule 10b–5 when the company whose stock they purchased is negatively impacted by the material

misstatement of another company, whose stock they do not purchase." *Id.* at 34.  It based its decision on what it read as the Supreme Court's "narrow interpretation" of standing in *Blue Chip*.  *Id.* at 33.  It further reasoned that allowing the plaintiffs' lawsuit to proceed would contravene the policy behind the *Blue Chip Stamps* ruling, because, as in *Blue Chip Stamps*, the plaintiffs' claims of reliance on Nortel's statements in purchasing JDS securities would be based principally on uncorroborated oral testimony of reliance.  *Id.* at 33.

Other courts applying *Blue Chip Stamps* have reached the same conclusion. In *Duane & Virginia Lanier Trust* v. *SandRidge Mississippian Trust I*, for instance, the Court rejected claims that purchasers of interests in one trust could sue another trust despite the fact that, among other things, the two trusts were created by the same company and shared the same management and directors.  361 F. Supp. 3d 1162, 1170-71 (W.D. Okla. 2019).  The court reasoned that the two trusts remained "independent securities sold by two different entities and publicly traded under two distinct ticker symbols."  *Id.*  The plaintiffs therefore were not purchasers and had no standing.  *Id.*  Likewise, in *APA Excelsior III LP* v. *Windley*, the court rejected § 10(b) claims brought by shareholders of a parent company against a wholly-owned subsidiary on a theory that they had formerly owned shares in the subsidiary prior to a merger between the two companies.  329 F. Supp. 2d 1328, 1347 (N.D. Ga. 2004).  Because the plaintiffs did not challenge the merger itself nor complain about misstatements made while they remained the subsidiary's shareholders, the court determined that the plaintiffs had no basis for proceeding as stockholders of the subsidiary for purposes of that suit.  *Id.*

Here, Lead Plaintiffs attempt to do precisely what the Second Circuit in *Ontario* and other courts have forbidden as a matter of law: claim that pre-Merger HRG shareholders have standing to sue pre-Merger Spectrum because "Spectrum Legacy's financial stability and profitability were critical to HRG shareholders" and the stock prices of the two companies were "highly correlative." (Am. Compl. ¶ 26.) Their claims suffer from the same fatal defects as those in the cases above. Most importantly, pre-Merger HRG shareholders never bought shares in Spectrum. Rather, pre-Merger HRG shareholders bought shares in pre-Merger HRG, which traded under a different ticker symbol, maintained separate management and a separate board, published separate financial statements, and had separate company headquarters. S*ee Duane & Virginia Lanier Trust I*, 361 F. Supp. 3d at 1170-71. Notably, there is no claim that pre-Merger HRG committed securities fraud; the claim is that pre-Merger Spectrum did. Thus, a straightforward application of *Blue Chip Stamps* bars their claim. Further, the fact that the companies later merged has no impact on the standing of pre-Merger HRG securities holders who do not challenge the merger itself. *See APA Excelsior III LP*, 329 F. Supp. 2d at 1347.

If this Court were to expand the scope of the securities laws to grant shareholders in one public company standing to sue a different company in which they did not actually invest, solely because of some commercial interdependence, such a ruling could have dramatic consequences that Congress never intended. If the law of standing were rewritten in this way, investors in Netflix could sue a publicly-traded movie producer that fell behind in its previously announced production schedule. Investors in General Motors could sue a publicly-traded tire manufacturer that announced a product recall. The

47

list is endless.  Such a change in the law is up to Congress, not—we respectfully submit—this Court.

In sum, because pre-Merger HRG shareholders did not purchase Spectrum securities, their claims against Spectrum for alleged damage to the value of their HRG shares must be dismissed for lack of standing.  This likewise extends to any control person claims asserted under Section 20(a).  *See Kaplan* v. *Utilicorp United, Inc.*, 9 F.3d 405, 408 (5th Cir. 1993) (plaintiff who lacked standing for direct action under § 10(b) also lacked standing for § 20(a) controlling person claim).

**B.    Claims by Pre-Merger HRG Shareholders Against Spectrum Should Be Dismissed Because the Statutorily Required PSLRA Process Was Not Followed for a Putative Class of HRG Shareholders**

Even if pre-Merger HRG shareholders did have standing to sue Spectrum for alleged damage to their HRG shares—which they do not—it remains the case that Lead Plaintiffs were not appointed to represent them and the claims should be dismissed for that reason as well.

