**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

|  |  |  |
|---|---|---|
| IN RE SPECTRUM BRANDS SECURITIES LITIGATION | ) ) ) ) ) | No. 19-cv-347-jdp |

---

**MEMORANDUM OF LAW IN SUPPORT OF LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND LITIGATION EXPENSES**

---

**STAFFORD ROSENBAUM LLP**
Douglas M. Poland
State Bar No. 1055189
222 West Washington Avenue, Suite 900
P.O. Box 1784
Madison, WI 53701-1784
Telephone:  (608) 256-0226
Facsimile:  (608) 259-2600
dpoland@staffordlaw.com

*Liaison Counsel for Lead Plaintiffs the*
*Public School Teachers' Pension and*
*Retirement Fund of Chicago and the*
*Cambridge Retirement System*
*and the Settlement Class*

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
Katherine M. Sinderson
Jai Chandrasekhar
Matthew Traylor
1251 Avenue of Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
KatieM@blbglaw.com
Jai@blbglaw.com
Matthew.Traylor@blbglaw.com

-and-

Avi Josefson
875 North Michigan Avenue, Suite 3100
Chicago, Illinois 60611
Telephone: (312) 373-3880
Facsimile: (312) 794-7801
avi@blbglaw.com

*Lead Counsel for Lead Plaintiffs the Public*
*School Teachers' Pension and Retirement*
*Fund of Chicago and the Cambridge*
*Retirement System and the Settlement Class*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT.............................................................................................................................5

I.      Lead Counsel's Fee Application Should be Approved.......................................................5

      A.      Counsel Are Entitled to Attorneys' Fees from the Common Fund .........................5

      B.      The Market Price is Measured as a Percentage of the Fund ...................................6

      C.      The 15% Attorneys' Fee Request is Reasonable and Appropriate ..........................8

            1.      The Requested Fee Is Consistent With Applicable Precedent.....................8

            2.      Other Factors Commonly Considered in the Seventh Circuit Also
                 Support the Requested Fee Award.............................................................10

            3.      The Requested Fee Is Also Reasonable Using the Lodestar Method ........18

II.     The Request for Payment of Litigation Expenses Should Be Approved...........................20

CONCLUSION.........................................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

*Abbott v. Lockheed Martin Corp.*,
  2015 WL 4398475 (S.D. Ill. July 17, 2015) ............................................................................21

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
  572 F.3d 221 (5th Cir. 2009) ...................................................................................................2

*Arenson v. Bd. of Trade of Chi.*,
  372 F. Supp. 1349 (N.D. Ill. 1974) .........................................................................................16

*Beane v. Bank of N.Y. Mellon*,
  2009 U.S. Dist. LEXIS 27504 (S.D.N.Y. Mar. 31, 2009) ......................................................21

*Beesley v. Int'l Paper Co.*,
  2014 WL 375432 (S.D. Ill. Jan. 31, 2014).....................................................................7, 9, 10

*Blum v. Stenson*,
  465 U.S. 886 (1984).................................................................................................................7

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980)..............................................................................................................5, 6

*Cent. Laborers' Pension Fund v. SIRVA, Inc.*,
  2007 U.S. Dist. LEXIS 105097 (N.D. Ill. Oct. 31, 2007).........................................................9

*City of Greenville v. Syngenta Crop Protection, Inc.*,
  904 F. Supp. 2d 902 (S.D. Ill. 2012).........................................................................................9

*City of Sterling Heights Gen. Emps. Ret. Sys. v. Hospira*,
  No. 11-cv-08332-AJS, slip. op. (N.D. Ill. Aug. 5, 2014).........................................................9

*Dalton v. Jones, Bird & Howell*,
  1993 U.S. App. LEXIS 11377 (7th Cir. May 13, 1993) .........................................................21

*Duncan v. Joy Global Inc., et al.*,
  No. 16-cv-1229-pp, slip op. (E.D. Wis. Dec. 27, 2018) ........................................................22

*Florin v. Nationsbank of Ga., N.A.*,
  60 F.3d 1245 (7th Cir. 1995) ............................................................................................14, 15

*Florin v. Nationsbank of Ga., N.A. ("Florin I")*,
  34 F.3d 560 (7th Cir. 1994) ............................................................................................. *passim*

*Gaskill v. Gordon*,
  160 F.3d 361 (7th Cir. 1998) ....................................................................................................7

ii

*Glickenhaus & Co. v. Household Int'l, Inc.*,
787 F.3d 408 (7th Cir. 2015) ..................................................................................3

*Great Neck Cap. Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*,
212 F.R.D. 400 (E.D. Wis. 2002) .........................................................................15

*Heder v. City of Two Rivers*,
255 F. Supp. 2d 947 (E.D. Wis. 2003)...................................................................19

*Heekin v. Anthem, Inc.*,
2012 WL 5878032 (S.D. Ind. Nov. 20, 2012) .......................................................9

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006), *aff'd*, 272 F. App'x 9 (2d Cir. 2008) .............16

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
792 F. Supp. 2d 1028 (N.D. Ill. 2011) .......................................................15, 22, 23

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
2015 WL 753946 (N.D. Ill. Feb. 20, 2015) ......................................................7, 8, 9

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
80 F. Supp. 3d 838 (N.D. Ill. 2015) ...............................................................10, 11, 12

*In re Gilat Satellite Networks, Ltd.*,
2007 WL 2743675 (E.D.N.Y. Sept. 18, 2007) .....................................................23

*In re Groupon, Inc. Sec. Litig.*,
2016 WL 3896839 (N.D. Ill. July 13, 2016)...........................................................8

*In re Household Int'l, Inc. ERISA Litig.*,
2004 WL 7329846 (N.D. Ill. Nov. 22, 2004) .......................................................20

*In re ITT Educ. Servs., Inc. Sec. Litig. (Indiana)*,
2016 WL 1162534 (S.D. Ind. Mar. 24, 2016)......................................................22

*In re Marsh & McLennan, Inc. Sec. Litig.*,
2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ......................................................18

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
No. 09 C 7666, slip op. (N.D. Ill. Jan. 22, 2014).................................................9

*In re Schering-Plough Corp. Enhance Sec. Litig.*,
2013 WL 5505744 (D.N.J. Oct. 1, 2013).............................................................12

*In re Synthroid Mktg. Litig.*,
264 F.3d 712 (7th Cir. 2001) ....................................................................... *passim*

iii

*In re Synthroid Mktg. Litig.*,
   325 F.3d 974 (7th Cir. 2003) ..............................................................................8, 17

*In re Xcel Energy, Inc., Sec., Deriv. & "ERISA" Litig.*,
   364 F. Supp. 2d 980 (D. Minn. 2005)......................................................................12

*Kaplan v. Houlihan Smith & Co.*,
   2014 U.S. Dist. LEXIS 83936 (N.D. Ill. June 20, 2014) .........................................21

*Kaufman v. Am. Express Travel Related Servs., Co.*,
   2016 WL 806546 (N.D. Ill. Mar. 2, 2016)..................................................................8

