## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

|  |  |  |
|---|---|---|
|  | ) |  |
|  | ) |  |
|  | ) |  |
| IN RE SPECTRUM BRANDS LITIGATION | ) | No. 19-cv-347-jdp |
|  | ) |  |
|  | ) |  |

---

## AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
## THE FEDERAL SECURITIES LAWS

---

RATHJE WOODWARD LLC
Douglas M. Poland
State Bar No. 1055189
10 E. Doty Street, Suite 507
Madison, Wisconsin 53703
Telephone: (608) 960-7430
Facsimile: (608) 960-7460
dpoland@rathjewoodward.com

*Liaison Counsel for Lead Plaintiffs The
Public School Teachers' Pension and
Retirement Fund of Chicago and the
Cambridge Retirement System
and the Class*

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
Avi Josefson
875 North Michigan Avenue, Suite 3100
Chicago, Illinois 60611
Telephone: (312) 373-3880
Facsimile: (312) 794-7801
avi@blbglaw.com

-and-

Katherine M. Sinderson
Jai Chandrasekhar
Julia K. Tebor
Matthew Traylor (*admission forthcoming*)
1251 Avenue of Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
KatieM@blbglaw.com
Jai@blbglaw.com
Julia.Tebor@blbglaw.com
Matthew.Traylor@blbglaw.com

*Lead Counsel for Lead Plaintiffs The Public
School Teachers' Pension and Retirement
Fund of Chicago and the Cambridge
Retirement System
and the Class*

**EXHIBIT**

tabbies®

C

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ................................................................. 2

II.   JURISDICTION AND VENUE ................................................................. 9

III.  THE PARTIES ......................................................................................... 9

IV.   DEFENDANTS' FRAUDULENT CONDUCT ........................................ 13

      A.   Spectrum, Its Businesses, and Relevant Pre-Class Period Events ....... 13

      B.   The Technological and Operational Demands of a Modern Distribution
           Center ................................................................................................. 16

      C.   Defendants Misled Investors During the Class Period About the Purported
           Success of the GAC and HHI Consolidations ..................................... 17

      D.   In Reality, the Consolidations Severely Disrupted Spectrum's Business ............. 21

           1.   The GAC Consolidation Was Not "Progressing Smoothly" ................... 21

                a.   Material Undisclosed Delays in Consolidating GAC's
                     Manufacturing Lines and Distribution ........................................ 22

                b.   The Dayton Center's Lack of Basic Infrastructure ...................... 25

                c.   The Dayton Center's Massive Undisclosed Quality-Control
                     Problems .................................................................................. 29

                d.   The Dayton Center's Inventory-Management Problems .............. 33

                e.   The Dayton Center's Inability to Fill Customer Orders
                     Promptly and Completely ........................................................... 37

           2.   The HHI Consolidation Was Not "On Track" ......................................... 38

                a.   Delays and Cost Overruns in Consolidating Distribution in
                     Edgerton .................................................................................... 39

                b.   Consolidation Delays at Edgerton Caused Excess Inventory
                     Buildup at the North Carolina, California, and Edgerton
                     Centers ...................................................................................... 42

                c.   The Edgerton Center's Failure to Install Basic
                     Infrastructure ............................................................................ 42

                d.   The Edgerton Center's Incomplete Shipments to Customers ....... 45

i

e.   The Edgerton Center's Delayed Shipments to Customers............ 50

f.   The Edgerton Center's Undisclosed Hiring, Retention, and
Training Problems........................................................................ 54

3.   The Consolidations' Undisclosed Impact on Spectrum's Sales to
Walmart and Other Major Retailers........................................................ 56

4.   The Consolidations' Undisclosed Adverse Impact on Spectrum's
Ability to Pay Both GAC's and HHI's Vendors....................................... 60

E.   The Truth Emerges While Defendants Continue to Mislead Investors ................ 65

1.   Spectrum Discloses That Significant Distribution Center
"Challenges" Had Occurred In March 2018, Fires Defendant
Rouvé, But Assures The Market That These Issues Are
"Transitory" ...................................................................................... 65

2.   Spectrum Again Asserts That Consolidation Issues Are
"Transitory" When Reporting Third-Quarter 2018 Earnings ................... 71

3.   In the Days Leading up to Its Fourth-Quarter 2018 Earnings
Release, Spectrum Announces Surprise Sale of GAC............................... 74

4.   November 19, 2018: Spectrum Admits that the Distribution-Center
Consolidation Challenges Were Not "Transitory" and Had
Ongoing Material Negative Effects on the Company's Financial
Results............................................................................................. 75

V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
OMISSIONS ............................................................................................................ 77

A.   January-June 2017: Defendants Falsely Claim That The Consolidations
Are "On Track" and "Progressing Smoothly" ........................................... 77

1.   First Quarter 2017 .............................................................................. 77

2.   Second Quarter 2017............................................................................ 82

B.   July 2017-February 2018: Defendants Misleadingly Claim That "Minor"
Negative Financial Results Are Partly Attributable to "Temporary"
"Transitory" "Normal Startup Inefficiencies" At Dayton and Edgerton .............. 85

1.   Third Quarter 2017 ............................................................................. 85

2.   Fourth Quarter 2017............................................................................ 93

3.   First Quarter 2018 .............................................................................. 96

C.     April 2018: Defendants Falsely Claim That Materially Poor Financial Results Are "Transitory in Nature".................................................................. 102

D.     July 2018: Defendants Falsely Claim That Positive Financial Results Demonstrate That The "Turnaround Is Well Underway" And The Issues Were Transitory" .......................................................................................... 105

VI.     ADDITIONAL ALLEGATIONS OF SCIENTER........................................................ 110

VII.     LOSS CAUSATION.................................................................................................... 119

VIII.     CLASS ACTION ALLEGATIONS ............................................................................ 122

IX.     INAPPLICABILITY OF STATUTORY SAFE HARBOR .......................................... 124

X.     PRESUMPTION OF RELIANCE................................................................................ 124

XI.     CLAIMS BROUGHT UNDER 10(b) AND 20(a) OF THE EXCHANGE ACT........... 125

COUNT I – For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against Spectrum, Spectrum Legacy, and The Executive Defendants .................................................... 125

COUNT II – For Violations of Section 20(a) of the Exchange Act Against The Executive Defendants ...................................................................................................................................... 127

COUNT III – For Violations Of Section 20(a) of The Exchange Act Against Defendant HRG Group, Inc................................................................................................................................ 128

XII.     PRAYER FOR RELIEF .............................................................................................. 129

XIII.     JURY DEMAND ......................................................................................................... 130

iii

Lead Plaintiffs the Public School Teachers' Pension and Retirement Fund of Chicago and the Cambridge Retirement System, by and through their undersigned counsel, bring this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf themselves and all other persons or entities who purchased securities of Spectrum Brands Holdings, Inc. or HRG Group, Inc. during the period from January 26, 2017 to November 19, 2018, inclusive (the "Class Period") and were damaged thereby (the "Class").[1]

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief are based on the ongoing investigation of their counsel, including from the following sources: (i) Spectrum Legacy's, HRG's, and Spectrum's public filings with the SEC; (ii) research reports from securities and financial analysts; (iii) Spectrum Legacy's, HRG's, and Spectrum's press releases and reports; (iv) Company website and marketing materials; (v) news and media reports concerning Spectrum Legacy, HRG, and Spectrum and other facts related to this action;

---

[1] The Class includes (i) purchasers from January 26, 2017 to July 13, 2018, of stock of HRG Group, Inc. ("HRG"), which was renamed Spectrum Brands Holdings, Inc. upon the closing of a merger between HRG and Spectrum Brands Legacy, Inc. (f/k/a Spectrum Brands Holdings, Inc.) ("Spectrum Legacy") on July 13, 2018 (the "HRG Merger"); (ii) purchasers from January 26, 2017, to July 13, 2018, of stock of Spectrum Legacy (then known as Spectrum Brands Holdings, Inc.), which was converted into stock of the Company on July 13, 2018, in the HRG Merger; and (iii) purchasers from July 13, 2018, to November 19, 2018, of stock of the Company. Paragraph 23 below further describes the HRG Merger and defines "Spectrum" and the "Company," as used in this complaint. Defendant HRG was a holding company and Spectrum Legacy's majority owner until Spectrum Legacy merged into HRG in July 2018, and the surviving entity was renamed "Spectrum Brands" (the "HRG Merger"). Before the HRG Merger, Spectrum Legacy was by far HRG's primary asset; in fact, 99% of HRG's income was derived from Spectrum Legacy. HRG specifically and repeatedly referred its shareholders to Spectrum Legacy's SEC filings and financial results to better understand their investment in HRG. HRG shareholders thus looked to the statements of Spectrum Legacy executives about Spectrum Legacy's operations in making their decisions to buy or sell HRG stock – including, as discussed in this complaint, Defendants' myriad misstatements about the Consolidations.

(vi) price and volume data for Spectrum and HRG securities; and (vii) additional materials and data concerning the Company and its industry as identified in this complaint. Lead Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support is likely to exist for the allegations in this complaint after a reasonable opportunity for discovery.

## I. PRELIMINARY STATEMENT

1. Spectrum and its top executive officers intentionally deceived investors regarding two projects that were vitally important to the Company's operations and financial results: the consolidation of two Spectrum divisions' multiple facilities into a single facility for each division (the "Consolidations"). Defendants told investors that these Consolidations would reduce Spectrum's expenses and working capital, simplify its supply and distribution chains, and improve its customer service, enhancing the Company's profitability and growth. But instead of improving the Company's financial prospects, unbeknownst to investors, the Consolidations turned into what both the Company and analysts later called "self-inflicted wounds" that materially impacted the Company's financial performance, destroyed major customer relationships, and wrecked management credibility. During the Class Period, Defendants falsely assured investors that the Consolidations were proceeding successfully or, at most, that any minor issues were purely "transitory." When the truth about the Consolidations was belatedly revealed, investors were shocked by the severity of the previously concealed problems and their adverse financial impact on the Company. In response to these disclosures, Spectrum's stock price declined sharply, inflicting massive damages on investors.

2. By way of background, Defendant Spectrum manufactures or purchases hundreds of consumer products and then sells them through retailers. Throughout the Class Period, Spectrum

had several divisions, including Global Auto Care ("GAC"), whose more than 100 products, including STP "performance" products, Armor All "appearance" products, and AC/PRO air-conditioning products, were responsible for 10% of Spectrum's annual revenue. Before the Class Period, GAC operated four separate facilities for distribution, manufacturing, and research-and-development facility across the country. During the Class Period, GAC consolidated its four facilities into a single enormous facility in Dayton, Ohio (the "Dayton Center").

3. Another division of Spectrum was Hardware and Home Improvement ("HHI"), whose thousands of products, including Kwikset and Weiser door hardware, Pfister faucets, and National Hardware products, were responsible for 25% of Spectrum's annual revenue. Before the Class Period, HHI operated two distribution centers on both coasts, in North Carolina and California. During the Class Period, HHI purportedly consolidated its two facilities into a single enormous facility in Edgerton, Kansas (the "Edgerton Center").

4. When Defendants announced the planned consolidation of GAC's multiple facilities into the Dayton Center in late 2016, before the start of the Class Period, they stated that the consolidation would enable GAC to eliminate "duplication of safety stock, duplication of warehousing cost, [and] a lot of cross shipments to replenish those warehouses" and thus to reduce costs and working capital. They also said that the consolidation would simplify GAC's supply chain and enable it to "react quicker . . . to the needs of our consumers" and to retailers' demands. On January 26, 2017, the first day of the Class Period, and again in February, May, and June 2017, Defendants told investors that GAC's consolidation into the Dayton Center would be "complete" by September 30, 2017, the end of the Company's fiscal year, and that the consolidation was "progressing smoothly." Similarly, when Defendants announced the consolidation of HHI's two distribution centers into the Edgerton Facility at the start of the Class Period, they said that this

3

consolidation would be "operational" by May 2017 and "complete" by the end of calendar year 2017 and would deliver the same kinds of benefits that they said GAC's consolidation would deliver.  Throughout the first half of 2017, Defendants claimed that both Consolidations were "on track" to timely completion.  Analysts credited these statements in recommending that investors invest in Spectrum's future, stating for example that Spectrum's "consolidation of distribution footprints" was "providing fuel for innovation, channel and market investments, and margin improvement."

5. To achieve the positive results that Defendants said the Consolidations would achieve, GAC's Dayton Center and HHI's Edgerton Center needed to perform effectively as modern distribution centers, which are constructed to rapidly fill client orders. Particularly given the large number and diversity of products sold by both GAC and HHI, their new distribution centers needed careful logistics planning to enable timely and accurate filling of customer orders. If Spectrum failed to set up these distribution centers in a way that they could continue to promptly and accurately fill client orders, Spectrum would quickly become subject to skyrocketing costs. Among other things, customers like Walmart, Home Depot and Lowe's—which alone were responsible for 40% of the Company's revenue—had negotiated Service Level Agreements ("SLAs") with Spectrum that dictated standards for delivery timing and "fill rate" (or percentage of customer order met with inventory on hand).  If Spectrum failed to meet these specifications— which they did, persistently and egregiously throughout the Class Period—Spectrum would be subject to penalties amounting to millions of dollars or risk losing customers altogether.

6. Contrary to Defendants' statements to investors that the Consolidations were "on track" or "progressing smoothly," both Consolidations were botched from the beginning.  As set forth below, numerous former Spectrum employees from across the Company – including at the

Dayton Center, Edgerton Center, headquarters at Middleton, and sales executives across the country – all uniformly recalled that Spectrum could not (and did not) execute the Consolidations according to Spectrum's internal plan and suffered enormous financial consequences and lost customer goodwill as a result. Among other things, first, in an astonishing violation of elementary principles of modern distribution-center design, Spectrum did not even initially install racks – or shelving – in either the Dayton Center or the Edgerton Center. Instead, pallets of goods were simply stacked on top of each other on the floor. As a result, large amounts of goods were crushed, inventory was not properly labeled and tracked, and workers were persistently unable to locate items that were needed to fill customer orders.

7. Second, far from "progressing smoothly," the transfer of operations from GAC's and HHI's other facilities to the new facilities were delayed for months – or secretly cancelled altogether. These delays exacerbated the concerns about inefficiency and costs that the Consolidations were supposed to ameliorate.

8. Finally, both new facilities were unable to receive inventory from vendors or fulfill client orders without massive delays. As a result, from the time the Edgerton Center opened, there were dozens—and later hundreds—of semi-truck trailers constantly lined up to pick up or deliver goods. Many truck drivers became so frustrated at the delays that they abandoned their trailers on Spectrum's lot – leaving Spectrum's loading lot and employee parking lot littered with trailers full of products that Spectrum was forced to lease until it could identify and unload them. In early 2018, HHI's backlog of orders became so insurmountable that Spectrum could not tell which products were still needed by customers (in the case of seasonal merchandise) or if the customers had obtained the inventory elsewhere. HHI therefore secretly "flushed" (i.e., cancelled) its enormous

5

backlog of unfilled orders to start fresh.  Spectrum then asked its customers to resubmit any items they still desired to order.

9.      The problems at the Dayton Center and the Edgerton Center were reported regularly to Spectrum's headquarters in Middleton, Wisconsin, including in written reports to Defendant Andreas Rouvé, then Spectrum's CEO; Defendant Douglas Martin, Spectrum's CFO; and Defendant David Maura, Spectrum's Executive Chairman until April 2018 and CEO since then.[2] They were also discussed during meetings with Rouvé and Martin.

10.      But Defendants concealed the truth about the problems at the new distribution centers. In fact, when in July 2017 Spectrum announced somewhat disappointing financial results partly attributable to problems in the GAC and HHI consolidations, Defendants went out of their way to reassure investors that the problems were "temporary" and "transitional," that GAC's consolidation in the Dayton Center was "98%" complete, and that "both projects remain[ed] on schedule and the issues [were] being quickly addressed." In November 2017, Defendants told investors that GAC's consolidation was "now complete" and that HHI's consolidation was "currently 65% complete" and would be completed in March 2018. Analysts credited Defendants' reassurances and continued to recommend that investors purchase Spectrum stock.

11.      But Defendants' reassurances and positive statements about the Consolidations' progress were false. In reality, the problems with the two consolidations were far from "temporary" or "quickly addressed," and the Dayton Center and the Edgerton Center were not "complete" (to the extent the Consolidations were ever complete) until at least mid-2018—months later than Defendants claimed. Indeed, serious problems in inventory tracking and order fulfillment continued

---

[2] A chart setting forth the relevant Spectrum executives discussed in this complaint is set forth at Appendix C.

beyond the end of the Class Period in November 2018. For example, the Dayton Center had not even finished installing racks at the end of the Class Period.

12. The truth about the two consolidations was partially revealed on April 26, 2018, when Spectrum announced shockingly bad quarterly financial results, including a 98% decrease in net income from the same quarter in the prior year. Spectrum acknowledged that the bad results were due to problems at the Dayton Center and the Edgerton Center, and the Company fired Defendant Rouvé and the president of GAC – a move that Deutsche Bank termed "perhaps not surprising" in light of the terrible news of the day. In response to this news, Spectrum's stock price fell 20%, from $94.23 to $75.01 in one day, and HRG's stock price fell 22%, from $93.15 to $72.56[3] in one day.

13. But Defendants continued to hide the full truth in April 2018. Instead, Spectrum and its new CEO, Defendant David Maura, falsely attributed the bad results to "transitory" disruptions at the distribution centers that arose in March 2018 that had been addressed with "swift and decisive actions." Defendants did not disclose the longstanding and continuing systemic problems in the distribution centers or the damage to client relationships. Analysts again accepted Defendants' reassurances that the problems had been "transitory." For example, BMO Capital Markets wrote that "our further conversations with management gives us more confidence the issues are transitory and we view the risk/reward here as favorable."

14. Defendants again reassured investors that the consolidations were proceeding successfully when they announced Spectrum's third-quarter results in July 2018. Analysts credited management's reassurances and reported that Spectrum had "put the company's self-inflicted wounds in the rear-view mirror."

---

[3] HRG's stock price has been adjusted for the HRG Merger.

15.     The truth was fully revealed only on November 19, 2018, the last day of the Class Period, when Spectrum announced another shockingly bad quarter, including earnings before interest, taxes, and depreciation ("EBITDA") of negative $82.1 million, down from $27.9 million in the same quarter of the prior year—a $110 million swing. Spectrum now admitted that GAC's EBITDA miss was caused largely by "excess and obsolete inventory liquidation," "Dayton plant inefficiencies, [and] physical inventory adjustments and scrap relating to the facility consolidation projects."

16.     In response to these disclosures, Spectrum's stock price fell another 20%, from $59.35 to $48.05 in one day.  (By this date, the merger between HRG and Spectrum Legacy was complete).

17.     Remarkably, by the end of the Class Period, Spectrum effectively admitted that the issues with the Consolidations were far from "transitory" and, indeed, gave up on the Consolidations altogether.  In November 2018, Spectrum seized the opportunity to unload its recently acquired GAC division to Energizer at a discount to the price Spectrum had paid for the division just three years before.  With respect to HHI, Spectrum apparently abandoned the concept of "consolidation" altogether.  To this day, Spectrum's distribution center in Mira Loma, California – which was supposed to be closed in 2018 and all distribution routed to Edgerton – is still open and is the "main distribution facility" for many of HHI's primary products.

18.     Defendants' false and misleading statements and omissions about the GAC and HHI consolidations have caused substantial damages to Lead Plaintiffs and the other members of the Class. As a result of the fraud alleged in this Complaint, Spectrum/HRG shareholders suffered market-capitalization losses of <u>over $2 billion</u>.

## II. JURISDICTION AND VENUE

19.     The claims asserted in this complaint arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

20.     Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Spectrum maintains its executive offices in this District, and many of the acts and conduct that constitute the violations of law complained of in this complaint, including the dissemination to the public of materially false and misleading information, occurred in this District. In connection with the acts alleged in this complaint, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. THE PARTIES

21.     Court-appointed Co-Lead Plaintiff the Public School Teachers' Pension and Retirement Fund of Chicago ("Chicago Teachers") is a pension fund established for the benefit of the current and retired public school teachers of the city of Chicago, Illinois. Chicago Teachers provides benefits for over 37,000 retirees and beneficiaries, manages over $11.1 billion in assets for its beneficiaries, and is responsible for providing retirement benefits to more than 28,000 current public employees. Chicago Teachers purchased Spectrum and HRG securities during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this complaint. Chicago Teachers' relevant trades are set forth in Appendix A.

22.     Court-appointed Co-Lead Plaintiff the Cambridge Retirement System ("Cambridge Retirement") is a pension fund established for the benefit of the current and retired public employees of the city of Cambridge, Massachusetts. Cambridge Retirement manages over $1.2

billion in assets for its beneficiaries, provides retirement benefits for over 2,100 retirees and beneficiaries, and is responsible for providing retirement benefits to more than 2,900 current public employees. Cambridge Retirement purchased Spectrum securities during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this complaint. Cambridge Retirement's relevant trades are set forth in Appendix A.

23. Defendant Spectrum Brands Holdings, Inc. maintains its principal executive offices at 3001 Deming Way, Middleton, Wisconsin 53562. The Company was formerly known as HRG Group, Inc. and was a holding company that held a majority stake in the company that was then known as Spectrum Brands Holdings, Inc. ("Spectrum Legacy") from January 7, 2011 until July 13, 2018. During that time, Spectrum Legacy's common stock traded on the New York Stock Exchange, which is an efficient market, under the ticker symbol "SPB," and HRG's common stock traded on the New York Stock Exchange ("NYSE") under the ticker symbol "HRG." On July 13, 2018, Spectrum Legacy was wholly acquired by the Company in a reverse merger, and the stock of Spectrum Legacy was converted into stock of the Company and ceased publicly trading as a separate security (defined above as the "HRG Merger"). Since July 13, 2018, the Company's common stock has traded on the NYSE under the ticker symbol "SPB." As used in this Complaint, "Spectrum" or the "Company" refers to Spectrum Legacy if referring to the period until July 13, 2018, and to the present Spectrum Brands Holdings, Inc. if referring to the period after July 13, 2018. As of December 30, 2018, Spectrum had over 53 million shares of common stock outstanding, owned by thousands of investors.

24. Defendant Spectrum Brands Legacy, Inc. ("Spectrum Legacy") is the Delaware corporation that was known as Spectrum Brands Holdings, Inc. until July 13, 2018, when Spectrum Legacy became a wholly owned subsidiary of the company that was known until then as HRG

10

Group, Inc. and has been known since then as Spectrum Brands Holdings, Inc. Spectrum Legacy's common stock was traded on the NYSE under the ticker symbol "SPB" until July 13, 2018.

25.     Defendant <u>HRG Group, Inc</u>. was a holding company that "conduct[ed] its operations principally through its operating subsidiaries," which as of 2017 was primarily comprised of Spectrum Legacy. HRG's principal executive office was 450 Park Avenue, 29th Floor, New York, NY. Spectrum Legacy was HRG's "principal operating subsidiary" throughout the Class Period. While HRG also owned two small insurance operations, Spectrum Legacy represented the vast majority of HRG's revenue. According to HRG's 2016 and 2017 Forms 10-K, consumer products sold exclusively through Spectrum Legacy, accounted for over 99% of HRG's total revenue. The two companies also had highly intertwined boards of directors and executives. The current CEO, Defendant Maura, who has been chairman of Spectrum's Board of Directors since 2011, was previously a managing director and Executive Vice President of investments at HRG from October 2011 to November 2016 and remained on the HRG board until December 2017. During the entirety of the Class Period, at least three Spectrum Legacy board members were either HRG officers or directors. Notably, before the HRG Merger, Spectrum Legacy regularly disclosed in its regulatory filings that "HRG and its significant stockholders exercise significant influence over us and their interests in our business may be different from the interests of our stockholders. . . . [They] have the ability to influence the outcome of any corporate action by us that requires stockholder approval, including, but not limited to, the election of directors, approval of merger transactions and the sale of all or substantially all of our assets."

26.     Consequently, Spectrum Legacy's financial stability and profitability were critical to HRG shareholders. In numerous SEC-required disclosures during the Class Period, HRG explicitly directed its stockholders to review Spectrum Legacy disclosures for a more informed

11

understanding of the underlying financial position of HRG. For all the aforementioned reasons, the two entities had highly correlative stock profiles, as seen below:



27.     Defendant <u>Andreas R. Rouvé</u> ("<u>Rouvé</u>") joined Spectrum in 2002 and was promoted to CEO in April 2015. Rouvé was CEO for most of the Class Period, until April 26, 2018, when the Company terminated him following terrible second-quarter 2018 financial results stemming from the poorly executed Consolidations. Rouvé routinely spoke on behalf of the Company in press releases, earnings calls, and at conferences. During the Class Period, he commented regularly on the Company's supposedly positive progress in consolidating the GAC and HHI facilities.

28.     Defendant <u>David M. Maura</u> ("Maura") joined Spectrum's Board as interim Chairman in June 2010. He was named permanent Chairman in July 2011 and Executive Chairman in January 2016. On April 26, 2018, he replaced Rouvé as CEO and immediately downplayed the potential for further fallout from the flawed Consolidations. Maura routinely spoke on behalf of the Company in press releases, earnings calls, and at conferences. During the Class Period, he regularly publicly commented on the Company's supposedly positive progress in consolidating the GAC and HHI facilities.

29.     Defendant <u>Douglas L. Martin</u> ("Martin") joined the Company in 2014 as its Chief Financial Officer. He was CFO throughout the Class Period. Martin routinely spoke on behalf of the Company in press releases, earnings calls, and at conferences.

30.     Defendants Rouvé, Maura, and Martin are collectively referred to in this complaint as the "Executive Defendants."

## IV.     DEFENDANTS' FRAUDULENT CONDUCT

### A.     <u>Spectrum, Its Businesses, and Relevant Pre-Class Period Events</u>

31.     Spectrum is a consumer-goods company that provides products to consumers through retail partners such as Wal-Mart, Home Depot, and Lowe's. Spectrum does not sell directly to consumers. The Company had five business segments during the Class Period: Global Auto Care (defined above as "GAC"); Hardware and Home Improvement (defined above as "HHI"); Global Batteries and Appliances; Home and Garden; and Global Pet Supply. This action primarily concerns GAC and HHI, which contributed approximately 10% and 25% of Spectrum's annual revenue, respectively, during the Class Period.

32.     As Spectrum acknowledged in its annual report on Form 10-K for 2018, the Company "compete[d] for limited shelf space and consumer acceptance" and also "compete[d] with our retail customers, who use[d] their own private label brands, and with distributors and foreign

13

manufacturers of unbranded products, typically at lower prices." Accordingly, Spectrum's ability to source and supply its products to customers through its distribution network quickly and efficiently was a key focus of the Company and investors throughout the Class Period.

33. In June 2016, Spectrum announced a major change in its supply chain for GAC: the Company would consolidate its four separate GAC manufacturing, distribution, and research and development facilities from Ohio, Texas, and California into one 570,000 square-foot "Center of Excellence" in Dayton, Ohio (the "Dayton Center"). Defendant Martin told investors in July 2016 that this consolidation would "bring GAC closer to its US customer base, provide more vertical integration, and reduce supply chain cost and complexity." In a July 29, 2016 call with analysts, Defendant Rouvé explained the reasoning for the consolidation and the timeline for completion as follows:

> [W]e had in the past a warehouse down in the south, you know, for auto care in Texas and one up in the north, so, you know, in the north of Ohio, and basically we were shipping to customers from both warehouses. So we had to replenish both warehouses across the country. That means any product which were produced in Texas we shipped all the way to Ohio, then to ship it back to a customer which was somewhere in the middle. And there we had a lot of inefficient supply chain. Also, it led to the fact we had excess inventory.

> As a consequence, we decided to consolidate it and we did it in the first step in our old warehouse in the north of Ohio. But at the same time we started to do a kind of center of gravity study where our customer base is located. And there we have identified the state of Ohio facility, which is the perfect location, and we are going to develop that into our center of excellence where we are going to have not only our central US warehouse, but also our . . . manufacturing. We are going to in-source part of the other items which we are currently sourcing from third parties.

> We're going to have our R&D there. So it is going to be our center of excellence going forward. Now, the timing of that, the first step we have actually done in this quarter, that means we have shut down our warehouse in Texas. But the Ohio facility, that's going to be more in early 2017, calendar 2017 completion date. So the project is on the way, but probably until it's completed, will be early 2017.

