# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| IN RE SPECTRUM BRANDS SECURITIES LITIGATION | ) | No. 19-cv-347-jdp |
| | ) | |
| | ) | |

## OBJECTION TO PLAN OF ALLOCATION

**ROLNICK KRAMER SADIGHI LLP**
Lawrence M. Rolnick (*pro hac vice forthcoming*)
Marc B. Kramer (*pro hac vice forthcoming*)
Richard A. Bodnar
1251 Avenue of the Americas
New York, New York 10020
Tel. 212-597-2800

**BASSFORD REMELE**
David M. Dahlmeier
100 South 5th Street, Suite 1500
Minneapolis, MN 55402-1254
Tel. 612-333-3000

# TABLE OF CONTENTS

PRELIMINARY STATEMENT……………………………………………………………....1

SUMMARY OF THE CASE……………………………………………………….........3

SUMMARY OF THE PLAN OF ALLOCATION………………………………………4

RELEVANT PROCEDURAL HISTORY……………………………………………………5

RELEVANT LEGAL STANDARD…………………………………………………..8

ARGUMENT………………………………………………….........................9

    I.    The Jet Capital Funds are Class Members by Virtue of their Purchase of HRG Stock and Have Significant Claims..................................................................9

    II.    A 75% Discount is Unfair to HRG Claimants and Benefits Lead Plaintiffs at the Expense of HRG Claimants...............................................................10

        a.    Shifting Settlement Value from the HRG Claimants to Lead Plaintiffs and Others Similarly Situated is Unfair......................................................11

        b.    The Discount Renders Statements in Lead Plaintiffs' Motions for Preliminary and Final Approval Misleading......................................................14

    III.    The 75% Discount is Arbitrary, Rendering it Unreasonable, Given the Merits of the Claims...................................................................................15

        a.    There is No Disclosed Basis for the 75% Discount.......................................15

        b.    The 75% Discount is Arbitrary Given the Lack of Other Discounts…….16

        c.    The 75% Discount is Arbitrary Given the Virtual Identity of Actual Litigation Risks Among Different Class Members……………………...18

    IV.    A 75% Discount is Unfair and Unreasonable Given the Status of the Litigation..20

    V.    A 75% Discount is Unwarranted by the Arguments Against HRG Claimants…..22

    VI.    The Notice Obfuscates the Value of the HRG Claimants' Claims, Explaining the Likely Lack of Other Objectors…………………………………………….24

CONCLUSION & RELIEF REQUESTED…………………………………………..25

## TABLE OF AUTHORITIES

Page

Cases

*Franks v. Kroger Co.,*
    649 F.2d 1216 (6th Cir.1981) ................................................................................. 11

*Hering v. Rite Aid Corp.*,
    331 F. Supp. 3d 412 (M.D. Pa. 2018) ..................................................................... 22

*Holmes v. Continental Can Co.,*
    706 F.2d 1144 (11th Cir.1983) .............................................................................. 11

*In re Am. Apparel, Inc. S'holder Litig.*,
    No. CV10-CV-06352, 2014 WL 10212865 (C.D. Cal. July 28, 2014) .................................. 21

*In re Barclays Liquidity Cross & High Frequency Trading Litig.*,
    390 F. Supp. 3d 432 (S.D.N.Y. 2019)...................................................................... 23

*In re Groupon, Inc. Sec. Litig.*,
    No. 12-cv-2450, 2016 WL 3896839 (N.D. Ill. July 13, 2016) .................................................. 8

*In re NYSE Specialists Secs. Litig.*,
    503 F.3d 89 (2d Cir. 2007)................................................................................... 23

*In re PaineWebber Ltd. Partnerships Litig.*,
    171 F.R.D. 104 (S.D.N.Y.) .................................................................................. 18

*In re Signet Jewelers Ltd. Sec. Litig.*,
    No. 16-cv-6728, 2019 WL 3001084 (S.D.N.Y. July 10, 2019)................................................ 17

*In re Sw. Airlines Voucher Litig.*,
    799 F.3d 701 (7th Cir. 2015) ................................................................................ 11

*In re Wells Fargo Mortgage-Backed Certificates Litigation*,
    No. 09-cv-1376 (N.D. Cal.) .............................................................................. 16, 20

*In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*,
    No. MDL No. 2672 (N.D. Cal.)........................................................................... 16, 20

*Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Tr. Co.*,
    834 F.2d 677 (7th Cir. 1987) ............................................................................... 22

*Plummer v. Chem. Bank,*
    91 F.R.D. 434 (S.D.N.Y.1981), *aff'd,* 668 F.2d 654 (2d Cir.1982) ......................................... 11

*Pope v. Harvard Banschares, Inc.,*
  240 F.R.D. 383 (N.D. Ill. 2006) .................................................................................... 12

*Pub. Employees Ret. Sys. of Mississippi v. Signet Jewelers Ltd.,*
  No. 19-3837, 2020 WL 773018 (2d Cir. Jan. 16, 2020) .......................................... 17

*Retsky Family Ltd. P'ship v. Price Waterhouse LLP,*
  No. 97 C 7694, 2001 WL 1568856 (N.D. Ill. Dec. 10, 2001) .................................... 8

*Reynolds v. Beneficial Nat. Bank,*
  288 F.3d 277 (7th Cir. 2002) ........................................................................................ 8

*Semerenko v. Cendant Corp.,*
  223 F.3d 165 (3d Cir. 2000) ........................................................................................ 23

*Shanawaz v. Intellipharmaceutics International Inc., et al.*
  No. 17-cv-05761-jpo (S.D.N.Y) .................................................................................. 21

*Suchanek v. Sturm Foods, Inc.,* No. 11-cv-00565,
  2019 WL 4345301 (S.D. Ill. Sept. 12, 2019) .............................................................. 8

*Wagner v. Lehman Bros. Kuhn Loeb Inc.,*
  646 F. Supp. 643 (N.D. Ill. 1986) .............................................................................. 12

*Zelman v. JDS Uniphase Corp.,*
  376 F. Supp. 2d 956 (N.D. Cal. 2005) ........................................................................ 23

## Statutes

15 U.S.C. § 78u-4(a)(3)(A)(i) ............................................................................................ 6

15 U.S.C. § 78u–4(a)(7)(A) ............................................................................................ 24

## Other Authorities

S. REP. 104-98, 12, 1995 U.S.C.C.A.N. 679 .................................................................. 24

Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1797.1 (3d ed.) ...................... 9

Jet Capital Master Fund LP, Jet Capital SRM Master Fund LP, and Walleye Investments Fund (collectively, the "Jet Capital Funds," and hereinafter, "Jet") object to the Plan of Allocation's proposed distribution of the Net Settlement Fund in connection with the proposed settlement of *In re Spectrum Brands Securities Litigation*, Case No. 19-cv-347-jdp (the "Jet Objection"). Specifically, Jet objects to Paragraph 61 and footnote 10 of the Notice/Plan of Allocation,[1] which imposes a *75%* discount on Class members' claims recognized loss related to HRG stock – and thus a massive discount on the *pro rata* share of the settlement available to premerger HRG claimants like Jet. Jet also opposes the entry of the Plan of Allocation as written, as unfair, unreasonable, and inadequate and respectfully submits this memorandum of law in support of its objection.[2]

By this objection, and the accompanying motion to intervene, Jet seeks to protect and further the interests of certain class members who are unfairly treated under the Class Settlement. This objection incorporates by reference (i) the Declaration of Richard A. Bodnar, Esq. in Support of the Jet Capital Funds Objection and accompanying exhibits; and (ii) all other papers and proceedings herein.