The PSLRA prescribes a detailed process in order for a putative lead plaintiff to assert a claim on behalf of an absent class of shareholders in a security.  It requires plaintiffs, "not later than 20 days after the date on which the complaint is filed," to publish notice to members of the purported class of the pending action, its claims, and the purported class period, "in a widely circulated national business-oriented publication or wire service."  15 U.S.C. § 78u-4(a)(3)(A)(i).  "[A]ny member of the purported class" then has 60 days in which to "move the court to serve as lead plaintiff of the purported class."  *Id.*  Within 90 days of the publication of the notice, the court must appoint as lead plaintiff the member of the purported class who it determines is "most capable of

adequately representing the interests of class members," i.e., the "most adequate plaintiff." *Id.* § 78u-4(a)(3)(B)(i).  And the PSLRA presumes the most adequate plaintiff is the person who "has the largest financial interest in the relief sought by the class."  *Id.*  § 78u-4(a)(3)(B)(iii).

The PSLRA's class notice provisions reflect congressional intent to encourage the most adequate plaintiff to come forward and direct the action.  *See* H.R. Conf. Rep. No. 104-369, at 32 (1995); *accord Vanleeuwen* v. *Keyuan Petrochems., Inc.*, No. CV 11–9495 PSG, 2013 WL 2247394, at *6 (C.D. Cal. May 9, 2013).  In light of this clear congressional intent, courts "scrutinize [a] published notice and ensure that [it] comports with the objectives of the PSLRA."  *Teamster Local 445 Freight Div. Pension Fund* v. *Bombardier Inc.*, No. 05 Civ. 1898(SAS), 2005 WL 1322721, at *2 (S.D.N.Y. June 1, 2005).

It takes no scrutiny at all to determine that with respect to HRG securities, Lead Plaintiffs did none of what the statute requires.  No wire notice or complaint apprised former HRG shareholders of their potential claims in this action.  The wire notices filed in this action mention only a single security: Spectrum Brands Holdings, Inc.[14]  Not one mentions HRG Group, Inc.  Likewise, the original complaints filed in the consolidated actions bring claims against only Spectrum Brands Legacy, Inc. (and individual defendants).  (ECF No. 1, No. 3:19-cv-00347; ECF No. 1, 3:19-cv-00178.)  They also expressly define the class as "investors who purchased or otherwise acquired the securities

---

[14]   *See* Levi & Korsinsky, LLP, *Shareholder Alert*, Globe Newswire (Mar. 7, 2019), attached as Ex. 2; Rigrodsky & Long, P.A., *Shareholder Alert*, (Mar. 27, 2019), attached as Ex. 3; *Bernstein Litowitz Berger & Grossmann LLP Announces Securities Class Action Suit Filed Against Spectrum Brands Holdings, Inc. and Certain of its Officers and Directors, Expanding Class Period Alleged in Related Action Notice of Class Action*, PR NewsWire (Apr. 30, 2019), attached as Ex. 4.

of *Spectrum Brands Legacy, Inc.*"  (ECF No. 1, No. 3:19-cv-00347; ECF No. 1, 3:19-cv-00178 (emphasis added).)   Neither original complaint names HRG Group, Inc. as a defendant; mentions HRG Group, Inc. shareholders as members of the class; nor do any of the attached PSLRA certifications identify transactions in HRG Group, Inc. securities.  As a consequence, no absent class member could be aware that she could apply for appointment as Lead Plaintiff—because there was no notice that anyone was pursuing the rights of HRG shareholders.  The only fair inference is that "individuals who could now be considered potential lead plaintiffs would have disregarded the earlier notice."  *Kipling* v. *Flex Ltd.*, No. 18-CV-02706-LHK, 2019 WL 1472358, at *2 (N.D. Cal. Apr. 3, 2019).

Given the notice published, it is no surprise that all of the filings in support of Motions for Appointment as Lead Counsel and Lead Plaintiffs represent that the putative class comprises shareholders of *Spectrum*, not HRG.  (*See* Rosen Decl. Ex. 23, at 1; Rosen Decl. Ex. 24, at 1 (defining "Spectrum" as "Spectrum Brands Legacy, Inc."); Rosen Decl. Ex. 25, at Exhibits A and B (omitting transactions in HRG securities); Rosen Decl. Ex. 26, at 2 (Chicago Teachers "suffered substantial losses as a result of its investment in the Spectrum Brands Legacy, Inc. . . . securities").)   Their filings omit any mention of HRG whatsoever; they certainly do not assert economic loss in connection with HRG securities. In their declaration filed in support of the lead plaintiff motion, Lead Plaintiffs attach a chart quantifying their losses in Spectrum stock only.  (*See* Ex. B to Rosen Decl. Ex. 25.) As they state in their brief in support of the motion, "the Court is required to determine which movant has the 'largest financial interest' in the relief sought by the Class in this litigation."  (Rosen Decl. Ex. 24, at 6.)  And, in making this determination, "most courts simply determine which potential lead plaintiff has suffered the greatest total losses."