*Kirchoff v. Flynn*,
   786 F.2d 320 (7th Cir. 1986) ......................................................................................8

*Kolinek v. Walgreen Co.*,
   311 F.R.D. 483 (N.D. Ill. 2015)................................................................................19

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
   735 F. Supp. 2d 856 (N.D. Ill. Aug. 13, 2010) ..........................................................2

*McKinnie v. JP Morgan Chase Bank, N.A.*,
   678 F. Supp. 2d 806 (E.D. Wis. 2009).......................................................................7

*Meredith Corp. v. SESAC, LLC*,
   87 F. Supp. 3d 650 (S.D.N.Y. 2015).........................................................................11

*Mills v. Elec. Auto-Lite Co.*,
   396 U.S. 375 (1970)...................................................................................................20

*Missouri v. Jenkins*,
   491 U.S. 274 (1989)...................................................................................................19

*Montgomery v. Aetna Plywood, Inc.*,
   231 F.3d 399 (7th Cir. 2000) ......................................................................................7

*Pension Plan v. Baxter Int'l Inc.*,
   2016 WL 10571629 (N.D. Ill. Jan. 22, 2016) ............................................................8

*Plymouth Cnty. Ret. Ass'n v. Spectrum Brands Holdings, Inc.*,
   Case No. 2019-CV-000982, slip op. (Dane County Cir. Ct. Aug. 20, 2020) ............9

*Roth v. AON Corp.*,
   No. 04-C-6835, slip op. (N.D. Ill. Nov. 18, 2009)......................................................9

*Shah v. Zimmer Biomet Holdings, Inc.*,
   2020 WL 5627171 (N.D. Ill. Sept. 18, 2020) ............................................................8

iv

*Silverman v. Motorola, Inc.*,
    2012 WL 1597388 (N.D. Ill. May 7, 2012) ...............................................................11, 18, 19

*Silverman v. Motorola Sols., Inc.*,
    739 F.3d 956 (7th Cir. 2013) ...................................................................... *passim*

*Smith v. Vill. of Maywood*,
    17 F.3d 219 (7th Cir. 1994) ....................................................................................19

*Standard Iron Works v. ArcelorMittal*,
    2014 WL 7781572 (N.D. Ill. Oct. 22, 2014)...............................................................9

*Sutton v. Bernard*,
    504 F.3d 688 (7th Cir. 2007) ...................................................................................10

*Taubenfeld v. AON Corp.*,
    415 F.3d 597 (7th Cir. 2005) ...........................................................................8, 10, 15

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*,
    551 U.S. 308 (2007)...................................................................................................6

*Will v. Gen. Dynamics Corp.*,
    2010 WL 4818174 (S.D. Ill. Nov. 22, 2010) ...........................................................19

*Williams v. Rohm & Haas Pension Plan*,
    2010 WL 4723725 (S.D. Ind. Nov. 12, 2010), *aff'd*, 658 F.3d 629 (7th Cir. 2011)................20

*Wong v. Accretive Health, Inc.*,
    2014 WL 7717579 (N.D. Ill. Apr. 30, 2014) ...........................................................20

**STATUTES**

15 U.S.C. § 78u-4(a)(4) ......................................................................................21, 22

Pursuant to Rule 23(h) of the Federal Rules of Civil Procedure, Lead Counsel for the Court-appointed Lead Plaintiffs, the Public School Teachers' Pension and Retirement Fund of Chicago ("CTPF") and the Cambridge Retirement System ("CRS") (collectively, "Lead Plaintiffs") and the Settlement Class, respectfully submits this memorandum in support of its motion, on behalf of Plaintiffs' Counsel,[1] for an award of attorneys' fees and payment of Litigation Expenses in the above-captioned action (the "Action").[2]

## PRELIMINARY STATEMENT

Lead Counsel has achieved an all-cash Settlement of $39 million in this securities class action. This excellent result was obtained in the face of substantial risks, and is the product of Plaintiffs' Counsel's vigorous and skilled efforts on behalf of the Settlement Class. Lead Counsel now seeks an award of attorneys' fees in the amount of 15% of the Settlement Fund, net of Court-approved Litigation Expenses and estimated Notice and Administration Costs. Lead Counsel also seeks $230,413.02 for Litigation Expenses reasonably and necessarily incurred by Plaintiffs' Counsel's in prosecuting and resolving the Action, and reimbursement of $5,398.95 to CTPF and $7,588.40 to CRS for their costs and expenses directly related to their representation of the

---

[1] "Plaintiffs' Counsel" consists of Lead Counsel Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") and Liaison Counsel Stafford Rosenbaum LLP ("Stafford Rosenbaum"). No firms or attorneys other than BLB&G and Stafford Rosenbaum will receive any portion of the attorneys' fees awarded in this Action.

[2] Unless otherwise defined in this memorandum, all capitalized terms have the meanings defined in the Stipulation and Agreement of Settlement, dated August 10, 2020, dkt. 44-1 (the "Stipulation") or in the Declaration of Katherine M. Sinderson in Support of (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses (the "Sinderson Declaration" or "Sinderson Decl."), filed herewith. Citations to "¶ __" in this memorandum refer to paragraphs in the Sinderson Declaration and citations to "Ex. __" refer to exhibits to the Sinderson Declaration.

Settlement Class, as authorized by the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

The Settlement represents an excellent recovery for the Settlement Class under the circumstances. Defendants raised numerous serious arguments on their pending motion to dismiss which, if accepted in all or in part, would have dramatically reduced, or eliminated altogether, the Settlement Class's potential recovery. Even if Lead Plaintiffs had succeeded at the motion-to-dismiss stage, this case likely would have continued for years through fact and expert discovery, summary judgment, trial, and appeals. Lead Plaintiffs and their counsel faced numerous hurdles in proving liability and damages, yet were able to achieve a timely and substantial resolution of the claims asserted in the Action.

A substantial recovery was by no means guaranteed in this Action. Lead Counsel was opposed by highly skilled defense counsel and faced substantial obstacles and risks from the outset of the case, including the heightened pleading requirements of the PSLRA, costly fact and expert discovery required to litigate a complex securities fraud case, and substantial risk of non-payment for their time expended on the Action. These are not insignificant risks. "To be successful, a securities class-action plaintiff must thread the eye of a needle made smaller and smaller over the years by judicial decree and congressional action." *Alaska Elec. Pension Fund v. Flowserve Corp.,* 572 F.3d 221, 235 (5th Cir. 2009) (O'Connor, J., by designation); *see Silverman v. Motorola Sols., Inc.,* 739 F.3d 956, 958 (7th Cir. 2013) (observing that "Defendants prevail outright in many securities suits."). Moreover, the risks attended to prosecuting a securities class action do not end at the pleading stage. Multiple cases have been dismissed at summary judgment. *See, e.g., Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 735 F. Supp. 2d 856, 928 (N.D. Ill. Aug. 13, 2010) (granting in large part defendants' motion for summary judgment). Also, payment is not guaranteed even

2

when a plaintiff is successful in obtaining a verdict at trial. *See, e.g.*, *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) (reversing and remanding jury verdict of $2.46 billion after 13 years of litigation).