34. At Spectrum's investor day in October 2016, Defendant Rouvé and Guy Andrysick, a Spectrum Senior Vice President and the President of GAC, who reported to Defendant Rouvé,

14

both commented on GAC's consolidation in Dayton. Defendant Rouvé stated that the consolidation would enable GAC to eliminate "duplication of safety stock, duplication of warehousing cost, [and] a lot of cross shipments to replenish those warehouses" and thus reduce costs and working capital. Andrysick stated that the consolidation would simplify GAC's supply chain and enable it to "react quicker . . . to the needs of our consumers" and to retailers' demands.

35.     Defendants told investors that the Consolidations would benefit not only the Company's operational efficiency but also its financial results, including its EBITDA[4] and EBITDA margin.[5] Specifically, as discussed by Defendant Rouvé in late 2016, these Consolidations would eliminate the "duplication of safety stock, duplication of warehousing cost, [and] a lot of cross shipments to replenish those warehouses." Thus, as Defendant Martin said in 2016, these Consolidations provided cost benefits "from a manufacturing cost perspective" and would "reduce supply chain cost and complexity."

36.     Analysts took note of these purported benefits from the GAC consolidation in Dayton. For example, a KeyBanc analyst report from January 26, 2017 stated that "consolidation of distribution" was "providing fuel for innovation and marketing investments and margin improvement."

37.     Before the Class Period, Defendants consistently assured the market that the Dayton Center would open in early 2017. For example, in July 2016, Defendants Rouvé and Martin both said that the Dayton Center facility would open in "early 2017." Further, Spectrum touted the "new manufacturing and logistics facility to open in Dayton, Ohio in early calendar 2017" as a

---

[4] Earnings before interest, tax, depreciation and amortization (EBITDA) is a measure of a company's operating performance, which is used to evaluate a company's performance without factoring in financing decisions, accounting decisions or tax environments.

[5] EBITDA margin is an assessment of a firm's operating profitability as a percentage of its total revenue.

15

marker of its "continuous improvement of processes" in multiple Company presentations to investors from September 2016 to December 2016.

38.     As discussed further below, Spectrum announced at the start of the Class Period that HHI was also going to consolidate its operations in North Carolina and California in Edgerton, Kansas (the "Edgerton Center"). Spectrum said that the Edgerton Center would be "operational" in May 2017 and would be complete in December 2017. Defendants told investors that like the Dayton Center, the Edgerton Center would reduce Spectrum's costs and working capital, simplify its supply chain, and improve its customer service.

### B.     The Technological and Operational Demands of a Modern Distribution Center

39.     Defendants announced that both the Dayton Center and the Edgerton Center were "distribution centers," as well as (in GAC's case) a manufacturing and research-and-development facility. While distribution centers share similarities with traditional warehouses—both receive and store goods to be distributed to customers—a distribution center is a much more sophisticated facility than a traditional warehouse. Unlike long-term static-storage warehouses, distribution centers are high-velocity operations that are primarily focused on order fulfillment. A distribution center stores products for shorter periods than an old-fashioned warehouse (thus substantially lowering costs) and must be able to move products in and out quickly.

40.     Particularly where distribution centers handle many different products—as Spectrum's did—in order to fulfill customer orders quickly and accurately, distribution centers require significant logistical planning, specialized racks (or warehouse shelving), and specialized forklifts and other product-handling equipment. A distribution center typically not only stores products and fulfills customer orders, but also transports, labels, and packs products, receives and ships supplies and inventory, and processes returned goods. To perform these complex tasks

16

promptly and efficiently, distribution centers must use sophisticated information technology (called "warehouse management systems" or WMS) so that workers can promptly and efficiently locate the products needed to fill customer orders. A distribution center must also be carefully designed so that workers can move products into and out of storage quickly, efficiently, and safely.[6]

41.     As discussed further below, GAC's and HHI's consolidated distribution centers fell grievously short of any conceivable industry standard, but Defendants misrepresented them as successfully implemented distribution centers.

## C.     Defendants Misled Investors During the Class Period About the Purported Success of the GAC and HHI Consolidations

42.     Throughout the Class Period, Defendants made numerous false and misleading statements to investors about the progress of the Dayton Center and the Edgerton Center, which are provided in full in Section IV.D below. As these statements make clear, the status of the Consolidations was a key topic of discussion by Defendants Rouvé and Martin (and later Maura), and a focus by analysts, throughout the Class Period.

43.     On January 26, 2017, the first day of the Class Period, Spectrum announced its first-quarter 2017 results. During the quarterly earnings call, Defendant Rouvé highlighted GAC's "good progress" on consolidating its facilities, describing it as a "major simplification of [GAC's] US production, distribution and R&D footprint by consolidating in Dayton, Ohio . . . . We expect to complete this project within the fiscal year," i.e., by September 30, 2017.[7] In multiple conference calls with investors over the subsequent months and at investor conferences in February, May, and

---

[6]    Michigan State University, "Warehouse and Distribution Center Best Practices. https://www.michiganstateuniversityonline.com/resources/supply-chain/warehouse-and-distribution-center-best-practices/.

[7] Spectrum's fiscal year ended on September 30 each year.

17

June 2017, Defendants confirmed that the Dayton Center was supposedly "on track" to completion by September 30, 2017.

44.     During Spectrum's May 2, 2017 earnings call, a KeyBanc Capital Markets analyst commented on Spectrum's "really good job leaning on some of the productivity initiatives, some of the manufacturing changes out there, whether it's in Ohio or St. Louis." In a May 2, 2017 report, KeyBanc analysts maintained their "Overweight" rating and stated that "Productivity gains are driving margin improvement and freeing up funds for reinvestment. Consolidation of distribution footprints, manufacturing capacity gains, discontinuation of low-margin lines and improved negotiating power with retailers are all providing fuel for innovation, channel and marketing investments, and margin improvement."[8]

45.     Defendants also consistently claimed from the beginning of the Class Period that HHI's consolidation would be complete by "the end of calendar year 2017." In fact, at investor conferences in February 2017, Defendants made a presentation to investors stating that HHI's consolidation in Edgerton was "going to be completed in this calendar year" and that the "[n]ew site [would be] operational in May 2017 and current sites fully exited by end of calendar 2017." Defendants repeated these claims at multiple investor conferences in May and June 2017.

46.     Then, on July 27, 2017, Spectrum announced its third-quarter 2017 financial and operational results, disclosing a year-over-year net-income decline compared to the third quarter of 2016. The Company admitted that the shortfall was caused in part by execution problems in the GAC and HHI Consolidations. But Defendant Rouvé minimized these issues: "[W]e experienced temporary, transitional supply chain challenges with our HHI U.S. distribution center consolidation in Kansas and the GAC U.S. operating consolidation in Ohio that affected shipping levels in the

---

[8] All emphasis is added throughout this complaint unless otherwise stated.

short term and impacted sales by approximately $24 million . . . . However, both projects remain on schedule and the issues are being quickly addressed . . . . Despite the start-up challenges, these major consolidation projects will bring a number of important productivity, efficiency, and other benefits, including reduced operating costs, lower working capital and even better service to our customers."

47. Defendant Martin similarly said during that day's earnings call that the Dayton Center was "really up and running from [a] production perspective, we have a one little line to bring in yet but things are running really well there." He said that distribution at the Dayton Center was "functioning better and better every day, I would say, it's about 98% right now. So it's in a good shape."

48. After an October 5, 2017 presentation by Defendant Martin at an investor conference, where he again reassured investors that any "start-up" distribution-center problems had been addressed, analysts reported that any execution problems and related impact on organic growth were in the past. For example, Deutsche Bank analysts noted in an October 4, 2017 report that gave Spectrum a "Buy" rating that while "the last quarter, the company's organic growth was impacted by $20m (1.5%) from execution issues related to consolidating two distribution facilities within the HHI business," "[t]he transition is now largely completed and we are modeling 3% organic sales growth in the segment during 4Q17."

49. On the Company's fourth-quarter 2017 earnings call in November 2017, Defendant Rouvé falsely claimed that "[t]he consolidation of our [GAC] manufacturing and distribution in Dayton, Ohio is now complete, and the consolidation of [HHI] distribution in Kansas is currently 65% complete, and we expect to complete this project in March 2018."

50.     On February 8, 2018, Spectrum announced its first-quarter 2018 financial and operational results. Defendant Rouvé reiterated that the GAC consolidation was "now complete, which [wa]s important as we head into the peak spring and summer period." He also said that "our HHI distribution consolidation in Kansas is moving toward completion in February . . . . These projects will bring cost savings, lower working capital and improved service levels later this year and beyond."

51.     On April 26, 2018, Spectrum disclosed materially disappointing financial results that it attributed in part to problems in the GAC and HHI Consolidations, but again reassured investors that the setbacks were one-time and "transitory." Analysts credited Defendants' reassurances. For example, an April 26, 2018 Credit Suisse analyst report stated that "we believe the operational issues are transitory and we are comfortable with the risk/reward at these levels." BMO analysts stated in an April 26, 2018 report in which BMO recommended the stock to investors that their "further discussions with management" gave them "confidence" that the distribution-center issues were "transitory." Similarly, an April 26, 2018 Oppenheimer & Co. analyst report stated that "distribution headwinds are largely temporary and order backlogs will quickly recede as facilities improve operating efficiencies."

52.     On July 26, 2018, Spectrum announced positive third-quarter results and again assured investors that the distribution-center problems from the previous quarter had been "largely transitory." Analysts again credited management's statements. Oppenheimer & Co. maintained Spectrum's "Outperform" rating and wrote on July 26, 2018, that "[o]verall, it appears new CEO David Maura has put the company's self-inflicted wounds in the rear-view mirror." Similarly, a July 27, 2018 Oppenheimer analyst report stated that "SPB posted good results today, essentially confirming that the issues last quarter were transitory[.]"

53. As discussed below, Defendants' statements about the GAC and HHI Consolidations were materially false and misleading. From at least the beginning of the Class Period, both projects were mired in serious, undisclosed operational problems that severely affected Spectrum's customer service, costs, and financial results. Indeed, as Defendants were forced to admit just a few months after their July 2018 reassurance, the Consolidations continued to suffer from much more material challenges that caused Spectrum to lose tens of millions of dollars. By the end of the Class Period, Spectrum was forced to admit that the problems in the distribution centers were far more longstanding and systematic than Defendants had previously admitted.

**D.** **In Reality, the Consolidations Severely Disrupted Spectrum's Business**

### 1. The GAC Consolidation Was Not "Progressing Smoothly"

54. Spectrum's plan to consolidate four separate facilities into its Dayton Center was a huge and complex undertaking. Spectrum's proposed "Center of Excellence" was a vast facility of 570,000 square feet, equivalent to approximately 10 football fields. In addition to distributing all of Spectrum's auto-care products, Spectrum proposed to manufacture its dozens of chemical auto-care products and conduct its research and development in the Dayton Center. GAC sold more than 100 different products, including various Armor All car-detailing products, STP oil and fuel additive products, and air-conditioning recharge products sold under the brand name "A/C PRO."

55. Particularly given the numerous products sold by GAC, which varied tremendously in customer demand, weight, and saleable unit size, careful logistics planning was necessary to map out the Dayton Center to allow for timely fulfillment of customer orders. If Spectrum failed to perform basic logistical planning, the Center would suffer significant costs from product damage, due to improper handling and storage, an inability to find products in inventory to fill customer orders quickly and accurately, lost business from dissatisfied customers, and fines by major customers.

21

56.     The Dayton Center's role in manufacturing Spectrum's auto-care products offered a unique challenge. Employees would blend Spectrum's proprietary formulas and then fill and package orders. Proper training of employees and calibration of equipment were necessary to ensure production of goods that met specifications. Errors in the manufacturing process as a result of inadequate training or equipment calibration could lead to the making of defective goods, which would have to be scrapped or, if shipped to customers, would lead to customer complaints, returns, financial penalties to Spectrum, and lost business.

57.     As discussed above, Spectrum announced its plan to consolidate GAC's prior facilities in the Dayton Center in June 2016. The Company said that the Dayton Center would open in early 2017 and that GAC's consolidation in the Dayton Center would be complete by September 2017.

### a. Material Undisclosed Delays in Consolidating GAC's Manufacturing Lines and Distribution

58.     Notwithstanding Defendant's claims that the GAC Consolidation was "on track" and "progressing smoothly," in reality, from the outset of the Dayton Center, Spectrum suffered from serious undisclosed delays against its schedule in making it operational for GAC's manufacturing and distribution. These delays and inadequate planning and execution of the consolidation in Dayton led to serious problems in GAC's manufacturing and distribution operations.

59.     For example, from before the beginning of the Class Period, Spectrum was far behind its internal schedule in transferring GAC's manufacturing "lines" to Dayton. Ken Burns, Spectrum's Vice President of Operations at the time, who reported to Guy Andrysick,[9] was a key

---

[9] As discussed below, Guy Andrysick was terminated in April 2018 in a major corporate "restructuring" in an acknowledgment of the deep problems with the GAC Consolidation. All

22

leader in GAC Consolidation and at the Dayton Center.  In a December 27, 2016 article in the *Dayton Business Journal*, Burns explained that Spectrum's plan was to begin "cycling" the first of three A/C Pro manufacturing lines transferred from Spectrum's Garland, Texas, facility in the first week of January 2017 and begin production by the third week of January 2017. Spectrum's plan was then to bring the remaining two Texas lines on-line by the end of January.  Those A/C Pro lines would be followed "in short order" by the Armor All manufacturing lines that were being moved in from a Painesville, Ohio facility. In fact, unbeknownst to investors, as Defendants continued to claim the GAC consolidation was "on track," the A/C Pro lines from Texas were not completely transferred until July 2017—or six months behind schedule—and the Armor All lines from Painesville were not completely transferred until September or October 2017—or approximately eight-to-nine months behind schedule.

60.     These delays were confirmed by former Spectrum employee ("FE") 1.[10] As NPI Project Manager, she would lay out the schedule for the new product, run meetings between the scientists and marketing teams, coordinate with the production teams, and control the first stages of development for the new product.[11] The status of GAC's manufacturing and production ability was thus fundamental to FE 1's tasks.

61.     FE 1 said that every manufacturing-line transfer to the Dayton Center was behind schedule. The Company planned to have the production lines 100% up and running by the end of

---

executives who had reported to Andrysick then reported to Randy Lewis, who took over leadership of the GAC division.

[10] FE 1 was a New Product Introduction ("NPI") Project Manager who worked for Spectrum in Dayton from January 2017 to December 2017 and was involved with consolidating the operations and planning the moving of equipment and product to Dayton from the Texas and Ohio facilities.

[11] All former employees' roles and tenure are described when introduced and in Appendix B. All former Spectrum employees and contractors quoted in this Complaint are referred to with feminine pronouns, regardless of whether the individuals are men or women.

23

July 2017, but they were actually not fully operational until late September, so the consolidation was at least two months behind schedule. FE 1 explained that there were many reasons for these delays. Among other things, Spectrum had not obtained certain key permits from the City of Dayton that it needed to open its manufacturing line. FE 1 recalled that Dayton had told Spectrum that only a small amount of chemicals could be stored in the Dayton Center until full permits for major industrialized vents were installed. FE 1 recalled that these permits were not obtained until September 2017. Public records corroborate FE 1's account: according to Dayton's Office of Building, Code Enforcement, and Planning Services, Spectrum did not even apply for the necessary permits to install the required exhaust fans until September 2017. Until then, the majority of the chemicals had to be stored in trailers in the parking lot. FE 1 recalled that, consequently, Spectrum was only able to start full production in late September 2017. FE 1 further recalled that it was September or October 2017 before all of the equipment from Painesville was transferred.

62. The delay had serious consequences for Spectrum's customer relationships. According to FE 1, during summer 2017, approximately 10-15% of product orders were being cancelled due to the manufacturing delays. Because these product orders were seasonal, these sales were permanently lost and would not be made up in following quarters. Ken Burns, Spectrum's Vice President of Operations, who reported to Andrysick was aware that the Dayton Center was behind schedule because FE 1 would meet with Burns every week and discuss that fact.

63. FE 2 stated that she was present when senior leadership did a tour of the facility in June or July 2017 and that it was apparent that the production area was still unfinished, and a lot of the automated systems had not yet been installed.[12]

---

[12] FE 2 was a Quality Technician at the Dayton Center from June 2017 through March 2018.

24

64.      Even once the manufacturing lines were brought into the Dayton Center (months behind schedule), they were not fully operational. FE 2 stated that the Company tracked Overall Equipment Efficiency (OEE), or the amount of time that machinery is up and running, including any machinery shutdowns and their causes for the shutdown. FE 2 stated that in her experience the goal for OEE at any manufacturing facility is at least 85%, but she estimated that the Dayton Center's OEE was at approximately 55% for the majority of time that she was at the Company (June 2017 through March 2018).  According to FE 2, when she started in June 2017, the OEE was "perilously bad." According to FE 2, the Dayton Center "had issues where the line would be shut down for hours at a time due to equipment issues, or a blend didn't come out correctly, or we didn't have components on hand. It happened so often that it was just another day at the office." Mary Michael, Spectrum Operations Manager who reported to Ken Burns and Stephen Keller, was briefed on these metrics every day.

### b.      The Dayton Center's Lack of Basic Infrastructure

65.      As discussed above, a distribution center handling large numbers of different types of products needs sophisticated racking systems, product-moving equipment, and well-trained employees to bring products in, store them, locate (or "pick") them, and ship them out promptly and accurately. But the new Dayton Center lacked the most basic infrastructure for <u>months</u> after it opened and was supposedly "smoothly progressing" to completion. In fact, as discussed below, until 2018, the Dayton Center did not even have basic racks for storing supplies and inventory.

66.      Racking systems are integral to inventory management and quality control at distribution centers. While stacking pallets of goods on top of each other on the floor may be appropriate for warehouses handling products that can be stacked without incurring damage, like crates of beer, it is not adequate for storing products that are likely to be damaged if stacked on the

floor.[13] Moreover, racks are needed to enable workers to store and track large numbers of products of different kinds and sizes, so that products can be accurately tracked and quickly and accurately "picked" and packaged to fill customer orders. Recognizing the fundamental role basic shelving played at Spectrum's Centers, Defendant Maura later admitted after the Class Period on February 19, 2019, that inventory "all over the floor" —which was readily apparent at the Centers because the lack of racking— "wasn't healthy."

67.     Despite the elementary principle that racking is necessary for distribution centers handling large numbers of diverse, damage-sensitive products, multiple former Spectrum employees recalled that Spectrum had failed to design or install even the most basic racking system in the Dayton Center until at least 2018. FE 3 confirmed that the Dayton Center opened without any racks, so pallets of inventory were stacked on the floor, 3-4 pallets high.[14] FE 4 further confirmed that the Dayton Center still did not have any racking as of January 2017, stating that when she first came into the Dayton Center in January 2017, it was empty.[15] Similarly, when FE 5 visited the facility relatively early in her term (in spring 2017), she saw boxes and boxes of material stacked everywhere.[16]

68.     FE 4's role, as the Lead Quality Control Technician, was to document and assess all the damage to inventory at the distribution center.  FE 4 recalled that Spectrum's practice of

---

[13] Gwynne Richards, Warehouse Management: A Complete Guide to Improving Efficiency and Minimizing Costs in the Modern Warehouse 162 (3d ed. 2019)

[14] FE 3 was a Global Quality Manager at Spectrum in Dayton, Ohio from November 2016 to January 2019, when GAC was sold to Energizer.

[15] FE 4 was a Document-Control Specialist at Spectrum in Dayton, Ohio from January 2017 to October 2017; a Procurement Officer from October 2017 to July 2018; and Lead Quality-Control Technician from July 2018 to April 2019.

[16] FE 5 was a Contract Data Analyst at Spectrum in Dayton, Ohio from February 2017 to September 2017.

26

simply stacking pallets on the floor led to substantially increased costs. FE 4 stated that the pallets were stacked dangerously close together and would be damaged when they fell on each other or would stick out into the laneway and get damaged. FE 3 confirmed this account and further recalled that Spectrum's careless stacking of pallets became untenable when summer arrived, the warehouse became humid, the cardboard weakened, and pallets of product collapsed, damaging inventory. According to FE 3, all of the damaged product would be "shoved" in a truck to be dealt with later or brought to her as Global Quality Manager to address. The sheer volume of product damaged at the Dayton Center amounted to hundreds of thousands of dollars in value. FE 3 stated that she kept a spreadsheet of damaged product and that her department would report these numbers on a weekly basis. The numbers concerning the amount of damaged products, as well as numbers and types of customer complaints, were also reported as part of PowerPoint presentations on Key Performance Indicators at monthly meetings attended by Ken Burns and Stephen Keller. According to FE 3, Burns, and Keller then had separate meetings with Company executives from Wisconsin headquarters to discuss the Key Performance Indicators and PowerPoint presentations, and FE 3 also personally participated in these meetings with headquarters executives on several occasions. These meetings were done via videoconference, and the PowerPoints were reviewed. FE 1, a New Product Introduction Project Manager, stated that during an August 2017 physical inventory, 10% of product was damaged. The Armor All "trigger bottles" were particularly susceptible to damage because they did not have adequate structural strength to withstand damage when the pallets collapsed. Similarly, FE 6 stated that the lack of racking led to damage not only of

the product but also of the facility itself.[17]  FE 6 provided the example of people trying to stack pallets on top of each other so high that they shoved a crate into a huge ceiling fan, damaging it.

69.    FE 7 further confirmed that Spectrum's failure to install racks in the Dayton Center caused inventory-management problems.[18] FE 7 recalled that she and other staff were told that poor planning was the reason for all of the issues out of the new GAC (and HHI) distribution centers that were affecting fulfillment of customer orders. She was told that when Spectrum designed the new distribution centers, it failed to add racking in the warehouse. This meant that product would have to be stacked on the floor, and directly on top of one another, increasing the products' susceptibility to damage. It also made finding and pulling product much more difficult. Spectrum was having to physically plant flags on different products, so they could be identified in the warehouse. She said that she understood that Spectrum was still having these issues when she left the Company in August 2018.

70.    FE 4 recalled that Spectrum only acknowledged the need for racking in late 2017, and further recalled that Spectrum did nothing to install any racking until late 2017 or early 2018. FE 3 recalled the "massive" project to install racks that was initiated in late summer or early fall 2017.  FE 4 recalled that by February 2018, the Dayton Center still did not have racking systems and was still stacking boxes directly on top of one another, incurring damage.  The rack system was "by no means" completed in January 2019, when FE 3 left, with only approximately 80% of the project complete over a year after it began.

---

[17] FE 6 was a Manufacturing Maintenance Technician at the Dayton Center from January 2017 to January 2018 and worked in the maintenance department on the manufacturing lines for the Armor All and Freon products.

[18] FE 7 was a Spectrum National Account Manager for Walmart, who worked for Spectrum in Bentonville, Arkansas (where Walmart is headquartered) from September 2017 to August 2018

### c. The Dayton Center's Massive Undisclosed Quality-Control Problems

71.     The lack of proper racks and Spectrum's inadequate training of its workers also led to an enormous scrap rate. "Scrap rate" is defined as the percentage of defective products that cannot be restored or repaired and are discarded. Scrapping defective products means that the manufacturer does not recoup the cost of the raw materials used to make the products and must incur additional costs to reuse, sell, recycle, or dispose of them. For example, a $50 million manufacturing facility with a scrap rate of 4% is effectively wasting $2 million to revise or discard products. Accordingly, manufacturers carefully track "scrap rates" as a Key Performance Indicator (or "KPI"). According to a 2014 study conducted by the MPI Group, minimizing "scrap" is the primary objective of manufacturing executives in production planning.[19] That same study found that the vast majority of manufacturers report a scrap rate under 2%. As discussed below, former Dayton Center employees recalled that the Dayton Center's scrap rate was 30%—meaning that, unbeknownst to investors, Spectrum was simply writing off 30% of the cost of its raw materials or incurring costs to rework the products. The Dayton Center's high scrap rate meant that the Company incurred enormous costs for products that could not be sold, and that the Company was unable to fill customer orders promptly and completely.

72.     The Dayton Center's quality-control failures were pervasive and persisted throughout the Class Period. FE 4, Lead Quality-Control Technician, confirmed that Spectrum's poor manufacturing processes caused significant quality problems and high scrap rates. According to FE 4, the Dayton Center's scrap rate was at least 30%, meaning that 30% of the product was unfit to ship. This was consistent the entire time Spectrum ran the distribution center. She said, "It

---

[19] http://www.toolingu.com/images/pdf/ToolingU-SME-Manufacturing-Insights-Report.pdf

was that bad from the beginning [January 2017] and was the same the entire time I was there until Energizer took over [through January 2019]." She said that even once the production lines were "up and running" (which took six months), they were not producing quality items. According to FE 4, the manufacturing lines relied on old machinery, and the Company was not doing proper preventative maintenance, which caused the scrap rates to be high. She said, "The quality of the product we were running was questionable. The machines were running, but we were making stuff with the wrong components, machines were not calibrated properly and were damaging the products on the line, and we had wrong blends of materials for some products. Products were non-conforming all over in every way you can think of. The scrap rates were atrocious." It was a daily occurrence that there was some major issue on the production line. If they went a day where there was not a major quality issue, it was surprising. Several times per month, the wrong formulations or data were inputted into Spectrum's WMS (called "SAP"), so the lines produced either the wrong product or product that was not usable.

73. FE 4 further confirmed the high scrap rate by noting that during the first physical inventory in August 2017, she and the other employees were walking around and seeing piles of junk, including product that was scrapped, everywhere. The Company did not even attempt to fix this until the next physical inventory, which was in September 2018, in anticipation of GAC's sale to Energizer. The Company used some of the off-site space that it rented (discussed above) to store much of this scrapped and obsolete product.

74. The Dayton Center lacked both proper quality-control procedures and proper training for its manufacturing employees, which caused high scrap rates. FE 2, a Quality Technician, confirmed that the Dayton Center's scrap rate was unusually high and that the driver of this scrap rate was a lack of quality procedures and proper training. Workers failed to confirm

that the products that were being run through the production lines met product specifications. On top of that, a lot of the quality systems were still paper based, so errors were common.

75.     When FE 4, Lead Quality Control Technician, moved over to quality control in July 2018, there were no processes in place to handle scrap and damaged product. She was sent to the back of the warehouse, where there were piles of damaged product thrown in a corner. She stated that there were also trailers filled with crushed product. FE 4 said that the damaged inventory was "very visible": "You could walk down an aisle and see quite a bit of broken or leaking cases." She explained that in August 2017 Spectrum conducted a physical inventory in the off-site warehouse, and it was "a disaster." There were products that should have been recycled, returns that had not been counted, and raw materials spilling out of ripped boxes. Burns (Vice President of Operations) was there, as were the directors of procurement, production, and R&D, and they all saw the damaged inventory. In response, FE 4 heard the product development director say, "Oh my God, this is horrible." Only once Spectrum announced the sale of GAC to Energizer in November 2018 was there a push to make things better. Spectrum began to employ auditors whose whole job was to audit pallets before they were shipped to customers. They would audit 1,000 pallets in a quarter and find that 500 had some kind of issue. FE 4's job after Energizer took over was to try to reconcile the damaged inventory. Energizer was still working through Spectrum's damaged-inventory mess as of May 2019.

76.     Other former Spectrum employees confirm that the Dayton Center's quality-control failures were systemic and caused high scrap rates. FE 6, a Manufacturing Maintenance Technician, confirmed that the Dayton Center had significant scrap-rate issues. According to FE 6, the scrap rate got so bad – up to 30% – that the Company was piling up product and telling employees to take it home for free. In FE 6's experience at other companies, a serious scrap rate problem would equate

31

to a single forklift load of scrap, but Spectrum was regularly taking many forklift loads of scrap off the line. Indeed, FE 6 stated that Spectrum's scrap was in Gaylord boxes (or pallet-sized boxes for bulk shipping) that would fill up her 1,800 square foot home.