**PRELIMINARY STATEMENT**

The class action settlement in this case reveals the dangers attendant in failing to follow the procedures Congress mandated in the Private Securities Litigation Reform Act ("PSLRA"). Prior to the passage of the PSLRA, Congress was concerned that securities class action litigation was counsel-driven and often controlled by small investors who had little financial incentive in the

---

[1] The Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Litigation Expenses (the "Notice") is attached to the Declaration of Richard A. Bodnar ("Bodnar Decl.") as Exhibit A. Capitalized terms not defined herein have the same meaning as in the Notice.

[2] For the avoidance of doubt, Jet objects to the fairness, reasonableness, and adequacy of the Plan of Allocation and anything such unfairness, unreasonableness and inadequacy taints, but does not object to: (a) the fact of the settlement or that settlement was entered into at this stage of the proceedings; (b) the amount of the settlement *in toto*; or (c) the amount or percentage of attorney's fees *in toto*; notwithstanding the above, Jet objects to the unfairness, unreasonableness and inadequacy of the Plan of Allocation.

outcome of the litigation. To remedy that situation, Congress enacted provisions that allowed the district court to select a lead plaintiff—usually the investor with the greatest losses—to represent and protect the interests of the class. To effectuate that process, the PSLRA requires a would-be class action plaintiff to publish a notice advising investors of the pendency of a proposed class action. This notice allows investors to apply for appointment as lead plaintiff and allows the court to select the best representatives to lead and protect the class. It also allows the court to consider possible conflicts of interest and to create subclasses with different representatives if necessary to protect the class.

Here, despite the clear requirements of the PSLRA, these important procedures were not followed with the result being that no adequate lead plaintiff was ever appointed to represent the HRG class. Instead, notice was given only for investors of Spectrum Legacy or Spectrum to come forward and apply as lead plaintiffs. No notice was ever given that HRG investors would be represented in a class action. Had such a notice been given, large investors like the Jet Capital Funds (which purchased over 4,200,000 shares of HRG prior to the merger), or others, could have applied to the Court to be appointed lead plaintiff and would have been in a position to protect HRG shareholders. Instead, the two entities that were appointed lead counsel had only *de minimis* purchases of HRG stock. One had no purchases and the other purchased only 7,500 shares (or less than two tenths of one percent (0.2%) of the shares purchased by Jet).

Despite a failure to notify HRG shareholders of a proposed class action, Lead Plaintiffs then proceeded to file a class action on behalf of HRG shareholders. Defendants moved to dismiss the class action as it related to HRG shareholders arguing, *inter alia*, that no notice under the PSLRA had ever been given with respect to an HRG class action and no lead plaintiff had been appointed to represent HRG shareholders. Before that motion was decided, the Lead Plaintiffs settled the class action and then unfairly reduced any share of the settlement that would be recovered by HRG shareholders. In the proposed allocation, Lead Plaintiff purport to discount any recoveries to HRG class members by a staggering *75%*. Of course, this reduction has very

little impact on Lead Plaintiffs, who hold virtually no shares, but has an enormous impact on a shareholder like Jet.

Had the procedures required by the PSLRA been followed, and a lead plaintiff properly appointed to represent HRG shareholders, HRG shareholders would have been protected and their right to participate fairly in the settlement would not have been compromised. At this point, the only way to remedy the situation and protect HRG shareholders who will be bound by the settlement is to reform the proposed allocation to fairly and adequately distribute it to all class members, including HRG shareholders.

The role of this Court in a class action fairness hearing is not to simply rubber-stamp a settlement agreement and the allocation proposed by a lead plaintiff, but to conduct a searching inquiry to ensure that the rights of absent class members are fairly and adequately protected. Here, HRG shareholders are being injured by a proposed allocation that discounts their claims by 75% - a direct result of having their claims settled by Lead Plaintiffs with little stake in the outcome for HRG shareholders, and who never even applied to this Court for permission to represent them. This strikes at the very heart of the Court's duty to oversee class actions.

## SUMMARY OF THE CASE

This securities-fraud class action was brought against Spectrum Brands Legacy, Inc. ("Spectrum Legacy"), HRG Group, Inc. ("HRG") and Spectrum Brands Holdings, Inc. ("Spectrum"). Prior to July 13, 2018, Spectrum Legacy and HRG were separate companies. Spectrum Legacy was traded on the New York Stock Exchange ("NYSE") under the ticker symbol "SPB" and HRG was a holding company whose principal asset was Spectrum Legacy stock. HRG was also traded on the NYSE under the ticker symbol "HRG." On July 13, 2018, HRG acquired the remaining shares of Spectrum Legacy that it did not already own and Spectrum Legacy became its wholly-owned subsidiary. As a result, Spectrum Legacy was no longer traded publicly and HRG was renamed Spectrum and traded under the ticker symbol "SPB." Thus, pre-merger HRG and post-Merger Spectrum are the identical corporation except for the change of name.

3

The instant class action is brought on behalf of all persons or entities who purchased either Spectrum or HRG securities during the period from January 26, 2017 to November 19, 2018, inclusive (the "Class Period"). Thus, for the period prior to the merger, the class consists of purchasers of both Spectrum Legacy and HRG. After the merger, the class consists only of purchasers of Spectrum (which was HRG, the only remaining corporation, renamed).

The class action asserts that during the class period, Spectrum Legacy—and then Spectrum—made material misrepresentations about a transformational consolidation plan that was underway at the Company. Prior to the merger, these misrepresentations inflated the price of Spectrum Legacy and HRG shares. HRG shares were inflated because HRG was a holding company for Spectrum Legacy shares. Prior to the merger, partial disclosures began to drive down the price of both Spectrum Legacy and HRG stock. After the merger, disclosures continued, driving down the price of Spectrum stock. Spectrum stock, of course, was previously HRG stock that was simply renamed following the merger.

## SUMMARY OF THE PLAN OF ALLOCATION

The Plan of Allocation for the class settlement in this case unfairly and unreasonably discriminates against class members who purchased pre-merger HRG stock at prices inflated by the fraudulent statements at issue. These investors, including Jet, were damaged as a result of revelations of information by Spectrum in April and November 2018. The discriminatory treatment of HRG class members comes from a half sentence and a footnote buried in the Plan of Allocation that applies a "0.25" multiplier to their "Recognized Claim." (Notice at ¶ 61 & n. 10.) The result of this multiplier is a *75% discount* **in the value of their settlement claims**. This 75% discount leaves HRG claimants with an inadequate share of the class settlement and unfairly shifts settlement proceeds to Lead Plaintiffs.

As set forth in greater detail below, Lead Plaintiffs purchased the vast preponderance of their shares in Spectrum Legacy and Spectrum. One Lead Plaintiff purchased only shares in Spectrum Legacy and Spectrum. As a result, they are credited with virtually 100% of the value of their claim when calculating the Recognized Loss. In contrast, HRG class members, like Jet, are

4

credited with just 25% of their Recognized Loss. Such an unfair allocation of settlement proceeds would not have occurred if a proper lead plaintiff had been appointed to protect HRG class members.