*Takara Tr.* v. *Molex Inc.*, 229 F.R.D. 577, 579 (N.D. Ill. 2005) (cited in ECF No. 4; Rosen Decl. Ex. 24, at 6).  Yet, despite their recognition of the requisites for establishing that they are the most adequate plaintiff, Lead Plaintiffs did not submit any declaration reflecting their losses in HRG.  Based on Lead Plaintiffs' representations, this Court's Order, dated June 12, 2019 (ECF No. 8), appointing Lead Plaintiffs characterizes them as entities who "purchased securities from defendant Spectrum Brands Legacy, Inc."  (*Id.* at 1.)

It is only for the first time in the Amended Complaint that pre-Merger HRG shareholders are explicitly added to the putative class.  Lead Plaintiff Public School Teachers' Pension & Retirement Fund of Chicago listed no purchases of pre-Merger HRG securities as part of its declaration in support of its application to be lead plaintiff, but rather identified only its transactions in Spectrum securities.  The first time Public School Teachers identified a purchase of pre-Merger HRG shares was in its declaration appended to the Amended Complaint, which was not filed until one month after the ruling on the lead plaintiff motion.  The Amended Complaint is also the first pleading in which HRG is named as a Defendant.  (Am. Compl. ¶ 25.)  Where the prior complaints and wire notices neither named HRG shareholders as potential plaintiffs or named HRG as a defendant, it is unreasonable to assume any pre-Merger HRG shareholders were put on notice of this action.  *See Vanleeuwen*, 2013 WL 2247394, at *6; *Teamster Local 445 Freight Div. Pension Fund* v. *Bombardier Inc.*, 2005 WL 1322721, at *3 (S.D.N.Y. June 1, 2005).

Under these circumstances, where the original complaint and notice "excluded" members of the expanded class and the Amended Complaint adds "entirely new factual allegations," it would be "contrary to the letter and intent of the [PSLRA class] notice requirements" to allow the Amended Complaint to proceed on behalf of the newly

expanded class. *Vanleeuwen*, 2013 WL 2247394, at *6; *see also Kipling* v. *Flex Ltd.*, 2019 WL 1472358 at *1 (N.D. Cal. Apr. 3, 2019) (quoting *Kaplan* v. *S.A.C. Capital Advisors, L.P.*, 947 F. Supp. 2d 366, 367 (S.D.N.Y. 2013)) (vacating lead plaintiff appointment); *Bombardier Inc.*, 2005 WL 1322721, at *3 (S.D.N.Y. June 1, 2005) (same).

## IV.     The Section 20(a) Claims Must Be Dismissed for Failure to Plead a Primary Violation

Lead Plaintiffs' Section 20(a) claims against the Individual Defendants and HRG must be dismissed for failure to plead a primary violation of the securities laws. The Amended Complaint fails to allege a primary violation because, as explained above in *supra* Sections I and II, the Section 10(b) claims do not adequately allege scienter and falsity, among other deficiencies. *Pugh*, 521 F.3d at 693 ("[B]ecause the plaintiffs have not adequately alleged the direct liability of any defendant, their § 20(a) claim was also correctly dismissed."); *accord SRM Global Master Fund Ltd. P'ship* v. *Bear Stearns Cos. LLC*, 829 F.3d 173, 177 (2d Cir. 2016).

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that the Amended Complaint should be dismissed with prejudice in its entirety.

Dated: August 26, 2019

Respectfully submitted,

/s/ Matthew D. Lee
Matthew D. Lee, WI Bar No. 1061375
FOLEY & LARDNER LLP
150 East Gilman Street, Suite 5000
Madison, WI 53703-1482
Tel.: 608-257-5035
Fax: 608-258-4258
mdlee@foley.com

Richard A. Rosen, admitted *pro hac vice*

52

Andrew J. Ehrlich, admitted *pro hac vice*
Adam J. Bernstein, admitted *pro hac vice*
PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel.: 212-373-3000
Fax: 212-757-3990
rrosen@paulweiss.com
aehrlich@paulweiss.com
abernstein@paulweiss.com

*Attorneys for Defendants*