As detailed in the accompanying Sinderson Declaration,[3] there were also particular and unique risks facing Lead Plaintiffs' claims in this Action. For example, Defendants put forth credible arguments that Class-Period purchasers of HRG stock—which comprised a significant portion of the proposed class—lacked standing and should be dismissed from the case. Defendants also argued that the alleged misstatements about Spectrum's business were not actionable under the federal securities laws, and that Lead Plaintiffs could not establish the requisite scienter to support a securities fraud claim.

Lead Plaintiffs also faced substantial risk in establishing loss causation and damages. Defendants argued with some force that many of the price declines on Lead Plaintiffs' alleged corrective disclosure dates were not due to the revelation of any fraud. Through these and other arguments, Defendants would have posed challenges to Lead Plaintiffs' ability to recover damages even if Lead Plaintiffs were successful in establishing liability.

To achieve the Settlement, Lead Counsel made significant efforts and litigated aggressively on a fully contingent basis, without any guarantee of payment. As detailed in the accompanying Sinderson Declaration, Lead Counsel spent considerable time investigating the claims; drafting pleadings; briefing in opposition to Defendants' motion to dismiss the Amended Class Action Complaint (the "CAC"); preparing for and engaging in mediation; negotiating the final terms of

---

[3] The Sinderson Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, Lead Plaintiffs respectfully refer the Court to it for a detailed description of, *inter alia*: the claims asserted (¶¶ 20-25); the history of the Action (¶¶ 26-48); the Settlement negotiations (¶¶ 49-56); the risks of continued litigation (¶¶ 63-98); and a summary of the services Plaintiffs' Counsel provided to the Settlement Class (¶¶ 11-15).

the Settlement; seeking preliminary approval of the Settlement; and conducting due diligence discovery to confirm the fairness, reasonableness, and adequacy of the Settlement.

As compensation for Plaintiffs' Counsel's considerable efforts on behalf of the Settlement Class and the risks of nonpayment they faced in bringing and prosecuting the Action on a contingent basis, Lead Counsel seeks attorneys' fees in the amount of 15% of the Settlement Fund net of Court-approved Litigation Expenses and estimated Notice and Administration Costs.[4] The requested fee is reasonable and consistent with the market rate for fees regularly awarded in class action settlements within this Circuit. The requested fee also represents a multiplier of approximately 2.84 on Plaintiffs' Counsel's lodestar, which is well within the range of multipliers typically awarded in class actions with significant contingency risks such as this one. In addition, the expenses for which Lead Counsel seeks payment were reasonable and necessary for the successful prosecution of the Action.

Moreover, the requested fee has the full support of the two Lead Plaintiffs, CTPF and CRS. *See* Declaration of Daniel Hurtado submitted by CTPF, Ex. 2, at ¶ 6-7; Declaration of Francis E. Murphy III submitted by CRS, Ex. 3, at ¶ 6-7. Lead Plaintiffs are sophisticated institutional investors that actively supervised the Action and have endorsed the requested fee as fair and reasonable in light of the result achieved in the Action, the quality of the work counsel performed, and the risks of the litigation. Ex. 2, at ¶¶ 2-7; Ex. 3, at ¶¶ 2-7.

In addition, in accordance with the Preliminary Approval Order, 78,213 copies of the Notice have been mailed to potential Settlement Class Members and their nominees through December 21, 2020, and the Summary Notice was published in *Investor's Business Daily* and

---

[4] The Court-approved Claims Administrator, JND, estimates that Notice and Administration Costs will be approximately $400,000. *See* Declaration of Luiggy Segura submitted by JND, Ex. 4, at ¶ 12.

4

transmitted over the *PR Newswire*. *See* Ex. 4, at ¶¶ 2-8. The Notice advised potential Class Members that Lead Counsel would apply for an award of attorney's fees in an amount not to exceed 16% of the Settlement Fund and for payment of Litigation Expenses (including the reasonable costs and expenses of Lead Plaintiffs) in an amount not to exceed $400,000. *See Id.*, Ex. A at ¶¶ 5, 75. The fees and expenses sought by Lead Counsel are within the amounts set forth in the Notice. While the deadline set by the Court for Class Members to object to the requested attorneys' fees and expenses has not yet passed, to date, no objections to the requests for fees and expenses have been received. ¶¶ 131-32.[5]

In light of the excellent recovery obtained, the time and effort devoted by Plaintiffs' Counsel to the Action, the skill and expertise required, the quality of the work performed, the wholly contingent nature of the representation, and the considerable risks that counsel undertook, Lead Counsel respectfully submits that the requested fee award is reasonable and should be approved by the Court. In addition, the costs and expenses incurred by Plaintiffs' Counsel and Lead Plaintiffs are reasonable in amount and were necessarily incurred in the successful prosecution of the Action, and they too should be approved.

**ARGUMENT**

**I.    LEAD COUNSEL'S FEE APPLICATION SHOULD BE APPROVED**

### A.  Counsel Are Entitled to Attorneys' Fees from the Common Fund

The Supreme Court has long recognized that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). The Seventh

---

[5] The deadline for the submission of objections is January 8, 2021. Should any objections be received, Lead Counsel will address them in its reply papers, which Lead Counsel will file with the Court on or before January 15, 2021.

5

Circuit has similarly held that "[w]hen a case results in the creation of a common fund for the benefit of the plaintiff class, the common fund doctrine allows plaintiffs' attorneys to petition the court to recover its fees out of the fund." *Florin v. Nationsbank of Ga., N.A. ("Florin I")*, 34 F.3d 560, 563 (7th Cir. 1994).

Courts routinely recognize that awarding attorneys' fees from a common fund attracts skilled counsel to represent those who seek redress for damages inflicted on classes of persons. *See, e.g., In re Synthroid Mktg. Litig.,* 264 F.3d 712, 720 ("*Synthroid I*") (7th Cir. 2001) ("[A]wards net of fees could rise with the level of fees if a higher payment attracts the best counsel."); *Silverman v. Motorola Sols., Inc.* ("*Motorola I*"), 739 F.3d 956, 958 (7th Cir. 2013) ("The greater the risk of walking away empty–handed, the higher the award must be to attract competent and energetic counsel."). Indeed, compensating plaintiffs' counsel for the risks they take in bringing federal securities actions is essential because private securities actions, such as this one, are "an indispensable tool with which defrauded investors can recover their losses—a matter crucial to the integrity of domestic capital markets." *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 320 n.4 (2007) (private actions are "an essential supplement to criminal prosecutions and civil enforcement actions" brought by the SEC). *Id.* at 313. Accordingly, common fund fee awards encourage and support meritorious class actions and thereby promote compliance with the federal securities laws.

Here, Plaintiffs' Counsel are entitled to an award of attorneys' fees from the common fund for their efforts on behalf of the Settlement Class.

## B. The Market Price is Measured as a Percentage of the Fund

Lead Counsel respectfully submits that the Court should award a fee based on a percentage of the common fund obtained. The Seventh Circuit has "held repeatedly that, when deciding on appropriate fee levels in common–fund cases, courts must do their best to award counsel the market

6

price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Synthroid I*, 264 F.3d at 718. In common fund cases, "the measure of what is reasonable is what an attorney would receive from a paying client in a similar case." *Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 408 (7th Cir. 2000).