77. According to FE 6, "[g]enerally . . . you slow the machine or stop the machine to fix the problem so [the scrap rate] stays in the single digits. But they just kept going. They didn't slow or stop [the lines]. They just kept going until it got so bad they absolutely had to [stop]. It was so bad that the railing on the side of the equipment was being blasted off the sides because they were pushing so much product down the line so fast." This would also cause product to become damaged, as the products smashed into each other and fell onto the floor. She said that it was consistently this bad throughout her tenure (from January 2017 to January 2018). FE 6 further stated that there were significant safety issues, including guard rails not being installed, and the "high pressure equipment was rocking really bad, and that's very very dangerous," but that "basically [the Company] did whatever it took to get it running." FE 6 complained to Burns, Vice President of Operations for Spectrum, and Mary Michael, Operations Manager, about the safety issues, and Burns would say "we'll take care of it." But nothing was done, and these issues were not fixed by the time she left Spectrum in January 2018. FE 2 similarly confirmed that Burns and Michael were trying to push through as much production as possible, and there was pressure to make sure products were approved even if they fell outside acceptable testing limits.

78. The rush to manufacture products and lack of proper racking caused storage problems in the manufacturing part of the Dayton Center, similar to the storage problems discussed above in the distribution part of the facility. FE 2 said that inventory would be stacked up around the lines. They would put literal tons of product on the floor, stacked two to three pallets high right next to the active production lines. On multiple occasions, she observed these stacks tilting and

32

thought "someone was going to get killed." FE 2 stated that the stacking of the inventory was hazardous and also overfilled the Center, making the lanes that forklifts drove down too narrow and causing at least one forklift crash. FE 2 stated that product was stacked in "the most non-useful, inefficient way." According to FE 3, because employees did not know how to drive forklift trucks, they would routinely run into boxes full of products, causing additional product damage and observable leaks.

### d. The Dayton Center's Inventory-Management Problems

79. As discussed in Section IV.B above, effective inventory management is essential for a modern distribution center. Spectrum's Dayton Center suffered serious inventory-management problems resulting from inadequate planning, inadequate information technology, a failure to properly use the information technology the Company had, and an inability to locate products. The Dayton Center's lack of appropriate inventory-management practices resulted in its inventory counts being off by millions of dollars. Moreover, because Spectrum did not know what inventory it already had on hand, the Center re-manufactured many products that it already had but could not locate, resulting in unnecessary expense and spoilage.

80. The Dayton Center did not – and could not – institute a standard "first in, first out" (FIFO) inventory management system. FE 3, a Global Quality Manager, said that typically inventory should be shipped to customers on a FIFO basis. The longer a product sits in a warehouse, the more opportunity it has to be damaged and the more likely it is to exceed its shelf life before it is sold. The Company's Mentor, Ohio distribution center had handled inventory on a FIFO basis, but the Company failed to apply FIFO inventory handling at the Dayton Center. Shipping on a FIFO basis requires racking, because if pallets are simply stacked on top of each other on the floor, workers cannot reach the earlier products that are at the bottom of the stacks and must instead use the most recent products that are at the top of the stacks to fill customer orders. Further, according

to FE 3, the Dayton Center's inventory-management software did not track the age of products, information necessary to institute a FIFO program. When GAC was sold to Energizer in November 2018, the Company was only beginning to implement a system intended to enable employees to "pick" product to fill orders based on a loose approximation of when the product was produced.

81.     Second, the Dayton Center's inventory-management deficiencies were also caused by Spectrum's inability to enter and maintain accurate information about the inventory into the Center's WMS. Indeed, FE 4 stated that there were many times when the Dayton Center's director would simply tell workers to throw out obsolete product, rather than properly registering its disposal. This would materially distort Spectrum's inventory records, because they would show that Spectrum still had these products in stock when it in fact did not. This caused other problems because (as discussed further in Section IV.D.1.e below) orders could not be filled.

82.     Conversely, the Center often had inventory on hand that it did not register in WMS or could not locate. FE 4 stated that there were persistent and significant failures to properly receive, scan, and scrap products at the Dayton Center. Employees failed to properly scan the right amounts or would not scan products at all. Employees regularly placed products on trailers to be shipped without scanning them, including loading the wrong products and then not scanning them. These practices made it very difficult to find correct inventory and created numerous instances where they were not able to find inventory necessary to fill customer shipments and so had to either cancel or seriously delay them. FE 3 confirmed that Spectrum employees did not properly enter inventory into the inventory management system. Often employees could not locate inventory to fulfill orders. The untrained staff did not know how to use SAP or how to locate inventory, and once inventory was found, workers did not enter it into the inventory management system. The issues with the SAP continued throughout her entire tenure, and employees were not trained to properly use the system.

34

Quality Technician FE 2 confirmed that Spectrum workers often put inventory in the wrong place or it was not received correctly, so that employees in the Dayton Center could not find it.

83.     The Dayton Center's inability to accurately track and locate the inventory it already had also meant that its manufacturing portion struggled to produce inventory to fill orders that should have been filled from existing stocks. FE 3 explained that because employees could not locate already existing inventory, they were scrambling on the lines to make inventory for orders, even though they already had the inventory somewhere in the facility.

84.     The Dayton Center's deficient inventory management was obvious to Spectrum managers both because it was apparent to the naked eye and because internal reports showed excess inventories. FE 5 stated that the engineers at the Dayton Center were frustrated because there was "no rhyme or reason." She met with Donna Cartwright, Senior Director of R&D Global Innovation at Spectrum from 2011 to January 2018, and Brian Cartwright, Senior Director of R&D Engineering and Quality at Spectrum from 2015 to early 2018 (who are married to each other), and asked them to explain to her how the Dayton Center's products were produced and what the workflow was like, which she needed to know so that she could put this information into the workflow software application and automate it, but they could not tell her. She thought that as directors, they should know what the workflow was. FE 5 said that a lot of people at the Dayton Center were frustrated due to inventory being so high, particularly inventory of raw materials. Her software project would have identified issues and made the process more efficient. She believes that the Company terminated the Cartwrights and Ken Burns due to frustration over the very high inventory levels. She had built out a generic workflow system but repeatedly told Donna and Brian Cartwright that they needed to input the specific needs and contours of the distribution center in order for the project to be fully functional. She had created dashboards showing inventory levels, which were far too

35

high. The Cartwrights and Burns would have had access to these dashboards, and the issues with high inventory levels would have been immediately apparent.

85. Spectrum management knew about these inventory management failures. The Dayton location was off by millions of dollars both times the Company did inventory checks while FE 3 was working there, in or around September 2017 and July 2018. When year-end inventory occurred, the inventory team spent days tallying what the Company actually had at the Dayton Center as opposed to what was listed in the SAP. Corrections were made by hand to make the SAP and floor count match. In the first year-end inventory count at Dayton in September 2017, the SAP and floor count were off by $10-$12 million, which was a discrepancy of at least 10% of the inventory at the warehouse at that time. In FE 3's experience, other distribution centers typically have a 99% match between inventory recorded in a company's WMS and the physical inventory count.

86. Moreover, due to the lack of racking systems and inventory control, Spectrum quickly ran out of room in its brand new Dayton Center. FE 4 recalled that the Dayton Center had so much inventory built up that the Company had to rent another facility nearby to store additional product. FE 3 confirmed that Spectrum stored overflow inventory in trailers outside, where the inventory got hot and ruined in the summer. This problem began in late summer 2017 and continued through winter 2017. FE 3 further recalled that seventy semi-trucks full of product were left on the lot during the winter, causing product to become damaged due to freezing weather that caused product to expand and damage the packaging. FE 3 similarly recalled that the Dayton Center also stored excess inventory at a rented warehouse called Air Commerce. The Air Commerce space was about 200,000 square feet (compared with 350,000 feet of the Dayton Center's approximately 550,000 square feet that were used for warehousing operations). Space there was leased based on

36

need, and Spectrum began renting it at the end of September 2017. Like the Dayton Center, the Company did not have an inventory-management system or racks in place at the rented Air Commerce space, so sending product to Air Commerce was "like sending product to a black hole." Often employees did not even know where inventory was. FE 4 confirmed that due to the lack of racking systems and inventory control, the Dayton Center was still renting off-site warehouses as late as February 2018. She said, "In terms of functionality, [the Dayton Center] was not complete at all. It was more about stuffing everything in here no matter how it fits."

> **e.** **The Dayton Center's Inability to Fill Customer Orders Promptly and Completely**

87. As a result of the serious problems with quality control and inventory management discussed above, Spectrum was unable to appropriately fill customer orders from the Dayton Center during the Class Period. This problem was recognized internally through tracking of "fill rates," the percentage of products ordered by a customer that are included in the shipment to the customer. Spectrum's major clients typically had Service Level Agreements ("SLAs") in place, which entailed a commitment by Spectrum to achieve a minimum fill rate over a certain time period (and to meet timely shipping requirements). Before the Consolidations, Spectrum had a reputation for high fill rates, and this was a key factor in winning and retaining retailers' business. Because of the metric's role in client retention, Spectrum monitored its fill rates as an important KPI, because, among other things, low fill rates can result in penalty payments to the customer under the SLA or cancellation of the customer's business. Indeed, after Spectrum publicly acknowledged certain of the major problems with the Centers in April 2018, Defendant Maura discussed the critical financial impact of fill rates, admitting that Spectrum's fill rates had dropped "in the 80s, when your customers want [fill rates] in the high 90s, now you have your cost of goods sold per piece is going through the roof."

88.     The order-fulfillment problems began from the opening of the Dayton Center in January 2017 and led to numerous customer complaints and lost sales. FE 3, who worked at the Dayton facility from its inception and personally dealt with customer complaints, said that it was clear from the "get-go" at Dayton that things were not progressing to plan. Customers were angry because the Company was not shipping the right things in the right amounts.  The service team would field complaints and send them to her, and she would then work with the teams on-site to perform preventative and corrective actions. The complaints from customers began in the summer of 2017 and were continual through the rest of her tenure (through January 2019). Complaints were typically regarding incorrect product received, shipping issues, and missing or damaged items. She estimated that approximately 70% of the issues were related to distribution and 30% to manufacturing issues like mislabeling and mispackaging. All of the issues were still happening in April 2018.

89.     The Dayton Center's inadequate fill rates also cost Spectrum large penalties by major customers. FE 4 explained that during the Class Period she would receive emails breaking down the fines being levied by customers due to missed shipments or low fill rates, including the names of customers and the amount being fined. There were weekly fine-reduction meetings, where strategies would be discussed on how Spectrum could increase fill rates without cutting orders. She would be told at these meetings that Spectrum was at risk of losing customers due to quality issues. Problems that the botched Consolidations caused in Spectrum's relationships with specific major customers are discussed in Section IV.D.3 below.

### 2. The HHI Consolidation Was Not "On Track"

90.     Like GAC, HHI experienced serious problems in consolidating its multiple prior facilities into a single facility. As discussed above, Spectrum announced in February 2017 that HHI would close its Mira Loma, California and Charlotte, North Carolina distribution centers and

transfer all distribution to Edgerton, Kansas. Spectrum further announced that the Edgerton Center would be operational in May 2017 and complete by December 2017. In other words, by December 2017 the California and North Carolina centers were supposed to be closed, and the Edgerton Center would be fully operational and fulfilling all HHI orders. Contrary to the Defendants' representations to investors, these timeframes were unachievable from the outset because of initial delays and poor planning and became ever more so because of serious undisclosed problems in the new distribution center. In November 2017, in recognition of the fact that the original schedule was never achievable, Defendants delayed the anticipated start date to February 2018 – then, without fanfare, the Company abandoned consolidation and kept the Mira Loma facility open.

91.     While Spectrum did not plan to manufacture HHI goods at the Edgerton Center, HHI's consolidation in the Edgerton Center was still an enormously complex project requiring careful planning because HHI sold thousands of different products. These products included "Kwikset," "Weiser," and "Baldwin" lock products, "Pfister" faucets, and thousands of diverse hardware products sold under the "National Hardware" brand name. As a result of the sheer number of products HHI sold, the Edgerton Center was even more enormous than the Dayton Center— 927,112 square feet, or the equivalent of 16 football fields.

### a.     Delays and Cost Overruns in Consolidating Distribution in Edgerton

92.     Like the GAC Consolidation in Dayton, the HHI Consolidation in Edgerton experienced significant, fundamental delays at the outset that caused problems that were never overcome during the Class Period. As discussed below, it was clear from the outset based on Spectrum's failure to plan or prepare for such an enormous undertaking that a successful Consolidation would not be possible. In fact, although Spectrum never admitted it, the Company apparently eventually abandoned the Consolidation altogether.

93. Contrary to Defendants' statements beginning in February 2017 that the Edgerton Center would be operational in May 2017 and completed by September 2017, Spectrum experienced significant delays in getting the Edgerton Center operational from the start. These significant delays were confirmed by FE 8, the individual who was responsible for setting up the Edgerton Center's infrastructure.[20] She said that the Edgerton consolidation was "the most disorganized plan [she'd] ever seen in her life." FE 8 was brought to Spectrum as an expert on manufacturing-process improvement. FE 8 recalled that from the outset it was impossible for the Consolidation to succeed, because all of the necessary pieces were not in place—as of January 2017 the Edgerton Center did not have shelves, employees, or processes in place—and she made that clear to her boss.

94. The delays in making the Edgerton Center operational at the start of the Class Period crippled it throughout the Class Period and caused severe financial harm to Spectrum. These delays contributed, along with the other problems at the Edgerton Center discussed below, to pervasive inefficiency and cost overruns throughout the Class Period. For example, FE 9 was told by a Senior Developer at Spectrum that when the project started, the Edgerton Center had a budget of $20 million, and by Thanksgiving 2017, the Company had spent around $50 million on the project.[21] Around Thanksgiving 2017, she started hearing about the budget being out of control, and the Company laid many people off between Thanksgiving and Christmas 2017 as a result.

---

[20] FE 8 was an Internal Consultant on manufacturing process improvement at Spectrum from August 2016 to May 2017, including at the Edgerton Center and at the Charlotte, North Carolina facility that was being consolidated into the Edgerton Center.

[21] FE 9 was a Solutions Analyst Consultant who has 20 years of experience in warehouse operations and who worked on warehouse management software at the Edgerton Center from October 2017 to February 2018.

95. Spectrum management was warned that it was rushing HHI's Consolidation and this would cause problems, but they ignored the warnings. FE 10 said that the HHI Consolidation was hurried because the plan for the Consolidation did not provide adequate time for proper completion.[22] The Company was essentially trying to do a nine- to twelve-month project in three to four months. According to PE 10, Spectrum's HHI divisional leadership tried to push back and explain the constraints and challenges of completing the transition in that timeframe, but corporate leadership basically said, "Tough, figure it out."

96. Well after the Class Period—after Spectrum claimed the HHI consolidation was "complete"—Spectrum still has not consolidated its operation in California with the Edgerton Center. No doubt because of the issues discussed below, Spectrum apparently determined that Consolidation was not feasible for HHI. As of July 12, 2019, Spectrum still operated the Mira Loma Distribution Center through its subsidiary Tell Manufacturing. On the "careers" portion of its website, Spectrum describes the facility as follows:

> Mira Loma, CA - Tell Manufacturing, Inc
>
> The Mira Loma Distribution Center is located in Southern California approximately 40 miles from our Lake Forest Offices. This is the <u>main distribution facility</u> for Kwikset, Price Pfister, and Weiser to our retail customers such as Home Depot, Lowes, and Ferguson, to name a few, as well as thousands of residential customers.[23]

Spectrum continues to this day to operate at least two distribution centers for its HHI products.

---

[22] FE 10 was a Senior Quality Engineer from 2009 to 2015; and an Operations Manager from 2015 to March 2018 in Spectrum's Denison, Texas manufacturing site.

[23] Lead Counsel contacted Tell Manufacturing directly to confirm that it did, in fact, continue to distribute these products through Mira Loma.

41

**b.  Consolidation Delays at Edgerton Caused Excess Inventory Buildup at the North Carolina, California, and Edgerton Centers**

97.  The poor planning of the Consolidation of HHI's two prior distribution centers into the Edgerton Center caused an excessive inventory buildup across all HHI facilities, contrary to Defendants' claims that the Consolidation would reduce the amount of inventory HHI needed to maintain and would thus reduce Spectrum's costs. The delayed Consolidation at the Edgerton Center also adversely affected Spectrum's manufacturing facilities that produced HHI products.

98.  The excessive inventory buildup was caused in part by HHI's delay in closing its legacy distribution centers, which were supposed to close by the time the HHI Consolidation was complete (originally to be in December 2017). FE 10, an Operations Manager at Spectrum's manufacturing facility in Denison, Texas, stated that the delays in the Consolidation of HHI's distribution centers in Edgerton affected Denison because it impacted the volume of product that the Denison facility had to manufacture. FE 10 said that the Denison site was having to manufacture more product because Spectrum did not shut down the distribution centers in Charlotte, North Carolina and Mira Loma, California on schedule. The Denison site was essentially filling three centers instead of two. FE 10 recalled that the North Carolina site stayed open six or more months past when it was supposed to close. A lot of FE 10's subordinates were sent to the North Carolina site to help run it because when it was announced that it was closing in a few months, workers there started quitting. When it did not close on time, the Company had to bring in people to run it. This was still happening when FE 10 left the Company in March 2018.

**c.  The Edgerton Center's Failure to Install Basic Infrastructure**

99.  The delays in making the Edgerton Center operational were caused in part by Spectrum's initial failure there, as in the Dayton Center, to install a racking system. FE 8 said that Spectrum had decided in January 2017—when the Edgerton Center did not have racking or,

42

remarkably, any employees—to ship all of the product from the California and North Carolina facilities to the Edgerton Center in March 2017. When FE 8 was first sent to Edgerton around January 2017, she was told that they had 60-75 days and then product would start being shipped there. When she arrived and saw that there was no racking in place and no employees had been hired, she knew there was no way the facility would be ready in 60 days. Two months later, the products started showing up at the Edgerton Center, but they still did not have the necessary infrastructure ready. They were not properly staffed and did not have shelving up, and the SAP systems were not functional. In fact, FE 11 confirmed that when she visited the facility for the first time in April 2017 before accepting her position, there were few racks installed, only 5% of the approximately one-million-square-foot building was set up, and the distribution center was operating out of a trailer.[24]

100.    FE 9, the Solutions Analyst Consultant identified above, said that when she arrived in October 2017, Spectrum was still building racks for inventory in Edgerton. FE 9 observed that, without having racks, Spectrum could not properly store and track its inventory. FE 12 also confirmed that racks were still being built in November 2017 and that two of Edgerton Center's conveyors were still not operational by March 2018 because no one knew how to use them.[25]

101.    Defendant Maura later admitted after the Class Period on February 19, 2019, that in April 2018 when he first visited the Edgerton Center, the hardware inventory at Edgerton was "all over the floor," which "wasn't healthy."

102.    The Edgerton Center's lack of proper storage racks meant that large amounts of inventory could not even be unloaded from the semi-trailer trucks delivering the products.

---

[24] FE 11 joined Spectrum as a member of the Operations Team in Edgerton in the second quarter of calendar year 2017 and left the Company near the end of 2017.

[25] FE 12 was a Training Specialist at Edgerton from November 2017 to March 2018.

Defendant Maura later admitted in July 2018 that the Edgerton Center had been at a "standstill" in March 2018 with 350 semi-trailers blocking both inbound and outbound shipments and in the Edgerton Center's parking lot.  But this problem was longstanding and existed from the time Spectrum opened the Edgerton Center. FE 8 said that throughout the spring of 2017, large trucks were backed up at the Edgerton Center's docking bays waiting to unload product, with eight or nine trucks waiting at every loading door at the Edgerton Center. The trucks could not wait indefinitely and so would frequently leave their trailers in the parking lot. The Company was then forced to rent the trailers until they could be unloaded and retrieved. By the time FE 8 left in May 2017, there were 30 trailers filled with product in the parking lot. There was still no racking system in place, and materials were being stacked on the floor. Similarly, FE 13 stated that in May 2017 there were semi-trailers sitting in the parking lot taking up space meant for employee parking.[26]

103.   FE 12 confirmed—as Defendant Maura later admitted—that the Edgerton Center's storage problems were not resolved by the time she left Spectrum in March 2018. There were still hundreds of 54-foot trailers out in the yard that were waiting to be received or shipped. FE 12 recalled an "all-hands" meeting around the end of February 2018 at which it was discussed that close to 300 trailers were on the property waiting to be unloaded. FE 12 similarly recalled that there were so many trailers that they overflowed into the employee parking lot, and employees had trouble finding parking. Employees were told that more overtime hours would be required to unload the trucks until all the product was unloaded and the Company could begin shipping orders.

104.   FE 12 also recalled that the Company was forced to rent a warehouse facility to hold overflow inventory. The Edgerton Center had a million square feet, and the rented warehouse provided an additional 500,000 square feet of storage. FE 12 confirmed that a nearby "smart"

_____

[26] FE 13 was a Human Resources Coordinator at Edgerton from March to May 2017.

44

warehouse was being used, which had been rented in February 2018 to handle product overflow since the Edgerton Center was full and Spectrum could not figure out how to get product out and ship it and instead had to rent space to unload product.

### d. The Edgerton Center's Incomplete Shipments to Customers

105. Like Spectrum's Dayton Center for GAC, the Edgerton Center's lack of proper racks, inadequate inventory management, and inadequately trained workforce caused a pervasive problem of incomplete shipments to customers, which significantly damaged Spectrum's customer relationships and cost it large amounts of money in lost sales and penalties. As discussed above, Spectrum carefully monitored these deficient "fill rates" because they were a critical metric affecting sales and revenue. While customers demanded (and enforced through substantial financial penalties) fill rates exceeding 90%, the Edgerton Center's fill rate fell to 30%.

106. HHI's fill rates were seriously deficient from the opening of the Edgerton Center into 2018. FE 14 said that the fill rates and shipping delays were consistently bad from January 2017 until she left Spectrum at the end of February 2018.[27] She said, "If it was shipped, it was on super delay and the fill rate was even lower than fifty percent." FE 14 said that after the Edgerton consolidation started in January 2017, "it was turmoil on the HHI side . . . [I]t was not going well." When the orders did ship, they had "horrendous" fill rates. The fill rates were 50% to 70% on all products. She said, "It was a nightmare. On top of that we weren't allowed to explain what was going on to customers. We were instructed not to tell them the truth, so it made us look really bad." She explained that sales staff were expected to visit customers at least once every four weeks to take their orders. Throughout January and February 2018, when she went to her customers, they

---

[27] FE 14 was a Territory Account Manager for HHI from September 2014 to February 2018 in Louisville, Kentucky.

would tell her that they only got their previous order a day or two before she showed up or had still not received it. That four-week delay in shipping really hurt her sales numbers. The problem of inadequate order fulfillment was so severe that the fill rate fell from over 90% before the Edgerton Center Consolidation to about 30%. She said, "We were getting orders, but it was a super low fill rate."

107.    The Edgerton Center's problem of inadequate fill rates became serious in mid-2017, almost immediately after the Center opened, but management instructed salespeople to lie to customers about how serious the problem was. FE 14 stated that the Edgerton Center's inadequate fill rates were discussed on conference calls involving senior management and the sales personnel from mid-2017 on, and fill-rate and related data were circulated to the participants before the calls. FE 14 recalled that salespeople were told to just tell customers that things were going to get better relatively soon and not engage with them about specifics. FE 14 said that the instructions she was given about what to say to customers were given on conference calls, beginning in the middle of 2017 and continuing until she left the Company.  These conference calls were held monthly and were usually led by HHI's Director of Sales (who reported to HHI's General Manager, a Spectrum SVP).[28] Later in 2017, HHI's General Manager also began participating in these calls. FE 14 personally heard both of these executives instruct sales staff during these conference calls not to tell the customers the truth about how bad the situation was. These instructions were at first given in response to sales staff asking what they were supposed to tell their customers in response to complaints about shipping delays and low fill rates. Despite the internal monthly reports showing ongoing seriously inadequate fill rates, management ordered salespeople to deceive their customers by telling the problems were temporary. FE 14 explained that her superiors, including (i) her direct

---

[28] Lead Plaintiffs can identify these executives by name at the Court's request.

46

supervisor; (ii) HHI's Director of Sales, to whom her direct supervisor reported; and (iii) HHI's General Manager himself all instructed sales staff not to tell customers what was going on in terms of delayed orders and "really unacceptable" fill rates. FE 14 and other sales staff were told just to let the customers know there was "some kind of temporary delay," but Spectrum was working on correcting it. She said, "They didn't want us to say how bad we knew it was. They just wanted us to go about our day to day business as usual. If stuff got cancelled off the order, we would just re-order it and hope it would come through. We were blindly ordering things and never knew what was going to come and what wasn't. But we were not allowed to tell [customers] the truth about what was going on."

108.     FE 14 said that HHI's General Manager and HHI's Director of Sales ordered sales staff to tell complaining customers that Spectrum was having some minor issues as it got the distribution center open, but things were getting better. She said, "But they knew it wasn't true. They had the same spreadsheets and data we did." She was told not to provide any specific timeframe for getting things back up to previous standards because "they knew whatever time they would have given would be wrong." She said that things were only getting worse and worse; they were not improving; the numbers in those spreadsheets proved it; and that was why she was being instructed to lie to customers.

109.     Because fill rates are a vital KPI, they were tracked and reported internally in monthly reports. FE 14 said that in advance of the above-described meetings, sales staff would receive an email with a spreadsheet. This spreadsheet would show the fill rates and lead times for products, territories, and orders. These spreadsheets were sent to all sales staff. Senior leadership, including HHI's Director of Sales and HHI's General Manager, clearly had access to them as well, because the senior leadership would go over the numbers during the monthly calls. Sales people

were all very interested in the numbers because they would also show whether the distribution center was improving month over month, which it rarely was.

110. Other former Spectrum employees confirm that the Edgerton Center had seriously deficient fill rates and that management was aware of this. FE 9, the Solutions Analyst Consultant identified above, said that the fill rate "was a mess" when she started in October 2017, even though the location had been up and running for months already. Around early October 2017, FE 9 heard a senior executive express concern to FE 9's boss that the fill rate was about half of what it had been before the Company consolidated the distribution centers and that the fill rate was "dismal."

111. Because the Edgerton Center was unable to achieve satisfactory fill rates, it simply lowered the fill rate it required to ship orders. FE 14 stated that sales staff brought up these issues to their bosses. She was told that the distribution center was understaffed and when orders came in it was creating a bottleneck. At some point in late 2017 or the beginning of 2018, the Company decided to cut the fill-rate threshold to ship an order out to reduce lead time. Instead of waiting for the entire order to be complete and letting orders pile up while the Company tried to get the distribution-center issues resolved, the center would just start pushing out the shipments once they reached 40%. This tactic was never done before the consolidation of the distribution centers. In fact, Spectrum had previously gained a lot of business because of its reputation for high fill rates and short lead times. FE 7, the National Account Manager identified above, also recalled that, in 2018, the Company began to cut the fill-rate threshold to push orders out of the distribution centers.

112. The Edgerton Center's inadequate fill rates severely damaged HHI's business in the major market of Texas. FE 15 said that Spectrum had approximately 80% of the market share

for door hardware in Texas, generating $45 million annually.[29] Due to the consolidation of the distribution centers and all the related issues, the Company lost approximately 15% of its market share, which resulted in a loss of approximately $6.5 million in revenues every year, if not more, just in the Texas market. Like other former employees, FE 15 described how the HHI division's consolidation of its distribution centers in one facility adversely affected sales. FE 15 was responsible for locks for the Texas area, which was the largest market in the entire division. She consistently produced the most revenue of any sales manager in the division during her entire time at the Company, including $40 million of sales during her last year there.

113.     According to FE 15, almost as soon as the Edgerton Center started shipping locks in January 2018, delays in shipment, lowered fill rate, and increased errors in orders arose. FE 15 stated that "[a]ll of our customers started complaining because it just wasn't working right. I would voice that to my upper management and was told that we'll take care of them, but you keep saying that and the customer isn't going to tolerate it. They're going to look for someone else. It just snowballed out of control and no one from leadership ever addressed it. They were just running from the issue." According to FE 15, before the consolidation, she rarely had issues with shipping and ordering, but after the consolidation she would have to talk to customers or distributors about missing, delayed, incorrect, or damaged orders at least four times a day.