As a member of the settlement class, Jet objects to the 75% discount contained in the proposed allocation and requests that this Court: (a) strike the discount entirely; or in the alternative, (b) appoint Jet and its counsel as liaison plaintiff to represent the interests of the HRG class members and to negotiate with Defendants, Lead Counsel and Lead Plaintiffs for a fair and reasonable treatment of HRG claims. In the case of (b), Jet further requests that the Court order Lead Plaintiffs to provide to Jet and its counsel the reports and work files of the Class's expert, the mediation statements exchanged (to be shared under a confidentiality stipulation), Lead Counsel's work product on damages and (to be shared under an attorneys' eyes only stipulation), including the reason or reasons that Lead Counsel arrived at a 75% discount for HRG claimants' claims.

## RELEVANT PROCEDURAL HISTORY

On March 7, 2019, Earl Wagner filed a putative class action (the "Wagner Action") against Spectrum Legacy, Inc., and two officers of Spectrum alleging violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). The Wagner Action was Case No. 19-cv-00178. The Complaint made no mention of HRG shareholders. (Case No. 19-cv-00178, Dkt. No. 1.)

Also on March 7, 2019, Levi & Korsinsky, LLP, which filed the Wagner Action, issued a notice via Global Newswire (the "March 2019 Notice") directed to "All persons or entities who purchased or otherwise acquired securities of Spectrum Brands Legacy, Inc. (f/k/a Spectrum Brands Holdings, Inc.) (NYSE:SPB) between June 14, 2016 and April 25, 2018, inclusive (the "Class Period")." (Bodnar Decl. Ex. B.) HRG was not mentioned anywhere in the March 2019 Notice.

On April 30, 2019, the West Palm Beach Firefighters' Pension Fund filed a putative class action against Spectrum Legacy and three officers or directors of Spectrum alleging violations of Section 10(b) and 20(a) of the Exchange Act. That action was Case No. 19-cv-00347 and later

was assigned the caption "*In re Spectrum Brands Securities Litigation.*"  The complaint made no mention of HRG shareholders (Dkt. No. 1.)[3]  Lead Counsel, who then represented West Palm Beach Firefighters' Pension Fund, did not issue a further notice advising that a securities class action would be brought on behalf of HRG investors.

From May 6, 2019, to May 13, 2019, the current lead plaintiffs moved for lead plaintiff for the class.  Neither purported to represent HRG shareholders, and neither filed information on their HRG stock purchases.  (*Id*. at 3-6.)

On June 12, 2019, this Court issued an Order appointing the Public School Teachers' Pension and Retirement Fund of Chicago ("Public Schools") and the Cambridge Retirement System ("CRS") as lead plaintiffs ("Lead Plaintiffs") and Bernstein Litowitz Berger & Grossman LLP as lead counsel for the class ("Lead Counsel").  HRG was not mentioned in the appointment order.  (Bodnar Decl. Ex. C (Dkt. No. 8).)

On July 12, 2019, Lead Plaintiffs filed an Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Amended Complaint"). (Dkt. No. 14.) The Amended Complaint, for the very first time and without notice to HRG shareholders as required by the PSLRA, asserted class action claims on behalf of pre-merger HRG shareholders.

On August 26, 2019, Defendants filed a motion to dismiss the Amended Complaint.  (Dkt. No. 20.)  Among other arguments, Defendants asserted that Lead Plaintiffs could not bring claims on behalf of pre-merger HRG shareholders against Spectrum because they had not complied with the PSLRA notice procedure pursuant to 15 U.S.C. § 78u-4(a)(3)(A)(i).   (Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint, Dkt. No. 20 at 48-52.)

On October 10, 2019, Lead Counsel filed its opposition on behalf of the Lead Plaintiffs. (Dkt. No. 26.)  Despite having been put on notice that the important procedural safeguards of the PSLRA had not been complied with, Lead Plaintiffs chose not to cure that deficiency by complying

---

[3] Unless expressly otherwise qualified with a different case number, citations to "Dkt. No." in this brief refer to the docket of Case No. 19-cv-00347.

with the full and fair notice procedure.  Instead, Lead Plaintiffs argued that the original notice ***did***
encompass HRG shareholders (despite HRG appearing nowhere in the notice, and no plaintiff
putting forth its HRG purchases in the lead plaintiff process).  (Lead Plaintiffs' Opposition to
Defendants' Motion to Dismiss the Complaint, Dkt. No. 26 at 57-59.)

On November 6, 2019, Defendants replied, (Dkt. No. 56) arguing that HRG was not
mentioned in the notice and asserting that a further publication of notice was not appropriate.
(Reply Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended
Complaint, Dkt. No. 56 at 32-34.)  Presumably, Defendants had little incentive that a class of HRG
shareholders was adequately represented by an institutional investor having an incentive to obtain
the greatest recovery for HRG shareholders.  Neither party suggested the obvious—re-opening the
lead plaintiff appointment process along with a new notice process, inviting HRG investors to
apply for appointment as lead plaintiff of an HRG class.

Although the motion to dismiss revealed the Lead Plaintiffs' failure to comply with the
PSLRA to ensure adequate representation of HRG class members, the Court was never informed
by the parties of the deficiency.  Instead, the parties repeatedly asked the Court to hold off on
ruling on the motion to dismiss, one potential outcome of which would have been to require
appointment of lead plaintiff and counsel to represent HRG shareholders. (Dkt. Nos. 59-69.)

After a number of delays, on August 10, 2020, the Class filed a motion for preliminary
approval of a class action settlement, including the settlement and release of all HRG shareholders
claims covered by the class.  (Dkt. Nos. 70 & 71.)[4]

On September 29, 2020, the Court granted preliminary approval and approved a notice
regime. (Dkt. No. 74.)  That notice was the *first time* HRG shareholders were notified that their
claims against Spectrum were part of an existing class action, and that those claims were being
compromised.

---

[4] The Memorandum of Law in Support of Lead Plaintiffs' Unopposed Motion for an Order
Preliminary Approving Class Action Settlement and Authorizing Dissemination of Notice of
Settlement (the "Preliminary Approval Motion") is attached to the Bodnar Decl. as Ex. D.

The Notice, which is discussed in more detail below, is 27 pages long, with 93 numbered paragraphs. (*See* Notice, Bodnar Decl. Ex. A.) HRG shareholders were informed, in paragraph 61, in a single partial sentence and footnote, that their claims in the Class were being discounted by 75% (styled as a multiplier of "0.25," instead of a discount of 75%). (*Id.* at ¶ 61, n.10).

On December 24, 2020, Lead Plaintiffs filed their motion to approve the settlement, including the Plan of Allocation. (Dkt. Nos. 75 & 76).[5] Lead Plaintiffs included a certification from the chosen mediator, Jed Melnick. (Dkt. No. 79-1.) Mr. Melnick's certification makes no mention of the 0.25 multiplier/75% discount, and it is unlikely that Mr. Melnick was involved in the Plan of Allocation. Nor does Jet have any reason to believe that the discount was a negotiated term of the settlement. Defendants are ordinarily not involved in fashioning the Plan of Allocation.

<b><u>RELEVANT LEGAL STANDARD</u></b>

"Before [] a settlement may be approved, the district court must determine that a class action settlement is fair, adequate, and reasonable, and not a product of collusion." *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 279 (7th Cir. 2002) (internal quotations omitted). "In determining whether a settlement is fair, reasonable, and adequate, the Court must evaluate the allocation of funds among class members." *Suchanek v. Sturm Foods, Inc.*, No. 11-cv-00565, 2019 WL 4345301, at *3 (S.D. Ill. Sept. 12, 2019); *see also Lucas v. Vee Pak, Inc.*, No. 12-cv-09672, 2017 WL 6733688, at *8 (N.D. Ill. Dec. 20, 2017).