Accordingly, the Seventh Circuit has strongly endorsed the percentage method, pursuant to which fees are awarded as a percentage of the common fund, because it most closely approximates the manner in which attorneys are compensated in the marketplace for contingent work. *See Gaskill v. Gordon*, 160 F.3d 361, 362 (7th Cir. 1998) ("When a class suit produces a fund for the class, it is commonplace to award the lawyers for the class a percentage of the fund . . . in recognition of the fact that most suits for damages in this country are handled on the plaintiff's side on a contingent–fee basis") (citation omitted); *see also Beesley v. Int'l Paper Co.*, 2014 WL 375432, at *2 (S.D. Ill. Jan. 31, 2014) ("When determining a reasonable fee, the Court of Appeals for the Seventh Circuit uses the percentage basis rather than a lodestar or other basis.") (citation omitted); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2015 WL 753946, at *3 (N.D. Ill. Feb. 20, 2015) (finding that the percentage method has "emerged as the favored method for calculating fees in common-fund cases in this district"); *McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 816 (E.D. Wis. 2009) ("'percentage of the fee' method is preferable because it more closely replicates the contingency fee market rate for counsel's legal services.").[6] In doing so, the Seventh Circuit has recognized "that there are advantages to utilizing the percentage method in common fund cases because of its relative simplicity of administration." *Florin I*, 34 F.3d at 566; *see also In re Synthroid Mktg. Litig.*, 325 F.3d 974, 979-80 (7th Cir. 2003)

---

[6] The Supreme Court has also indicated a preference for the percentage of the fund method, stating that in common fund cases "a reasonable fee is based on a percentage of the fund bestowed on the class." *See Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984).

7

("*Synthroid II*") (noting that the lodestar method may create a conflict of interest between the attorney and client); *Kaufman v. Am. Express Travel Related Servs., Co.*, 2016 WL 806546, at \*13 n.19 (N.D. Ill. Mar. 2, 2016) ("[T]he use of a lodestar cross-check in a common fund case is unnecessary, arbitrary, and potentially counterproductive.").

Accordingly, Lead Counsel respectfully submits that the Court should award a fee based on a percentage of the common fund obtained.

### C.  The 15% Attorneys' Fee Request is Reasonable and Appropriate

#### 1)  The Requested Fee Is Consistent With Applicable Precedent

In order to calculate the market rate for counsel's services, a district court must "ascertain the appropriate rate for cases of similar difficulty and risk, and of similarly limited potential recovery." *Kirchoff v. Flynn,* 786 F.2d 320, 326 (7th Cir. 1986); *see also Synthroid I,* 264 F.3d at 718 (courts look to the going market rate for legal services in similar cases as a barometer for assessing the reasonableness of a fee award in common–fund cases); *Taubenfeld v. AON Corp.*, 415 F.3d 597, 600 (7th Cir. 2005) ("[A]ttorneys' fees from analogous class action settlements are indicative of a rational relationship between the record . . . and the fees awarded by the district court.").

The 15% fee requested here is plainly consistent with—if not well below—fee awards that courts in the Seventh Circuit have made in similar cases with comparable recoveries. *See*, *e.g.*, *Shah v. Zimmer Biomet Holdings, Inc.*, 2020 WL 5627171, at \*13 (N.D. Ill. Sept. 18, 2020) (awarding 30% of \$50 million settlement fund); *In re Groupon, Inc. Sec. Litig.*, 2016 WL 3896839, at \*4 (N.D. Ill. July 13, 2016) (awarding 30% of \$45 million settlement fund); *City of Lakeland Emps.' Pension Plan v. Baxter Int'l Inc.*, 2016 WL 10571629, at \*1 (N.D. Ill. Jan. 22, 2016) (awarding 26% of \$42.5 million settlement fund); *Dairy Farmers*, 2015 WL 753946, at \*16 (awarding 33% of \$46 million common fund); *City of Sterling Heights Gen. Emps. Ret. Sys. v.*

*Hospira*, No. 11-cv-08332-AJS, slip. op. at 1-2 (N.D. Ill. Aug. 5, 2014), dkt. 207 (awarding 30% of $60 million settlement fund) (Ex. 7); *Beesley*, 2014 WL 375432, at *1, *4 (awarding one-third of $30 million class recovery); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, No. 09 C 7666, slip op. at 2 (N.D. Ill. Jan. 22, 2014), dkt. 693 (awarding 33 1/3% of $64 million settlement fund) (Ex. 8); *Roth v. AON Corp.*, No. 04-C-6835, slip op. at 1 (N.D. Ill. Nov. 18, 2009), dkt. 220 (awarding 31% of $30 million settlement fund) (Ex. 9); *Cent. Laborers' Pension Fund v. SIRVA, Inc.*, 2007 U.S. Dist. LEXIS 105097, at *18-19 (N.D. Ill. Oct. 31, 2007) (awarding 29.85% of $53.3 million settlement).[7]

The 15% fee request is also in line with nationwide fee awards. Using data from securities class actions from 2010–2019, a recent study found that for settlements between $25 million and $100 million—the range of recovery where this Settlement falls—the median fee award was 27% of the settlement value. *See* Janeen McIntosh, *et al.*, *Recent Trends in Securities Class Action Litigation: 2019 Full-Year Review*, NERA Economic Consulting (2020).

As illustrated above, the 15% fee request is consistent with the market rate for counsel's services in this type of matter.

---

[7] Indeed, courts within the Seventh Circuit have awarded percentage fees that are significantly higher than the amount requested here in cases with much larger settlements. *See, e.g.*, *Motorola I*, 739 F.3d at 959 (holding that fee award of 27.5% of a $200 million settlement was not excessive); *Standard Iron Works v. ArcelorMittal*, 2014 WL 7781572, at *1, *3 (N.D. Ill. Oct. 22, 2014) (awarding 33% of $163.9 million total common fund, finding the amount "a fair and reasonable attorneys' fee"); *City of Greenville v. Syngenta Crop Protection, Inc.*, 904 F. Supp. 2d 902, 908-09 (S.D. Ill. 2012) (awarding one-third of $105 million common fund); *Heekin v. Anthem, Inc.*, 2012 WL 5878032, at *1 (S.D. Ind. Nov. 20, 2012) (awarding 33.3% of $90 million common fund). Also, the 15% fee request is well below the 30% fee awarded by the Dane County Circuit Court to class counsel in *Plymouth Cnty. Ret. Ass'n v. Spectrum Brands Holdings, Inc., et al.*, Case No. 2019-CV-000982, which asserted violations of the Securities Act of 1933 arising out of the July 2018 Merger between Spectrum and HRG Group. *See Plymouth Cnty. Ret. Ass'n v. Spectrum Brands Holdings, Inc., et al.*, Case No. 2019-CV-000982, slip op. at 2 (Dane County Cir. Ct. Aug. 20, 2020), dkt. 143 (Ex. 10).