114.     Because the Edgerton Center's operational problems started as soon as it officially opened in May 2017, Spectrum encouraged customers to buy extra inventory before the legacy distribution centers closed. Spectrum's fiscal year ends on September 30, and FE 15 said that beginning in July 2017, she was instructed by HHI's Vice President of Field Sales, Nick Kruse, to

---

[29] FE 15 was a Sales Manager at HHI from before 2012, when Spectrum acquired HHI, to May 2018 who was located in Houston, Texas.

49

offer customers an extra 5% rebate on large orders, plus special 90-day extensions on payments in response to delays and errors in shipping. Both of these strategies had never been done before.

115. The Edgerton Center's inability to accurately and promptly fill customer orders lasted until at least May 2018. Contrary to the Company's public statements in April 2018 that the problems at the new distribution centers were temporary, FE 15 said that the problems were not temporary. They had existed from as soon as the Edgerton Center opened and continued to get worse up until she left the Company in May 2018. Contrary to the Company's public statements that the problems had been largely fixed, she said, "No, they were getting worse. Every time [senior management] said they were getting better they were actually getting worse."

### e. The Edgerton Center's Delayed Shipments to Customers

116. Due to the issues discussed above, the Edgerton Center was chronically delayed in fulfilling orders for its clients. In fact, as discussed below, the huge backlog of unfulfilled orders at the Edgerton Center grew so out-of-control that in early 2018, Spectrum simply cancelled its backlog of unfilled orders and required customers to place new orders.

117. FE 8 confirmed that the Edgerton Center suffered serious order-shipment delays from the outset. She said that the Company's May 17, 2017 public statement that the Edgerton Center was "on track" was "not a truthful statement"; there was no time when the Edgerton Center was on schedule. She said that the Company's July 27, 2017 public statement that the Edgerton Center consolidation remained on schedule, issues were being quickly addressed, and the Company was making good progress clearing the higher order book was also untrue. When she left in May 2017, the Edgerton Center was $200 million behind in filling orders. It was so bad that in May 2017 a message was sent around headquarters asking anyone available to go to Kansas to help support the distribution center. Employees from finance and other administrative roles were sent down to

the Edgerton Center, only to end up standing around because the systems and organization were not in place to clear the issues.

118. FE 15 stated that after the consolidation, she and the other sales staff were told to prepare clients to temporarily expect the lead time to increase from 7-10 days before the consolidation to 14-21 days until the Edgerton Center was fully up and running. But the lead-time increase was not temporary. She said, "It got real bad. The average lead time was 68 days, and it even extended beyond that a lot of the time. It got so bad that the regional sales manager[s] were trying to coach our teams how to talk customers through it; trying to have us tell them it wasn't as bad as it looks. I couldn't do it in good conscience. They were telling us to lie." The Company offered rebates and credits to the customers to try to make up for the delays; however, "The rebates were like trying to put a band aid over a gunshot wound. It wasn't enough."

119. According to FE 15, by mid-January 2018 the lead time had gone from 7-10 days to expecting six weeks or longer, and beyond. This lag in lead time continued to get worse throughout 2018 until she left in May, and she understands from speaking with former colleagues that it continued to get worse after that time.

120. Other former HHI employees confirmed the Edgerton Center's serious problems with late shipments to customers during the Class Period. FE 14 said that multiple issues with shipping and big delays in getting orders out on time persisted from January 2017 until she left Spectrum at the end of February 2018.

121. In addition to the extended delays, FE 15 said that a lot of products were shipped either damaged or with the wrong products in the box. At least four times per day, she would have to talk to customers or distributors about missing, delayed, incorrect, or damaged orders. Before the

51

consolidation, she rarely had issues with the shipping and ordering side, having to deal with one complaint every other month, and typically very minor ones.

122.    FE 16, said that after the distribution-center consolidation began there was "a tremendous backlog and issues with shipping."[30] It took six to eight weeks from the time an order was placed to get it shipped, compared to 7-8 days before the consolidation to the Edgerton Center. The increased lead time built up as the Company began to consolidate the distribution centers. In either January or February 2018, she said, "It had become so insurmountable that they flushed all of the orders. There were so many direct shipments [to customers] in the system that if you did a workflow chart it would have taken six to eight months to get caught up." FE 16 explained that, in early 2018, she was told there were so many orders in the system, and that many of those orders were so old, that Spectrum did not know which orders were still valid and which the customers no longer wanted or needed. This was the rationale for Spectrum to "flush the system" of all open orders. She had to call back her clients, explain the situation, and ask them to resubmit any orders they still needed. She said that the general reaction of her clients was "Frustration . . . exasperation. But it was such a mess they were almost like, 'Fine. Whatever it takes to fix this.' It was really bad." Notwithstanding this "order flush," the 6-8-week lead time remained consistent from when the Edgerton Center opened until she left the Company in October 2018. FE 14 corroborated FE 16's account, stating that she understood that the Company purged all open orders from its system in February 2018 just before she left.

123.    Despite the Edgerton Center's serious, ongoing, unresolved delays in filling customer orders, Spectrum ordered salespeople to lie to customers and say the problems would be

---

[30] FE 16 was a Business Development Manager from 2009 to October 2018, who was responsible for HHI clients with less than 100 brick-and-mortar locations and was located in Oxford, Missouri.

fixed soon. FE 16's leadership kept saying that they would have the situation resolved in 30 days, then 60 days, then 120 days. She would be instructed to go to her clients and explain that to them. At first, she had no reason not to believe what her leadership was telling her. However, she said, "Those deadlines came and went with nothing happening. I finally stopped making the calls [to clients] because I got tired of lying. I couldn't be a part of it anymore. I couldn't take it and that's when I left." She had spent decades in the industry and did not want to ruin the credibility she had built up over her career.

124. FE 11 stated that she learned about these delays from daily reports that were circulated, as well as daily meetings with the leadership of the Edgerton Center, including the Site Leaders, Operation Managers, and Operations Supervisors. According to FE 11, these reports were available via the Company software used to manage operations, and David Booher, a Senior Vice President who reported to HHI's General Manager, who reported to Defendants Rouvé and Maura, had access to these numbers. FE 11 also learned from Booher and likely Shawn Simmons, Vice President of Human Resources who reported to HHI's General Manager, that Home Depot and Lowe's were fining Spectrum for late shipments.

125. The Edgerton Center's low fill rates and delayed shipments severely affected Spectrum's sales. FE 14 said that the reduction in fill rate was "absolutely" impacting the Company's revenues: "Our quarterly bonuses were based on sales, and they were severely impacted." She could not book revenue until the customer received the product. If the fill rate was only 30-40%, that meant that she couldn't book most of her order. She said that at the end of the first quarter of fiscal 2018 (January 2018), "everyone was down on year over year sales and no one had shown any growth. It was widely known we could not hit our goals. We were still being somewhat pressured to hit them, but we pushed back. We had the data [on the fill rates] to show

[HHI's General Manager and HHI's Director of Sales] that there was no way we were going to hit our goals."

### f. The Edgerton Center's Undisclosed Hiring, Retention, and Training Problems

126. The Edgerton Center's problems in receiving its inventory and filling customer orders promptly and accurately were exacerbated by its inability to hire, retain, and train a workforce capable of doing the necessary tasks for a sophisticated distribution center handling thousands of products. FE 13, an HR Coordinator who worked at Spectrum in Edgerton from March to May 2017, stated that she was put in charge of finding people for the laborer roles at the site, and she told the Company it was "mission impossible." Edgerton is located 40 miles from the center of Kansas City, well outside the metro area, and there was no public transportation available. She was told by a Spectrum HR manager who came in from Texas, "If they have a pulse, hire them." FE 13 raised all of her concerns to Shawn Simmons, Vice President of Human Resources, Rita Huske, Human Resources Manager at Spectrum, and Stephanie Chapman, Senior Human Resources manager at Spectrum, but nothing was done.

127. FE 13 confirmed that the Edgerton Center's inability to hire and retain qualified workers was caused in part by competition from a nearby Amazon distribution center, which offered much higher wages. When the Edgerton Center opened, Spectrum was starting workers at $9.50 and $10.50 an hour, which was low for the area. The Amazon distribution center in the area was starting workers at $14.00 an hour. FE 8 also said that Spectrum could not compete for employees against the nearby Amazon distribution center that paid better wages.

128. The Edgerton Center's uncompetitive wages contributed to extremely high employee turnover, which exacerbated the center's inability to adequately train its employees, which exacerbated its problems in inventory management and order fulfillment. FE 11 recalled

54

conversations with Shawn Simmons, Vice President of Human Resources, in which she learned that the Edgerton Center was losing more employees than it was hiring. These problems were ongoing when FE 11 left Spectrum near the end of calendar year 2017. FE 17 said that "the turnover was tremendous" and "atrocious."[31] The Company brought in a team "from all over" to try to stem the attrition, including from Middleton headquarters and from California. None of these issues had been resolved when FE 17 left in June 2018.

129.   FE 8 stated that she participated in several monthly status meetings with Phil Gaebler, Vice President of Business Improvement and Global Supply Management, and HHI's General Manager, (who reported directly to Defendants Rouvé and Maura), who were explicitly briefed on the numerous issues plaguing the Edgerton center, including Spectrum's challenges in hiring staff, receiving product and, shipping delays.

130.   The Edgerton Center's extremely high employee turnover was caused not only by uncompetitive wages but also by inadequate training. FE 12, a Training Specialist who worked at Spectrum's Edgerton facility from November 2017 to March 2018, said that the facility was losing people faster than it could hire them. She told upper management, including David Booher, in January and February 2018 that people were leaving because they were not getting the training they needed. FE 13 further recalled that supervisors and managers were placed in positions they did not understand, and that warehouse workers were constantly being hired and put in power-equipment positions with minimal training. FE 12 agreed that employees did not know how to properly use equipment, including forklifts, causing misplacement, mixed product, and damaged product. There were accidents "all the time" with forklifts. Forklifts and other power equipment were running into

---

[31] FE 17 was a Contract Recruiter at Spectrum in Edgerton from January 2018 to June 2018,

racks, hitting pallets, hitting the product, and causing damage. She said that the training problems were not fixed by the time she left Spectrum in March 2018.

### 3. The Consolidations' Undisclosed Impact on Spectrum's Sales to Walmart and Other Major Retailers

131. The bungled GAC and HHI Consolidations jeopardized Spectrum's ability to continue to sell its products to Walmart, which is the largest retailer in the United States and Spectrum's most important customer, as well as other major retailers and homebuilders.

132. FE 7, the Spectrum National Account Manager for Walmart identified above, confirmed that Spectrum's relationship with Walmart was seriously harmed by the GAC and HHI Consolidations. She said that Walmart was upset about supply disruptions after the 2017 distribution-center Consolidations and threatened to leave its contracts with Spectrum. She said, "The team continually talked about how every time they had a meeting with Walmart they were called to the carpet. They had to have a top president [from Spectrum] come in and explain why we weren't getting our stuff out on time." National account managers would have weekly or monthly meetings with Walmart buyers. On at least two occasions, once during late 2017 and then again in early 2018, Walmart demanded face-to-face meetings between its VPs and Spectrum senior leadership to address distribution issues. Steven Fraundorfer, Special Advisor to Spectrum's Chief Operating Officer, and Spectrum's Vice President of Sales and Marketing[32] were both flown down to meet with their counterparts at Walmart. Due to the ongoing shipment delays and problems, Spectrum's Vice President of Sales and Marketing lost all credibility with Walmart. FE 7 was told by one of the senior Walmart buyers she dealt with that Spectrum's Vice President of Sales and Marketing was no longer allowed to appear at meetings because Walmart considered him to be a

---

[32] Lead Plaintiffs can identify this individual at the Court's request.

56

"liar." FE 7 stated that Walmart's complaints about fulfillment rates and shipping times were consistent throughout her tenure at Spectrum, from September 2017 through August 2018. This was one of the reasons she decided to leave the Company.

133. FE 4 also confirmed that the botched GAC consolidation hurt Spectrum's relationship with Walmart. She said that the Dayton Center's order-fulfillment problems cost Spectrum millions of dollars in penalties to major customers, which would penalize Spectrum if they had under 90% fill rates on orders (i.e., more than 10% of the orders was missing, damaged, etc.). Penalties from major customers, including Home Depot, Walmart, and Lowe's, were into the millions of dollars during 2017. FE 4 explained that she knew this because she would receive emails breaking down the penalties, including the names of customers and the amount of the penalty and they would have weekly fine-reduction meetings where they would discuss strategies on how to increase fill rates without cutting orders. These meetings were implemented in June 2018 when Stephen Keller took over as Vice President. FE 4 stated that she would be told at these meetings that they were at risk of losing customers due to quality issues.

134. FE 4 further explained that there were monthly "Tier Meetings" involving senior leadership at the Dayton Center. They were led by either Ken Burns or Vice President of Finance Jim Garvey, who reported to GAC CFO Carol Anderson, and were attended by all directors, managers, supply planners, and quality-control people. She said, "Constantly at the tier meetings people were saying that Walmart had just about had it with us. We have to get this order out or they're going to leave us because we're so far behind. There were screaming matches between the distribution directors and supply planners. It got worse at the beginning of our peak season in 2018. [The possibility of losing major clients] was talked about daily. We were all very aware that we were getting heat." She stated that she was warned about major client threats during the meetings

57

by Larry Buck, Senior Director of Manufacturing for Spectrum, and Dave Hartzell, Senior Director of Distribution and Transformation, but that Burns and Garvey were also at these meetings and aware of these issues.

135. FE 7 stated that the Defendants would have had to be aware of Walmart's concerns because Fraundorfer and Spectrum's Vice President of Sales and Marketing were being flown down to Arkansas specifically for meetings. With her knowledge of decision-making within Spectrum, she does not believe that these meetings could have taken place without the knowledge of, and direction by, Spectrum's C-suite.

136. Other former Spectrum employees confirmed that the GAC and HHI Consolidations caused similar problems in Spectrum's relationships with Lowe's and Home Depot. FE 16, the Business Development Manager identified above, understood from colleagues that Lowe's and Home Depot were also experiencing huge inventory issues with Spectrum. She also understood that in these major contracts, Lowe's and Home Depot could levy penalties against Spectrum for every day they were short on inventory. She understood that these fines were growing very fast, and at the height of the distribution issues had become millions of dollars.

137. FE 12, who from November 2017 until February 2018 attended large weekly meetings of facility personnel including David Booher, FE 12's direct report Kimberly Johnson, and all floor supervisors and managers from the distribution center, said that shipments being behind was discussed a lot at these meetings. She also heard in a meeting in January 2018 that Home Depot was planning to drop Spectrum as a supplier because of the delays, but Home Depot ultimately remained a customer.

138. The HHI consolidation also cost Spectrum an exclusive hardware-supply contract with Tractor Supply Co., which had 1,500 locations across the United States. FE 16, the Business

58

Development Manager discussed above, said that distribution issues were the direct cause of Spectrum losing its HHI exclusivity contract with Tractor Supply in 2018, which she heard about from former colleagues. A Tractor Supply Vice President of Sales in Texas was visiting a store in March 2018 and saw that the store had bare shelves where Spectrum product should be, and "things sort of blew up from there." Tractor Supply then began looking back through its last few quarters and saw all the lost sales due to lack of product being delivered to the stores. That gave Tractor Supply grounds to initiate an "emergency line review." There was a 3-year contract between Tractor Supply and Spectrum giving Spectrum exclusive rights to the HHI products. The line review meant that Spectrum had to defend its product line to Tractor Supply, assuming an open competition with other suppliers. This line review began one to two months after the initial call for it, and Tractor Supply found cause to end the contract. Spectrum lost exclusive rights over its 16 core products (standard hardware items such as hinges, brackets, etc.) being offered at Tractor Supply's locations. When FE 16 left in October 2018, Tractor Supply was transitioning off Spectrum. She was aware of these talks because they directly impacted the revenue generation of her team. FE 14 corroborated FE 16's account, having also understood from colleagues that the Company lost its exclusive rights to sell its core HHI product line at Tractor Supply stores. FE 14 recalled that the Company "definitely lost sales" because of the long lead times and low fill rates. When Spectrum could not deliver the products, her customers would have no choice but to look for someone else to fill the order.

139. FE 15 said that the Edgerton Center's delayed, inaccurate and damaged shipments particularly damaged the Company's relationships with major homebuilders including D.R. Horton (which is America's largest homebuilder), David Weekley (which is the largest privately held custom home builder in America), Toll Brothers (which is America's leading builder of luxury

homes), and PulteGroup, Inc. She understands from colleagues that Pulte ended up tearing up its contract with Spectrum because of all the Edgerton Center issues. Pulte was one year into a four-year contract and walked away from it. She said that Pulte is the second-largest homebuilding company in the country, and she estimated that the contract was worth approximately $20 million per year.

### 4. The Consolidations' Undisclosed Adverse Impact on Spectrum's Ability to Pay Both GAC's and HHI's Vendors

140. The serious inventory-management problems discussed above in Sections IV.D.1 and IV.D.2 made it impossible for Spectrum to pay GAC's and HHI's vendors—the Companies that supplied Spectrum's finished products, raw materials, and equipment—because Spectrum could not account for the inventory received from vendors in order to pay vendor bills in a timely manner. These vendors amounted to nearly 500 vendors for each of GAC and HHI, according to FE 18, Spectrum's Accounts Payable ("AP") Manager beginning in February 2018.[33]

141. Spectrum's inability to timely pay GAC's and HHI's vendors because of the Dayton and Edgerton Centers' inability to track their inventory was confirmed by FE 18. FE 18 became familiar with GAC's and HHI's challenges when she was promoted to AP Manager, because she was then responsible for accounts payable for all vendors servicing both GAC and HHI. According to FE 18, shipments from vendors would sit in trailers in the warehouse lot or in a corner of the warehouse for months. The Centers would not know what had been received, so vendors could not be paid. In sum, "because the [distribution centers] had no proper processes in place, we couldn't verify what things we had. There were no control processes." As a result, when

---

[33] FE 18 joined Spectrum as a senior accountant in its Middleton, Wisconsin office in July 2017, was promoted to Accounts Payable Manager in February 2018, and remained at Spectrum until May 2019.

FE 18 came into her role as AP Manager in February 2018, there were vendor invoices that were over a year old and had been submitted in February 2017 that had still not been paid. Thus, according to FE 18, the Company's July 2017 public statement that the distribution centers were on schedule and making good progress was not accurate, since the unpaid invoices caused by the receiving issues went back to at least February 2017.

142. FE 18 explained that there was an "exception list" of invoices that were not able to be processed even after an investigation and stated that most of the issues causing invoices to be put on this exception list were related to the GAC and HHI receiving problems. She understood that, shortly after the Consolidations, in early 2017, this exception list had grown to almost 800 invoices. When she started as AP Manager in February 2018, the exception list still had 350 invoices on it due to the HHI and GAC Consolidation issues. She believed that the exception list was distributed to Steve Siguenza, the HHI Assistant Controller, and as the problems with outstanding vendor payments worsened the report was also sent to Lanie Scoggins, Director, Global Financial Planning & Analysis/Controller, who was between Siguenza and Brent Esplin, HHI Division CFO who reported to HHI's General Manager.

143. The late-payment problem was pervasive for both GAC and HHI. FE 18 confirmed that, on both the HHI and GAC sides, virtually 100% of vendor invoices had some sort of issue caused by the deficient receiving and control processes at the distribution centers. FE 18 further recalled that likely only 50-60% of payments to GAC/HHI vendors were on-time payments. According to FE 18, most of the issues were related to inventory tracking and management, and often they would have to have vendors provide proof of delivery because they were unable to find their own proof of delivery at the Centers. She clarified that before the Consolidations, vendor invoices (which usually ranged from a few hundred dollars to a few thousand dollars) were being

paid on time per the contractual terms which were usually between 30 and 90 days, but after the Consolidations it would generally take anywhere from three to eight months to resolve vendor issues for both HHI and GAC. When she started in AP in February 2018, there was approximately $900,000 worth of backlogged GAC invoices, at least 90 days past due, that could not be paid because the distribution centers were not operating properly. She brought this up to leadership, including Carol Anderson, GAC's CFO who reported to Guy Andrysick and then to Randy Lewis, and Brent Esplin, HHI's CFO, who would tell her and her colleagues that the Company's Consolidations just did not go well and they had to deal with it.

144. According to FE 18, the late-payment problem seriously harmed Spectrum's relationships with its vendors, several of which serviced multiple divisions of the Company, and led some to refuse to ship to Spectrum at all. Indeed, FE 18 stated that vendors would threaten to stop shipments and doing business with the Company 5-6 times per day throughout her tenure as the AP Manager. These large vendors would threaten to or actually stop doing business with the Company when the Company was hundreds of thousands of dollars behind on making payments. This would shut down business across all divisions, meaning that the GAC Consolidation issues could, and did, impact the entire Company. FE 18 recalled the following major vendors threatening to stop servicing the Company: Westrack, Green Bay Packaging, and Chicago Extruded Metals. FE 18 recalled that Spectrum's failure to pay its vendors in turn exacerbated both GAC's and HHI's problems with inventory and shipping, as vendors delayed or halted shipments of products and supplies to Spectrum, further rendering Spectrum unable to provide timely and complete shipments to its own customers.

145. The information known internally at Spectrum about the late-payment problem contradicted Defendants' public statements to investors about the Consolidations' progress. FE 18

said that shortly after she was promoted, her director asked her to listen to the February 8, 2018 investors call, where Defendant Martin was taking questions. Martin was answering quite a few questions from analysts expressing concerns about the distribution centers. The AP Manager stated she was "outraged" because Martin "blew off" these concerns by repeatedly assuring investors everything was fine, the Consolidations were being handled well, and things were progressing smoothly, but this was blatantly untrue. FE 18, who spent some of her career working for financial institutions, stated that she believes, having listened to the February 2018 shareholders call, that the Company was clearly in violation of the securities law. She does not believe it is reasonable that her director, the VP of Financial Services, and the business unit CFOs all concealed information from the C-suite about the late vendor payments. It would have required a half dozen or more director-level and above personnel all lying for the C-suite to not be aware of the drastic consolidation and receiving issues at the distribution centers.

146. Similarly, FE 18 said that she knows that the Company's May 2018 public statement regarding the Dayton Center's fill rate being 90% was not accurate because one of the members of her team had gone to the Dayton Center to assist in setting up proper shipment-receipt services. By May 2018, their fulfillment rates were nowhere near 90%.

147. FE 18 stated that Annette Pena, Spectrum's Director of Shared Services-Accounts Payable, to whom FE 18 reported, would brief Defendant Martin on the issues with vendor payments, particularly when those larger vendors that serviced multiple business units were threatening to stop servicing Spectrum. She also knew that the GAC and HHI CFOs, Carol Anderson and Brent Esplin, were escalating these issues to Martin because Martin would come back and ask her or Pena why specific vendors were not being paid. Pena would also tell FE 18 that she had spoken with Martin about the receiving issues at the distribution centers and the number of

vendors threatening to stop business due to late payments. She stated that she believes that Martin would have had to be aware of the fact that Spectrum was getting 100-150 payment complaints per day. FE 18 stated that the number of complaints per day was consistent from when she first was promoted into AP until she left the Company in May 2019. FE 18 stated that "When I came in [to the role] in February [2018], we'd made almost every single payment late. My very first day I had 150 emails from vendors threatening to shut their business down." By the time FE 18 left the Company in May 2019, approximately 40% of the invoices still had some partial issues. She stated that "it was bad until at least March [2019] . . . . [P]rior to March [2019] every single vendor receipt had some issue."

148.     FE 18 said that it was not realistic to think that, at the time of the February 2018 shareholders call, the Defendants did not know about the challenges. When the media first started reporting the securities-fraud allegations earlier in 2019, she and her colleagues at Spectrum asked their Vice President what was going on. He told everyone, "It's fine. This isn't a big deal. It happens all the time." She was angered at this statement, given her knowledge of the distribution-center issues.

149.     The pervasive late-payment problems were reported to senior management. When vendors threatened to end shipments to the distribution centers, FE 18 would have to escalate the issues to the HHI and GAC divisional CFOs, Anderson and Esplin. In February 2018, she was escalating vendor threats due to non-payment "almost every single day." This included a lot of strategic Chinese vendors bringing in raw material and finished products impacting "all of the product lines . . . across HHI and GAC." She would speak to Anderson and Esplin virtually every day. She would have to escalate the issue to the divisional CFOs so they could override various

controls and force payment to the vendors in order to get their services turned back on or avert having those suppliers shut down on Spectrum.

150. Furthermore, the C-Suite–including Defendants Martin, Rouvé, and Maura–received internal reports showing that 40-50% of payments to vendors were late and that many of the invoices had other issues. FE 18 stated that she knew that reports related to invoice payments being late and vendors threatening to stop servicing the distribution centers were presented by her boss to the C-suite, including Defendants Martin, Rouvé, and Maura. According to FE 18, reports tracking Key Performance Indicators would also show the number of invoices processed, the percentage of payments made on-time, and how past-due vendor invoices were.

## E. The Truth Emerges While Defendants Continue to Mislead Investors

### 1. Spectrum Discloses That Significant Distribution Center "Challenges" Had Occurred In March 2018, Fires Defendant Rouvé, But Assures The Market That These Issues Are "Transitory"

151. Before the market opened on April 26, 2018, Spectrum shocked investors when it simultaneously disclosed (1) "very disappointing" financial results for the second quarter of 2018 and guidance for the full year, which Spectrum attributed directly to "challenges" at the Dayton and Edgerton distribution centers that were supposedly "meaningfully greater than we expected," and (2) the immediate termination of Defendant Rouvé and GAC President Guy J. Andrysick. Defendant Rouvé was replaced by Defendant Maura, Spectrum's longstanding executive chairman of its Board of Directors. Specifically, the Company's April 26 press release stated:

> "The challenges related to our two greenfield manufacturing and distribution projects were meaningfully greater than we expected. As we brought our East Coast distribution center into our new Hardware & Home Improvement facility in Edgerton, Kansas at the end of February, we experienced facility-wide disruptions which hampered distribution capabilities materially in March," Maura said. "Our Global Auto Care facility in Dayton struggled at higher production levels in March, which led to significant inefficiencies and shipping challenges.

65

Given these issues, sales of about $30 million from in-house orders could not be shipped by quarter-end due to higher customer order backlogs at our HHI and GAC facilities, and we are working to return them to normal efficiency levels[.]

152. In other words, Defendant Maura attributed the Company's disappointing financial results to disruptions that occurred in March 2018, rather than longstanding or systemic problems with the consolidating.

153. As a direct result of these "challenges," Spectrum disclosed quarterly net income of $0.8 million, a 98% decrease from the same quarter a year before; adjusted EBITDA of $115.6 million, a 33.3% decrease from the year before; and adjusted EBITDA margin of 15.1%, a 29% decrease from the year before. Defendant Maura directly attributed the EBITDA and margin decreases to the distribution-center issues, stating that "the most significant drivers were the late quarter major manufacturing and distribution center operating inefficiencies," as well as bad spring weather.

154. Significantly, Spectrum's poor second-quarter performance drove the Company to lower its full year EBITDA and Free Cash Flow ("FCF") guidance to $600M-$617M (from ($657M-$674M, a 9% decrease) and $485M-$505M (from $620M-$640M, a 22% decrease), respectively.

155. At the same time, the Company announced that Defendant Rouvé had been terminated from both his CEO and Director positions and replaced by Defendant Maura as CEO. Analysts noted that Rouvé's termination was "not surprising" given the extremely disappointing financial results. The Company further announced a significant global restructuring of its business lines, in which GAC, Pet, and Home and Garden businesses would form a new "Consumer Products" group led by Randy Lewis (who had been President of Pet and Home and Garden), reporting directly to Defendant Maura, and Guy Andrysick, President of GAC, would leave the Company.

66

156.     During a conference call with analysts that morning, Defendants Maura and Martin unequivocally attributed the Company's terrible financial performance to "our HHI and GAC consolidation projects," which had problems that were purportedly "meaningfully greater than management anticipated or expected, and that resulted in a short-term degradation of sales, margin, and free cash flow." Defendant Maura further stated that the Company would create the consumer products division because the GAC unit "needs discipline."