"The same standards of fairness, reasonableness and adequacy that apply to the settlement apply to the Plan of Allocation." *Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, No. 97 C 7694, 2001 WL 1568856, at *3 (N.D. Ill. Dec. 10, 2001); *see, e.g.*, *In re Groupon, Inc. Sec. Litig.*, No. 12-cv-2450, 2016 WL 3896839, at *1 (N.D. Ill. July 13, 2016) (reviewing whether the proposed Plan of Allocation was "fair, just, reasonable, and adequate…"). In addition, as Lead Plaintiffs recognize, a settlement must treat "class members equitably relative to each other." (Final Approval Motion at 5.) The burden rests on the "proponent of the settlement" to show that

---

[5] The Memorandum in Support of Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation (the "Final Approval Motion") is attached to the Bodnar Decl. as Ex. E.

8

it meets these standards. 7B C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1797.1 (3d ed.).

HRG class members were not fairly or properly represented in this class action. As a result, the current Plan of Allocation is unfair to HRG class members and is unreasonable, inadequate and should be rejected or reformed. The Plan of Allocation fails to treat class members equitably relative to each other, and instead heavily favors claimants who purchased shares of Spectrum Legacy and Spectrum to the disadvantage of class members who purchased pre-merger HRG shares.

**ARGUMENT**

### I. The Jet Capital Funds Are Class Members by Virtue of their Purchase of HRG Stock and Have Significant Claims

The Jet Capital Funds are investment funds managed by a common manager – Jet Capital Investors LP, with offices in New York, New York. The Jet Capital Funds purchased a net position of 4,200,000 premerger HRG shares during the Class period at a weighted average price of $17.72 per share (premerger prices, unadjusted). (*See* Bodnar Decl Ex. F (attaching Jet trading records in securities relevant to the Class.))[6] Jet made purchases of HRG stock from February 7, 2017 through and including February 22, 2018.[7] For comparison, and as discussed above, one Lead Plaintiff purchased no HRG stock and is not an HRG class member at all, and the other purchased only 7,500 shares (compared to Jet's 4,200,000, or less than 0.2% of Jet's total) on a single date, May 6, 2017.

On April 26, 2018, the date of the first alleged corrective disclosure in this matter, Jet suffered a market loss of approximately $14,000,000 on its HRG position. By comparison, Lead

---

[6] Jet's net position was partially hedged with a small position in legacy Spectrum stock. Jet's hedging activity, common for large investment managers, left Jet with a net long (or positive) exposure of almost $37,000,000 to HRG/Legacy Spectrum on April 25, 2018. Thus, taking into account Jet's hedge, Jet suffered a net market loss of over $8,000,000 on April 26, 2018 compared to combined damages for both Lead Plaintiffs of just $25,000.

[7] *See* Bodnar Decl. at Ex. G (attaching trading records required by the Notice).

9

Plaintiff(s) suffered a market loss on its HRG position of approximately $25,000—or less than two tenths of one percent (0.2%) of Jet's losses.

Jet is a class member, has significant claims related to premerger HRG stock, and makes this objection based on the interests of all premerger HRG shareholders and class members.

## II.    A 75% Discount is Unfair to HRG Claimants and Benefits Lead Plaintiffs at the Expense of HRG Claimants.

A Plan of Allocation is supposed to be a method for distributing the class settlement fairly among all class members. It proposes to divide or allocate the overall "pot" of funds available— here, the class settlement after counsel fees and costs. Here, the class settlement is set to be distributed *pro rata* based on a claimants' "Recognized Claims." (Notice ¶ 69.) As a matter of mathematics, whenever one class member's Recognized Claim (often referred to as "recognized loss") is decreased in size, it has the effect of increasing the relative recovery of other class members. That is because the total size of the "settlement pot" is static.

To illustrate the relationship between two competing sets of claimants entitled to a common "pot" of settlement funds, assume the S Group and H Group are two claimants:

- Hypothetically, a settlement fund of $10 is established for the benefit of the S Group and the H Group, collectively.
- Each Group has approximately $50 of potential losses, and thus, $100 of potential losses exist in total.[8]  On a *pro rata* distribution, both S and H group members will expect to receive about 10% of their loss (or $5 each) in the settlement distribution.
- The S Group now imposes a 0.25 multiplier (75% discount) on the H Group losses. As a result, the S Group has $50 of Recognized Claim, while the H Group has $12.50 of Recognized Claim ($50*0.25).
- The result is that the S Group now possesses **80%** of all Recognized Claims ($50 S group Claim/$62.50, total Recognized Claim). The S Group will now recover $8, while the H Group recovers $2, or four times less, despite the loss equivalency.

---

[8] Per Lead Plaintiffs, the HRG claim represented "almost half" of the total damages in this case. *See* Motion for Final Approval, Dkt. No. 76 at 13 ("If Defendants succeeded in convincing the Court, or a jury, that Lead Plaintiffs failed to sufficiently allege that pre-Merger HRG shareholders had standing to sue Spectrum, Lead Plaintiffs' securities fraud claim would have been significantly impaired, as Lead Plaintiffs' **damages would have been reduced by almost half**.") (emphasis added).

10

- The result at the distribution phase is that the S Group is recovering 16% of their losses. The H Group is recovering 4% of their losses. This is true despite the fact that the two groups each lost the same amount.

Lead Plaintiffs are squarely in the S Group. The Plan of Allocation is designed to provide Lead Plaintiffs an excess share of the settlement because they traded in Spectrum and Spectrum Legacy rather than HRG. They will receive significantly more per dollar of potential damages than an HRG claimant. In effect, the discount imposed on HRG claimants will "supercharge" the Recognized Claims from Legacy Spectrum shares, perhaps by 60% or more.[9] Lead Plaintiffs will thus disproportionately benefit financially from the reduction in HRG claims. This is contrary to fundamental fairness, as well as to Lead Plaintiffs' own statements in their brief, and must be rejected. *See, e.g.*, *Franks v. Kroger Co.,* 649 F.2d 1216, 1226 (6th Cir.1981) ("As appellants correctly argue, the 'preferred positions' of the named plaintiffs should have signaled the district court of potential inequities in this proposed settlement."), *vacted on reh'g on other grounds,* 670 F.2d 71 (6th Cir.1982); *see also Holmes v. Continental Can Co.,* 706 F.2d 1144, 1148 (11th Cir.1983) ("[W]here representative plaintiffs obtain more for themselves by settlement than they do for the class for whom they are obligated to act as fiduciaries, serious questions are raised as to the fairness of the settlement to the class.") (quoting *Plummer v. Chem. Bank,* 91 F.R.D. 434, 441–42 (S.D.N.Y.1981), *aff'd,* 668 F.2d 654 (2d Cir.1982)); *Plummer,* 91 F.R.D. at 442 ("While there may be circumstances in which additional benefits to the named plaintiffs may be justified, such disparities must be regarded as prima facie evidence that the settlement is unfair to the class, and a heavy burden falls on those who seek approval of such a settlement.") (citations omitted).