### 2) Other Factors Commonly Considered in the Seventh Circuit Also Support the Requested Fee Award

In addition to looking at comparable cases for the market rate, Courts in this Circuit have also found "the market rate for legal fees depends in part on (1) the risk of nonpayment a firm agrees to bear, in part on (2) the quality of its performance, in part on (3) the amount of work necessary to resolve the litigation, and in part on (4) the stakes of the case." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.,* 80 F. Supp. 3d 838, 844 (N.D. Ill. 2015) ("*Dairy Farmers II*") (citing *Synthroid I,* 264 F.3d at 721); *see also Taubenfeld,* 415 F.3d at 599. The reaction of the class to the requested fees is also relevant. *See Beesley,* 2014 WL 375432, at *1 (only one objection to counsel's fee request after mailing notices was "an unmistakable sign of the Class's overwhelming support for Class Counsel's Application."). As detailed below, each of these factors supports Lead Counsel's fee request.

### a. The Market Rewards Risk, and this Action Was Inherently Risky to Litigate

As noted by the Seventh Circuit in *Synthroid I*, "the market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear." *Synthroid I*, 264 F.3d at 721; *see also Motorola I*, 739 F.3d at 958 ("The greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel."); *Sutton v. Bernard*, 504 F.3d 688, 694 (7th Cir. 2007)(reversing district court's fee award and stating "[b]ecause the district court failed to provide for the risk of loss, the possibility exists that Counsel, whose only source of a fee was a contingent one, was undercompensated"). Thus, "[w]hen determining the reasonableness of a fee request, courts put a fair amount of emphasis on the severity of the risk (read: financial risk) that class counsel assumed in undertaking the lawsuit." *Dairy Farmers II*, 80 F. Supp. 3d at 847-48. "[T]his consideration incentivizes attorneys to accept and (wholeheartedly) prosecute the seemingly too-big-to-litigate wrongs hidden within the esoteric recesses of the law, ensuring that

10

the attorneys are compensated for their work at the end of the day." *Id.* at 848; *see also Florin I*, 34 F.3d at 565 (directing district court to determine fair attorneys' fees in class action by considering the probability of success at the outset of litigation).

Here, Plaintiffs' Counsel undertook the Action on a fully contingent basis, assuming the significant risk that the litigation would yield no recovery and leave them uncompensated. ¶¶ 125-30. Unlike Defendants' Counsel, who are paid on an ongoing basis and whether they win or lose, Plaintiffs' Counsel have thus far received no compensation for their considerable efforts on behalf of the Settlement Class, and any award of fees or expenses to counsel has always been entirely dependent on their success in obtaining a common fund for the Class. *Id*.

Putting aside the many obstacles to recovery associated with the prosecution of a complex securities fraud class action—including, but not limited to, the PSLRA's heightened pleading standard and automatic stay of discovery (15 U.S.C. §§ 77z-1(b)(1) and 78u-4(b)(3)(B))—this case lacked any of the obvious badges of fraud that often provide significant tailwinds for plaintiffs' overall case. For example, there was no parallel SEC or criminal action that Lead Plaintiffs could use to support their case or guide its investigatory or discovery efforts. To the contrary, "Plaintiffs' counsel (and their teams and experts) were truly the authors of the favorable outcome for the class." *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 670 (S.D.N.Y. 2015); *see also Silverman v. Motorola, Inc.,* 2012 WL 1597388, at *3 (N.D. Ill. May 7, 2012) ("*Motorola II*") (fee request supported by fact that "there were no governmental investigations or prosecutions related to the alleged fraud upon which Class Counsel could rest their theory of the case. Rather, they investigated the facts and developed their theory of liability from scratch, involving significant time and expense."); *Dairy Farmers II*, 80 F. Supp. 3d at 848 ("One proxy for assessing risk is whether the litigation followed on the heels of some prior criminal or civil proceeding involving

11

the same parties or subject matter…This inquiry provides insight into whether class counsel benefitted from the work of others, which acts a red flag for judges assessing fee petitions.").

This was also not a case where the corporate defendant restated its financial statements, thereby admitting a material misstatement of its financial reporting. Restatement cases are often associated with diminished risk because the misstatement and materiality elements of a securities fraud claim are already established. *See In re Schering-Plough Corp. Enhance Sec. Litig.*, 2013 WL 5505744 at *30 (D.N.J. Oct. 1, 2013) (granting fee request where the case was the antithesis of cases where liability is virtually certain due to a financial restatement); *In re Xcel Energy, Inc., Sec., Deriv. & "ERISA" Litig.*, 364 F. Supp. 2d 980, 995 (D. Minn. 2005) (noting that one of the many hurdles plaintiffs faced was the fact that the case did not involve a restatement of financials).

The record further shows that the motion filed by CTPF and CRS for appointment as lead plaintiffs in the Action under the PSLRA was unopposed. ¶ 27. This "[l]ack of competition not only implies a higher fee, but also suggests that most members of the securities bar saw this litigation as too risky for their practices." *Motorola I*, 739 F.3d at 958.

Moreover, as detailed in the Sinderson Declaration and the accompanying Settlement Memorandum, this Action involved unique litigation risks that made any recovery for the Class far from certain. At the time the Parties reached their agreement in principle to settle the Action, the Court had not yet ruled on Defendants' motion to dismiss the CAC. ¶ 7. While Lead Plaintiffs and Lead Counsel believe that the motion would be denied, they also understood that Defendants raised numerous credible arguments regarding liability, loss causation, and damages. These arguments created a significant risk that, after years of protracted litigation, Lead Plaintiffs and the Settlement Class would achieve no recovery at all, or a far smaller recovery than the Settlement Amount. ¶ 98.

As discussed in greater detail in the Sinderson Declaration, the core allegation in this case was that Defendants violated the federal securities laws by making materially false and misleading statements about the success of two major supply-chain consolidation projects in Spectrum's Global Auto Care ("GAC") and Hardware and Home Improvement ("HHI") divisions. ¶¶ 20-25. Lead Plaintiffs alleged that the prices of Spectrum, Old Spectrum, and HRG common stock were artificially inflated during the Class Period as a result of the allegedly false and misleading statements and declined when the truth was revealed. ¶ 25.

In their motion to dismiss the CAC, Defendants argued that purchasers of HRG stock did not have standing to bring a claim against Spectrum because Spectrum's alleged false and misleading statements did not directly implicate HRG stock. ¶¶ 70-74. While Lead Plaintiffs contend that claims were properly asserted on behalf of HRG shareholders, Defendants put forth credible arguments that might have convinced the Court that these Class Members lacked standing. *Id*. If the Court were to rule in favor of Defendants on the issue of HRG shareholders' standing, purchasers of HRG stock—which represent a large section of the proposed Class—would be dismissed from the case or excluded from the potentially certified class, which would have substantially reduced the potential recovery in the Action. ¶ 74.