157.     During that same call, Defendant Martin explained how the distribution-center problems affected the Company's financial performance. First, "about $21 million of HHI customer orders and $9 million of Global Auto Care customer orders, or about $30 million in total, were in-house but not shipped before quarter-end due to higher order backlogs that developed in March as we worked to complete the HHI and GAC facility consolidations and return to normal operating efficiency levels. We expect to ship most of these orders in Q3 and complete the return to normal operating rhythms by the end of this fiscal year." Second, "our decline in adjusted EBITDA and EBITDA margins were more pronounced than our overall revenue shortfall. The biggest drivers were the major manufacturing and distribution center operations inefficiencies from HHI and Global Auto Care, which materially hampered our distribution capabilities in March, and also unfavorable product mix across the businesses."

158.     These disclosures caused the price of the Company's stock to decline from $94.23 per share on April 25, 2018, to $75.01 per share on April 26, 2018, or 20%, on abnormally high trading volume of nearly 12 million shares traded in one day (versus a daily average of 500,000 during the Class Period). Similarly, the price of HRG stock immediately declined from $93.15 per share on April 25, 2018, to $72.56 per share on April 26, 2018, or 22%, on abnormally high trading

volume of over 15 million shares (versus an average of 1.5 million shares daily traded during the Class Period).

159. Investors reacted strongly and negatively to this news. For example, Deutsche Bank wrote in an April 26, 2018 report that "management has lost credibility" concerning distribution center issues. Moreover, BMO analysts reported on April 26, 2018 that "SPB delivered a disappointing print, with a lower-than-expected topline and deteriorating margins and the company struggled with operating inefficiencies from HHI and GAC facility consolidations . . . [w]e are moving our target price to $95 from $125 . . ." and "we worry SPB could potentially face shelf space losses if supply chain issues persist." Similarly, an April 26, 2018 Oppenheimer analyst report stated that it was "Overall, a surprisingly disappointing quarter. These ramp-up issues should have been fixed quarters ago and, we believe, is the reason Andreas Rouvé was replaced."

160. Defendants Maura and Martin downplayed the distribution-center problems by insisting that they were personally involved in correcting the "temporary" issues at the distribution centers and that they expected a quick turnaround. For example, Maura stated that "we believe the U.S. facility operating inefficiencies are <u>transitory in nature and the adverse margin impact from them is temporary</u>." Similarly, in the second-quarter 2018 press release, Maura said: "It is our firm belief that the current impact to our free cash flow is mostly transitory and largely reflects one-time investments in working capital and customer relationships. The fact is our recovery is already under way, and full recovery will take place gradually over the next several quarters."

161. Similarly, in the earnings call that same day, Defendant Maura told investors that while some "challenges" "relate to our HHI and GAC consolidation projects," the Company had "taken swift and decisive action in recent weeks to steady the HHI and Global Auto Care facilities with new front-line management, along with improved plans and aggressive oversight." Maura said

68

that he was "confident that the longer-term strategic merits of these consolidations will result in improved operating efficiency, reduced costs and much lower inventories." In response to close analyst questioning, Maura explained that Spectrum had designated one of its "best operators" (Randy Lewis), who had "taken over running that plant. He's already cleared some of the bottlenecks in distribution that are out in front of those production lines, and we're getting our fill rates back up."

162. Defendants Maura and Martin again stressed that these setbacks were "transitory" and did not reflect deeper issues with the Consolidations. Specifically, Martin said, "[w]e believe the HHI and GAC operating inefficiencies are transitory in nature . . . and the adverse margin impact is largely behind us . . . . Looking at the second half, we are optimistic about delivering an increase– a significant increase in net sales and adjusted EBITDA . . . . Given the recent actions to improve operational efficiency that David [Maura] mentioned, we are confident that customer order backlogs at HHI and [GAC] will continue to come down as the facilities improve their on-time shipments, which we expect will create a tailwind for these businesses during the more peak demand times of their year." Martin also assured investors that "[o]nce completed, the Kansas consolidation will result in more streamlined footprint with significantly lower inventory levels."

163. Similarly, Defendant Maura said that the Company took "swift and decisive actions," "we are working to return [backlog] to normal efficiency levels," and "this hit this quarter is transitory."

164. Analysts were concerned and asked many questions regarding the consolidation issues and whether they were, in fact, "transitory" in nature. For instance, a Deutsche Bank analyst asked whether Defendants could "talk about what gives you the confidence that these consolidation actions will not result in further issues going forward." Defendant Maura responded that "[a]s you

enter into April, . . . [there are] the efficiencies we see, both on the manufacturing and the fill rates inside the Dayton facility and also the debottlenecking of the distribution at both Dayton and Kansas. And we're seeing that this month, and we should relay that to you."

165.    Additionally, in response to an analyst question about EBITDA margins "particularly in Global Auto but also in HHC" and Defendants' "confidence in restoring them to . . . .last year's levels," Maura stated that

> when you restore efficiencies and you move back toward standard costs in the facility, your COGS [cost of goods sold] drop, your margins expand. If you unblock the passageways in front of the production line, which was blocked before we dropped Steve Keller in there, and you may need to use some third-party [logistics companies] in the short run, which again boosts costs, now you're starting to get distribution back. Your fill rates–we are seeing our fill rates go up, so our cost of piece is dropping, you remove the distribution bottleneck. Now you're flowing the inventory faster and then you get the lift in the absorption [in the factory] overhead. So that's why I'm very confident that the underlying margin structure is intact.

166.    In connection with their earnings call, Defendants also circulated a presentation to investors. Similar to Defendants' statements on the call, this presentation stated that "We took swift and decisive actions in recent weeks to steady the HHI and GAC facilities with new front-line management, along with improvement plans and aggressive oversight." The presentation further stated that "We believe the HHI and GAC operating inefficiencies are transitory in nature and the adverse margin impact is largely behind us," and that "given recent actions to improve operational efficiency, we are confident that HHI and GAC custom order backlogs will come down as the facilities improve their on-time shipment levels, which is expected to create a tailwind in shipments for these businesses."

167.    In analyst reports following the earnings call, analysts noted that conversations with management had convinced them that the problems related to the Consolidations were "transitory" and not structural. For example, an April 26, 2018 BMO Capital Markets analyst report stated that while "SPB delivered disappointing 2Q/18 print owing to greater-than-expected challenges related

70

to its HHI and GAC consolidation projects, which led to a $30M sales shortfall (4%) and caused the company to replace the CEO with Executive Chairman David Maura," "we believe the operational issues are transitory and we are comfortable with the risk/reward at these levels." Similarly, BMO analysts stated that while "the company struggled with operating inefficiencies from HHI and GAC facility consolidations . . . our further discussions with management gives us more confidence the issues are transitory and we view the risk/reward here as favorable." Similarly, an April 26, 2018 Oppenheimer & Co. analyst report stated that "distribution headwinds are largely temporary and order backlogs will quickly recede as facilities improve operating efficiencies."

168. Moreover, Defendants continued to tell investors that the issues with the consolidation of the distribution centers were largely fixed. For example, a May 17, 2018 Oppenheimer & Co. report discussing "recent investor meetings" noted that with regard to HHI and GAC, "[t]he team has aggressively debottlenecked the DC and worked off its backlog" and that "Dayton's fill-rate is now in the 90%s vs. 80%-82% in March and is on its way to 98%-99% in the next 12-18 months."

### 2. Spectrum Again Asserts That Consolidation Issues Are "Transitory" When Reporting Third-Quarter 2018 Earnings

169. When Spectrum announced its third-quarter 2018 earnings on July 26, 2018, and revealed no negative news about the consolidations, Defendants again took the opportunity to assert that the problems were fixed. In a press release dated July 26, 2018, Defendant Maura told investors that "the turnaround of our HHI and GAC business units is well under way." Maura told investors that the Company "benefited from markedly reduced order backlogs in Kansas and Dayton," and that the Company "continue[d] to improve the efficiency of the Kansas and Dayton facilities." Maura told investors that with regard to the Dayton facility "we are on our way and the business is rebounding, proving the issues we faced were indeed largely transitory." Moreover, with regard to

71

GAC, the press release stated that "[a]lso contributing to the growth was the elimination of the customer order backlog at the Dayton facility."

170. During the July 26, 2018 earnings conference call, Defendant Maura told investors that "We did deliver increased sales and adjusted EBITDA versus the prior year, and we achieved significant encouraging progress against the operating efficiencies that we've been experiencing in the greenfield facilities for both our Hardware & Home Improvement assets in Edgerton, Kansas and our Global Auto Care assets in Dayton, Ohio."

171. During the call, Defendant Maura also assured investors that "customer order backlogs were markedly reduced . . . which confirms that our new approach to culture and our new efficiency measures are taking hold and are working." Maura further stated that he "remain[ed] confident that the long-term strategic merits of these consolidations will result in improved operating efficiencies and lower inventories going forward."

172. Defendant Maura stated that in the Edgerton Center, "our order backlog was reduced by about $20 million this quarter, which essentially got rid of the backlog that was created in the month of March. The facility achieved—this is remarkable. The facility achieved its highest network shipments in the history of our company. And we did it with a single [distribution center] model versus the actual—we had a 3-[distribution center] model before and moved to 2. So it proves actually that this one [distribution center] facility is going to work."

173. In response to an analyst question about HHI stating that "it sounds like a lot of the excess backlog has been cleared" and asking about the "underlying trends in HHI," Defendant Maura stated:

> I'm pleased we got the backlog down by $20 million. . . . And we basically went from a standstill in the month of March with 350 trailers blocking, not only inbound, but outbound. And we don't have any aged trailers in that parking lot today. And that's, listen, that's a yeoman's effort. But look, you can do the math.

If you just back out the $20 million of backlog, the rest of that was organic and that's a double-digit number. So listen, it's a fantastic result for HHI. I can tell you the numbers I see in this quarter remain at that level of double-digit organic growth.

174. Defendant Maura similarly touted the progress at the Dayton Center, stating that "[i]n Dayton, we saw improved and impressive results in the third quarter under the new leadership in that facility. That team did make a number of short-term and tactical fixes in the third quarter, and the clear focus is on servicing the customer. I can't emphasize enough the cultural shift there. There's an absolute maniacal focus on serving the customer. That team shipped its entire $9 million March backlog, ending the third quarter with a modest and normal backlog and meaningful improvement, which is exceedingly important to me. Our on-time shipment rates are now acceptable and I'm very pleased with that." Maura further stated that "Dayton employees rose to the challenge. They did an excellent job of what we call shipping the season, given the solid market demand for our products during this peak demand period in the Global Auto Care's seasonal calendar. Under the new leadership team there, we believe Dayton will be operating in a much more efficient and lower cost per unit basis by the start of next year's spring season."

175. In connection with their earnings call, Spectrum also circulated an investor presentation. This investor presentation stated that "Q3 continuing operations results rebounded strongly from Q2 with increased net sales and adjusted EBITDA vs. last year, and we achieved significant, encouraging progress against operating inefficiencies at our greenfield sites for HHI in Kansas and GAC in Ohio." Moreover, the presentation stated that Spectrum's "[h]ighest quarterly organic sales growth rate–7.3%–in many years in Q3," which was led in part by "markedly reduced customer order backlogs at the Kansas and Dayton facilities." Further, the presentation stated that "Adjusted EBITDA of $206 million grew nearly 4 percent even as we continue to be impacted by increased commodity input and freight costs, unfavorable product mix and higher operating costs

73

even as we continue to improve the efficiency of the Kansas and Ohio facilities, confirming our new approach to culture and efficiency is working."

176. Analysts again credited management's statements. Oppenheimer & Co. analysts wrote on July 26, 2018, that "[o]verall, it appears new CEO David Maura has put the company's self-inflicted wounds in the rear-view mirror." Similarly, a July 27, 2018 analyst report stated that "SPB posted good results today, essentially confirming that the issues last quarter were transitory[.]"

177. Over the course of the fall, Defendants continued to tout the progress in the Kansas and Ohio facilities. For example, Defendant Martin attended the Barclays Global Consumer Staples Conference on September 5, 2018. In connection with this conference, Spectrum circulated a slide deck to investors, which stated with regard to the HHI facility, "Order backlog reduction continues to normal levels," "Improving inventory picking speed and accuracy," and "Focus on greater labor efficiency." With regard to the GAC facility, the presentation stated, "[C]leared order backlog, and shipping capacity and timelines improving."

### 3. In the Days Leading up to Its Fourth-Quarter 2018 Earnings Release, Spectrum Announces Surprise Sale of GAC

178. On November 15, 2018, Spectrum announced that it had decided to sell GAC to Energizer Holdings Inc. in a transaction valued at $1.25 billion—a discount to the $1.4 billion Spectrum had paid for GAC in 2015. This announcement surprised analysts, who believed—based on Defendants' representations at the end of the third quarter of 2018—that GAC had turned the corner and would deliver material benefits to the Company going forward. For example, in a November 15, 2018 note, Wells Fargo asked,

> Why sell the relatively stable GAC biz (esp. now that supply chain issues are likely in the rear view mirror) and double-down on exposure to less "Staples-esque" businesses such as Appliances and Hardware & Home Improvement? . . . While GAC's results have been mixed (at best) in recent quarters in our view, due to

74

supply chain challenges and inventory destocking, we were looking forward to a sustained recovery in segment fundamentals. As such, we are somewhat surprised that SPB chose an outright sale at a time when the GAC business was theoretically poised for better performance and, as such, await add'l detail on the FQ4 call.

179. It soon became clear that GAC's issues were not in the rear view mirror at all.

### 4. November 19, 2018: Spectrum Admits that the Distribution-Center Consolidation Challenges Were Not "Transitory" and Had Ongoing Material Negative Effects on the Company's Financial Results

180. On November 19, before the market opened, Spectrum disclosed its fourth-quarter 2018 results, which made it clear that notwithstanding the Company's previous statements, the Company's distribution and restructuring challenges persisted throughout fiscal year 2018 and cost the Company millions of dollars. Specifically, the Company disclosed, among other disappointing metrics, fourth-quarter 2018 earnings per share ("EPS") of $0.79, relative to prior Street estimates of $1.05 EPS, a 25% miss. Further, the Company reported that all segments posted lower-than-expected EBITDA; GAC reported EBITDA of <u>negative</u> $82.1 million, down from $27.9 million the year before. The Company further reported full-fiscal-year 2018 free cash flow of $386 million, well below the Company's guidance of $485-$505 million.

181. The Company admitted that fourth-quarter results were "disappointing across the business units" and that the Consolidations continued to have a material negative impact on its results. For example, Spectrum directly attributed GAC's EBITDA miss to "$18 million related to low-margin excess and obsolete inventory liquidation, lower volume related to greater-than-expected retailer inventory reductions, Dayton plant inefficiencies, physical inventory adjustments and scrap relating to the facility consolidation projects, and a cumulative correction of duty rates on a significant sourced component." Further, the Company disclosed that in the fourth quarter alone, the Company spent $11.6 million on the HHI distribution-center consolidation for a total of

75

$52 million in 2018–a nearly 50% <u>increase</u> from 2017, when the consolidation was originally supposed to be completed.

182.     Spectrum held a conference call with analysts to discuss these results that same day. During that call, analysts expressed surprise and dismay that notwithstanding Defendants' prior statements claiming these issues were "transitory," Spectrum was still exposed to such significant financial harm from the Consolidations. For example, a Deutsche Bank analyst asked, "what changed from 3 months ago or when you last reported? Because it seems like a lot of the factors that you've talked about today, we knew about. So maybe if you could talk in a little bit more detail around what surprised you the most this quarter?" Similarly, an analyst from Bank of America asked, "In the second quarter [in April 2018], you'd had some challenges in Kansas and Dayton and then it sounded like a lot of those have been improved into the third quarter [in July 2018]. I guess, maybe, you can talk a little bit about what happened between the third and fourth quarter that reverted some of the challenges?" Defendant Maura responded that <u>over a year after the Dayton facility was supposed to be complete</u>, the "Dayton facility is 75% of the way back to where it should be."

183.     The Company's disclosures caused the price of the Company's stock to decline from $59.35 per share on November 16, 2018 (the previous trading day) to $48.05 per share on November 19, 2018, or a 19% decrease–a statistically significant amount–on abnormally high trading volume of 5,875,980 shares (versus a daily trading average of 565,000 after the HRG Merger closed.

184.     In addition, Oppenheimer immediately downgraded Spectrum stock to "Perform" from "Outperform," and Deutsche Bank downgraded Spectrum from Buy to Hold. In explaining its downgrade decision, Deutsche Bank wrote:

> We no longer have conviction that SPB's business results have bottomed, and as such are downgrading our rating from Buy to Hold and lowering our PT to $50. We were hopeful last quarter that the company had finally overcome its many issues— which we previously viewed as "transitory." However, at this point, given a lack of visibility and continuing "one-time" issues, it is apparent that there are underlying structural issues that will take time (we assume 12+ months) and investment dollars to resolve.

185. A Bank of America Merrill Lynch analyst report dated November 19, 2018 stated that "[e]ven factoring business transitions, FQ4 a <u>surprising miss</u>" and that "[o]verall, results are likely to <u>renew concerns around fundamentals for SPB</u>, which had improved in FQ318 after rebounding from a similarly wide miss in FQ218." Further, discussing the Energizer purchase of GAC, the report stated that "Auto seemingly far from steady footing . . . [Energizer] is an adept integrator, but increasing leverage for the Global Auto Care acquisition <u>adds notable risk</u> to the near-term with the business <u>still working through supply chain/integration issues</u>."

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A. January-June 2017: Defendants Falsely Claim That The Consolidations Are "On Track" and "Progressing Smoothly"

#### 1. First Quarter 2017

186. During the earnings call on January 27, 2017 to discuss the first-quarter 2017 results, Rouvé highlighted the supposed "<u>good progress</u>" of the GAC Consolidation. On that same earnings call, a Wells Fargo analyst asked about decreasing the impact of seasonality on Spectrum's revenue: "What is going into that smoothing of the seasonality?" Defendant Martin responded, among other things, that "[c]onsolidating our global auto care business into one location is going to <u>continue to help us with better managing inventories going forward. And we've already seen a nice impact in that business.</u>"

187. Defendants' statements in ¶186 were materially false and misleading and omitted material facts. Specifically, it was false and materially misleading to state that there had been

"good progress" on the GAC consolidation where Spectrum had not made good progress on it, and in fact the Consolidation was significantly delayed. For example, as of January 2017, Spectrum had major issues at the Dayton Center with both production, storage, and shipping from the beginning. As discussed above in Section IV.D, according to multiple former Spectrum employees:

(i)     Despite the fact that the Dayton Center purportedly opened for distribution in January 2017, Spectrum had not even planned or installed the necessary racking system to store inventory, which was instead stored in boxes on top of each other, and the boxes would break, get crushed, or deteriorate, damaging inventory;

(ii)    There were major issues with production from the beginning, including that every production-line transfer was significantly delayed, and Spectrum had already missed the deadline for the scheduled transfer of three lines, which would not be installed until July 2017;

(iii)   These production issues created a scrap rate or unusable product rate of approximately 30%; and

(iv)    The information in the inventory-management system was often incorrect and also did not note the age of inventory, and employees could not find existing inventory.

It was also false and misleading for Defendant Martin to state that the Dayton Center would "continue to help us with better managing inventories going forward" and that GAC had "already seen a nice impact in that business" because, in fact, consolidating the different facilities had actually worsened GAC's inventory-management and distribution abilities.

188.    On February 23, 2017, Defendants Rouvé and Martin attended the Consumer Analyst Group of New York conference. Rouvé touted the GAC and HHI consolidations, stating among other things that "The second project, which is very similar [to the GAC consolidation], is in [HHI] . . . . [A]fter a study, we decided to centralize also US distribution into a place in Kansas. And here again, we are expecting a nice improvement, especially in our working capital. And this project is going to be completed in this calendar year."

189.    Defendants' statements in ¶188 were materially false and misleading and omitted material facts. It was materially false and misleading to state that the HHI distribution-center consolidation would "be completed in this calendar year" because the Edgerton Center was already significantly delayed in transferring operations, hiring employees, and setting up racks, and it was impossible to complete the consolidation by December 2017. FE 8, who was the individual responsible for setting up the Edgerton Center's infrastructure, said that the Edgerton consolidation was "the most disorganized plan [she'd] ever seen in [her] life" and that it was impossible for the Consolidation to be successful based on where things stood in January 2017. Indeed, as discussed in Section IV.D, according to FE 8 and several other former employees, in February 2017: (i) the Edgerton Center did not have racks installed and could not properly store and track its inventory; and (ii) the distribution center was struggling to hire employees and to retain the employees that it was able to hire due to higher wages at other distribution centers in the area, inadequate training, and lack of public transportation. Moreover, Spectrum's inability to track inventory at both centers led to an inability to pay vendor invoices at least as early as February 2017, and an "exception list" of invoices that could not be processed even after an investigation included almost 800 invoices by early 2017.

190.    On March 7, 2017, Defendant Martin attended the Raymond James Institutional Investors Conference, where he touted the progress of both of the distribution centers, stating among other things that the HHI consolidation was "a similar activity [to the GAC consolidation] . . . [W]e are actually receiving product there this week and we'll be fully shipping out of that DC by the end of August. And that will provide additional good productivity for this business and also help serve our customers better."

191.    Moreover, in connection with no fewer than <u>six</u> separate investor conferences and meetings in February and March 2017, Defendants circulated an identical or nearly identical investor slide deck with materially false and misleading statements concerning the GAC and HHI Consolidations.[34] The slide decks stated that, with respect to the GAC Consolidation, the "Project [was] <u>progressing smoothly</u> with completion in FY 17." With respect to HHI, the slide decks stated that the "new site [would be] operational in May 2017 and current sites [would be] fully exited by end of calendar 2017."

192.    Defendants' statements in ¶¶190-191 were materially false and misleading and omitted material facts. It was materially false and misleading to state that the GAC distribution-center consolidation was "progressing smoothly" because, unbeknownst to investors, the GAC Consolidation was already significantly delayed at this time. For example, as of March 2017 Spectrum had major issues from the beginning at the Dayton Center with production, storage, and shipping, and according to former employees the problems "only seemed to be getting worse and worse." As discussed above in Section IV.D, according to multiple former Spectrum employees, as of March 2017:

(i)    Despite the fact that the Dayton Center purportedly opened for distribution in January 2017, Spectrum had not even planned or installed the necessary racking system to store inventory, which was instead stored in boxes on top of each other, and the boxes would break, get crushed, or deteriorate, damaging inventory;

---

[34] These conferences and meetings included (i) the February 23, 2017 Consumer Analyst Group of New York Conference attended by Defendants Rouvé and Martin; (ii) the February 28, 2017 JP Morgan Global High Yield & Leveraged Finance Conference 2017 attended by Martin and David Prichard, Spectrum Investor Relations; (iii) the March 2, 2017 Monness Crespi Hardt Client Luncheon attended by Prichard; (iv) the March 7, 2017 Raymond James Institutional Investors Conference attended by Martin; (v) the March 8, 2017 UBS Global Consumer & Retail Conference attended by Martin; and (vi) the March 14, 2017 Atlanta Investors presentation attended by Prichard.

(ii) There were major problems with production and storage from the beginning, including that the production lines were frequently making incorrect or damaged product, and those problems did not improve through 2018;

(iii) Spectrum had <u>already</u> missed the deadline to transfer its manufacturing lines from Texas and Ohio, which would not be installed for months past their deadline;

(iv) These production issues created a scrap rate or unusable product rate of approximately 30%;

(v) The information in the inventory-management system was often incorrect and also did not note the age of inventory, and employees could not find existing inventory;

(vi) The Dayton Center was unable to timely or correctly fill customer orders because of the production and inventory problems; and

(vii) Spectrum's inability to track inventory at the centers made it unable to pay hundreds of vendor invoices.

193. It was materially false and misleading to state that with regard to the Edgerton Center, the Company was "actually receiving product" and would be "fully shipping out of that DC by the end of August" because the Edgerton Center was experiencing massive problems with shipping and receiving. It was also materially false and misleading to state that the Edgerton Center would be operational in May 2017 because it was clear in March of 2017 that the Edgerton Center could not be operational by that time due to enormous problems in hiring and building out the distribution center. For example, and as discussed in Section IV.D.2, according to numerous former employees:

(i) From the beginning and through March 2017 (and after), the distribution center was struggling to hire employees and to retain the employees that it was able to hire due to inadequate training, higher wages at other distribution centers in the area, and lack of public transportation;

(ii) As of April 2017, the Company had less than 5% of the center built out and did not have racks for its thousands of products (which the Company would not start building until October 2017);

(iii) While both the Charlotte and Mira Loma centers were supposed to be closed by December 2017, the Charlotte center closed six or more months behind schedule and the Mira Loma center <u>never</u> closed;

81

(iv) Employees could not locate existing product in the facility and could not track where existing product was coming from;

(v) Spectrum's inability to track inventory at the centers made it unable to pay hundreds of vendor invoices; and

(vi) The Edgerton Center's fill rates were only 50-70% starting when the HHI consolidation started in January 2017.

### 2. Second Quarter 2017

194. On May 2, 2017, Spectrum announced its second-quarter 2017 financial and operational results. During the earnings call that day, Rouvé again highlighted the supposedly effective execution of the consolidations: "[W]e are making good progress with our continued improvement initiatives . . . . Both the consolidation of [GAC] in Dayton, Ohio and the consolidation of our [HHI] distribution center in Kansas are on track and will help us reduce expenses and inventory in the back half of 2017 and in 2018."

195. During the May 2, 2017 earnings call, a KeyBanc Capital Markets analyst asked "what other type of projects do you see out there that can kind of drive more productivity savings to . . . insulate the EBITDA as you make more of these investments in growing channels?" In response, Defendant Martin stated that "on the productivity element, some of the things that you've heard us talk about very overtly have been the HHI and DC consolidation project and the Dayton DC and manufacturing consolidation. And those are going well."

196. In connection with its earnings announcement, Spectrum also circulated an investor slide deck, which stated that "Consolidations of GAC manufacturing and distribution into Dayton, Ohio and HHI distribution centers into Edgerton Kansas on track and will reduce expenses and inventory."

197. Throughout the months of May and June 2017, at no fewer than fifteen investor conferences and meetings, Defendants circulated a presentation identical to that discussed above

82

at ¶191 that misrepresented the status of the Consolidations and misled investors by omitting material facts by, among other statements, claiming that the GAC consolidation was "progressing smoothly" and that the Edgerton Center was already operational and would be totally complete by December 31, 2017.[35]

198. Defendants' statements in ¶¶194-97 were materially false and misleading and omitted material facts. Specifically, Defendants' statements above, including that the Consolidations were "on track" and "going well," were materially false and misleading because the Company was far behind schedule for both Consolidations and was not "on track" to complete the GAC consolidation by September 2017 or the Edgerton consolidation by December 2017. Specifically, with respect to the Dayton Center, Spectrum had major problems with production, storage, and shipping from the beginning that according to former employees "only seemed to be getting worse and worse." As discussed above in Section IV.D.1, according to multiple former Spectrum employees, as of May 2017 and June 2017:

(i)     Spectrum had not even planned or installed the necessary racking system to store inventory, which was instead stored in boxes on top of each other, and the boxes would break, get crushed, or deteriorate, damaging inventory;

---

[35] These conferences and meetings included (i) a May 8, 2017 RBC Capital Markets Consumer and Retail Conference attended by Defendant Martin and Dave Prichard, Spectrum VP Investor Relations; (ii) a May 9, 2017 Columbus Investors meeting attended by Prichard; (iii) a May 9, 2017 Cincinnati Investors meeting attended by Prichard; (iv) a May 10, 2017 Pittsburgh Investors meeting attended by Prichard; (v) a May 10, 2017 Cleveland Investors meeting attended by Prichard; (vi) a May 23, 2017 Denver Investors meeting attended by Prichard; (vii) a May 24, 2017 Portland Investors meeting attended by Prichard; (viii) a May 25, 2017 Seattle Investors meeting attended by Prichard; (ix) a May 31, 2017 RBC Capital Markets Consumer and Retail Conference attended by Martin and Prichard; (x) a June 1, 2017 Chicago Investors Conference attended by Martin and Prichard; (xi) a June 6, 2017 Baird Global Consumer, Technology & Services Conference attended by Prichard; (xii) a June 7, 2017 Philadelphia Investors conference attended by Prichard; (xiii) a June 13, 2017 Piper Jaffray Consumer Conference attended by Prichard; (xiv) a June 20, 2017 Jefferies Consumer Conference attended by Prichard; and (xv) a June 21, 2017 Oppenheimer 17th Annual Consumer Conference attended by Prichard.