### a. Shifting Settlement Value from the HRG Claimants to Lead Plaintiffs and Others Similarly Situated is Unfair.

Lead Plaintiffs are required to act as fiduciaries to the entire class. *In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 704 (7th Cir. 2015); *see also Pope v. Harvard Banschares, Inc.,* 240

---

[9] The effect of the discount in aggregate is dependent on the relationship between the total claimant pool size for Spectrum Legacy/post-merger and the HRG pool size. Half for each group is used here per Lead Plaintiffs' calculation.

F.R.D. 383, 390 (N.D. Ill. 2006) ("Because the lead plaintiffs will act as fiduciaries for the absent plaintiffs, the court can examine their integrity and credibility in determining whether they are suitable representatives for the class . . . . . A class is not fairly and adequately represented if class members have antagonistic or conflicting claims.") (internal citations omitted); *Wagner v. Lehman Bros. Kuhn Loeb Inc.*, 646 F. Supp. 643, 661 (N.D. Ill. 1986) ("The putative representative must demonstrate that he will fulfill his fiduciary duty to the class he purports to represent . . . . Wagner, as a fiduciary, owes the putative class a duty of the finest loyalty.") (internal quotations omitted). Further, the PSLRA specifically *prohibits* Lead Plaintiffs from getting a better deal under a class settlement than anyone else. Specifically, it provides: "The share of any…settlement that is awarded to a representative party serving on behalf of a class shall be equal, on a per share basis, to the portion of the…settlement awarded to all other members of the class." 15 U.S.C.A. § 78u-4(a)(4). However, the two Lead Plaintiffs, CRS and Public Schools, each stand to disproportionately benefit from the discount imposed on HRG.

**CRS.** CRS disclosed no purchases at all of pre-merger HRG stock. CRS purchased just 13,800 shares of Legacy Spectrum stock before the first disclosure (these shares ultimately generated about $250,000 of Recognized Claim). Over the course of the remaining Class Period, CRS also purchased approximately 16,000 shares of Legacy Spectrum stock (ultimately generating an additional $75,000 of Recognized Claim). None of CRS's shares receive any kind of discount to their Recognized Claim amounts. As a result, CRS will receive 100% of its Recognized Claim number as part of the *pro rata* allocation of settlement funds.

**Public Schools.** Public Schools disclosed a *single* purchase, on May 6, 2017, of 7,500 shares of pre-merger HRG stock. Per the Plan of Allocation, before the 75% discount, this purchase generates approximately $22,000 of HRG-applicable Recognized Claim.[10] In contrast, Public Schools disclosed purchases resulting in a net position of approximately 47,000 shares of pre-

---

[10] This number is derived by first multiplying the number of pre-merger HRG shares (7,500) by the merger ratio (0.16125), as provided by footnote 7 of the Notice and then taking the product (1,209.375) and multiplying it by the artificial inflation provided for in the Notice.

12

merger Spectrum Legacy stock as of the first disclosure, and then further purchases and sales of pre- and post-merger Spectrum stock, which collectively generate around $900,000 of Recognized Claim.

Taken together, Lead Plaintiffs have over $1,200,000 in Recognized Claims associated with Spectrum Legacy and post-merger stock, compared to $22,000 pre-discount of HRG Recognized Claims.

Unlike many cases—where Lead Plaintiffs have claims very much in line with the class—Lead Plaintiffs claims based on Spectrum Legacy and Spectrum, and their comparative lack of claims based on purchases of HRG, create a situation where Lead Plaintiffs stand to gain from suppressing the Recognized Claims of HRG—whether or not there is a legitimate basis to do so. Indeed, the damages suffered by the HRG class represented more than half of the total damages in the class (*see infra* n.7) and thus the effect of the discount is to increase the relative share of the settlement for Spectrum Legacy and Spectrum class members from approximately 50% to 80%.

To further illustrate: if Lead Plaintiffs and Jet were the *only* claimants in the Class (and obviously they are not), Lead Plaintiffs would go from a *pro rata* share of the Class Settlement of about 11% to over 33%, i.e., a more than 3x multiple, by virtue of the discount imposed on Jet (*i.e.*, an HRG claimant).

|  | Spectrum Legacy/Post-merger | HRG (Pre-Discount) | HRG (Post-Discount) |
|---|---|---|---|
| CRS | ~$325,000 | $0 | $0 |
| Public Schools | ~$900,000 | $22,000 | $5,500 |
| Jet | $0 | ~$10,000,000 | ~$2,300,000 |

Shifting value from the HRG Claimants to claimants more like Lead Plaintiffs is fundamentally unfair and not consistent with the Lead Plaintiffs' fiduciary duty to treat all class members fairly. That Lead Plaintiffs in this litigation lacked a meaningful amount of HRG shares sufficient to induce them to fairly protect HRG claimants would have been remedied if the issue had been raised with this Court and an adequate notice had been sent to putative HRG class members. Now, the issue can be remedied only through the protection of this Court to insist that

the Plan of Allocation be fair to all class members, including HRG claim class members.  At the very least, the discount should be eliminated.

**b.  The Discount Renders Statements in Lead Plaintiffs' Motions for Preliminary and Final Approval Misleading.**

In their motion for preliminary approval, Lead Plaintiffs stated:

> Lead Plaintiffs' claims are typical of and coextensive with those of other Class Members, and they lack any interests that are antagonistic to the interest of other members of the Settlement. Therefore, Lead Plaintiffs—like all other Class Members—have an interest in obtaining the largest possible recovery from Defendants.

(Motion for Preliminary Approval, Dkt. No. 71 at 11.)

The 75% discount imposed on pre-merger HRG claimants, which has a *de minimis* negative impact on the amount of Lead Plaintiffs' Recognized Claim, but provides an outsize windfall to Lead Plaintiffs' when it comes time for *pro rata* distribution of the actual settlement, renders this statement misleading.  The discount imposed on HRG class members and the "limited" settlement pot combine to make the interests of Lead Plaintiffs antagonistic to HRG class members.

In their briefing seeking final approval of the proposed settlement, Lead Plaintiffs state that "Lead Plaintiffs' damages expert developed the proposed Plan of Allocation . . . with the assistance of Lead Counsel. The Plan provides for the distribution of the Net Settlement Fund to Class Members on a pro rata basis based on the extent of their injuries attributable to the alleged fraud." (Motion for Final Approval, Dkt. No. 76, at 4.)  This is rendered misleading by the discount—in fact, the Plan provides for distribution to Class Members on a basis that is **not** related to the extent of their injuries attributable to the fraud—but instead on the basis of Lead Counsel's arbitrary determination that the claims of HRG class members are worth only 25% of the claims of other investors.

This Court should enter a Plan that in fact divides the Net Settlement Fund on the basis the Class puts forward:  the extent of injuries attributable to the alleged fraud, with no arbitrary

discount applied to HRG class members that disproportionately benefits Lead Plaintiffs at the expense of HRG class members.

## III.    The 75% Discount is Arbitrary, Rendering it Unreasonable, Given the Merits of the Claims

### a.    There Is No Disclosed Basis for the 75% Discount.

The 75% discount applied to HRG claimants is arbitrary, and rests on no disclosed analysis or quantification of risk.  The Notice discloses *no basis* for the 75% discount beyond undefined and unspecified "litigation risk."  Moreover, to the extent that the "litigation risk" that attached to HRG claims included that Lead Plaintiffs were never properly appointed to represent HRG shareholders, that risk could have (and should have) been remedied by providing the requisite notice and appointing a proper HRG representative.  To the extent that "litigation risk" included arguments peculiar to HRG class members (as further refuted below), a proper HRG representative would have sought judicial resolution of that defense.