Lead Plaintiffs faced significant risks that it would not be able to establish that Defendants' statements about the progress of the GAC and HHI consolidations were actionable under the federal securities laws. ¶¶ 64-69. For example, Defendants would have continued to argue that their statements about the progress of its consolidation efforts, including the "transitory" nature of the consolidation issues affecting the Company, were not false. ¶ 77. Defendants made credible arguments that the consolidations were progressing adequately during much of the Class Period. Similarly, Defendants made credible arguments that the issues facing the consolidations were in

13

fact transitory, because the issues were significantly resolved by the end of the Class Period. *Id*. These arguments, if found persuasive by the Court or later by the jury, would have made certain of Defendants' statements regarding the consolidations true and inactionable.

Third, Lead Plaintiffs would have faced challenges in proving that Defendants made the alleged false statements with scienter, or that they possessed the intent to deceive or were reckless. ¶¶ 82-86. For example, Defendants would have continued to argue that the Company was making adequate progress in consolidating its distribution networks, and that Defendants were only made aware of any deeper issues later in the Class Period—directly before Defendants informed the market of these issues. ¶ 83. Under those circumstances, Defendants have argued, Lead Plaintiffs could not establish the requisite scienter to support a securities fraud claim. ¶ 85.

Even if Lead Plaintiffs overcame the above liability risks and successfully established falsity, materiality, and scienter, they faced significant hurdles in establishing "loss causation"— that the alleged misstatements were the cause of investors' losses—and in proving damages. ¶¶ 89-93. Defendants put forth strong arguments that the price declines on the alleged corrective disclosure dates were not solely due to the revelation of the alleged misstatements or omissions, but rather reflect investors' reaction to poor Company-wide financial performance, predicated on a number of factors wholly unrelated to the financial impact caused by issues related to the consolidations. ¶ 90. If Defendants prevailed on their loss-causation and damages arguments, recoverable damages would be eliminated or significantly reduced. ¶ 93.

In light of these uncertainties regarding the outcome of the case, it is clear that Plaintiffs' Counsel were never "assured of a paycheck." *See Florin v. Nationsbank of Ga., N.A.,* 60 F.3d 1245, 1247 (7th Cir. 1995) ("*Florin II*"). Unlike Defendants' counsel, who are paid on an ongoing basis and whether they win or lose, Plaintiffs' Counsel have thus far received no compensation for

14

their considerable efforts on behalf of the Settlement Class, and any award of fees or expenses to counsel has always been entirely dependent on their success in obtaining a common fund for the Class. ¶ 126.

In sum, the only certainties regarding the prosecution of the claims in the Action were that Defendants would continue to vigorously contest each element of those claims at trial and on appeal, and there was a significant risk of non-recovery. The significant litigation risk here supports the reasonableness of the requested fee. *See In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1032 (N.D. Ill. 2011); *Great Neck Cap. Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*, 212 F.R.D. 400, 411 (E.D. Wis. 2002).

**b.      Plaintiffs' Counsel Provided Quality Legal Services that Produced an Excellent Result for the Settlement Class**

In evaluating a fee request, the Seventh Circuit has held that the trial court may consider the "quality of legal services rendered" by plaintiffs' counsel. *Taubenfeld*, 415 F.3d at 600; *Synthroid I*, 264 F.3d at 721. From the inception of the Action, Lead Counsel engaged in a skillful and concerted effort to obtain the maximum recovery for the Settlement Class. This case required an in-depth investigation, a thorough understanding of complicated issues, and the skill to respond to a host of legal and factual issues raised by Defendants during the litigation. *See* ¶ 11. Lead Counsel practices extensively in the highly challenging field of complex class action litigation and has skillfully litigated these types of actions in courts across the country. *See* ¶ 122 and Ex. 3 to Ex. 5A. Here, the Settlement provides an excellent result for the Settlement Class particularly in light of the risks of continued litigation. Lead Counsel respectfully submits that the quality of its diligent efforts in the litigation to date, together with its substantial experience in complex class actions and its commitment to the litigation, provided it with the leverage necessary to negotiate the Settlement.

15

The quality of opposing counsel is also an important factor in evaluating the work performed by Plaintiffs' Counsel. *Arenson v. Bd. of Trade of Chi.*, 372 F. Supp. 1349, 1354 (N.D. Ill. 1974); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006) ("The fact that the settlements were obtained from defendants represented by 'formidable opposing counsel from some of the best defense firms in the country' also evidences the high quality of lead counsels' work"), *aff'd*, 272 F. App'x 9 (2d Cir. 2008). Plaintiffs' Counsel were opposed in this case by the nationally known and highly capable law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, who have spared no effort in their zealous defense of the Action. ¶ 124. Notwithstanding this formidable opposition, Lead Counsel presented a strong case and demonstrated its willingness to continue to vigorously prosecute the claims asserted in the Action. The ability of Lead Counsel to obtain a favorable result for the Settlement Class while litigating against this renowned defense firm further evidences the quality of Lead Counsel's work and weighs in favor of the Court granting the attorneys' fees sought here. *Id*.

### c.       Plaintiffs' Counsel Worked Extensively to Obtain a Recovery on Behalf of the Settlement Class

Plaintiffs' Counsel spent a substantial amount of time and effort successfully representing the Settlement Class in this Action. Among other things, Plaintiffs' Counsel (i) conducted a comprehensive investigation of the alleged fraud, which included a thorough review of the voluminous public record and interviews with dozens of witnesses with knowledge of the alleged wrongdoing; (ii) researched, drafted, and filed the CAC; (iii) conducted extensive research and briefed in opposition to Defendants' motion to dismiss the CAC; (iv) consulted with an expert regarding loss-causation and damages issues; (v) conducted extensive, arm's length settlement negotiations, which included a formal, all-day mediation session overseen by an experienced mediator, Jed Melnick, Esq. of JAMS ADR, followed by additional negotiations under the

16

supervision and guidance of the mediator that culminated in the Parties' agreement to settle the Action for $39 million in cash; (vi) drafted and negotiated the final terms of the Settlement set forth in the Stipulation; and (vii) moved for preliminary approval of the Settlement . ¶¶ 32-56; 61-62. Following the agreement-in-principle and prior to the execution of the Stipulation, Lead Counsel also conducted due diligence discovery to confirm the fairness, reasonableness, and adequacy of the Settlement, which involved Lead Counsel's careful review of over a thousand pages of internal Company reporting produced by Defendants, including board and financial materials. ¶¶ 57-60. Such efficiency in litigating the Action further supports the fee percentage requested by Lead Counsel. *See Synthroid II*, 325 F.3d at 979–80 ("The client cares about the outcome alone" and class counsel's efficiency should not be used "to reduce class counsel's percentage of the fund that their work produced.")

### d.    The Stakes of the Action Were High

This Action was high stakes, complex litigation alleging significant monetary damages. As detailed in the Sinderson Declaration, maximum recoverable damages, after giving effect to certain of Defendants' strongest arguments concerning the makeup of the class and damages—namely, the challenge to including HRG shareholders and the disaggregation of damages—would be approximately $320 million. ¶¶ 93. Defendants had additional credible and substantial arguments concerning loss causation and damages—which Lead Counsel believed to be a significant risk, which could have reduced maximum recoverable damages to approximately $6.2 million. *Id*. However, under any scenario, the Parties disputed a significant portion of potential damages, which posed a material risk to the Class.