(ii)    There were major problems with production and storage, including that the production lines were frequently making incorrect or damaged product, and those problems did not improve through 2018;

(iii)    In fact, the manufacturing lines were <u>already</u> months behind schedule and it would be four to five more months before they were transferred;

(iv)    These production problems created a scrap rate or unusable product rate of approximately 30%;

(v)    The information in the inventory-management system was often incorrect and also did not note the age of inventory, employees could not find existing inventory, and an inventory audit in and around September 2017 showed that the inventory system was incorrect by millions of dollars;

(vi)    The Dayton Center was unable to timely or correctly fill customer orders because of the production and inventory problems, and customers were fining Spectrum millions of dollars because of missed or incorrect shipments and threatening to leave; and

(vii)    Spectrum's inability to track inventory at the centers made it unable to pay hundreds of vendor invoices.

199.    With regard to the Edgerton Center, according to numerous former employees, the Edgerton Center was also experiencing massive production, storage, and shipping problems in and around May and June 2017 that derailed the consolidation from being "on track." For example, numerous former employees corroborated that:

(i)    From the beginning and through June 2017 (and after), the distribution center was struggling to hire and retain employees due to inadequate training, higher wages at other distribution centers in the area, and lack of public transportation;

(ii)    As of April 2017, the Company had less than 5% of the center built out and did not have racks for its thousands of products (which the Company would not start building until October 2017);

(iii)    Employees could not locate existing product in the facility and could not track where existing product was coming from;

(iv)    The Edgerton Center was weeks and sometimes months behind on shipments because of the production and shipping problems, so that the Company started having workers work six days a week and ten hours a day;

(v)    The Edgerton Center's fill rates were only 50-70% starting when the HHI consolidation started in January 2017;

84

(vi)     The staffing shortage and shipping delays were so egregious that an email had been sent in May 2017 to Middleton headquarters employees asking them to go to Edgerton to help with shipping;

(vii)    According to FE 14, the Edgerton Center's problems with low fill rates were discussed on conference calls involving senior management starting in mid-2017 on;

(viii)   As confirmed FE 8 and FE 13, in May of 2017, the Company could not adequately store inventory within the warehouse and resorted to using approximately 30 semi-trailers to store product, which were parked in the employees' parking lot;

(ix)     Spectrum's inability to track inventory at the centers made it unable to pay hundreds of vendor invoices; and

(x)      According to FE 8, who was responsible for setting up the Edgerton Center's infrastructure, it was "not a truthful statement" to say that Edgerton was "on track" in May 2017.

**B.      July 2017-February 2018: Defendants Misleadingly Claim That "Minor" Negative Financial Results Are Partly Attributable to "Temporary" "Transitory" "Normal Startup Inefficiencies" At Dayton and Edgerton**

### 1.  Third Quarter 2017

200.    On July 27, 2017, Spectrum announced its third-quarter 2017 financial and operational results, disclosing a year-over-year net-income decline of 25% compared to the third quarter of 2016.  The Company blamed most of the shortfall on a "confluence of factors, some macro and others Company-specific," including unfavorable weather and a major product safety recall, but admitted it was caused in part by execution issues in the GAC and HHI Consolidations. Defendants immediately, however, downplayed the magnitude of the issues at those facilities and told the market that these were onetime setbacks that did not indicate any longstanding or structural problems with the distribution centers.

201.    Specifically, Defendant Rouvé said in the third-quarter earnings press release that: "we experienced temporary, transitional supply chain challenges with our HHI U.S. distribution center consolidation in Kansas and the GAC U.S. operating consolidation in Ohio that affected

shipping levels in the <u>short term</u> and impacted sales by approximately $24 million . . . . However, both projects remain <u>on schedule and the issues are being quickly addressed</u> with delayed shipments shifted into our fourth quarter. Despite the start-up challenges, these major consolidation projects will bring a number of important productivity, efficiency, and other benefits, including reduced operating costs, lower working capital and even better service to our customers."

202.    Similarly, during the earnings call that day, Defendant Rouvé told investors that "We are in the middle of 2 major transformational projects, which will allow us to operate much more efficiently . . . by consolidating our entire U.S. [HHI] distribution in Kansas and our [GAC] manufacturing and distribution in Ohio.  Both facilities are up and running.  However, in the transition from the old to the new facilities, we did experience <u>temporary supply chain challenges</u>, which impacted our sales in the third quarter by about $24 million or 1.8%.  Both projects remain on schedule, and we are making <u>good progress</u> in clearing the much higher than usual order book in our fourth quarter."

203.    For his part, Defendant Martin told investors during the call that "Temporary shipping startup issues at GAC's new Dayton facility also impacted Q3 results . . . .  Overall, the Dayton facility consolidation is on schedule and will deliver meaningful cost savings and improved working capital in fiscal 2018."

204.    Defendant Martin further assured investors that HHI's first quarterly top-line decline since it was acquired in late 2012 was a result of "<u>temporary</u> operating startup issues connected with the U.S. distribution center consolidation project."  Moreover, in response to analyst questions about the "cost saves from the Dayton consolidation," Defendant Martin also told investors that "we broke ground [on the Dayton facility] about 13 months ago and [are] <u>really up and running from production perspective, we have a 1 little line to bring in yet but things are</u>

86

running really well there. And the DC is functioning better and better every day, I would say, it's about 98% right now. So it's in a good shape. And while we haven't disclosed specifically what the cost savings are, it is a better than 3-year payback and also has a significant inventory reduction benefit associated with it. So it's a very attractive pro[ject] despite the fact that, it's had a bit of a negative impact on our quarter."

205. Defendant Rouvé also further touted the progress of the HHI Consolidation. For example, in response to an analyst question asking "how has July been going," Rouvé stated that the Company was "also making good progress in clearing the backlog in our HHI and also in our Auto Care division, where we had those DC moves because now the efficiency continues to ramp up every day, and we are getting better on that." Moreover, in response to analyst questions, Rouvé told investors that HHI's "order book" was higher than usual because the Company had "orders on hand, which we could not ship in time," but that those orders would be shipped with only a "slight delay."

206. In connection with its earnings call, Spectrum also circulated an investor presentation, which stated with regard to the consolidation of HHI's distribution in Kansas and Auto Care's manufacturing and distribution in Ohio, "[b]oth are up and running," and while impacted by "temporary supply challenges," "[b]oth projects are on schedule and making progress in clearing the much higher than usual order book in Q4."

207. Throughout August, at investor conferences, Defendants circulated a presentation virtually identical to that discussed above at ¶191 that misrepresented the status of the consolidations and misled investors by omitting material facts by, among other statements,

87

claiming that the GAC consolidation was "progressing smoothly" and that the Edgerton Center was already operational and would be totally complete by December 31, 2017.[36]

208.    On September 6, 2017, Defendant Martin attended the Barclays Global Consumer Staples Conference.  While there, Martin told investors that "We also have a couple self-inflicted wounds. The [Distribution Center] moves, the—2 of them for us. We, on the Global Auto Care side, consolidated several manufacturing, several distribution sites and our R&D organization into Dayton, Ohio this year. And I would say that one went really well, and the team executed really well. And there was a minor impact to the top line in the quarter as we ramped up manufacturing and distribution in this new facility. But I would call that a fairly normal start-up situation for us."

209.    Defendants' statements in ¶¶200-208 were materially false and misleading and omitted material facts.  It was materially false and misleading for Defendants to state that the consolidation issues were "temporary," that Spectrum was making "good progress" on the consolidations, that the Dayton Center was "really up and running" and in "good shape," and that only "1 little line" remained to be brought into Dayton because both Centers were in poor shape and experiencing severe production, inventory, and shipping issues problems that were long-term, continued to be unresolved through 2018, and prevented them from fully functioning.

210.    Specifically, with respect to the Dayton Center, Spectrum had major issues with production, storage, and shipping from the beginning that according to former employees "only seemed to be getting worse and worse." As discussed above in Section IV.D.1, according to multiple former Spectrum employees as of July 2017:

---

[36] These conferences and meetings included (i) an August 10, 2017 Baltimore Investors meeting attended by Prichard; (ii) an August 16, 2017 Oppenheimer Midwest Corporate Access Day attended by Prichard; and (iii) an August 23, 2017 Intellisight Conference in Minneapolis attended by Prichard.

(i)      Spectrum had not even planned or installed the necessary racking system to store inventory, which was instead stored in boxes on top of each other and the boxes would break, get crushed, or deteriorate, damaging inventory;

(ii)     There were major problems with production and storage, including that the production lines were frequently making incorrect or damaged product, and those problems did not improve through 2018;

(iii)    According to FE 2, senior leadership toured the Dayton Center in June or July 2017, and it was apparent that the production area was still unfinished and the automated systems had not yet been installed;

(iv)    Far from just "1 little line" more to be transferred, the manufacturing lines were months behind schedule and it would take three more months after this statement before they were transferred;

(v)     These production issues created a scrap rate or unusable product rate of approximately 30%;

(vi)    According to FE 1, during the summer of 2017, approximately 10-15% of product orders were being cancelled due to the manufacturing delays;

(vii)   The information in the inventory management system was often incorrect and also did not note the age of inventory and employees could not find existing inventory, and an inventory audit in and around September 2017 showed that the inventory system was incorrect by millions of dollars;

(viii)  The Dayton Center was unable to timely or correctly fill customer orders because of the production and inventory problems, and customers were fining Spectrum millions of dollars because of missed or incorrect shipments and threatening to leave; and

(ix)    Spectrum's inability to track inventory at the centers made it unable to pay hundreds of vendor invoices.

211.    Similarly, with regard to the Edgerton Center, according to numerous former employees, the Company was not making "good progress" with consolidation and the Edgerton Center was experiencing many production, inventory, and shipping problems that were not "temporary." For example, as discussed in Section IV.D.2, numerous former employees corroborated that in July 2017:

(i)      The distribution center was struggling to hire and retain employees due to inadequate training, higher wages at other distribution centers in the area, and lack of public transportation;

(ii)     As of April 2017, the Company had less than 5% of the Center built out and did not have racks for its thousands of products (and would not start building racks until October 2017);

(iii)    According to FE 8, who was responsible for setting up the Edgerton Center's infrastructure, it was untrue to say that the center was "on schedule" in July 2017;

(iv)    Employees could not locate existing product in the facility and could not track where existing product was coming from;

(v)     The Edgerton Center was weeks and sometimes months behind on shipments because of the production and shipping problems, so that the Company started having workers work six days a week and ten hours a day;

(vi)    The Edgerton Center's fill rates were only 50-70% starting when the HHI Consolidation began in January 2017;

(vii)   The staffing shortage and shipping delays were so egregious that an email had been sent in May 2017 to Middleton headquarters employees asking them to go to Edgerton to help with shipping;

(viii)  FE 15, a Sales Manager at HHI, said that beginning in July 2017, she was instructed by Vice President of Field Sales HHI, Nick Kruse, to offer customers an extra 5% rebate on large orders, plus special 90-day extensions on payments in response to delays and errors in shipping; and

(ix)    The Company could not adequately store inventory within the warehouse and resorted to using dozens of semi-trailers to store product in the employees' parking lot; and

(x)     Spectrum's inability to track inventory at the centers made it unable to pay hundreds of vendor invoices.

212.    It was also false and misleading for Defendants to state that HHI was "making good progress in clearing the backlog" or that orders would be shipped with only a "slight delay," because according to numerous multiple former employees, as of July 2017 and later: (i) Spectrum was weeks and sometimes months behind on shipments, so that the Company started having workers work six days a week and ten hours a day and had to offer discounts and extended payment terms to customers; and (ii) major customers, such as Walmart, Lowe's, and Home Depot, were levying substantial financial penalties against Spectrum as a result of the late shipments.

213. Defendant Martin also addressed HHI at the September 6, 2017 Barclays conference, stating that although the Company had "stumbled," it "began to really turn the corner on the operations in early to mid August, and it began eating away at that backlog." Specifically, Martin stated that "[o]n the other hand, our HHI business is in the process of consolidating an East Coast and a West Coast DC. And in that process, which we kicked off in late April and early May, we have not been able to bring up our distribution capabilities as fast as we had planned to. . . . And it impacted the quarter by about $20 million, we believe. The impact of this was a pretty good-sized backlog at the end of June. And we began to really turn the corner on the operations in early to mid August, and it began eating away at that backlog. So we expect to have some recovery on the backlog during this quarter, and then the remainder of the backlog, we'll pull down in the first couple quarters of our next year."

214. Defendants' statements discussed in ¶213, including that HHI "really began to turn the corner on the operations in early to mid August" and that it "began eating away at that back log," were materially false and misleading because (i) the fill rates were far worse than when the distribution centers were not consolidated and were still deteriorating; (ii) Spectrum was weeks and sometimes months behind on shipments, so that the Company started having workers work six days a week and ten hours a day and had to offer discounts and extended payment terms to customers; and (iii) major customers, such as Walmart, Lowe's, and Home Depot, were fining Spectrum as a result of the late shipments.

215. Defendant Martin attended the Deutsche Bank Leveraged Finance Conference on October 5, 2017. While there, Martin told investors that the Company had

> been involved in 2 major footprint optimization moves this year, one in our HHI business and one in our Global Auto Care business. The Global Auto Care business consolidated multiple manufacturing and distribution sites, along with research and development, into one facility, brand-new facility, in Dayton, Ohio. And we would

91

do this project over and over and over again because the payback is very, very attractive, not only from a cost savings perspective, which will drive nice productivity for us next year but also because of our ability to take out meaningful amounts of working capital, especially inventory. It did though impact our third quarter a little bit on the top line. I would consider this transition to be a fairly normal one with normal startup issues associated with the consolidation of this much activity into one new location.

216. Defendant Martin's statements in ¶215 were materially false and misleading and omitted material facts. It was materially false and misleading to state that the Dayton Center had already been "consolidated" with only "normal startup issues" because as of September 2017, numerous production, shipping, and inventory problems remained and were only getting worse. Indeed, according to numerous former employees, as of September 2017:

(i)     Spectrum had not even planned or installed the necessary racking system to store inventory, which was instead stored in boxes on top of each other, and the boxes would break, get crushed, or deteriorate, damaging inventory;

(ii)    There were major problems with production and storage, including that the production lines were frequently making incorrect or damaged product, every production-line transfer was significantly delayed, and those problems did not improve through 2018;

(iii)   These production issues created a scrap rate or unusable product rate of approximately 30%;

(iv)    Spectrum lacked basic quality control processes for damaged product and resulting scrap;

(v)     The information in the inventory-management system was often incorrect and also did not note the age of inventory, employees could not find existing inventory, and an inventory audit in September 2017 showed that the inventory system was incorrect by millions of dollars, or at least 10% of the total inventory;

(vi)    The Dayton Center was unable to timely or correctly fill customer orders because of the production and inventory problems, and customers were fining Spectrum millions of dollars because of missed or incorrect shipments and threatening to leave; and

(vii)   Spectrum's inability to track inventory at the centers made it unable to pay hundreds of vendor invoices.

## 2. Fourth Quarter 2017

217.    On November 16, 2017, Spectrum announced its fourth-quarter 2017 financial and operating results.  In the SEC-filed press release, Defendant Rouvé was back to highlighting the Company's supposed effectiveness in delivering operational improvements in general, and at Dayton and Edgerton in particular, stating: "We finished a challenging fiscal 2017 with a strong fourth quarter performance . . . .  We . . . delivered strong continuous improvement savings along with major efficiency enhancement programs in GAC and HHI that will bring important future benefits . . . ."

218.    Defendant Rouvé again represented that "[w]e are also making good progress in our 2 transformational projects in the U.S.  The consolidation of our [GAC] manufacturing and distribution in Dayton, Ohio is now complete, and the consolidation of [HHI] distribution in Kansas is currently 65% complete, and we expect to complete this project in March 2018.  Both projects streamline our supply chain and will allow us to reduce our inventory levels and improve our service levels."

219.    Defendant Martin also again downplayed the potential for further problems: "Operationally, HHI continues to complete its U.S. distribution center consolidation into a single, new larger facility in Kansas.  The project began in April and has experienced some operating startup issues, cost inefficiencies and higher-than-normal customer backlog, but we've now closed the West Coast distribution center successfully, and the East Coast facility will wind down soon. This consolidation will result in a more streamlined footprint and lower inventories later in 2018 and beyond."

220.    Defendant Martin was also asked by an analyst about gross margins: "I'm specifically trying to get a sense of the mix given that the gross margin trend has trended down over the course of fiscal '17, and just trying to get a sense of how to think about that going into

93

fiscal '18." Martin responded that "some of the startup inefficiencies related to those major footprint decisions we made in Dayton, Ohio around Global Auto Care, which as you'll recall, is 5 locations into 1 between manufacturing and distribution sites as well as moving in our R&D facility into a greenfield operation. So you would have an expectation—and we did have an expectation of some <u>normal startup inefficiencies</u> there, and that had been a little bit of drag on gross margin in the year."

221.    In connection with its earnings call, Spectrum circulated a presentation to investors. The presentation stated that the Company was "making <u>good progress</u> on two U.S. transformational projects; GAC consolidation in Ohio now complete and HHI distribution consolidation in Kansas expected completion is March 2018."

222.    Defendants' statements discussed in ¶¶217-221 were materially false and misleading and omitted material facts. It was false and misleading for Defendants to state that Spectrum was making "good progress" on the GAC and HHI consolidations, the GAC consolidation was "complete," and the HHI consolidation was "65% complete" by November 2017. According to numerous former employees, at that time, Spectrum was still facing major problems at the Dayton Center with production, storage, and shipping that according to former employees "only seemed to be getting worse and worse." As discussed above in Section IV.D.1, according to multiple former Spectrum employees, as of November 2017:

(i)     Spectrum had not even planned or installed the necessary racking system to store inventory, which was instead stored in boxes on top of each other, and the boxes would break, get crushed, or deteriorate, damaging inventory;

(ii)    Spectrum's production problems continued, including that production lines were frequently making incorrect or damaged product, every production-line transfer was significantly delayed, and those problems did not improve through 2018;

(iii)   These production issues created a scrap rate or unusable product rate of approximately 30%;

94

(iv)    Spectrum lacked basic quality control processes for damaged product and resulting scrap;

(v)     The information in the inventory-management system was often incorrect and also did not note the age of inventory, employees could not find existing inventory, and an inventory audit in September 2017 showed that the inventory system was incorrect by millions of dollars;

(vi)    Storage difficulties continued to plague the facility to such an extent that in September 2017, management rented out a 200,000 square feet space called "Air Commerce" to store additional goods;

(vii)   The Dayton Center was unable to timely or correctly fill customer orders because of the production and inventory problems, and customers were fining Spectrum millions of dollars because of missed or incorrect shipments and threatening to leave; and

(viii)  As a result of the centers' inability to track incoming products, Spectrum did not pay vendors for as long as a year starting at least in February 2017, and vendors were threatening to stop their supplies.

223.    Defendants' statements that the Edgerton Center was "65% complete" were also false and misleading because the Center continued to have massive problems in hiring employees and building out the center and was not over halfway complete. For example, according to numerous former employees:

(i)     The distribution center was struggling to hire and retain employees due to inadequate training, higher wages at other distribution centers in the area, and lack of public transportation;

(ii)    The Company did not have racks for its thousands of products (which the Company did not start building until October 2017) and, as corroborated by FE 12, these racks were still being built in November 2017;

(iii)   While both the Charlotte and Mira Loma centers were supposed to be closed by December 2017, the Charlotte center closed six or more months behind schedule and the Mira Loma center never closed;

(iv)    Employees could not locate existing product in the facility and could not track where existing product was coming from;

(v)     The Edgerton Center was weeks and sometimes months behind on shipments because of the production and shipping problems, so that the Company started having workers work six days a week and ten hours a day;

95

(vi)     Customer relationships had deteriorated to the point where the Spectrum SVP and HHI General Manager personally intervened to prevent customer departures;

(vii)    By March or April 2018, there were still hundreds of trucks out in the yard full of product waiting to get loaded into the Edgerton Center; and

(viii)   As of Thanksgiving 2017, the fill rate was less than half of what it had been before the Company consolidated the distribution centers and did not get significantly better as of February 2018; and

(ix)     As a result of the centers' inability to track incoming products, Spectrum did not pay vendors for as long as a year starting at least in February 2017, and vendors were threatening to stop their supplies.

### 3. First Quarter 2018

224.    On February 8, 2018, Spectrum announced its first-quarter 2018 financial and operational results. In the SEC-filed press release, Rouvé declared that "[w]e've made major progress in our key strategic initiatives . . . . Our GAC U.S. footprint consolidation is now complete, which is important as we head into the peak spring and summer period. Also, our HHI distribution consolidation in Kansas is moving toward completion in February. These projects will bring cost savings, lower working capital and improved service levels later this year and beyond."

225.    On an earnings call on the same day, Defendant Rouvé reported that "We have made major progress in our key strategic initiatives. The U.S. footprint consolidation of our Auto Care division in Dayton, Ohio, is now complete, which is important as we head into the peak spring and summer period. Also the consolidation of our Hardware & Home Improvement distribution in Kansas is moving forward to a completion as we exited our West Coast distribution center in November and will exit our East Coast distribution center in February."

226.    Defendant Martin also touted the progress of the consolidation, stating that "HHI delivered a record first quarter top line performance, partially driven by reducing the backlog associated with the continued ramp-up of the new Kansas distribution center." Martin also told investors that "impacting profitability in Q1 were costs associated with HHI's continuing work to

complete its U.S. distribution center consolidation into a single, new and larger facility in Kansas" but assured investors that these "operating startup cost inefficiencies and a higher-than-normal customer backlog" were "beginning to ease." He further stated that "HHI's West Coast DC was closed a few months ago and the East Coast facility is expected to be shut down this month. Once completed, the consolidation will result in a more streamlined footprint and lower inventory levels later in 2018 and beyond."

227.    In connection with its earnings call, Spectrum distributed a presentation to investors, which stated that there had been "Major progress achieved in our key strategic initiatives—GAC U.S. footprint consolidation in Dayton, Ohio now complete which is important heading into peak spring and summer period—HHI distribution center consolidation in Kansas moving toward completion; West Coast distribution center exited in November and East Coast distribution center to be closed in February."

228.    The presentation assured investors that "Shipment delays and lower efficiencies caused by these projects during the transition and start-up phase will give way to the benefits of cost savings, lower working capital and improved service levels later this year and beyond." The presentation also stated: "Dayton consolidation now complete in time for large spring and summer demand season; expected to deliver both cost savings and improved working capital." The presentation also stated with regard to the HHI consolidation that while "Profitability [was] also impacted by operating start-up cost inefficiencies associated with HHI's U.S. distribution center consolidation in Kansas," the "higher than normal customer order backlog [was] beginning to ease" and that the "Kansas consolidation will result in a more streamlined footprint and lower inventory levels later in 2018 and beyond."

97

229. Defendants' statements discussed in ¶¶224-28 were materially false and misleading and omitted material facts. Indeed, FE 18 listened to the February 8, 2018 earnings conference call and said that it was false based on her knowledge of the Centers' inability to track inventory or to fill orders accurately.

230. It was also false and misleading for Defendant Rouvé to state that the GAC consolidation was "complete" when the Dayton Center was still facing serious operational and inventory problems. For example, with regard to the Dayton Center, according to numerous former employees, as of February 2018:

(i)    Spectrum had not installed the necessary racking system to store inventory, which was instead stored in boxes on top of each other, and the boxes would break, get crushed, or deteriorate, damaging inventory;

(ii)    Major problems with production continued, including that the production lines were frequently making incorrect or damaged product, every production-line transfer was significantly delayed, and those problems did not improve through 2018;

(iii)    Spectrum lacked basic quality control processes for damaged product and resulting scrap;

(iv)    These production issues created a scrap rate or unusable product rate of approximately 30%;

(v)    The information in the inventory-management system was often incorrect and also did not note the age of inventory, and employees could not find existing inventory;

(vi)    Storage difficulties continued to plague the facility and management continued to rent out hundreds of thousands of square feet of additional off-premise warehouse space to store inventory;

(vii)    The Dayton Center was unable to timely or correctly fill customer orders because of the production and inventory problems, and customers were fining Spectrum millions of dollars because of missed or incorrect shipments and threatening to leave;

(viii)    As a result of the centers' inability to track incoming products, Spectrum did not pay vendors, and as of February 2018, there were nearly $1 million in vendor invoices outstanding, and vendors were threatening to stop their supplies.

98

231. With regard to the Edgerton Center, it was false and misleading for Defendant Rouvé to state that the HHI consolidation was "moving toward completion in February," and it was also false for Defendant Martin to claim that the Company's results were the result of "reducing the backlog association with the continued ramp-up of the new Kansas distribution center." The Edgerton Center was nowhere near complete, and the backlog was so voluminous that in February 2018 the Company purged all existing orders and started fresh because it did not know if customers still even wanted those products. Additionally, as discussed in Section IV.D.2, according to numerous former employees, as of February 2018:

(i) The distribution center was struggling to hire and retain employees due to inadequate training, higher wages at other distribution centers in the area, and lack of public transportation;

(ii) While both the Charlotte and Mira Loma centers were supposed to be closed by December 2017, the Charlotte center closed six or more months behind schedule and the Mira Loma center never closed. As a result, the Company was stocking three separate distribution centers with inventory;

(iii) Employees could not locate existing product in the facility and could not track where existing product was coming from;

(iv) The Edgerton Center was weeks and sometimes months behind on shipments because of the production and shipping problems, so that the Company started having workers work six days a week and ten hours a day;

(v) There were hundreds of trucks out in the yard full of product waiting to get loaded into the Edgerton Center in addition to product in an additional rented warehouse that provided an additional 500,000 square feet of storage;

(vi) As of Thanksgiving 2017, the fill rate was less than half of what it had been before the Company consolidated the distribution centers and did not get significantly better as of February 2018;

(vii) By January-February 2018, the fill rate was down to 30%;

(viii) Because the backlog at the Edgerton Center was so enormous, the Company simply purged all open orders from its system in or around February 2018; and

(ix) As a result of the centers' inability to track incoming products, Spectrum did not pay vendors, and as of February 2018, there were nearly $1 million in vendor invoices outstanding, and vendors were threatening to stop their supplies.

99

232. Further, it was also false and misleading for both Defendant Rouvé and Defendant Martin to claim that Spectrum "exited [its] West Coast Distribution Center in November" and that "HHI's West Coast Distribution Center was closed a few months ago" when that distribution center is still in operation to this day.

233. On February 24, 2018, Defendants Rouvé and Martin presented at the Consumer Analyst Group of New York Conference. While there, Rouvé discussed the HHI and GAC consolidations, citing any issues as "temporary" and stating that "Both projects are going to deliver significant working capital improvement, but also expense reductions, once complete. But in the transition period, while we were running multiple sites, unfortunately, we did incur <u>temporary inefficiencies</u> and also our service level has suffered."

234. Defendants' statements discussed in ¶233 were materially false and misleading and omitted material facts. It was also false and misleading for Defendants to state that the GAC and HHI consolidations faced only "temporary inefficiencies" where the problems with production, inventory storage, and shipping were longstanding and fundamental. Indeed, numerous employees corroborate that the Company failed to address any problems, instead flushing all backlogged orders from the Edgerton Center system in February 2018 because these orders were building up at an alarming rate. With respect to the Dayton Center, problems were not resolved and continued through February 2018, including that:

(i) Spectrum had not finished installing racks and instead stored inventory in boxes on top of each other, and the boxes would break, get crushed, or deteriorate, damaging inventory;

(ii) Spectrum failed to fix its production lines, which frequently made incorrect or damaged product;

(iii) Spectrum lacked basic quality control processes for damaged product and resulting scrap;

100

(iv)     Spectrum failed to fix its inventory-management system, which was often incorrect and also did not note the age of inventory, and employees could not find existing inventory;

(v)     Storage difficulties continued to plague the facility and management continued to rent out hundreds of thousands of square feet of additional off-premise warehouse space to store inventory;

(vi)     The Dayton Center was unable to timely or correctly fill customer orders because of the production and inventory problems, and customers were fining Spectrum millions of dollars because of missed or incorrect shipments and threatening to leave;

(vii)     The centers could not track incoming products, as a result, Spectrum did not pay vendors, and as of February 2018, there were nearly $1 million in vendor invoices outstanding, and vendors were threatening to stop their supplies.