Neither the preliminary approval nor final approval memoranda of law attempt to justify the specific 75% discount (as opposed to a 10%, 25%, 50% discount or otherwise).  The only issue Jet has been able to identify that was unique to HRG class members was the argument that Spectrum could not be held responsible for statements it made that damaged HRG stock.  This baseless argument was barely briefed by either party because the antifraud provisions of the securities laws allow broad remedial relief against all statements made in connection with the purchase or sale of a security.  Obviously, since HRG was a holding company for Spectrum Legacy stock owning 60% of the outstanding shares, fraudulent statements inflating the price of Spectrum Legacy stock fraudulently inflated the price of HRG stock (and this was foreseeable by Spectrum). Had the HRG class been represented by a lead plaintiff solely devoted to protecting its interests, it would have sought judicial resolution of such a claim rather than discounting it by 75%. Indeed, in other cases prosecuted by Lead Counsel, a 50% discount has been applied for claims that were *already dismissed* by a district court.  *See, e.g.*, *In re: Volkswagen "Clean Diesel" Marketing,*

15

*Sales Practices, and Products Liability Litigation*, MDL No. 2672 (Class Notice applied 50% discount to dismissed claims); *In re Wells Fargo Mortgage-Backed Certificates Litigation*, 09-cv-1376 (same).[11]

> In describing how the Plan of Allocation was created, Lead Plaintiffs state:

> > Lead Plaintiffs' damages expert calculated the estimated amount of artificial inflation in the per share closing prices of Spectrum, Old Spectrum, and HRG common stock during the Class Period that was allegedly caused by Defendants' alleged materially false and misleading statements and omissions. To calculate the estimated artificial inflation, the expert considered the price changes in Spectrum, Old Spectrum, and HRG common stock in reaction to the public disclosures that allegedly corrected the alleged misrepresentations and omissions, adjusting for price changes that were attributable to market or industry forces.

(Motion for Final Approval, Dkt. No. 76 at 27.)

In contrast to this long and detailed statement of how artificial inflation was calculated by Lead Plaintiffs' expert, the 75% discount receives no explanation whatsoever—and certainly no explanation of why 75% was chosen, what portion of the discount is attributable to Lead Counsel's own apparent failure to comply with the notice provisions of the PSLRA, and whether any rigor or analysis at all was applied to the selection of the discount rate. The 75% discount is arbitrary and thus unreasonable.

### b.  The 75% Discount Is Arbitrary Given the Lack of Other Discounts.

The 75% discount is also arbitrary given that Lead Plaintiffs identified other potentially idiosyncratic risks to the class and applied ***no discount whatsoever*** to those claimants. In discussing the litigation risks justifying settlement, Lead Plaintiffs laid out far more (and more serious) risks that those applicable solely to pre-merger HRG shareholders. Lead Plaintiffs state as one risk that: "Defendants would argue that Lead Plaintiffs' proposed 23-month Class Period was overbroad and would be limited to the first half of 2018." But no discount for shares

---

[11] The Notices in these two cases are attached to the Bodnar Decl. as exhibits H and I.

16

purchased in 2017 is applied in the Plan of Allocation despite the idiosyncratic risk to those shares.[12]

Lead Plaintiffs also state that a substantial litigation risk existed for shares purchased after April 2018, writing "Defendants further argued that the Class Period would then have had to end with the alleged April 2018 corrective disclosure, when Spectrum and the Executive Defendants first disclosed serious problems with the consolidations and announced that Defendant CEO Rouvé was terminated." *Id*. at 19. They further wrote: "Thus, Defendants would argue with some force that any resulting stock price decline could not be attributed to the alleged fraud and the Class Period must end in April 2018." *Id.* The shortening of a class period as a result of corrective information entering the marketplace is a risk often faced by class actions. *See In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-cv-6728, 2019 WL 3001084, at *21 (S.D.N.Y. July 10, 2019), *appeal withdrawn sub nom. Pub. Employees Ret. Sys. of Mississippi v. Signet Jewelers Ltd.*, No. 19-3837, 2020 WL 773018 (2d Cir. Jan. 16, 2020) (Case where Lead Counsel represented the class, and where Court shortened certified class as a result of pled disclosures). Despite this idiosyncratic risk to purchasers after April 26, 2018, no discount is applied in the Plan of Allocation to those claims.

Still other potential discounts were possible from statements concerning risks regarding disaggregation, and other loss causation arguments. In particular, the November 2018 disclosure was subject to a unique attack: "The November 19, 2018 disclosure largely addressed issues with the GAC consolidation, rather than the HHI consolidation. Id. However, four days before the disclosure, Spectrum had announced the sale of GAC to Energizer. Id. Therefore, Defendants had argued that investors would have been aware that GAC's future financial performance would have no impact on the value of Spectrum as an ongoing financial enterprise." (Motion for Final

---

[12] This risk would have both eliminated a significant set of damaged shares, but also eliminated Lead Plaintiffs' standing to pursue any claim for the HRG class, because the sole HRG purchase alleged by Lead Plaintiffs to gain Article III standing as to the HRG claim was in early 2017. *See* Amended Complaint, Dkt. 14-1. In contrast, Jet would have had standing to pursue an HRG claim even if all of 2017 was eliminated from the class.

Approval, Dkt. No. 76 at 20.)   But the November 19, 2018 disclosure does not have an idiosyncratic discount associated with it.

In fact, the *only* discount applied in the Plan of Allocation is the one that also happens to be the one discount that does not lower Lead Plaintiffs' recognized loss.   HRG class members, like Jet, should not be singled out for an arbitrary discount, calculated with no disclosed analysis when other discounts that could have been applied, were not.[13]

### c. The 75% Discount Is Arbitrary Given the Virtual Identity of Actual Litigation Risks Among Different Class Members.

The 75% discount is arbitrary because it ignores that the dominant litigation risks in the case were virtually identical for all class members.  In such an instance, no discount is necessary or appropriate.  *See, e.g., In re PaineWebber Ltd. Partnerships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y.), *aff'd sub nom. In re PaineWebber Inc. Ltd. Partnerships Litig.*, 117 F.3d 721 (2d Cir. 1997) (rejecting imposition of a discount).

The identical nature of the allegations on behalf of HRG shareholders compared to those made on behalf of Spectrum shareholders far outweigh any differences.  The same legal claims and theories were alleged on behalf of each group (Exchange Act claims with respect to Rule 10b-5 and 20(a).   The same misstatements are alleged, the same arguments regarding falsity, materiality, and scienter apply to both classes, the same evidence of scienter is provided, and the same corrective disclosure dates are alleged.  The only difference was the slight variations in the stock-price decline attributable to HRG stock verses Spectrum stock, based on the structural

---

[13] Lead Plaintiffs may argue that the threat of these other arguments was less severe than that of the HRG standing issue, or the notice failure issue (the latter issue being a procedural issue created by Lead Plaintiffs themselves).  But in urging approval of the amount of the settlement, Lead Plaintiffs took these other arguments very seriously, arguing that the $39 million settlement was an exceptional result because it represented a significant portion of the damages available assuming many of these same arguments were accepted.  (*See* Motion for Final Approval at 20 ("[I]f the Court or a jury were to also accept certain of Defendants' additional strongest arguments concerning loss causation and damages detailed above, Class-wide damages would have been reduced to as little $49 million, further highlighting the very favorable result achieved under the Settlement….").)

differences inherent in trading the stock of a holding company.  In a motion to dismiss brief

spanning 61 pages, the vast majority of arguments were focused on arguments applicable to *all*

class members, and the vast majority would have been dispositive of the entire class, not just as to

HRG (*see, e.g.*, Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended

Complaint, Dkt. No. 47, at 13-23 (Argument I, spanning 10 pages, is that the complaint fails to

allege facts giving rise to a strong inference that Defendants acted with scienter).