Moreover, this Action involves thousands of Class Members who were allegedly defrauded by Defendants. For most Class Members, the costs to successfully prosecute an individual action are so high that a class action is realistically the only way that they would receive any relief. The

17

large number of Class Members who will be receiving compensation in this case confirms the high stakes of this litigation.

### e.    The Approval of Lead Plaintiffs and the Reaction of the Settlement Class to Date Support the Requested Fee

Lead Plaintiffs, which were actively involved in the prosecution and settlement of the Action and have actively supervised the work of counsel, have approved the requested fee. *See* Ex. 2, at ¶¶ 3-7; Ex. 3, at ¶¶ 3-7. This endorsement of the fee by Lead Plaintiffs as fair and reasonable supports approval of the fee. *See In re Marsh & McLennan, Inc. Sec. Litig.*, 2009 WL 5178546, at *16 (S.D.N.Y. Dec. 23, 2009) ("public policy considerations support fee awards where, as here, large public pension funds, serving as lead plaintiffs, conscientiously supervised the work of lead counsel, and gave their endorsement to lead counsel's fee request").

The reaction of the Settlement Class to date also supports the requested fee. Pursuant to the Preliminary Approval Order, through December 21, 2020, the Claims Administrator, JND, disseminated 78,213 copies of the Notice to potential Class Members and nominees, informing them, among other things, that Lead Counsel intended to apply to the Court for an award of attorneys' fees in an amount not to exceed 16% of the Settlement Fund and up to $400,000 in expenses. *See* Ex. A to Ex. 4, at ¶¶ 5, 75. While the time to object to the fee and expense application does not expire until January 8, 2021, to date, no objections have been received. ¶ 104. Should any objections be received, Lead Counsel will address them in its reply papers.

### 3)    The Requested Fee Is Also Reasonable Using the Lodestar Method

Unlike certain other jurisdictions, the Seventh Circuit does not use a lodestar calculation as a secondary measure of reasonableness when the percentage–of–the–recovery approach is employed. *See, e.g., Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011) ("consideration of a lodestar check is not an issue of required methodology"); *Motorola II*, 2012

WL 1597388, at *4 (stating it was unnecessary to do a lodestar calculation); *Kolinek v. Walgreen Co.*, 311 FRD 483, 500 (N.D. Ill. 2015) ("no Seventh Circuit case law suggests that a percentage–of–the–fund approach will yield a reasonable result only where it satisfies a lodestar cross–check"); *Will v. Gen. Dynamics Corp.*, 2010 WL 4818174, at *3 (S.D. Ill. Nov. 22, 2010) ("The use of a lodestar cross–check in a common fund case is unnecessary, arbitrary, and potentially counterproductive."). Nonetheless, Lead Counsel's requested attorneys' fees are reasonable under the lodestar method.

The lodestar method is calculated by multiplying a reasonable hourly rate by the number of hours counsel reasonably expended, and then applying a multiplier. *See Florin I*, 34 F.3d at 565 ("a risk multiplier is not merely available in a common fund case but mandated, if the court finds that counsel had no sure source of compensation for their services.") (citation and internal quotations omitted). Here, Plaintiffs' Counsel spent 3,714.45 hours of attorney and other professional time prosecuting the Action for the benefit of the Settlement Class through December 18, 2020. ¶ 120. Plaintiffs' Counsel's lodestar, derived by multiplying the hours spent on the litigation by each attorney or other professional by his or her current hourly rate,[8] is $2,026,241.25. *Id*. Accordingly, the requested fee of 15% of the Settlement Fund, net of the requested Litigation Expenses and estimated Notice and Administration Costs, which equates to approximately $5.754

---

[8] The Supreme Court and courts in this Circuit have approved the use of current hourly rates to calculate the base lodestar figure as a means of compensating for the delay in receiving payment, inflationary losses, and the loss of interest. *See Missouri v. Jenkins*, 491 U.S. 274, 284 (1989); *Smith v. Vill. of Maywood*, 17 F.3d 219, 221 (7th Cir. 1994) ("A court may elect to use . . . current rates . . . as acceptable compensation for the delay in payment of fees."); *Heder v. City of Two Rivers*, 255 F. Supp. 2d 947, 958 (E.D. Wis. 2003) ("awarding fees at the current rate . . . is an accepted method").

million (before interest), represents a multiplier of approximately 2.84 on Plaintiffs' Counsel's lodestar.[9] *Id*.

The requested 2.84 multiplier is well within the range of multipliers commonly awarded in securities class actions and other comparable litigation. *See, e.g., Wong v. Accretive Health, Inc.*, 2014 WL 7717579, at *1 (N.D. Ill. Apr. 30, 2014) (awarding multiplier of approximately 4.7); *Williams v. Rohm & Haas Pension Plan*, 2010 WL 4723725 (S.D. Ind. Nov. 12, 2010), *aff'd*, 658 F.3d 629 (7th Cir. 2011) (awarding $43.5 million fee on lodestar of $7.43 million, for multiplier of 5.85); *In re Household Int'l, Inc. ERISA Litig.*, 2004 WL 7329846, at *1 (N.D. Ill. Nov. 22, 2004) (awarding multiplier of approximately 4.65).

In sum, whether calculated as a percentage of the common fund or under the lodestar method, the requested fee award is reasonable and within the range of fees awarded by courts in other securities class actions.

## II.    THE REQUEST FOR PAYMENT OF LITIGATION EXPENSES SHOULD BE APPROVED

In addition to attorneys' fees, Lead Counsel also seeks payment of Litigation Expenses incurred by Plaintiffs' Counsel through December 18, 2020. ¶ 120. It is well-settled that attorneys who have created a common fund for the benefit of a class are entitled to payment for their expenses incurred in creating the fund. *See, e.g.*, *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 389-90 (1970); *Dalton v. Jones, Bird & Howell*, 1993 U.S. App. LEXIS 11377, at *4 (7th Cir. May 13, 1993) ("Attorneys in a class action in which a common fund is created are entitled to compensation for their services and reimbursement of their out-of-pocket expenses."). As set forth in detail in

---

[9] The actual realized multiplier will decline over time, as Lead Counsel will devote additional attorney time to drafting the reply brief, preparing for the Settlement Fairness Hearing, overseeing the processing of claims by the Claims Administrator, and overseeing the distribution of the Settlement proceeds to Class Members with valid claims.

the Sinderson Declaration, Plaintiffs' Counsel collectively incurred $230,413.02 in Litigation Expenses in connection with the institution, prosecution, and settlement of the Action. ¶¶ 133-43.