235.     With regard to the Edgerton Center, numerous former employees corroborated that as of February 2018 serious foundational issues remained and were not fixed, including that:

(i)     The Company was unable to hire sufficient or competent employees and failed to train its existing employees;

(ii)     The inventory-management systems prevented employees from locating existing product in the facility and could not track where existing product was coming from;

(iii)     While both the Charlotte and Mira Loma centers were supposed to be closed by December 2017, the Charlotte center closed six or more months behind schedule and the Mira Loma center never closed. As a result, the Company was stocking three separate distribution centers with inventory;

(iv)     The Edgerton Center was weeks and sometimes months behind on shipments because of the production and shipping problems, so that the Company started having workers work six days a week and ten hours a day;

(v)     There were still hundreds of trucks out in the yard full of product waiting to get loaded into the Edgerton Center and according to FE 12 the Company rented an additional warehouse that provided an additional 500,000 square feet of storage in February 2018;

(vi)     The fill rate was less than half of what it had been before the Company consolidated the distribution centers and, according to FE 14, in late 2017 or early 2018, the Company decided to cut the fill-rate threshold and send out orders that were not full in order to reduce lag time;

(vii)     The backlog at the Edgerton Center was so bad that the Company purged all open orders from its system in and around February 2018;

101

(viii) The Edgerton Center was unable to timely or correctly fill customer orders because of the production and inventory problems that customers were threatening to leave;

(ix) By January-February 2018, the fill rate was down to 30%;

(x) FE 12 confirmed that she heard at a January 2018 meeting that Home Depot was planning to drop Spectrum as a supplier because of the delays;

(xi) As confirmed by FE 7, during late 2017 and early 2018, Walmart demanded meetings between their VPs and Spectrum senior leadership to address distribution problems; and

(xii) As confirmed by FE 15, issues arose with delays in shipment, lowered fill rates and increased errors once the Edgerton Center started shipping locks in January 2018; and

(xiii) The centers could not track incoming products, as a result, Spectrum did not pay vendors, and as of February 2018, there were nearly $1 million in vendor invoices outstanding, and vendors were threatening to stop their supplies.

**C. April 2018: Defendants Falsely Claim That Materially Poor Financial Results Are "Transitory in Nature"**

236. As discussed above, in connection with its second-quarter 2018 financials, Defendants reported significant problems at the distribution centers. The Company assured investors, however, that the problems at these facilities were largely resolved and that the consolidation projects were poised to deliver positive results. Specifically, in the second-quarter 2018 press release issued on April 26, 2018, Defendant Maura said: "It is our firm belief that the current impact to our free cash flow is <u>mostly transitory</u> and largely reflects one-time investments in working capital and customer relationships. Maura further stated that "<u>We believe the U.S. facility operating inefficiencies are transitory in nature</u> and the adverse margin impact from them is temporary.

237. Defendant Martin stated on a conference call on the same day that "[w]e believe the HHI and GAC operating inefficiencies are <u>transitory in nature</u> . . . and the adverse margin impact <u>is largely behind us</u>[.]"

102

238.    Defendants' confidence was noted by an analyst who stated that Maura "sound[ed] pretty darn confident that things are going to get better."

239.    In connection with their earnings call, Defendants circulated a presentation to investors.  Similar to Defendants' statements on the call, this presentation stated that "We believe the HHI and GAC operating inefficiencies are <u>transitory in nature</u> and the adverse <u>margin impact is largely behind us</u>," and that "given recent actions to improve operational efficiency, we are confident that HHI and GAC customer order backlogs will come down as the facilities improve their on-time shipment levels, which is expected to create a tailwind in shipments for these businesses."

240.    After the April 26, 2018 call, Defendants continued to tell investors that the issues with the consolidation of the distribution centers were largely fixed. For example, a May 17, 2018 Oppenheimer & Co. report discussing "recent investor meetings" with Defendant Maura stated that, according to Spectrum, "Dayton's fill-rate is now in the <u>90%s</u> vs. 80%-82% in March and is on its way to 98%-99% in the next 12-18 months."

241.    Defendants' statements discussed in ¶¶236-239 were materially false and misleading and omitted material facts. It was false and misleading for Defendants to state that the GAC and HHI problems were only "<u>transitory in nature</u>," and that the Dayton fill rate was in the 90% range. It was false and misleading for Defendants to state that the GAC and HHI consolidation issues were "transitory in nature" where the issues with production, inventory storage, and shipping were longstanding and fundamental. As discussed in Section IV.D.1, with respect to the Dayton Center, significant problems, such as those with delayed shipments, were not resolved and continued through April 2018, including that:

103

(i) Spectrum had not finished installing racks and instead continued to store inventory in boxes on top of each other, and the boxes would break, get crushed, or deteriorate, damaging inventory;

(ii) Spectrum failed to fix its production lines, which frequently made incorrect or damaged product;

(iii) Spectrum lacked basic quality control processes for damaged product and resulting scrap;

(iv) Spectrum failed to fix its inventory-management system, which was often incorrect and also did not note the age of inventory, and employees could not find existing inventory;

(v) Storage difficulties continued to plague the facility and management continued to rent out hundreds of thousands of square feet of additional off-premise warehouse space to store inventory;

(vi) The Dayton Center was unable to timely or correctly fill customer orders because of the production and inventory problems, and customers were fining Spectrum millions of dollars because of missed or incorrect shipments and threatening to leave;

(vii) FE 18 confirmed that the Dayton Center's fill rates confirmed were nowhere near 90% as of May 2018.

(viii) Due to the centers' inability to track incoming products, Spectrum did not pay vendors, and as of February 2018, there were nearly $1 million in vendor invoices outstanding and vendors were threatening to stop their supplies.

242. As discussed in Section IV.D.2, with regard to the Edgerton Center, numerous former employees corroborated that as of April 2018 serious foundational issues remained and were not fixed or "transitory," including that:

(i) The Company was unable to hire sufficient or competent employees and failed to train its existing employees;

(ii) The inventory-management system prevented employees from locating existing product in the facility and could not track where existing product was coming from;

(iii) While both the Charlotte and Mira Loma centers were supposed to be closed by December 2017, the Charlotte center closed six or more months behind schedule and the Mira Loma center never closed. As a result, the Company was stocking three separate distribution centers with inventory;

104

(iv)    The Edgerton Center was weeks and sometimes months behind on shipments because of the production and shipping issues, so that the Company started having workers work six days a week and ten hours a day;

(v)     By March or April 2018, there were still hundreds of trucks out in the yard full of product waiting to get loaded into the Edgerton Center in addition to product in an additional rented warehouse that provided an additional 500,000 square feet of storage; and

(vi)    The backlog at the Edgerton Center was so bad that the Company purged all open orders from its system in February 2018.

243.    Further, it was false for Spectrum and Defendant Maura to claim that Dayton's fill-rate was "now in the 90% vs. 80%-82% in March." *See* ¶240. FE 18 stated that she knew this statement was false, because an employee reporting to her had gone to Dayton to set up proper shipment-receipt services, and by May 2018 the Dayton Center's fill-rate was nowhere near 90%

**D.    July 2018: Defendants Falsely Claim That Positive Financial Results Demonstrate That The "Turnaround Is Well Underway" And The Issues Were Transitory"**

244.    When Spectrum announced its third-quarter 2018 earnings on July 26, 2018, and revealed no negative news about the Consolidations, Defendants again took the opportunity to assert that the distribution-center problems were fixed. In a press release dated July 26, 2018, Defendant Maura told investors that "the turnaround of our HHI and GAC business units is well under way." Maura told investors that the Company "benefited from markedly reduced order backlogs in Kansas and Dayton," and that the Company "continue[d] to improve the efficiency of the Kansas and Dayton facilities. Maura told investors that with regard to the Dayton facility "we are on our way and the business is rebounding, proving the issues we faced were indeed largely transitory." Moreover, with regard to GAC, the press release stated that "[a]lso contributing to the growth was the elimination of the customer order backlog at the Dayton facility."

245.    During the third-quarter earnings call that day, Defendant Maura told investors that we achieved significant encouraging progress against the operating efficiencies that we've been

105

experiencing in the greenfield facilities for both our Hardware & Home Improvement assets in Edgerton, Kansas and our Global Auto Care assets in Dayton, Ohio."

246. During the call, Defendant Maura also assured investors that "<u>customer order backlogs were markedly reduced</u> . . . which confirms that our new approach to culture and our new efficiency measures are taking hold and are working." Maura further stated that he "remain[ed] confident that the long-term strategic merits of these Consolidations will result in improved operating efficiencies and lower inventories going forward."

247. Defendant Maura discussed the HHI distribution center, stating that in "Kansas, our <u>order backlog was reduced by about $20 million this quarter, which essentially got rid of the backlog that was created in the month of March</u>. The facility achieved–this is remarkable. The facility achieved its highest network shipments in the history of our company. And we did it with a single DC model versus the actual–we had a 3-DC model before and moved to 2. So it proves actually that this one DC facility is going to work."

248. Defendant Maura went on to state that "[t]he <u>DC management team has been strengthened, process improvement teams are in place, and they continue to drive down our cycle times. We have brought improvements to help to expand our shipping capacity</u>. And looking forward, I'm confident that a strengthened leadership team, better trained and more experienced workforce, along with newly installed automated picking equipment to improve our product selection speed and accuracy will enable Kansas City–sorry, our Kansas DC to continue to work down the order backlog to an optimal level by the end of this calendar year."

249. Defendant Maura similarly touted the progress at the Dayton facility, stating that, "[i]n Dayton, <u>we saw improved and impressive results in the third quarter under the new leadership in that facility. . . . . That team shipped its entire $9 million March backlog, ending the third quarter</u>

106

with a modest and normal backlog and meaningful improvement, which is exceedingly important to me.

250. In response to an analyst question about HHI stating that "it sounds like a lot of the excess backlog has been cleared" and asking about the "underlying trends in HHI," Defendant Maura stated:

> I'm pleased we got the backlog down by $20 million. . . . And we basically went from a standstill in the month of March with 350 trailers blocking, not only inbound, but outbound. And we don't have any aged trailers in that parking lot today. And that's, listen, that's a yeoman's effort. But look, you can do the math. If you just back out the $20 million of backlog, the rest of that was organic and that's a double-digit number. So listen, it's a fantastic result for HHI. I can tell you the numbers I see in this quarter remain at that level of double-digit organic growth.

251. In connection with the earnings call, Spectrum also circulated an investor presentation. This investor presentation claimed that "we achieved significant, encouraging progress against operating inefficiencies at our greenfield sites for HHI in Kansas and GAC in Ohio." Moreover, the presentation noted Spectrum's "[h]ighest quarterly organic sales growth rate—7.3%—in many years in Q3" which was led in part by "markedly reduced customer order backlogs at the Kansas and Dayton facilities."

252. The presentation also touted the "strong progress in Q3 in correcting operational inefficiencies at our HHI Kansas and GAC Dayton facilities" and noted that some "highlights" included the following:

- Highlights of solid progress at HHI Kansas site include:

    − Order backlog reduced by about $20 million, which was essentially all of the increased backlog created in March, and achieved highest network shipments in the history of HHI in Q3 through the single DC model versus HHI's historical 2 DC model

    − Management team strengthened, process improvement teams continued to drive cycle time down, and broad improvements helped to expand shipping capacity

107

- Combination of strengthened leadership team, better trained and more experienced workforce, and new automated picking equipment to improve product selection speed and accuracy will enable the Kansas DC to continue to work down its order backlog to an optimum level by calendar year-end while continuing to improve customer service levels

- Highlights of impressive improvement at GAC Dayton site include:

  − New leadership team made a number of short-term, tactical fixes in Q3 with the clear focus on servicing the customer

  − $9 million order backlog from March was shipped and Q3 ended with modest, normal backlog and meaningful improvement in on-time shipping rates; employees did excellent job of "shipping the season" given solid market demand during peak season

- More significant improvements, especially in manufacturing, scheduled after seasonal demand winds down this fall, and we believe Dayton will operate much more efficiently and at a lower cost per unit by the start of 2019's spring season demand; I am extremely excited about the future prospects for our Auto Care unit.

253.    Defendants' statements discussed in ¶¶244-52 were materially false and misleading and omitted material facts. Among other things, it was false and misleading for Defendant Maura to state that Spectrum "benefited from markedly reduced order backlogs in Kansas and Dayton" and that the "issues we faced were indeed largely transitory" where the issues faced—including issues with production, inventory storage, and shipping—were longstanding and fundamental, and order backlogs remained outstanding.  It was not true that the HHI backlog was "created in March" 2018; it had been building up for many months and, to the extent it ballooned in March, this was a result of Spectrum's cancelling all outstanding orders in February and forcing customers to place new orders.  Indeed, numerous employees corroborate that the Company failed to address any issues, instead flushing all backlogged orders from the Edgerton Center system in February 2018 because its backlogged orders were building up at an overwhelming rate.

254.    With respect to the Dayton Center, significant issues were not resolved and continued through July 2018, including that:

108

(i) Spectrum had not finished installing racks and instead stored inventory in boxes on top of each other, and the boxes would break, get crushed, or deteriorate, damaging inventory;

(ii) Spectrum failed to fix its production lines, which frequently made incorrect or damaged product;

(iii) Spectrum lacked basic quality control processes for damaged product and resulting scrap;

(iv) Spectrum failed to fix its inventory-management system, which was often incorrect and also did not note the age of inventory, and employees could not find existing inventory;

(v) Storage difficulties continued to plague the facility and management continued to rent out hundreds of thousands of square feet of additional off-premise warehouse space to store inventory;

(vi) The Dayton Center was unable to timely or correctly fill customer orders because of the production and inventory problems, and customers were fining Spectrum millions of dollars because of missed or incorrect shipments and threatening to leave;

(vii) Due to the Center's inability to track and unload incoming product, the Company did not pay vendors, and as of February 2018, there were nearly $1 million in vendor invoices outstanding, and vendors were threatening to stop their supplies.

255. With regard to the Edgerton Center, it was false and misleading to for Defendant Rouvé to state, among other things, that "broad improvement helped to expand shipping capacity." Indeed, according to numerous former employees, as of July 2018 the Edgerton Center was weeks and sometimes months behind on shipments because of the production and shipping issues, such that the Company started having workers work six days a week and ten hours a day and provided substantial discounts and payment extensions to customers.

256. Further, Defendant Maura's and Spectrum's claim that HHI had achieved this success through a "single Distribution Center mode" was false and misleading when Spectrum's California distribution center remained open and continues to distribute several of HHI's primary products.

## VI.  ADDITIONAL ALLEGATIONS OF SCIENTER

257.    At all relevant times during the Class Period, Defendants Rouvé, Maura, and Martin acted with scienter in making material omissions of fact and materially false and misleading statements. Each of the Executive Defendants had knowledge that the statements he or Spectrum made were false and misleading and omitted material facts, or acted with reckless disregard for the truth or falsity of those statements, as demonstrated by the allegations above and the additional substantial direct and circumstantial facts and evidence below supporting a strong inference of scienter for the Executive Defendants.

258.    First, from the beginning of his tenure as CEO in April 2018, Defendant Maura was personally responsible for instituting corrections to address the problems at the Dayton Center and the Edgerton Center. He stated that, under his new leadership, Spectrum had taken "swift and decisive action in recent weeks" with "aggressive oversight" over the Centers.  Further, he stated that "while today is technically day 1 on the job for me, I've been traveling and probably haven't slept for 2 weeks" and that he had been "recently . . . living between Dayton and Edgerton."  Thus, Defendant Maura was either aware of the problems at both the Edgerton and Dayton Centers before he made his false and misleading statements that, among other things, the problems at the Center were "transitory" or reckless in making these statements.

259.    Second, as reported by numerous former employees, the Executive Defendants received reports and were on calls and in meetings regarding the problems with shipping, production, and inventory storage at the distribution centers. For example, FE 18 stated that she knew that reports showing that 40-50% of payments to vendors were late because of GAC's and HHI's inability to track their inventory and vendors threatening to stop servicing the distribution centers were presented by her boss to the C-suite, including Defendants Martin, Rouvé, and Maura. Defendant Martin was acutely aware of problems with receiving inventory at the Centers and

paying vendors. Specifically, FE 18 explained that her director, Annette Pena, would brief Martin on the significant problems with backlogged vendor bills (which at one point totaled nearly $1 million), particularly when larger vendors that serviced multiple business units were threatening to stop servicing Spectrum. She also knew that the GAC and HHI division CFOs, Carol Anderson, who reported to Guy Andrysick and then to Randy Lewis, and Brent Esplin, who reported to HHI's General Manager, were escalating these problems to Martin because Martin would ask her or Pena questions about payments to specific vendors.

260.    FE 3 stated that the numbers on the amount of damaged products at the Dayton Center, as well as numbers and types of customer complaints and the production lines' first-pass rates, were also reported as part of PowerPoint presentations on Key Performance Indicators at monthly meetings attended by Ken Burns and Stephen Keller. According to FE 3, Burns and Keller then had separate meetings with Company executives from Wisconsin headquarters to discuss the Key Performance Indicators and PowerPoint presentations, including the damaged products numbers, and FE 3 also personally participated in these meetings with headquarters executives on several occasions. These meetings were done via videoconference, and the PowerPoints were reviewed.

261.    Additionally, according to FE 4, Defendant Rouvé visited the Dayton Center in 2017 and again in 2018 where many of these problems would have been obvious. Further, according to FE 4, Guy Andrysick, the President of GAC, visited the Dayton Center at least once per quarter, and the storage and production problems would have been obvious to him. As discussed in Section IV.D.1 above, a multitude of significant problems would have been in plain sight and obvious to any visitors to the Dayton Center, including (i) a lack of any racking; (ii) boxes of inventory that were crushed or deteriorated sitting on top of each other; (iii) piles of scrap material, including dirty

or damaged product; (iv) trailers full of crushed product; and (v) dozens of trucks lined up to deliver or pickup inventory.

262. According to FE 12, Defendant Rouvé listened in telephonically to an Edgerton Center meeting between November 2017 and February 2018 concerning the need to reduce shipping times, which according to Spectrum's former employees were several weeks or several months delayed.

263. Moreover, senior management at the distribution centers, many of whom reported directly to the Executive Defendants or to others in the C-suite, were acutely aware of the problems with production, storage, and shipping at those distribution centers.

264. With regard to the Edgerton Center, numerous former employees confirmed that the problems with late shipments and customer fines were well known throughout senior management at the Center. For example, FE 9 stated that she was present when either an SVP or Chief Information Officer discussed that the Edgerton Center's fill rate was half of what it had been before the consolidation. And FE 12 recalled an "all-hands" meeting around the end of February 2018 involving Shawn Simmons, Vice President of Human Resources, who reported to HHI's General Manager, at which it was discussed that close to 300 trailers were on the property waiting to be unloaded. The Edgerton Center's order-fulfillment problems became so dire that personnel from Spectrum headquarters were sent to help pack boxes in May 2017, which could not have happened without top Spectrum management's knowledge and approval. By February 2018, the Edgerton Center's order backlog was so severe that HHI "flushed" the entire backlog, which could not have happened without top Spectrum management's knowledge and approval.

265. With regard to the Dayton Center, FE 1 confirmed that Ken Burns, Spectrum's Vice President of Operations from August 2015 to April 2019 who reported to Guy Andrysick and then

112

Randy Lewis, was aware of the delays in setting up the production lines. Similarly, FE 2 stated that Mary Michael, Spectrum's Operations Manager from July 2016 to March 2019 who reported to Burns and then Keller, was aware of and concerned with inefficiencies and downtime on the production lines. FE 3 also confirmed that she raised employees' inability to track and find inventory with Brian Cartwright, Senior Director of R&D, who brought the issue to Ken Burns, VP Operations, and Stephen Keller, Senior Director, US Manufacturing at Spectrum Brands who reported to Guy Andrysick and then Randy Lewis. As Defendant Maura discussed on the Company's April 26, 2018 earnings call, Keller was "one of our best operators and we dropped him into Dayton. He's now taken over running that plant."

266. Additionally, members of senior management received the "exception list" of vendor invoices unable to be processed referenced by FE 4, including Steven Siguenza, HHI Assistant Controller, and Lannie Scoggins, Director of Global Financial Planning and Analysis/Controller.

267. Members of senior management from headquarters in Middleton were also directly involved in troubleshooting many of the distribution-center issues. For example, FE 8 stated that she participated in quite a few monthly status meetings with Phil Gaebler, Vice President of Business Improvement and Global Supply Management, and HHI's General Manager (who reported directly to Defendants Rouvé and Maura), both of whom were explicitly briefed on the numerous issues plaguing the Edgerton center, including challenges hiring staff and getting product received and delays in shipping.

268. FE 8 stated that Phil Gaebler, Vice President of Business Improvement and Global Supply Management, who reported to HHI's General Manager, was sent to the Edgerton Center to deal with the center's significant problems and that he and HHI's General Manager (who reported

113

directly to Defendants Rouvé and Maura), were explicitly briefed on the numerous issues plaguing the Edgerton Center, including challenges hiring staff and getting product received and delays in shipping. Indeed, former employees reported that HHI's General Manager first instructed account managers to mislead customers with respect to fill rates and later participated in customer calls himself.

269.    It is not plausible that these myriad members of senior management at both headquarters and the Centers would be directly engaged in addressing the production, inventory, and shipping problems at the Centers, and yet none of these problems would have been reported to Defendants Rouvé, Maura, and Martin.  This is particularly the case where, as discussed in this Complaint, the consolidation into the Centers was a topic of paramount importance to the Company's financial position during the Class Period.

270.    Third, senior management, who reported directly to the Executive Defendants or to others in the C-Suite, were aware of and discussed millions of dollars of customer fines and threats to leave Spectrum due to delayed shipping and inadequate fill rates.  For example, at Walmart's demand, the Special Advisor to Spectrum's COO and Spectrum's VP of Sales and Marketing flew from Spectrum's headquarters to Arkansas to discuss Walmart's various complaints about Spectrum's order fulfillment in late 2017 and again in early 2018. FE 11 stated that Senior Vice President David Booher (who reported to HHI's General Manager who in turn reported to Rouvé and then Maura), had access to reports and participated in meetings about these fines and threats to leave, and that FE 11 discussed the penalties with Booher. FE 12 similarly discussed with Booher in January 2018 that Home Depot was considering dropping Spectrum as a supplier because of Spectrum's inability to fill shipments in a timely manner. Similarly, FE 4 explained that there were monthly "Tier Meetings" involving senior leadership at the Dayton Center that were led by either

Ken Burns or Vice President of Finance Jim Garvey, who reported to GAC CFO Carol Anderson, and were attended by all directors, managers, supply planners, and quality-control people. At these meetings, it was repeatedly discussed that Walmart might leave Spectrum because Spectrum was so far behind on its shipments.

271.   Fourth, senior management was also aware of and repeatedly discussed problems with hiring at the Edgerton Center. For example, FE 11 recalled several conversations with the Vice President of Human Resources, Shawn Simmons, who reported to HHI's General Manager, and who told him that the Company was losing more employees than it could hire. Similarly, FE 12 discussed with David Booher the Company's significant hiring problems.

272.   Fifth, Spectrum's largest customers Walmart, Lowe's, and Home Depot, making up nearly 40% of the Company's net sales, threatened to leave Spectrum and fined the Company millions of dollars due to late, incorrect, or partial shipments. The reports from numerous former employees quoted above confirm that the Centers' dysfunctionality eroded the business relationships between Spectrum and its three largest customers. These customer's frustrations were consistent enough that all three threatened to leave Spectrum during the Class Period. Accordingly, all three companies levied massive fines, in the millions of dollars, on Spectrum for late or incorrect shipments. And according to FE 14, former colleagues told her that Spectrum's DC's dysfunctionality was the direct cause of HHI losing its exclusivity contract with Tractor Supply, a significant customer, in 2018.  And FE 16 stated that Spectrum lost exclusive rights over its 16 core products (standard hardware items such as hinges, brackets, etc.) being offered at Tractor Supply's 1,500 locations across the United States. The Edgerton Center's order -fulfillment problems also seriously hurt Spectrum's relationships with the major homebuilders D.R. Horton, David Weekley, Toll Brothers and PulteGroup, according to FE 15. Pulte, the second-largest homebuilders in the

115

country, cancelled a four-year contract with Spectrum because of the Edgerton Center's late, inaccurate and damaged shipments. Thus, the GAC and HHI problems seriously jeopardized Spectrums' relationships with major customers representing the entire Company's core offering for all of its divisions.

273. Sixth, Defendant Rouvé's role in the Spectrum fraud is further confirmed by the circumstances of his termination simultaneous with the Company's announcement of problems in the distribution centers. Specifically, Spectrum announced on April 26, 2018, simultaneous with its report of significant problems in the consolidation of the distribution centers, that Defendant Rouvé was immediately stepping down both as CEO and as a Director on Spectrum's Board. The fact that his termination was involuntary is demonstrated by Rouvé's Separation Agreement, filed as an exhibit to a May 1, 2018 Form 8-K, in which Rouvé received $183,750.00 in lieu of 90-days' notice in accordance with the termination-without-cause provision of his contract. His sudden termination at the same time as the announcement of problems in the distribution-center Consolidations is probative of his scienter.

274. Further, on the same day that it announced Defendant Rouvé's firing, Spectrum announced the termination of Guy Andrysick, the President of GAC, who had been intimately involved in the Dayton Center consolidation. As set forth above, Andrysick visited the Center at least once a quarter. According to FE 2, in or around March 2018, a mere month before his termination, Andrysick sent out a Company-wide email admitting that the consolidation was very difficult and that the Company was still trying to meet the challenges faced by the consolidation. Shortly thereafter, Andrysick visited the Dayton Center and admitted to the workers there that the Company was struggling with the consolidation. This simultaneous termination of yet another

116

executive who was active in the Dayton Center consolidation is further support for an inference of scienter.

275. Seventh, as discussed in greater detail in Sections IV.c and V, the Executive Defendants made numerous statements during the Class Period regarding the strategic importance and benefits of the Consolidations and the new distribution centers. For example, upon announcing the Dayton Center, Defendant Rouvé announced that the facility would be GAC's "center of excellence" and would enable GAC to eliminate the "duplication of safety stock, duplication of warehousing cost, [and] a lot of cross shipments to replenish those warehouses." Defendant Martin similarly told investors that the Dayton Center would provide an "extra benefit for us not only from a manufacturing cost perspective but also a transportation and distribution perspective" and would "bring GAC closer to its US customer base, provide more vertical integration, and reduce supply chain cost and complexity." Similarly, the Company told investors in various Forms 10-K and 10-Q during the Class Period that "We continually seek to improve our operational efficiency, match our manufacturing capacity and product costs to market demand and better utilize our manufacturing resources. We have undertaken various initiatives to reduce manufacturing and operating costs . . . the most significant of these initiatives are the GAC Business Rationalization Initiative . . . and the HHI Distribution Center Consolidation."

276. Moreover, GAC and HHI were significant divisions within Spectrum, and the distribution centers were core to the operations of these divisions. In 2017, HHI and GAC represented 34% of Spectrum's net sales, and as of 2018, HHI represented 44% of Spectrum's net sales and GAC represented 15% of net sales, combining for almost 60% of net sales. Given the financial importance of the Consolidations to Spectrum's financial well-being and attractiveness to investors, the Executive Defendants can be presumed to know of facts critical to Spectrum's core

117

operations or to its important transactions. The Executive Defendants in their positions would also be expected to have knowledge of the facts regarding the Consolidations at the time that they were making statements about them, and thus were at a minimum reckless in making their statements about the Consolidations and failing to disclose the serious operational failures at both distribution centers.

277.     Eighth, the Executive Defendants spoke repeatedly and extensively to investors about the subject matters of the fraud—specifically, the progress of the Consolidations, the completeness of the distribution centers, the distribution center's fill rate, and the backlogs of orders. They are thus presumed to have spoken on these topics with personal knowledge of the true facts on those subjects. These types of repeated, detailed public comments—through which the Executive Defendants held themselves out as knowledgeable on these subjects—further support a strong inference of scienter. The Executive Defendants either spoke on these subjects with knowledge on the topics, making their statements knowingly false, or failed to investigate or inquire as to the true facts underlying their statements, making their statements recklessly false.