Lead Plaintiffs acknowledged a long list of risks that were the same for the entire class,

writing, as examples:

- "Lead Plaintiffs faced significant risks that it would not be able to establish that Defendants' statements about the progress of Spectrum's consolidations were actionable under the federal securities laws." (Motion for Preliminary Approval, Dkt. 71, at 12.)
- "Lead Plaintiffs would have faced challenges in proving that Defendants made the alleged false statements with scienter: that they acted with intent or recklessness." (*Id.*)
- "Even if Lead Plaintiffs established liability, it would have faced significant hurdles in proving loss causation—that the alleged misstatements were the cause of investors' losses—and in proving damages." (*Id.*)
- "Further, even if Lead Plaintiffs successfully defeated Defendants' motion to dismiss, which was far from certain, Defendants would likely make the same arguments at summary judgment and trial." (*Id.*)
- "there was a real risk here that, had the litigation continued, the Court or a jury could have found that Defendants' alleged misstatements and omissions did not trigger liability under the securities laws." (Motion for Final Approval, Dkt. No. 76, at 14)
- "Defendants have also argued, and would continue to argue, that discovery would significantly undermine Lead Plaintiffs' allegations of wrongdoing." (*Id.* at 15.)
- "Lead Plaintiffs also faced significant hurdles in establishing Defendants' scienter, or intent to defraud." (*Id.* at 16.)
- "Defendants have argued that Spectrum's decision to repurchase more than $250 million of Company stock during the Class Period "completely refut[es] the notion it was attempting to mislead the market and improperly inflate its share price" as "it makes 'no economic sense for a company to buy back its stock at a price it knows to be inflated.'"  . . . For these reasons, there was a real risk that had litigation continued, the Court or a jury could have found that the CAC failed to plead facts giving rise to a strong inference that the Executive Defendants acted with scienter, which would have resulted in the complete dismissal of the Action." (*Id.* at 17.)

19

- "After reviewing this discovery, Lead Counsel understood how Defendants would use these documents to support their arguments that Defendants had made their statements during the Class Period in good faith." (*Id*. at 10.)

HRG and Spectrum Legacy claimants faced virtually identical litigation risk. Had a properly noticed and appointed lead plaintiff represented HRG, it would never have imposed a 75% discount on the claims of HRG class members or argued that such a discount would be reasonable and fair.

**IV.    A 75% Discount is Unfair and Unreasonable Given the Status of the Litigation**

Even if the claims on behalf of HRG had been reviewed by the Court and, a 75% discount would have been unwarranted. As of the date of the settlement, premerger HRG claims were in the same legal position as all other claims in this case: the claims had been alleged but were subject to a motion to dismiss. It is indisputable that the HRG claims had not been dismissed by this Court, no less dismissed with prejudice. Yet, in other cases, Lead Counsel has applied a 50% discount – i.e., a 0.5 multiplier, or *double* what it accords HRG claimants in this case to claims that were *already dismissed from a case*.

In particular, in *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, MDL No. 2672, class claims based on misstatements prior to May 2014 were ***already dismissed*** by the district court. Thus, recognizing the "significant risks" to those claims (again – which had already been dismissed), the plan of allocation in *Volkswagen* reduced the recognized loss by only "50 percent (or one-half)". Bodnar Decl. Ex. H (attaching *Volkswagen* Notice, containing plan of allocation).

In *In re Wells Fargo Mortgage-Backed Certificates Litigation*, again, the court dismissed claims based on certain specific certificates/securities and allowed other claims based on different certificates/securities to proceed. The plan of allocation in that case stated "the Recognized Loss Amount for purchases or acquisitions of Certificates for which the claims have been dismissed will be discounted by 50% to reflect the lesser likelihood of success on the dismissed claims." Bodnar Decl. Ex. I (attaching the Notice from *In re Wells Fargo Mortgage-Backed Certificates*

20

*Litigation*, containing plan of allocation). Thus, claims that had already been dismissed were discounted in the plan of allocation by only 50%.

Here, the Plan discounts the HRG claim (which are as much "alive" as any other claim in the case) *by 75%,* or half the value that claims that were already dismissed were allocated in other class actions. *Accord Shanawaz v. Intellipharmaceutics International Inc., et al.* (17-cv-05761-jpo) (Class Action Notice, Plan of Allocation, ¶ 4) (in recently settled case, plan of allocation applied a 50% discount, not 75%, to claims previously *dismissed* by the court, stating that ". . . the Plan of Allocation takes into account the fact that the Court's December 17, 2018 Order dismissed all claims related to allegedly false and misleading statements made between May 21, 2015 and November 24, 2016, inclusive. . . . Recognized Losses resulting from purchases/acquisitions during this period . . . shall be discounted by fifty percent (50%) to reflect the increased litigation risk on the dismissed claims.").[14]

Even a 50% discount for dismissed claims is not standard and *lower* discounts for dismissed claims have been accepted by courts. In *In re Am. Apparel, Inc. S'holder Litig.*, No. CV10-CV-06352, 2014 WL 10212865, at *4 (C.D. Cal. July 28, 2014), for example, the court found a 10% discount for *dismissed claims* to be appropriate. Here, Lead Counsel is attempting to apply a discount over *seven times* that amount for claims that were not dismissed and still subject to litigation, and where Lead Counsel had advanced strong, good faith, arguments for those claims to be sustained.

A properly motivated representative of HRG stockholders would have sought resolution of a motion to dismiss before imposing a draconian discount. Even if a Plan of Allocation allows Lead Counsel some leeway with determining the relative merits of different claims, it cannot allow

---

[14] Bodnar Decl. Ex. J.

21

Lead Counsel to give more value to claims *already dismissed* than to claims Lead Counsel was vigorously defending on a motion to dismiss.[15]

### V.   A 75% Discount is Unwarranted by the Arguments Against HRG Claimants

The appropriate remedy here is either to strike the discount or empower Jet to negotiate on behalf of HRG class members. "[A]pproval proceedings should not be transformed into an abbreviated trial on the merits." *Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Tr. Co.*, 834 F.2d 677, 684 (7th Cir. 1987). Moreover, this Court has already received significant briefing on the only two arguments Defendants raised against HRG claimants' claims; specifically, standing and a notice failure. However, neither defense warrants a huge and unique discount on HRG settlement recoveries:

As to standing:[16]

- Defendants could not cite a single dispositive case, no less one in this Circuit, on the claim that HRG shareholders could not recover for fraudulent misrepresentations that inflated the price of HRG stock, simply because the misrepresentations were made by Spectrum Legacy and Spectrum.

- The Class advanced "compelling" arguments (Motion for Preliminary Approval, Dkt. No. 71 at 12) that HRG claimants had standing.