Plaintiffs' Counsel's Litigation Expenses include, among others, charges for online research, expert fees, mediation fees, court fees, and copying costs. *Id*. All of these expenses are reasonable, necessary, and directly related to the prosecution of the Action, and are of the sort that would typically be charged to paying clients in the marketplace. *See Abbott v. Lockheed Martin Corp.*, 2015 WL 4398475, at \*4 (S.D. Ill. July 17, 2015) ("It is well established that counsel who create a common fund like this one are entitled to the reimbursement of litigation costs and expenses, which includes such things as expert witness costs; computerized research; court reporters; travel expense; copy, phone and facsimile expenses and mediation.").[10] These expense items were charged separately by Plaintiffs' Counsel, and such charges were not duplicated in the firms' hourly rates. Payment of these expenses from the Settlement Fund is fair and reasonable.

In connection with its request for Litigation Expenses, Lead Counsel also seeks total reimbursement of $12,987.35 in costs and expenses incurred by Lead Plaintiffs directly related to their representation of the Settlement Class. The PSLRA specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the

---

[10] *See Synthroid I*, 264 F.3d at 722 (explaining the appropriateness of considering what the private market would bear in determining the reasonableness of litigation expenses); *Kaplan v. Houlihan Smith & Co.*, 2014 U.S. Dist. LEXIS 83936, at \*12-13 (N.D. Ill. June 20, 2014) (awarding expenses in class action including copying costs, *pro hac vice* admission fees, overnight shipping fees, travel and meal expenses, and mediation fees); *see also Beane v. Bank of N.Y. Mellon*, 2009 U.S. Dist. LEXIS 27504, at \*25-26 (S.D.N.Y. Mar. 31, 2009) (awarding as "properly chargeable to the Settlement Fund," because they "are the type for which 'the paying, arms' length market' reimburses attorneys," reimbursement for court fees, photocopying and reproduction, deposition transcripts, postage and messenger services, transportation and lodging, telephone bills, and expert and electronic litigation database support).

class" may be made to "any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4).

Here, Lead Plaintiffs both took active roles in the litigation and have been fully committed to pursuing the Class's claims since they became involved in the litigation. *See* Ex. 2, at ¶¶ 3-4; Ex. 3, at ¶¶ 3-4. These efforts, which included communicating regularly with Lead Counsel regarding case strategy and developments, reviewing pleadings and briefs, attending the mediation, consulting with Lead Counsel regarding settlement negotiations, and evaluating and approving the Settlement, required employees of the Lead Plaintiffs to dedicate time they otherwise would have devoted to their regular duties. *See* Ex. 2, at ¶ 9; Ex. 3, at ¶ 9. The requested reimbursement amounts are based on the number of hours that Lead Plaintiffs' employees committed to these activities multiplied by a reasonable hourly rate for each employee. Ex. 2, at ¶ 9; Ex. 3, at ¶ 9. In addition, both CTPF and CRS request reimbursement of the fees incurred by their outside counsel who provided advice in connection with their role as a Lead Plaintiff in the Action. Ex. 2, at ¶ 10; Ex. 3, at ¶ 10.

The reimbursement amounts requested, $5,398.95 for CTPF and $7,588.40 for CRS, are reasonable and justified under the PSLRA and Courts have routinely granted similar awards to plaintiffs for reimbursement of expenses in similar cases. *See, e.g.*, *Duncan v. Joy Global Inc., et al.*, No. 16-cv-1229-pp, slip op. at 2 (E.D. Wis. Dec. 27, 2018), dkt. 79 (awarding two lead plaintiffs amounts ranging from $2,400 to $23,000 for reimbursement of reasonable costs and expenses, including lost wages) (Ex. 11); *In re ITT Educ. Servs., Inc. Sec. Litig. (Indiana)*, 2016 WL 1162534, at *5 (S.D. Ind. Mar. 24, 2016) (awarding institutional lead plaintiff $10,000 for reasonable costs and expenses directly related to its representation of the settlement Class, including for lost wages); *AT&T Mobility*, 792 F. Supp. 2d at 1041 (approving $5,000 for each

22

class representative, despite the lack of any formal discovery, for "their role in reviewing, considering, and approving the Settlement Agreement and fee application, and especially their willingness to take a more-active role if necessary"); *In re Gilat Satellite Networks, Ltd.*, 2007 WL 2743675, at *19 (E.D.N.Y. Sept. 18, 2007) (granting PSLRA awards where, as here, "the tasks undertaken by employees of lead plaintiffs reduced the amount of time those employees would have spent on other work and these tasks and rates appear reasonable to the furtherance of the litigation").

The Notice informed potential Class Members that Lead Counsel would apply for payment of Litigation Expenses in an amount not to exceed $400,000, which may include the reasonable costs and expenses of Lead Plaintiffs directly related to their representation of the Settlement Class. *See* Ex. A to Ex. 4, at ¶¶ 5, 75. The total amount of expenses requested by Lead Counsel is $243,400.37, which includes $230,413.02 in Litigation Expenses incurred by Plaintiffs' Counsel, $5,398.95 in costs incurred by CTPF, and $7,588.40 in costs incurred by CRS, and is well below the amount listed in the Notice. To date, there has been no objection to the request for expenses.

## CONCLUSION

Lead Counsel respectfully requests that the Court: (i) award attorneys' fees in the amount of 15% of the Settlement Fund, net of Court-approved Litigation Expenses and estimated Notice and Administration Costs; (ii) award $230,413.02 for the reasonable Litigation Expenses that Plaintiffs' Counsel incurred in connection with the prosecution and resolution of the Action; and (iii) award $5,398.95 to CTPF and $7,588.40 to CRS as reimbursement for their costs and expenses directly related to their representation of the Settlement Class.

23

Dated:  December 24, 2020                    Respectfully submitted,

*/s/ Katherine M. Sinderson*
**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
Katherine M. Sinderson, admitted *pro hac vice*
Jai Chandrasekhar, admitted *pro hac vice*
Matthew Traylor, admitted *pro hac vice*
1251 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 554-1400
Facsimile:  (212) 554-1444
KatieM@blbglaw.com
Jai@blbglaw.com
Matthew.Traylor@blbglaw.com

-and-

Avi Josefson
875 North Michigan Avenue, Suite 3100
Chicago, Illinois 60611
Telephone: (312) 373-3880
Facsimile: (312) 794-7801
avi@blbglaw.com

*Lead Counsel for Lead Plaintiffs the Public
School Teachers' Pension & Retirement Fund of
Chicago and the Cambridge Retirement System
and the Settlement Class*

**STAFFORD ROSENBAUM LLP**
Douglas M. Poland
State Bar No. 1055189
222 West Washington Avenue, Suite 900
P.O. Box 1784
Madison, WI 53701-1784
Telephone:  (608) 256-0226
Facsimile:  (608) 259-2600
dpoland@staffordlaw.com

*Liaison Counsel for Lead Plaintiffs the Public
School Teachers' Pension & Retirement Fund of
Chicago and the Cambridge Retirement System
and the Settlement Class*

24

## <u>CERTIFICATE OF SERVICE</u>

I, Katherine M. Sinderson, an attorney, hereby certify that a copy of the foregoing **"Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses"** was served on counsel for all parties electronically via the CM/ECF system on December 24, 2020.

Dated:  December 24, 2020               By:     */s/ Katherine M. Sinderson*
                                                                    Katherine M. Sinderson