278.     Ninth, the Executive Defendants spoke repeatedly and extensively to investors about the "temporary," "transitional," or "transitory" nature of problems at the distribution centers and the Company's progress in correcting the problems. They are thus presumed to have spoken on these topics with personal knowledge of the true facts on those subjects. Moreover, the problems in the distribution centers were areas of intense market concern, and analysts repeatedly asked the Executive Defendants about to the extent and origin of the problems.  The Executive Defendants either spoke on these subjects with knowledge on the topics, making their statements knowingly false, or failed to investigate or inquire as to the true facts underlying their statements, making their statements recklessly false.

279. <u>Tenth</u>, numerous former employees corroborated the existence of widespread problems with the consolidation of the HHI and GAC distribution centers, including with inventory production, storage, and shipment, as well as widespread problems in employee hiring, training, and retention and customer attrition. The numerous corroborating reports by Spectrum's former employees underscore that the problems affecting the consolidation of the HHI and GAC distribution centers were widely known, including to the Executive Defendants. Indeed, numerous former employees in various roles at both the Edgerton Center and the Dayton Center corroborated that the Company failed to plan for or set up racks for inventory storage such that inventory was sitting in stacked boxes, resulting in inventory damage; that production lines were delayed or inoperable resulting in a high percentage of scrap or unusable product; that inventory-management systems were problematic and that employees could not locate inventory; that fill rates were far below those before the Consolidations and that customers were threatening to leave or fining the Company millions of dollars due to late or incorrect shipments. Moreover, both the Dayton Center and the Edgerton Center had to rent outside warehouse space to hold excess inventory, a major expense that presumably required approval by the top corporate management. That these issues affecting the Company's core operations were widespread and corroborated by numerous former employees is further evidence of scienter, and the Executive Defendants knew or were reckless in not knowing that their statements regarding the progress of the Consolidations and of the correction of purportedly "temporary" operational issues were false and misleading.

## VII. LOSS CAUSATION

280. The market prices of Spectrum's and HRG's publicly traded common stock were artificially inflated by the material misstatements and omissions alleged in this complaint, including misstatements and omissions regarding the Consolidations of the Edgerton and Dayton Centers and

the progress of correcting any disclosed operational issues, including issues with shipping and backlogs.

281. The artificial inflation in Spectrum's and HRG's stock prices was at least partially removed on April 26, 2018, and November 19, 2018, among other dates, when Spectrum revealed certain aspects of the truth behind those material misrepresentations and omissions to the public.

282. First, on April 26, 2018, Defendants disclosed "very disappointing" financial results for the second quarter of 2018 and guidance for the full year, which Spectrum attributed directly to "challenges" at the Dayton and Edgerton Centers that were "meaningfully greater than we expected." Investors had a negative reaction to this news, and an April 26, 2018 Deutsche Bank report stated that "management has lost credibility" concerning the distribution center issues.

283. Second, on November 19, 2018, Defendants disclosed to the market disappointing results and attributed GAC's EBITDA miss to "$18 million related to low-margin excess and obsolete inventory liquidation, lower volume related to greater-than-expected retailer inventory reductions, Dayton plant inefficiencies, physical inventory adjustments and scrap relating to the facility consolidation projects, and a cumulative correction of duty rates on a significant sourced component." Further, the Company disclosed that in the fourth quarter alone, the Company spent $11.6 million on the HHI distribution center consolidation for a total of $52 million in 2018 – a nearly 50% increase from 2017, when the consolidation was originally supposed to be completed. Analysts expressed surprise that the Consolidations were still faring so poorly and had such a widespread impact on the Company's financials. For example, both Deutsche Bank and Oppenheimer analysts downgraded Spectrum's rating, and a Deutsche Bank analyst report stated that Deutsche Bank "no longer ha[d] conviction that SPB's business results have bottomed" and

120

that "it is apparent that there are underlying structural issues that will take time (we assume 12+ months) and investment dollars to resolve."

284.    These statements revealed on a piecemeal basis the true nature and extent of Defendants' scheme to conceal the significant foundational issues in the distribution centers that continued over time and were not resolved.  These disclosures, more particularly described above (§IV. E), reduced the amount of inflation in the prices of Spectrum's and HRG's publicly traded common stock, causing economic injury to Lead Plaintiffs and other members of the Class.

285.    As illustrated by the chart below, each of these loss-causing disclosures occurred against a backdrop of positive movements in the wider stock market on the following days, among others:

| Date of Corrective Disclosure | Corrective Disclosure | Common Stock Price Change | S&P 500 Price Change |
|---|---|---|---|
| April 26, 2018 | Spectrum disclosed "very disappointing" financial results for the second quarter of 2018 and guidance for the full year that Spectrum attributed directly to "challenges" at the Dayton and Edgerton distribution centers | Spectrum<br>$94.23 on day before disclosure.  Closed day of disclosure at $75.01<br><br>Percentage Change: -20.39%<br><br>HRG<br>$93.15 on day before disclosure.  Closed day of disclosure at $72.56 (split-adjusted prices)<br><br>Percentage Change: -22.10% | $2,639.40 on day before disclosure. Closed day of disclosure at $2,666.94.<br><br>Percentage change: +1.04% |

121

| Date of Corrective Disclosure | Corrective Disclosure | Common Stock Price Change | S&P 500 Price Change |
|---|---|---|---|
| November 19, 2018 | Spectrum disclosed disappointing fourth quarter 2018 results, which made it clear that the consolidation issues persisted throughout fiscal year 2018 and cost the Company millions of dollars. | $59.35 on day before disclosure. Closed day of disclosure at $48.05.<br><br>Percentage Change: -19.03% | $2,736.27 on day before disclosure. Closed day of disclosure at $2,690.73.<br><br>Percentage change: +1.66% |

286. None of these disclosures was sufficient on its own to fully remove the inflation from Spectrum's and HRG's stock prices because each of them only partially revealed the conditions, risks, and trends that had been concealed from investors. The corrective impact of the April 26, 2018 disclosures was tempered by Defendants' continued misstatements and omissions about the progress of the Consolidations and of the correction of the attendant operational issues. These misrepresentations and omissions inflated and maintained the prices of Spectrum's and HRG's publicly traded stock at levels that were artificially inflated, inducing members of the Class to continue purchasing Spectrum's and HRG's common stock even after the truth began to partially enter the market.

## VIII. CLASS ACTION ALLEGATIONS

287. Lead Plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired Spectrum's and HRG's publicly traded common stock during the Class Period.[37] Excluded from the Class are Defendants and their families, directors and officers of Spectrum and HRG, and their families.

---

[37] *See* note 1, *supra*.

288. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of December 30, 2018, Spectrum had over 53 million shares of common stock outstanding, owned by hundreds, if not thousands, of investors worldwide. Similarly, prior to the HRG Merger, HRG had 203 million shares of common stock outstanding, owned by hundreds, if not thousands, of investors worldwide.

289. There is a well-defined community of interests in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class, which predominate over questions that may affect individual Class members, include.

- Whether Defendants violated the Exchange Act;

- Whether Defendants omitted and misrepresented material facts;

- Whether Defendants made false and misleading statements;

- Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

- Whether Defendants knew or recklessly disregarded that their statements and omissions were false and misleading;

- Whether the Executive Defendants are personally liable for the alleged misrepresentations and omissions;

- Whether the prices of Spectrum and HRG stock were artificially inflated;

- Whether Defendants' misconduct caused the members of the Class to sustain damages; and

- The extent of damages sustained by Class members and the appropriate measure of damages.

290. Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

123

291. Plaintiffs will adequately protect the interests of the Class and has retained counsel experienced in class-action securities litigation. Plaintiffs have no interests that conflict with those of the Class.

292. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## IX. INAPPLICABILITY OF STATUTORY SAFE HARBOR

293. Spectrum's "safe harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield the statements discussed above in Section V from liability. None of these statements were forward-looking. To the extent that any statement was found to be forward-looking, Defendants are liable for any such statements because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and approved by an executive officer of Spectrum who knew the statement was false. As alleged above, then-existing facts contradicted Defendants' statements regarding the status of the consolidation of the GAC and HHI facilities, the success of the Dayton and Edgerton Centers, and the correction of the problems that arose in the Consolidations.

## X. PRESUMPTION OF RELIANCE

294. At all relevant times, the market for Spectrum and HRG stock was an efficient market for the following reasons, among others:

(a) Spectrum and HRG stock both met the requirements for listing and were listed and actively traded on NYSE, a highly efficient and automated market;

(b) As regulated issuers, Spectrum and HRG filed periodic public reports with the SEC and NYSE;

(c) Spectrum and HRG regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as

124

communications with the financial press and other similar reporting services; and

(d)  Spectrum was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

295.  As a result of the foregoing, the market for Spectrum and HRG stock promptly digested current information regarding Spectrum from all publicly available sources and reflected that information in the price of Spectrum and HRG stock. Under these circumstances, all purchasers of Spectrum and HRG stock during the Class Period suffered similar injury through their purchase of Spectrum and HRG stock at artificially inflated prices, and the presumption of reliance applies.

296.  A Class-wide presumption of reliance is also appropriate in this action under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded, in part, on Defendants' material omissions. Because this action involves, in part, Defendants' failure to disclose material adverse information that Defendants were obligated to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. As alleged above, that requirement is satisfied here.

## XI.  CLAIMS BROUGHT UNDER 10(b) AND 20(a) OF THE EXCHANGE ACT

### COUNT I – FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 AGAINST SPECTRUM, SPECTRUM LEGACY, AND THE EXECUTIVE DEFENDANTS

297.  Lead Plaintiffs repeat and reallege every allegation contained above as if fully alleged in this count.

298.  During Class Period, Spectrum (including Spectrum Legacy) and the Executive Defendants carried out a plan, scheme, and course of conduct, which was intended to and, throughout the Class Period, did (i) deceive the investing public, including Plaintiffs and other Class

125

members, and (ii) caused Plaintiffs and other members of the Class to purchase Spectrum's (including Spectrum Legacy's) and HRG's common stock at artificially inflated prices.

299. Spectrum, Spectrum Legacy, and the Executive Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Spectrum's and HRG's common stock in an effort to maintain artificially high market prices for Spectrum's and HRG's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

300. Spectrum, Spectrum Legacy, and the Executive Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's well-being and operations.

301. During the Class Period, Spectrum, Spectrum Legacy, and the Executive Defendants made the false statements specified above, which they knew, were (or recklessly disregarded the likelihood that the statements were) false or misleading, in that the statements contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

302. Spectrum, Spectrum Legacy, and the Executive Defendants had actual knowledge of the misrepresentations and omissions of material fact alleged in this complaint, or recklessly disregarded the true facts that were available to them. Spectrum, Spectrum, Spectrum Legacy and the Executive Defendants engaged in this misconduct to conceal Spectrum's true condition from the investing public and to support the artificially inflated prices of Spectrum's and HRG's common stock.

126

303. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Spectrum's common stock and HRG's common stock. Plaintiffs and the Class would not have purchased these securities at the prices they paid, or at all, had they been aware that the market prices had been artificially inflated by Spectrum's, Spectrum Legacy's, and the Executive Defendants' fraudulent course of conduct.

304. As a direct and proximate result of Spectrum's and the Executive Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered economic loss and damages in connection with their respective purchase of Spectrum's common stock and HRG's common stock during the Class Period, as the prior artificial inflation in the prices of those securities was removed over time.

305. By virtue of the foregoing, Spectrum, Spectrum Legacy's, and the Executive Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5.

## COUNT II – FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE EXECUTIVE DEFENDANTS

306. Lead Plaintiffs repeat, incorporate, and reallege every allegation above as if fully alleged in this count.

307. This Count is asserted on behalf of Lead Plaintiffs and members of the Class against the Executive Defendants.

308. Spectrum violated Section 10(b) of the Exchange Act and Rule 10b-5 by making untrue statements of material fact and omitting material facts necessary to make the statements not misleading in connection with the purchase or sale of Spectrum common stock.

309. The Executive Defendants acted as controlling persons of Spectrum within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of

127

the Company, intimate knowledge of the Company's actual performance, and their power to control public statements about Spectrum, the Executive Defendants had the power ability to control the actions of Spectrum and its employees, and to cause the Company to engage in the wrongful conduct complained of in this complaint.

310. As alleged above, Spectrum violated Section 10(b) and Rule 10(b)-5 by its acts and omissions. By virtue of the Executive Defendants' positions as controlling persons of Spectrum, the Executive Defendants are liable under Section 20(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of Spectrum's common stock during the Class Period.

### COUNT III – FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST DEFENDANT HRG GROUP, INC.

311. Lead Plaintiffs repeat, incorporate, and reallege every allegation above as if fully alleged in this count.

312. This Count is asserted on behalf of Lead Plaintiffs and members of the Class against HRG.

313. Spectrum Legacy violated Section 10(b) of the Exchange Act and Rule 10b-5 by making untrue statements of material fact and omitting material facts necessary to make the statements not misleading in connection with the purchase or sale of Spectrum Legacy's and HRG's common stock.

314. HRG acted as a controlling person of Spectrum Legacy within the meaning of Section 20(a) of the Exchange Act. By virtue of its status as majority shareholder and the positions of several HRG executives and directors on Spectrum Legacy's board of directors, HRG had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Spectrum Legacy, including the content and dissemination of the various statements

128

made by Spectrum Legacy that Lead Plaintiffs contend are false and misleading. HRG was provided with, or had unlimited access to, copies of Spectrum Legacy's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and shortly after these statements were issued and had the ability to prevent the issuance of the false statements and material omissions or cause the misleading statements and omissions to be corrected.

315.     In addition, HRG had direct supervisory involvement in the day-to-day operations of Spectrum Legacy and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged in this complaint and exercised that power. As previously discussed, HRG's own financial success was predicated on that of Spectrum Legacy, and it maintained a significant presence on Spectrum Legacy's board of at least three of the eight members.

316.     As alleged above, Spectrum Legacy violated Section 10(b) and Rule 10(b)-5 by its acts and omissions. By virtue of HRG's position as a controlling person of Spectrum Legacy, HRG is liable under Section 20(a) of the Exchange Act. As a direct and proximate result of HRG's wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

317.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

318.     Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

319. Award Lead Plaintiffs and the Class their reasonable attorneys' fees and costs and expert fees;

320. Awarding any equitable/injunctive or other further relief that the Court may deem just and proper.

## XIII. JURY DEMAND

321. Lead Plaintiffs demand a trial by jury.

Dated: July 12, 2019

Respectfully submitted,

*/s/ Katherine M. Sinderson*
**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
Avi Josefson
875 North Michigan Avenue, Suite 3100
Chicago, Illinois 60611
Telephone: (312) 373-3880
Facsimile: (312) 794-7801
avi@blbglaw.com

-and-

Katherine M. Sinderson
Jai Chandrasekhar
Julia K. Tebor
Matthew Traylor
1251 Avenue of the Americas, Fl. 44
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
Email: KatieM@blbglaw.com
Email: Jai@blbglaw.com
Email: Julia.Tebor@blbglaw.com
Email: Matthew.Traylor@blbglaw.com

*Lead Counsel for Lead Plaintiffs the Public School Teachers' Pension & Retirement Fund of Chicago and the Cambridge Retirement System and the Class*

**RATHJE WOODWARD LLC**

Douglas M. Poland
State Bar No. 1055189
10 E. Doty Street, Suite 507
Madison, WI 53703
Telephone: (608) 960-7430
Facsimile: (608) 960-7460
dpoland@rathjewoodward.com

*Liaison Counsel for Lead Plaintiffs the Public
School Teachers' Pension & Retirement Fund of
Chicago and the Cambridge Retirement System
and the Class*

131

# Appendix A

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Charles A. Burbridge, on behalf of the court appointed Lead Plaintiff Public School Teachers' Pension & Retirement Fund of Chicago ("Chicago Teachers"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Executive Director of Chicago Teachers. I have reviewed the Amended Class Action Complaint in this matter and authorize its filing by counsel.

2. Chicago Teachers did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Chicago Teachers is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. Chicago Teachers fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4. Chicago Teachers' transactions in the Spectrum Brands securities that are the subject of this action are set forth in the chart attached hereto.

5. Chicago Teachers has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *In re: RH, Inc. Securities Litigation,* No. 17-cv-554 (N.D. Cal.)
   *In re Spectrum Brands Litigation*, No. 19-cv-347 (W.D. Wis.)

6. Chicago Teachers has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motions for lead plaintiff or was not appointed lead plaintiff:

   *Galmi v. Teva Pharmaceutical Industries Limited,* No. 16-cv-8259 (C.D. Cal.)
   *Boynton Beach General Employees' Pension Plan v. Dentsply Sirona, Inc.,*
   No. 18-cv-07253 (E.D.N.Y.)

7. Chicago Teachers will not accept any payment for serving as a representative party on behalf of the Class beyond Chicago Teachers' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this [ 24 ] day of July, 2019.

Charles A. Burbridge
Executive Director
*Public School Teachers' Pension &*
*Retirement Fund of Chicago*

**Public School Teachers Pension & Retirement Fund of Chicago**
**Transactions in Spectrum Brands**

| Transaction | Date | Shares | Price |
| --- | --- | --- | --- |
| Purchase | 6/23/2017 | 13 | 126.5300 |
| Purchase | 8/24/2017 | 21,251 | 108.2893 |
| Purchase | 8/30/2017 | 6,223 | 107.4344 |
| Purchase | 8/31/2017 | 3,212 | 109.7185 |
| Purchase | 9/1/2017 | 2,583 | 110.7630 |
| Purchase | 9/6/2017 | 2,299 | 106.2805 |
| Purchase | 9/7/2017 | 2,451 | 104.9985 |
| Purchase | 9/11/2017 | 2,115 | 104.5530 |
| Purchase | 9/20/2017 | 1,775 | 104.6340 |
| Purchase | 9/27/2017 | 645 | 105.2648 |
| Purchase | 11/2/2017 | 4,488 | 99.1948 |
| Purchase | 2/21/2018 | 3,480 | 100.9898 |
| Purchase | 3/19/2018 | 4,674 | 95.4932 |
| Purchase | 6/11/2018 | 100 | 80.6015 |
| Merger shares | 7/16/2018 | 1,371.796 | |
| Purchase | 7/18/2018 | 1,300 | 76.5689 |
| Purchase | 7/18/2018 | 500 | 76.5689 |
| Purchase | 10/24/2018 | 8,089 | 64.2281 |
| Purchase | 11/6/2018 | 7,014 | 66.2032 |
| | | | |
| Sale | 11/7/2017 | (6,374) | 112.6729 |
| Sale | 12/7/2017 | (3,288) | 115.1156 |
| Sale | 6/22/2018 | (150) | 83.3500 |
| Sale | 6/22/2018 | (745) | 83.3500 |
| Sale | 7/12/2018 | (2,950) | 84.1321 |
| Sale | 7/13/2018 | (1,664) | 84.4074 |
| Sale | 7/18/2018 | (1,961) | 77.7470 |
| Fractional Sale | 7/23/2018 | (0.796) | |
| Sale | 8/8/2018 | (1,987) | 88.8829 |
| Sale | 8/13/2018 | (2,469) | 85.5450 |

**Transactions in HRG Group, Inc.**

| Transaction | Date | Shares | Price |
| --- | --- | --- | --- |
| Purchase | 5/6/2017 | 7,500 | 17.7600 |

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Francis E. Murphy, III, on behalf of Cambridge Retirement System ("Cambridge"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Board Chairman of Cambridge. I have reviewed a complaint filed in this matter. Cambridge has authorized the filing of this motion for appointment as lead plaintiff.

2. Cambridge did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Cambridge is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. Cambridge fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4. Cambridge's transactions in the Spectrum Brands Holdings, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. Cambridge has served as a representative party on behalf of a class in the following action filed under the federal securities laws during the three years preceding the date of this Certification:

   *In re Willis Towers Watson plc Proxy Litigation*, No. 17-cv-1338 (E.D. Va.)

6. Cambridge has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motions for lead plaintiff or was not appointed lead plaintiff:

   *French v. CBL & Associates Properties, Inc.*, No. 16-cv-165 (E.D. Tenn.)
   *Cambridge Retirement System v. Mednax, Inc.*, No. 18-cv-61572 (S.D. Fla.)

7. Cambridge will not accept any payment for serving as a representative party on behalf of the Class beyond Cambridge's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 6th day of May, 2019.

Francis E. Murphy, III
Board Chairman
*Cambridge Retirement System*

**Cambridge Retirement System**
**Transactions in Spectrum Brands Holdings, Inc.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 3/15/2017 | 100 | 139.9083 |
| Purchase | 4/12/2018 | 6,373 | 97.9493 |
| Purchase | 4/13/2018 | 1,156 | 97.8243 |
| Purchase | 4/16/2018 | 896 | 99.0036 |
| Purchase | 4/17/2018 | 3,132 | 99.0597 |
| Purchase | 4/18/2018 | 1,660 | 98.0543 |
| Purchase | 4/19/2018 | 483 | 99.6358 |
| Purchase | 4/26/2018 | 5,582 | 74.3412 |
| Purchase | 5/31/2018 | 858 | 79.7527 |
| Purchase | 6/15/2018 | 873 | 78.4153 |
| Purchase | 6/18/2018 | 175 | 78.4099 |
| Merger shares | 7/16/2018 | 526.659 | |
| Purchase | 7/18/2018 | 1,300 | 78.1813 |
| Purchase | 7/19/2018 | 1,543 | 77.9049 |
| Purchase | 10/1/2018 | 214 | 74.2984 |
| Purchase | 10/1/2018 | 214 | 74.2804 |
| Purchase | 10/1/2018 | 214 | 74.3411 |
| Purchase | 10/2/2018 | 214 | 74.6649 |
| Purchase | 10/2/2018 | 214 | 74.0210 |
| Purchase | 10/2/2018 | 214 | 74.7882 |
| Purchase | 10/2/2018 | 198 | 74.4029 |
| Purchase | 10/2/2018 | 24 | 74.2983 |
| Purchase | 10/2/2018 | 214 | 74.2430 |
| Purchase | 10/3/2018 | 214 | 74.4382 |
| Purchase | 10/3/2018 | 186 | 74.4736 |
| Purchase | 10/3/2018 | 214 | 74.6351 |
| Purchase | 10/3/2018 | 172 | 74.3055 |
| Purchase | 10/8/2018 | 516 | 72.0954 |
| Purchase | 10/9/2018 | 1,457 | 71.7833 |
| Purchase | 10/10/2018 | 545 | 69.3349 |
| | | | |
| Sale | 6/27/2016 | (100) | 111.7300 |
| Sale | 8/29/2017 | (100) | 107.5200 |
| Sale | 2/23/2018 | (130) | 103.6100 |
| Sale | 6/7/2018 | (100) | 80.8200 |
| Sale | 6/22/2018 | (670) | 83.3420 |
| Fractional Sale | 7/23/2018 | (0.659) | 76.3278 |
| Sale | 9/26/2018 | (1,835) | 77.2785 |

# **<u>Appendix B</u>**

**APPENDIX B**

| Former Employee Number | Title/Tenure | Location |
|---|---|---|
| 1 | New Product Introduction Project Manager from January 2017 to December 2017 | Dayton, OH |
| 2 | Quality Technician from June 2017 to March 2018 | Dayton, OH |
| 3 | Global Quality Manager from November 2016 to January 2019 | Dayton, OH |
| 4 | Document-Control Specialist from January 2017 to October 2017; Procurement Officer from October 2017 to July 2018; and Lead Quality-Control Technician from July 2018 to April 2019. | Dayton, OH |
| 5 | Contract Data Analyst from February 2017 to September 2017 | Dayton, OH |
| 6 | Manufacturing Maintenance Technician from January 2017 to January 2018 | Dayton, OH |
| 7 | National Account Manager for Walmart from September 2017 to August 2018 | Bentonville, AR |
| 8 | Internal Consultant on manufacturing process improvement from August 2016 to May 2017 | Edgerton, KS Charlotte, NC |
| 9 | Solutions Analyst Consultant the fall of 2017 to February 2018 | Edgerton, KS |
| 10 | Senior Quality Engineer from October 2009 to 2015; Operations Manager from 2015 to March 2018 | Denison, TX |
| 11 | Member of the Operations Team from second quarter of calendar year 2017 to near the end of 2017 | Edgerton, KS |
| 12 | Training Specialist from November 2017 to March 2018 | Edgerton, KS |
| 13 | Human Resources Coordinator from March 2017 to May 2017 | Edgerton, KS |
| 14 | Spectrum Territory Account Manager for HHI from September 2014 to February 2018 | Louisville, KY |
| 15 | Sales Manager at HHI from 2008 to May 2018 | Houston, Texas |
| 16 | Business Development Manager for HHI from May 2009 to October 2018 | Oxford, MS |
| 17 | Recruiter from January 2018 to June 2018 | Edgerton, KS |
| 18 | Senior Accountant from July 2017 to February 2018; Accounts Payable Manager from February 2018 until May 2019 | Middleton, WI |

# **<u>Appendix C</u>**

**APPENDIX C**

| Name | Title/Tenure | Location |
|---|---|---|
| Anderson, Carol | VP & CFO, Global Auto Care (GAC) from 2011 to Present | Danbury, CT |
| Andrysick, Guy | President, Global Auto Care (GAC) from May 2015-April 2018 | Naples, FL |
| Booher, David | Senior VP, Global Ops & E2E Supply Chain from January 2012 to Present | Orange County, CA |
| Buck, Larry | Senior Director of Manufacturing from October 2016 to March 2019 | Dayton, OH |
| Burns, Ken | VP of Operations, Supply Chain, from August 2015 to Present | Pettysburg, OH |
| Cartwright, Brian | Senior Director of R&D, Engineering and Quality from January 2017 to January 2018 | Pleasanton, CA |
| Cartwright, Donna | Senior Director, Research and Development Global Innovation from February 2011 to January 2018 | Pleasanton, CA |
| Esplin, Brent | CFO, Hardware & Home Improvement (HHI) from October 2002 to Present | Orange County, CA |
| Fraundorfer, Steven | President, Batteries and Appliances Division from February 2017 to November 2017; President, Home and Personal Care Appliances Division from November 2017 to February 2019; Special Advisor to Spectrum's Chief Operating Officer from February 2019 to Present | Madison, WI |
| Gaebler, Phil | VP, Business Improvement & Global Supply Management, Hardware and Home Improvement (HHI) from January 2017 to Present | Orange County, CA |
| Garvey, Jim | VP of Finance, Global Auto Care (GAC) from January 2017 to November 2018 | Unknown |
| Hartzell, Dave | Senior Director of Distribution and Transformation from January 2017 to Present | Baltimore, MD |
| Johnson, Kimberly | Human Resources Manager, Hardware & Home Improvement (HHI) from October 2017 to January 2019 | Edgerton, KA |
| Keller, Stephen | Senior Director, US Manufacturing at Spectrum Brands from December 2016 to Present | Earth City, MO |
| Lewis, Randy | President, Pet, Home and Garden from February 2017 to April 2018; President, Consumer Products Group from April 2018 to November 2018 | Earth City, MO |
| Martin, Douglas | CFO, Spectrum Brands Holding from 2014 to Present | Madison, WI |

| Name | Title/Tenure | Location |
|---|---|---|
| Maura, David | CEO, Spectrum Brands from April 2018 to Present | New York, NY |
| Michael, Mary | Operations Manager from July 2016 to Present | Dayton, OH |
| Pena, Annette | Director, Shared Services-Accounts Payable from July 2017 to Present | Middleton, WI |
| Rouvé, Andreas | CEO, Spectrum Brands from April 2015 to April 2018 | Madison, WI |
| Siguenza, Steven | Assistant Controller, Hardware & Home Improvement (HHI) | Unknown |
| Simmons, Shawn | VP of Human Resources, Hardware & Home Improvement (HHI) from January 2017 to Present | Orange County, CA |
| Vice President of Sales and Marketing* | VP of Sales and Marketing from January August 2016 to Present | Madison, WI |
| HHI General Manager* | Senior VP and General Manager, Hardware & Home Improvement (HHI) from September 2015 to Present | Orange County, CA |
| HHI Director Of Sales* | Director of Sales from March 2013 to Present | Baltimore, MD |

*Lead Plaintiff can identify this individual at the Court's request.*