- Courts have recognized parties who purchased the stock of one issuer having claims against a second entity for statements made inflating the price of the issuers' stock. *See, e.g.*, *Hering v. Rite Aid Corp.*, 331 F. Supp. 3d 412, 428 (M.D. Pa. 2018) (refusing to dismiss

---

[15] Lead Counsel may argue that a range of discounts have been found appropriate for dismissed claims. But here, the claims of HRG shareholders were explicitly *not* dismissed and in fact Lead Counsel was pushing good faith and strong arguments that dismissal was inappropriate. It is impossible to square giving dismissed claims a 50% discount with giving claims being actively litigated *half* that value.

[16] The fact that this Court denied, without prejudice to renewal, Defendants' motion to dismiss on January 7, 2020 (Dkt No. 60) also cuts in favor of this point. While the Court likely did so because of pending settlement negotiations, a standing argument (as Defendants have termed their own argument), invokes the Court's ability to act *sua sponte*.

claims against Walgreens for misstatements about a merger process affecting Rite Aid stock); *accord Semerenko v. Cendant Corp.*, 223 F.3d 165, 170 (3d Cir. 2000); *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 965 (N.D. Cal. 2005).

- At worst for HRG claimants, there is a lively debate as to the standing issue, including as to the interpretation and relevance of *Nortel*, the Second Circuit case Defendants made a centerpiece of their argument. *In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 390 F. Supp. 3d 432, 447 (S.D.N.Y. 2019), *motion to certify appeal denied,* No. 14-MD-2589 (JMF), 2019 WL 3202745 (S.D.N.Y. July 16, 2019) (recognizing that Nortel has been "clarified" by further precedent, citing *In re NYSE Specialists Secs. Litig.*, 503 F.3d 89, 102 (2d Cir. 2007) for the statement that it is not the case that "an action under Rule 10b-5 for false statements about a security purchased by the plaintiff lies only against the issuer of the security, or that only statements about a security issuer are actionable").

As to notice:

- Any issues with the Notice procedure were the result of noncompliance with the PSLRA by Lead Counsel and Lead Plaintiffs, and it would be improper to apply a discount to HRG claimants for a failure to comply with procedures meant to protect HRG shareholders.
- This is particularly true where, as here, HRG claimants were not even given notice that their claims were to be included in to a class action.
- The parties' arguments on remedy (dismissal, as favored by Defendants, or the possibility of re-notice as noted by Lead Plaintiffs) did not go to the merits of HRG claimants' claims. One possibility was that this Court would agree with Defendants that the Notice procedure was not followed, but simply require notice, re-open the lead plaintiff procedure and proceed further. This does not affect the merits of the HRG claimants' claims.

The Court should not be called into debates over the percentage chance of success or failure of specific arguments at this late stage. Having failed to comply with the notice provisions of the PSLRA Lead Plaintiffs and Lead Counsel should (at least) be estopped from arguing that HRG shareholders should be subject to a discount.

**VI.    The Notice Obfuscates the Value of the HRG Claimants' Claims, Explaining the Likely Lack of Other Objectors**

Under the PSLRA, the notice to class members is required to disclose "[t]he amount of the settlement proposed to be distributed…on an average per share basis". 15 U.S.C. § 78u–4(a)(7)(A).  One of the purposes of the PSLRA was to ensure that this critical information was "readily ascertainable". S. REP. 104-98, 12, 1995 U.S.C.C.A.N. 679, 691. And the purpose of the notice provision itself is to allow class members to decide whether to object to the settlement or exclude themselves from the settlement and pursue an independent claim.

For HRG claimants, the notice does not provide "readily ascertainable" information as to the amount of the settlement proposed to be distributed on a per share basis. [17]   Compliance with this provision would have required the notice to inform HRG shareholders as follows: "For each premerger HRG share purchased during the class period, the average recovery per share is expected to be [x]."  Instead, the notice obfuscates the value of HRG claims.

First, the Notice expresses all values in terms of post-merger shares (Notice at 16 n.7). By doing so, the Notice manipulates the way it expresses the amount an HRG claimant can expect to recover.   Because HRG stock converted to post-merger Spectrum stock at 0.16125 to 1, when the Notice expresses that an HRG claimant is recovering $0.33 per "affected share of HRG common stock" – what it really means is that a claimant can expect $0.05 per share of pre-merger HRG common stock versus *$1.27* per share of pre-merger Old Spectrum common stock.

Second it fails to clearly and prominently disclose the existence and impact of the 75% discount on the expected recovery per share of HRG.  Unless an HRG class member hired an experienced securities lawyer to interpret the notice, he or she would have no idea what the expected recovery per share of HRG stock would have been without the discount, or even that a

---

[17] Lead Plaintiffs may argue, incorrectly, that there is no definable group of "HRG Claimants" as opposed to Claimants with mixed claims among Spectrum Legacy and HRG.  But Form 13-F data alone shows a number of major financial institutions who appear to possess solely HRG-related claims. (Institutional investors that manage assets of more than $100 million are required to report their holdings to the SEC on a quarterly basis on Form 13-F.) This data indicates that there are more investors than just the Jet Capital Funds in the position of being harmed by this discount.

discount existed.  As noted above, the Notice buries the 75% discount of HRG claimants Recognized Claim under "Additional Provisions", and even then, discloses the 75% discount not as a discount (despite that being the terminology used in multiple other settlements by lead counsel), but instead as a multiplier, stating that "HRG Recognized Loss Amounts as calculated above, multiplied by 0.25".

Finally, the Notice presents HRG and Legacy Spectrum shareholders as having similar inflation tables, but these tables are not adjusted for the discount to the HRG claim.  Thus, an HRG shareholder looking at the Notice quickly and comparing inflation tables would find similar numbers when the reality was quite different.

The fact that the Notice obfuscates the extent to which HRG claimants' claims are being discounted explains why other HRG claimants have not objected.

## CONCLUSION & RELIEF REQUESTED

For the reasons stated above, Jet requests that this Court deny approval of the Plan of Allocation as written (but otherwise approve the Settlement), and enter an order:

**DENYING** approval to the Plan of Allocation and **MODIFYING** the Plan of Allocation to **strike** "multiplied by 0.25" from Paragraph 61, and the corresponding footnote 10; or, *in the alternative*:

**DENYING** approval to the Plan of Allocation and **APPOINTING** the Jet Capital Funds as Liaison Plaintiff and Rolnick Kramer Sadighi LLP as Liaison Counsel to act in favor of the interests of the HRG class members and to negotiate with Lead Counsel and Lead Plaintiffs on a fair and reasonable treatment of HRG claims; and in **ORDERING** Lead Plaintiffs to provide to Jet and its counsel the reports and work files of the Class's expert, the mediation statements exchanged (to be shared under a confidentiality stipulation), and (to be shared under an attorneys'-eyes only stipulation) Lead Counsel's work product on a 75% discount for HRG claimants claims and any damages analyses.

25

Dated: January 8, 2021

Respectfully submitted,

**ROLNICK KRAMER SADIGHI LLP**
By: */s/ Richard A. Bodnar*
Richard A. Bodnar
Lawrence M. Rolnick *(pro hac vice forthcoming)*
Marc B. Kramer *(pro hac vice forthcoming)*
1251 Avenue of the Americas
New York, New York 10020
Tel. 212-597-2800

&

**BASSFORD REMELE**
David M. Dahlmeier
100 South 5th Street, Suite 1500
Minneapolis, MN 55402-1254
Tel. 612-333-3000

*Counsel for Jet*

26