**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

|  |  |  |
|---|---|---|
|  | ) |  |
|  | ) |  |
| IN RE SPECTRUM BRANDS SECURITIES LITIGATION | ) | No. 19-cv-347-jdp |
|  | ) |  |
|  | ) |  |

---

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION**

---

**STAFFORD ROSENBAUM LLP**
Douglas M. Poland
State Bar No. 1055189
222 West Washington Avenue, Suite 900
P.O. Box 1784
Madison, WI 53701-1784
Telephone:  (608) 256-0226
Facsimile:  (608) 259-2600
dpoland@staffordlaw.com

*Liaison Counsel for Lead Plaintiffs the Public School Teachers' Pension and Retirement Fund of Chicago and the Cambridge Retirement System and the Spectrum Class*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Katherine M. Sinderson
Jai Chandrasekhar
Matthew Traylor
1251 Avenue of Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
KatieM@blbglaw.com
Jai@blbglaw.com
Matthew.Traylor@blbglaw.com

-and-

Avi Josefson
875 North Michigan Avenue, Suite 3100
Chicago, Illinois 60611
Telephone: (312) 373-3880
Facsimile: (312) 794-7801
avi@blbglaw.com

*Lead Counsel for Lead Plaintiffs the Public School Teachers' Pension and Retirement Fund of Chicago and the Cambridge Retirement System and the Spectrum Class*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT ...........................................................................................................................4

I.    THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL ..........................4

    A.    Lead Plaintiffs and Lead Counsel Have Adequately Represented the
        Spectrum Class.............................................................................................................6

    B.    The Settlement Is the Product of Good-Faith, Arm's-Length Negotiations
        Among Experienced Counsel and a Mediator ..........................................................7

    C.    The Relief that the Settlement Provides for the Spectrum Class is
        Adequate, Taking Into Account the Costs and Risks of Further Litigation
        and All Other Relevant Factors................................................................................11

        1.    The Strength of Lead Plaintiffs' Case Compared to the
            Amount of Settlement ....................................................................12

        2.    The Complexity, Length, and Expense of Further Litigation
            Support Approval of the Settlement ...............................................21

        3.    All Other Factors Established by Rule 23(e)(2)(C) Support
            Approval of the Settlement .............................................................22

    D.    The Settlement Treats Class Members Equitably Relative to Each Other ............24

    E.    The Amount of Opposition to the Settlement and Reaction of the
        Spectrum Class to the Settlement ..........................................................................25

II.   THE PLAN OF ALLOCATION IS FAIR AND REASONABLE....................................26

III.  THE SPECTRUM CLASS SHOULD BE CERTIFIED .................................................28

IV.   NOTICE TO THE SPECTRUM CLASS SATISFIES THE REQUIREMENTS
    OF RULE 23 AND DUE PROCESS..............................................................................28

CONCLUSION.....................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
572 F.3d 221 (5th Cir. 2009) ........................................................................................20

*In re Amgen Inc. Sec. Litig.*,
2016 WL 10571773 (C.D. Cal. Oct. 25, 2016)...........................................................15, 21

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
789 F. Supp. 2d 935 (N.D. Ill. 2011) ..........................................................................12

*In re Career Educ. Corp. Sec. Litig.*,
2008 WL 8666579 (N.D. Ill. June 26, 2008)...............................................................9, 29

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156 (1974) .....................................................................................................28

*Equal Emp. Opportunity Comm'n v. Hiram Walker & Sons, Inc.*,
768 F.2d 884 (7th Cir. 1985) .....................................................................................4, 5

*Goldsmith v. Tech. Solutions Co.*,
1995 U.S. Dist. LEXIS 15093 (N.D. Ill. Oct. 10, 1995).............................................17

*Great Neck Cap. Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*,
212 F.R.D. 400 (E.D. Wis. 2002) ...................................................................9, 12, 21, 26

*In re Heritage Bond Litig.*,
2005 WL 1594403 (C.D. Cal. June 10, 2005) ..............................................................26

*Hubbard v. BankAtlantic Bancorp, Inc.*,
688 F.3d 713 (11th Cir. 2012) ....................................................................................20

*In re IMAX Sec. Litig.*,
283 F.R.D. 178 (S.D.N.Y. 2012) ................................................................................26

*Isby v. Bayh*,
75 F.3d 1191 (7th Cir. 1996) .....................................................................................4, 20

*Levie v. Sears Roebuck & Co.*,
676 F. Supp. 2d 680 (N.D. Ill. Dec. 18, 2009).............................................................20

*Luna v. Marvell Tech. Grp.*,
2018 WL 1900150 (N.D. Cal. Apr. 20, 2018) ..............................................................28

*Mangone v. First USA Bank*,
206 F.R.D. 222 (S.D. Ill. 2001) ..................................................................................9

*Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Tr. Co.*,
  834 F.2d 677 (7th Cir. 1987) ...............................................................................6

*McKinnie v. JP Morgan Chase Bank, N.A.*,
  678 F. Supp. 2d 806 (E.D. Wis. 2009)................................................................5, 12

*In re Mego Fin. Corp. Sec. Litig.*,
  213 F.3d 454 (9th Cir. 2000) ...............................................................................11

*In re Mex. Money Transfer Litig.*,
  164 F. Supp. 2d 1002 (N.D. Ill. 2000) ..................................................................6, 9

*In re Northfield Labs., Inc. Sec. Litig.*,
  267 F.R.D. 536 (N.D. Ill. May 18, 2010) ...............................................................20

*In re Polaroid ERISA Litig.*,
  240 F.R.D. 65 (S.D.N.Y. 2006) ...............................................................................6

*Retsky Fam. Ltd. P'ship v. Price Waterhouse LLP*,
  2001 WL 1568856 (N.D. Ill. Dec. 10, 2001)......................................................21, 26

*Robbins v. Koger Props.*,
  116 F.3d 1441 (11th Cir. 1997) .............................................................................20

*Roberti v. OSI Sys., Inc.*,
  2015 WL 8329916 (C.D. Cal. Dec. 8, 2015) ............................................................9

*Schulte v. Fifth Third Bank*,
  805 F. Supp. 2d 560 (N.D. Ill. 2011) .....................................................................11

*In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*,
  2016 WL 772785 (N.D. Ill. Feb. 29, 2016) ......................................................5, 6, 12

*Shah v. Zimmer Biomet Holdings, Inc.*,
  2020 WL 5627171 (N.D. Ind. September 18, 2020) ............................................26, 29

*Snyder v. Ocwen Loan Servicing, LLC*,
  2019 WL 2103379 (N.D. Ill. May 14, 2019)......................................................7, 12

*Strougo v. Bassini*,
  258 F. Supp. 2d 254 (S.D.N.Y. 2003).....................................................................21

*Susquehanna Corp. v. Korholz*,
  84 F.R.D. 316 (N.D. Ill. 1979)................................................................................9

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
  463 F.3d 646 (7th Cir. 2006) ..................................................................................5

iii

*In re Tyco Int'l, Ltd.*,
    535 F. Supp. 2d 249 (D.N.H. 2007).....................................................................17

*In re Vivendi Universal, S.A. Sec. Litig.*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011)..................................................................20

*Wong v. Accretive Health, Inc.*,
    773 F.3d 859 (7th Cir. 2014) ..................................................................... *passim*

*Yang v. Focus Media Holding Ltd.*,
    2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014).....................................................9, 10

**STATUTES**

15 U.S.C. § 78u-4(e) .............................................................................................27

**OTHER AUTHORITIES**

Federal Rules of Civil Procedure Rule 23 ............................................................... *passim*

Lead Plaintiffs, the Public School Teachers' Pension and Retirement Fund of Chicago ("Chicago Teachers") and the Cambridge Retirement System ("Cambridge") (collectively, "Lead Plaintiffs"), on behalf of themselves and the other members of the Spectrum Class (defined below), respectfully submit this memorandum of law in support of their motion for final approval of the proposed settlement of this Action (the "Settlement") and the proposed plan of allocation of the net proceeds of the Settlement (the "Plan of Allocation").[1]

## PRELIMINARY STATEMENT

Subject to Court approval, Lead Plaintiffs have agreed to settle all claims in the Action in exchange for a cash payment of $32 million, which Spectrum has caused to be deposited into an escrow account. Lead Plaintiffs respectfully submit that the proposed Settlement is an excellent result for the Spectrum Class and satisfies all the standards for final approval under Rule 23 of the Federal Rules of Civil Procedure.

As detailed in the Sinderson Declaration,[2] the Settlement is the product of extensive, arm's-length settlement negotiations between experienced counsel. The negotiations included two formal mediation sessions held before Jed Melnick, Esq. of JAMS (the "Mediator"), an experienced mediator of securities class actions and other complex litigation, as well as additional

---

[1] Unless otherwise defined in this memorandum, all capitalized terms have the meanings defined in the Stipulation and Agreement of Settlement, dated August 27, 2021, dkt. 96-1 (the "Stipulation") or in the Declaration of Katherine M. Sinderson in Support of (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses (the "Sinderson Declaration" or "Sinderson Decl."), filed herewith. Citations to "¶ __" in this memorandum refer to paragraphs in the Sinderson Declaration and citations to "Ex. __" refer to exhibits to the Sinderson Declaration.

[2] The Sinderson Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, Lead Plaintiffs respectfully refer the Court to it for a detailed description of, *inter alia*, the nature of the claims asserted (¶¶ 19-24, 36), the history of the Action (¶¶ 25-50), the negotiations leading to the Settlement (¶¶ 51-56, 63-67), the risks and uncertainties of continued litigation (¶¶ 70-100), and the terms of the Plan of Allocation (¶¶ 108-115).

settlement negotiations.   The $32 million Settlement reached was based on Mr. Melnick's mediator's recommendation, after both sides made multiple thorough presentations concerning the strength and weaknesses of Lead Plaintiffs' claims and the obstacles to recovery.

Lead Plaintiffs and Lead Counsel believe that the proposed Settlement is in the best interest of the Spectrum Class considering the range of possible outcomes of the litigation, including the real risk that there might be no recovery at all.  Notably, at the time that the Parties agreed in principle to settle the Action, the Court had not yet decided Defendants' motion to dismiss the Complaint.  Although Lead Plaintiffs believe that they had compelling arguments in response to Defendants' motion, there was a serious risk that the Court would have ruled in Defendants' favor, which might have eliminated Class Members' potential recovery.

As discussed below and in the Sinderson Declaration, Defendants put forth credible arguments that Lead Plaintiffs did not adequately plead materially false and misleading statements or evidence of Defendants' scienter, and that Lead Plaintiffs failed to establish loss causation and Class-wide damages.  Even if Lead Plaintiffs successfully defeated Defendants' motion to dismiss, which was far from certain, Defendants would likely make similar arguments at summary judgment and trial.

The Settlement is also reasonable when considered in relation to the range of potential recoveries that might be recovered if Lead Plaintiffs prevailed at trial, which was far from certain for the reasons noted above.  Lead Plaintiffs' expert estimates, after giving effect to certain of Defendants' strongest arguments concerning the disaggregation damages, that the maximum recoverable damages were approximately $300 million. Lead Plaintiffs' damages expert further estimated that recoverable damages in the Action could have been reduced to as little as $68.3 million if Defendants were ultimately successful on certain (though not all) of their additional

2

arguments concerning loss causation and damages—while Defendants contended that even with a full liability finding for Spectrum shareholders (which they hotly contested), damages were as low as $6.2 million. Under any of these scenarios, the $32 million Settlement Amount represents a significant percentage of the realistic maximum recoverable damages for the Spectrum Class.

In addition, by the time the Parties agreed to settle, Lead Plaintiffs and Lead Counsel had a well-developed understanding of the strengths and weaknesses of the Action and the claims of the Spectrum Class. Before the Settlement was agreed to, Lead Counsel had, among other things: (i) conducted an extensive investigation into the alleged fraud, including a thorough review of SEC filings, analyst reports, conference call transcripts, press releases, news articles, and other public information, and interviews with dozens of former employees of Spectrum and other witnesses; (ii) drafted a detailed Amended Class Action Complaint (the "CAC"); (iii) briefed in opposition to Defendants' motion to dismiss the CAC; (iv) consulted with an expert in loss causation and damages; and (v) engaged in extensive arm's-length settlement negotiations in connection with both the Initial Settlement and the Settlement. The settlement negotiations included the Parties' preparation of two sets of mediation statements and participation in two mediation sessions with Mr. Melnick. Further, Lead Counsel conducted substantial due diligence discovery, received in connection with the Initial Settlement, which allowed them to review confidential internal Spectrum documents to further assess the strengths and weaknesses of the Class claims.

Absent the Settlement, the Parties faced the prospect of protracted litigation through the completion of fact discovery; costly expert discovery; summary judgment; a trial; post-trial motion practice; and likely ensuing appeals. The Settlement avoids these risks and delays while

3

providing a substantial, certain, and immediate benefit to the Spectrum Class in the form of a $32 million cash payment.

The Settlement also has the full support of the Court-appointed Lead Plaintiffs, which are sophisticated institutional investors of the type Congress favored when it passed the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Lead Plaintiffs were actively involved in the litigation and the settlement negotiations, and they recommend approval of the Settlement. *See* Declaration of Daniel Hurtado submitted by Chicago Teachers, Ex. 2, at ¶¶ 3-5; Declaration of Francis E. Murphy III submitted by Cambridge, Ex. 3, at ¶¶ 3-5.  Further, while the deadline to object to the Settlement has not yet passed, to date, no Class Members have objected to the Settlement.[3]

In light of these considerations, Lead Plaintiffs and Lead Counsel respectfully submit that the proposed Settlement is fair, reasonable, and adequate and warrants final approval by the Court. Additionally, Lead Plaintiffs request that the Court approve the proposed Plan of Allocation, which was set forth in the Notice mailed to potential Spectrum Class Members.  The Plan of Allocation, developed by Lead Plaintiffs' damages expert in consultation with Lead Counsel, provides a reasonable method for allocating the Net Settlement Fund among Spectrum Class Members who submit valid claims based on damages they suffered that were attributable to the alleged fraud.

## ARGUMENT

### I.    THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL

"Federal courts naturally favor the settlement of class action litigation."  *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996); *see also Equal Emp. Opportunity Comm'n v. Hiram Walker &*

---

[3] The deadline for the submission of objections is February 22, 2022. Should any objections be received, Lead Plaintiffs will address them in their reply papers, due on March 4, 2022.

4

*Sons, Inc.*, 768 F.2d 884, 888-89 (7th Cir. 1985); *McKinnie v. JP Morgan Chase Bank, N.A.,* 678 F. Supp. 2d 806, 811 (E.D. Wis. 2009). "Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources." *In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*, 2016 WL 772785, at *6 (N.D. Ill. Feb. 29, 2016).

The Court should approve a class action settlement if it finds it "fair, reasonable, and adequate," Fed. R. Civ. P. 23(e)(2). This involves a consideration of whether:

> (A)    the class representatives and class counsel have adequately represented the class;
>
> (B)    the proposal was negotiated at arm's length;
>
> (C)    the relief provided for the class is adequate, taking into account, [among other things,] the costs, risks, and delay of trial and appeal . . .; and
>
> (D)    the proposal treats class members equitably relative to each other.

*Id*.  In addition, the Seventh Circuit has held that district courts should consider the following six factors in evaluating the fairness of a class action settlement:

> (1) the strength of the case for plaintiffs on the merits, balanced against the extent of settlement offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the reaction of members of the class to the settlement; (5) the opinion of competent counsel; and (6) stage of the proceedings and the amount of discovery completed.

*Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863 (7th Cir. 2014); *see also Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006).[4]

---

[4] The Advisory Committee Notes to the 2018 amendments to the Federal Rules of Civil Procedure indicate that the four factors provided in Rule 23(e)(2) are not intended to "displace" any factor previously adopted by the courts, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Advisory Committee Notes to 2018 Amendments. Accordingly, Lead Plaintiffs discuss below the fairness, reasonableness, and adequacy of the Settlement principally in relation to the four factors provided in Rule 23(e)(2) but also discuss the application of relevant, non-duplicative factors identified by the Seventh Circuit in *Wong*.

Although the Settlement here confers a substantial benefit upon the Spectrum Class, approval does not require that a settlement be "the 'best possible deal' for plaintiffs" or that "the class has received the same benefit from the settlement as they would have recovered from a trial." *Sears,* 2016 WL 772785, at \*7 (citing *In re Mex. Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1004 (N.D. Ill. 2000)). Approval proceedings should not be transformed into an abbreviated trial on the merits. *See, e.g., Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Tr. Co.*, 834 F.2d 677, 684 (7th Cir. 1987).

### A.  Lead Plaintiffs and Lead Counsel Have Adequately Represented the Spectrum Class

In determining whether to approve a class action settlement, the Court should first consider whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A).

Here, Lead Plaintiffs and Lead Counsel have adequately represented the Spectrum Class in both their prosecution of the Action and in the negotiation and achievement of the Settlement. Lead Plaintiffs' claims are typical of and coextensive with those of other Class Members, and they lack any interests that are antagonistic to the interest of other members of the Spectrum Class. Therefore, Lead Plaintiffs—like all other Class Members—have an interest in obtaining the largest possible recovery from Defendants. *See In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest between the class representatives and other class members."). The institutional investor Lead Plaintiffs have also diligently supervised and participated in the litigation on behalf of the Spectrum Class. *See* Ex. 2, at ¶¶ 3-4; Ex. 3, at ¶¶ 3-4.

Moreover, Lead Plaintiffs have retained counsel who are highly experienced in securities litigation and have successfully prosecuted many complex class actions throughout the United

6

States. *See* BLB&G Firm Resume, Ex. 5A-3. Lead Counsel has vigorously pursued the claims on behalf of the Class and aggressively negotiated a favorable Settlement through mediation. *See Snyder v. Ocwen Loan Servicing, LLC*, 2019 WL 2103379, at *4 (N.D. Ill. May 14, 2019) (finding adequacy of representation of the class under 23(e)(2)(A) where named plaintiffs "participated in the case diligently" and class counsel "fought hard throughout the litigation and pursued mediation when it appeared to be an advisable and feasible alternative").

**B.     The Settlement Is the Product of Good-Faith, Arm's-Length Negotiations Among Experienced Counsel and a Mediator**

In reviewing a class action settlement, the court should next consider whether the settlement was "negotiated at arm's length." Fed R. Civ. P. 23(e)(2)(B). This includes the court's consideration of other related circumstances to ensure the "procedural" fairness of a settlement, including (i) "the opinion of competent counsel";[5] (ii) "stage of the proceedings and the amount of discovery completed";[6] and (iii) the involvement of a mediator. All these considerations support approval of the Settlement here.

The Parties reached the Settlement only after protracted, arm's-length negotiations between experienced and informed counsel and with the assistance of Mr. Melnick, an experienced mediator in complex litigation. *See* Declaration of Jed D. Melnick, Ex. 1 (the "Melnick Decl."). On June 3, 2020, the Parties conducted their first formal, all-day, remote mediation session before Mr. Melnick. *Id*. ¶ 7. In advance of the mediation session, the Parties made lengthy and substantive submissions, and the mediation itself involved exchanges of the Parties' respective views on the merits of Lead Plaintiffs' claims, Defendants' defenses, and issues related to recoverable damages. *Id*. ¶ 6. Although the Parties were unable to reach a

---

[5] *See Wong*, 773 F.3d at 863 (fifth factor).

[6] *See id.* (sixth factor).

7

settlement at the end of the mediation session, they continued to engage in additional subsequent negotiations under the supervision of the Mediator. *Id.* ¶ 8. These negotiations ultimately culminated in a Mediator's "double-blind" recommendation that the Parties settle the Action (which then included claims of purchasers of both Spectrum Brand shares and HRG shares) for $39 million, which the Parties accepted (the "Initial Settlement"). *Id.*

After the Court declined to approve the Initial Settlement based on the composition of the Settlement Class and a new lead plaintiff was appointed to represent the interest of the HRG Class, the Parties scheduled a second mediation for July 22, 2021. Melnick Decl. ¶ 9. In advance of that mediation, Lead Plaintiffs, Defendants, and HRG Class Lead Plaintiff Jet Capital Master Fund LP ("Jet Capital") all exchanged mediation statements setting forth their views on relative risks of liability and damages as to the Spectrum Class and the HRG Class. *Id.* On July 22, 2021, Lead Plaintiffs, Plaintiffs' Counsel, Defendants' Counsel, and Jet Capital's counsel participated in the mediation before Mr. Melnick, which was conducted by videoconference. *Id.* ¶ 10. At the mediation, Lead Plaintiffs, Defendants, and Jet Capital sought to negotiate a mutually acceptable allocation of the $39,000,000 in settlement consideration that had previously been agreed, but were unsuccessful in doing so. Sinderson Decl. ¶ 63. Thereafter, following additional settlement negotiations between the Parties with the oversight of Mr. Melnick, the Parties accepted the Mr. Melnick's mediator's recommendation that Lead Plaintiffs and Defendants agree to settle the Action for $32 million with respect to the Spectrum Class only (the "Settlement"). Sinderson Decl. ¶ 64; Melnick Decl. ¶ 11.

Mr. Melnick has submitted a declaration describing his experience and the Parties' mediation efforts, including his opinion that the Settlement "is the result of extended good-faith,

arm's-length negotiations among the Parties" and is "fair, reasonable, and adequate under all of the circumstances." *Id*. ¶ 12.

As courts in this Circuit have found, the fact that the Parties reached the proposed Settlement after arm's-length negotiations between experienced and informed counsel creates a presumption of its fairness. *See Great Neck Cap. Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.,* 212 F.R.D. 400, 410 (E.D. Wis. 2002) ("[a] strong presumption of fairness attaches to a settlement agreement when it is the result of this type of [arm's-length] negotiation."); *Mangone v. First USA Bank*, 206 F.R.D. 222, 226 (S.D. Ill. 2001) ("a settlement proposal arrived at after arms-length negotiations by fully informed, experienced and competent counsel may be properly presumed to be fair and adequate") (citing *Susquehanna Corp. v. Korholz*, 84 F.R.D. 316, 320 (N.D. Ill. 1979)); *In re Mex. Money Transfer Litig. (W. Union & Orlandi Valuta)*, 164 F. Supp. 2d 1002, 1020 (N.D. Ill. 2000) ("The court places significant weight on the unanimously strong endorsement of these settlements by [Settling] Plaintiffs' well-respected attorneys.") (citing *Isby*, 75 F.3d at 1200).

The assistance of an experienced mediator like Mr. Melnick in the settlement process further supports that the Settlement is fair and that the Parties achieved it free of collusion. *See In re Career Educ. Corp. Sec. Litig.*, 2008 WL 8666579, at *3 (N.D. Ill. June 26, 2008) (settlement "resulted from arms-length negotiations and voluntary mediation between experienced counsel"); *Wong*, 773 F.3d at 864 (settlement "was proposed by an experienced third-party mediator after an arm's-length negotiation where the parties' positions on liability and damages were extensively briefed and debated"); *Roberti v. OSI Sys., Inc.,* 2015 WL 8329916, at *3 (C.D. Cal. Dec. 8, 2015) (approving settlement reached through mediator's "double-blind Mediator's Recommendation"); *Yang v. Focus Media Holding Ltd.*, 2014 WL 4401280, at *5

(S.D.N.Y. Sept. 4, 2014) ("The participation of this highly qualified mediator [Mr. Melnick] strongly supports a finding that negotiations were conducted at arm's length and without collusion.").

Moreover, at the time the Parties reached the Settlement, the knowledge of Lead Plaintiffs and Lead Counsel, and the proceedings themselves, had reached a stage where the Parties could make a well-founded evaluation of the claims and propriety of settlement. As discussed above and in the Sinderson Declaration, Lead Counsel conducted a detailed, substantive investigation by, among other things, reviewing SEC filings, analyst research reports, investor conference calls, press releases, news articles, and other public material; consulting with a damages expert; and speaking with dozens of potential witnesses (the reports of 18 of which were relied upon in drafting the Complaint). ¶¶ 31-34. Lead Counsel also performed extensive legal research in preparing the Complaint and the briefing in opposition to Defendants' motion to dismiss the Complaint. ¶¶ 35, 43-46. In addition, the Parties' extensive settlement negotiations, which included multiple exchanges of information concerning Class-wide damages and other merits-based considerations, further informed the Parties of the strength of each side's arguments. ¶¶ 54-55, 63-64.

Finally, Lead Plaintiffs were able to conduct due diligence discovery that allowed them to obtain and review Spectrum documents that they would otherwise not have seen as a result of the PSLRA discovery stay. ¶¶ 49-50. In connection with this due diligence discovery, Spectrum produced over a thousand pages of internal Company documents, which included: (i) monthly steering committee presentations and summaries concerning Spectrum's consolidation of HHI; (ii) monthly "President's Reports" with consolidated and individual financial reporting for all of Spectrum's divisions; (iii) Monthly Financial Reviews ("MFRs") with financial and status

reporting for HHI and GAC, including relevant information concerning the status of the consolidations; (iv) Annualized Operations Plans ("AOPs") for GAC, discussing the consolidation of GAC's four distribution centers to a single facility in Dayton, OH; and (v) revised operations plans ("Rev2s") for GAC, which documented management's ever-changing financial projections for GAC. ¶ 50. The due diligence discovery undertaken by Lead Counsel provided Lead Plaintiffs and Lead Counsel with a more thorough understanding of the facts and risks of the case and Defendants' arguments. *Id*. After reviewing this discovery, Lead Counsel understood how Defendants would use these documents to support their arguments that Defendants had made their statements during the Class Period in good faith. *Id*.

Accordingly, at the time the Parties agreed to the Settlement, Lead Plaintiffs and Lead Counsel had sufficient information to evaluate their case and the adequacy of the proposed Settlement. *See Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 587-589 (N.D. Ill. 2011) (approving settlement where settlement agreement entitled class counsel to conduct confirmatory discovery that confirmed the fairness of the settlement); *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (even absent extensive formal discovery, class counsel's significant investigation and research supported settlement approval).

### C. The Relief that the Settlement Provides for the Spectrum Class is Adequate, Taking Into Account the Costs and Risks of Further Litigation and All Other Relevant Factors

The Court next considers whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal," as well as other relevant factors. Fed. R. Civ. P. 23(e)(2)(C). Rule 23(e)(2)(C) encompasses two of the factors traditionally considered by the Seventh Circuit when evaluating a proposed class action settlement: (1) the strength of the case for plaintiffs on the merits, balanced against the extent of settlement offer; and (2) the complexity, length, and expense of further litigation. *See Wong*, 773 F.3d at 863-64. As

11

demonstrated below, these factors support approval of the Settlement under Rule 23(e)(2)(C).

### 1.    The Strength of Lead Plaintiffs' Case Compared to the Amount of Settlement

When deciding whether to approve a proposed class action settlement under *Wong* and Seventh Circuit precedent, the primary consideration is "the strength of the plaintiff's case on the merits balanced against the amount offered in settlement." *Snyder*, 2019 WL 2103379, at *6 (citing *Wong*, 773 F.3d at 864); *see also McKinnie,* 678 F. Supp. 2d at 814.  Under this factor, courts consider whether the proposed settlement is reasonable in light of the risks of proceeding with the litigation.  *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.,* 789 F. Supp. 2d 935, 959, 961, 963-64 (N.D. Ill. 2011); *see also Sears,* 2016 WL 772785, at *7 (finding that approval does not require that a settlement be "the 'best possible deal' for plaintiffs" or that "the class has received the same benefit from the settlement as they would have recovered from a trial"); *Great Neck Cap.*, 212 F.R.D. at 409-10 ("The mere possibility that the class might receive more if the case were fully litigated is not a good reason for disapproving the settlement. If the case were fully litigated there is also a possibility that plaintiffs could receive less.").  The $32 million cash recovery obtained for the benefit of the Spectrum Class here is well within the range of reasonableness considering the legal, factual, and practical risks of continued litigation.

In considering whether to enter into the Settlement, Lead Plaintiffs, represented by experienced counsel, weighed the $32 million Settlement Amount against the strength of Lead Plaintiffs' claims, taking into consideration the risks inherent in proving materiality, scienter, loss causation, and recoverable damages, as well as the expense and likely duration of the Action.  At the time that the Parties agreed in principle to settle the Action, the Court had not yet decided Defendants' motion to dismiss the Complaint.  While Lead Plaintiffs and Lead Counsel believed in the merits of the claims they asserted, they also recognized the serious risk that the Court would

12

have ruled in Defendants' favor on the motion to dismiss, which would have dramatically reduced, or eliminated altogether, the potential recovery for the Spectrum Class.

***Risks to Proving Defendants' Liability.*** Lead Plaintiffs faced substantial risks in establishing Defendants' liability under the federal securities laws, either at the motion to dismiss or, after substantial expensive discovery, at summary judgment.  ¶¶ 77-90.

*Risks to Proving False or Misleading Statements or Omissions.*  In their motion to dismiss the CAC, Defendants vigorously argued that Lead Plaintiffs did not adequately plead any actionable false or misleading statements or omissions.  ¶ 78.  As discussed in the Sinderson Declaration, the core allegation in this case was that Defendants violated the federal securities laws by making materially false and misleading statements about the success of two major supply-chain consolidation projects in Spectrum's Global Auto Care ("GAC") Hardware and Home Improvement ("HHI") divisions.  ¶¶ 23-24.  Lead Plaintiffs allege that the Company's statements regarding the GAC and HHI consolidations were misleading because they failed to disclose that the projects were suffering significant delays and setbacks which were having a material effect on the Company's finances and customer relationships.  *Id.*

Defendants argued, however, that the CAC failed to adequately allege the falsity of many of Spectrum's statements.  ¶ 79.  For example, Defendants argued that the CAC did not adequately plead that the key alleged false or misleading statements concerning the consolidations' progress and milestones, such as the Company's statement that the HHI distribution center was "receiving product" in early March 2017, were in fact untrue.  *Id.*  Defendants also argued that the CAC failed to allege the falsity of Defendants' statements regarding the challenges experienced at the Dayton and Edgerton distribution centers after the purported completion of the consolidations.  *Id.*  Specifically, Defendants argued that the issues facing the consolidation projects were, in fact,

13

"temporary" and "transitory," as both facilities were running at normal capacity by the conclusion of the Class Period. *Id.* Further, Defendants argued that many of their purported affirmative misstatements were either (i) non-actionable opinions; (ii) forward-looking statements that fall within the PSLRA's safe harbor provision; and/or (iii) puffery. ¶ 80. For these reasons, there was a real risk here that, had the litigation continued, the Court or a jury could have found that Defendants' alleged misstatements and omissions did not trigger liability under the securities laws.

Defendants have also argued, and would continue to argue, that discovery would significantly undermine Lead Plaintiffs' allegations of wrongdoing. ¶ 81. For example, Defendants would argue that Lead Plaintiffs significantly overstated the issues plaguing the HHI consolidation. *Id.* More specifically, Defendants argued that a key factual allegation in the CAC *i.e.*, that Spectrum never closed one of its distribution centers in Mira Loma, California, was based upon a factual misunderstanding. Defendants would argue and attempt to prove that Spectrum left the Mira Loma distribution center in December 2017 as originally planned. *Id.* Defendants would also argue that many of the specific allegations in the CAC, such as those relating to the specific shipping lead times and backlogs, were materially overstated and would weigh against a finding of falsity by the Court or jury. *Id.*

Similarly, with respect to the GAC consolidation, Defendants would argue that Lead Plaintiffs did not adequately allege that Defendants made false or misleading statements about this project or Spectrum's decision to sell the GAC Division. ¶ 82. Specifically, Defendants have argued that discovery would show that, despite Lead Plaintiffs' allegations that, among other things, Spectrum did not install "racking" (which Lead Plaintiffs alleged was key infrastructure for a distribution center) until very late or even after the Class Period, the Company had in fact

installed the required infrastructure.  Defendants were therefore expected to argue that it was simply a dispute between the Parties as to how much infrastructure was foreseeably necessary to make their public statements not misleading.  *Id.*

Furthermore, Lead Counsel expected that Defendants would dispute Lead Plaintiffs' allegation that the problems with the GAC consolidation were severe enough to cause Spectrum to sell the entire division.  ¶ 83.  On this point, Defendants had and would continue to argue that the decision to sell GAC was driven by the financial needs of the Company and a reevaluation of GAC's long-term financial prospects, rather than because of short-term issues with the consolidation.  *Id.*

*Risks to Proving Scienter.*  Lead Plaintiffs also faced significant hurdles in establishing Defendants' scienter, or intent to defraud.  ¶¶ 84-88.  A defendant's state of mind in a securities case "is the most difficult element of proof and one that is rarely supported by direct evidence" such as an admission.  *In re Amgen Inc. Sec. Litig.*, 2016 WL 10571773, at *3 (C.D. Cal. Oct. 25, 2016).  Here, at the motion-to-dismiss stage, Defendants put forth credible arguments challenging Lead Plaintiffs' scienter allegations that relied on statements from former employees of Spectrum. Lead Plaintiffs allege that these employee statements established that the Executive Defendants were personally aware of the issues plaguing the consolidations and knew that their statements about the Company's progress in executing the consolidations were misleading.  ¶ 85.  However, Defendants argued that these statements did not give rise to a strong inference of scienter because: (i) Lead Plaintiffs failed to sufficiently allege that the information possessed by these "low-level and middle management" employees was also in the possession of senior management; and (ii) even if senior management was aware of these issues, the confidential witness allegations do not raise an inference that senior management did not honestly believe that progress on the

15

consolidations was "good" or that these issues were "short term" and "transitory." *Id.* Defendants argued that even if Lead Plaintiffs' allegations were true and even if this information was communicated to Defendants, that still would not establish that Defendants did not believe their statements about the progress of the consolidations as of the time that they made the statements. *Id.*

Defendants have also argued that many of the witness allegations did not support an inference of scienter because of their indefiniteness as to time. ¶ 86.  In their motion to dismiss, Defendants identified 38 such allegations that were silent about when such events were to have occurred.  *Id.*  The motion to dismiss cross referenced each confidential witness's allegations against Defendants' statements during the same period and argued that the confidential witness allegations did not demonstrate that Defendants were aware of the underlying information.  *Id.*

Finally, Defendants have argued that Spectrum's decision to repurchase more than $250 million of Company stock during the Class Period "completely refut[es] the notion it was attempting to mislead the market and improperly inflate its share price" as "it makes 'no economic sense for a company to buy back its stock at a price it knows to be inflated.'"  ¶ 87.  For these reasons, there was a real risk that had litigation continued, the Court or a jury could have found that the CAC failed to plead facts giving rise to a strong inference that the Executive Defendants acted with scienter, which would have resulted in the complete dismissal of the Action.  *Id*.

Moreover, Defendants would have once again levied further forceful attacks on Lead Plaintiffs' scienter allegations through discovery and at trial.  ¶ 88.  For example, Defendants have argued that discovery would show that the Executive Defendants' statements about the consolidation projects were honestly believed.  *Id.*  More specifically, Defendants have argued that Spectrum's internal documents accounting for the material effects of the consolidation

projects setbacks demonstrate that management's views were honestly held and that the businesses simply performed more poorly than expected. *Id.*

*Risks to Proving Control.* Defendants further argued that Lead Plaintiffs would be unable to prove that HRG controlled Spectrum, which would defeat Lead Plaintiffs' claim against HRG. ¶¶ 89-90. Lead Plaintiffs allege in the CAC that HRG, as the majority shareholder in Spectrum, exercised control over Spectrum Brands—and that this control was not only evident through Spectrum's own public disclosures, but also by the intertwinement of the companies' boards of directors and executive personnel. ¶ 89. The CAC alleges that because HRG exercised control over Spectrum when Spectrum made many of its materially false and misleading statements, HRG was also liable as a control person of Spectrum under Section 20(a) of the Exchange Act. *Id.* Defendants, however, argued that control-person liability required Lead Plaintiffs to show that HRG both (i) "actually participated in, that is, exercised control over" Spectrum and (ii) "possessed the power or ability to control the specific transaction or activity upon with the primary violation was predicated." ¶ 90. Defendants argued that Lead Plaintiffs provided no non-conclusory evidence that HRG exercised any such control. *Id.* Further, Defendants argued that Lead Plaintiffs would be unable to establish control-person liability because the CAC failed to plead a primary violation of Section 10(b). *Id.*

***Risks to Establishing Loss Causation and Damages.*** Even if Lead Plaintiffs were successful in proving liability, their ability to establish loss causation and damages also presented a significant risk to recovery in the Action. *See Goldsmith v. Tech. Solutions Co.*, 1995 U.S. Dist. LEXIS 15093, at *13 (N.D. Ill. Oct. 10, 1995); *In re Tyco Int'l, Ltd.,* 535 F. Supp. 2d 249, 260-61 (D.N.H. 2007) ("Proving loss causation would be complex and difficult. Moreover, even if the jury agreed to impose liability, the trial would likely involve a confusing 'battle of the experts'

17

over damages."). Lead Counsel expected to face multiple significant arguments challenging loss causation and damages in this case if the Court sustained the CAC. ¶ 91. Specifically, Lead Counsel expected Defendants to argue, among other significant challenges, that (i) Lead Plaintiffs' damages theory failed to account for confounding information introduced to the market on the same day as the alleged corrective events; (ii) Lead Plaintiffs' putative class could not be certified as proposed; and (iii) under basic economic principles, certain of the alleged corrective events could not have driven the stock price down. *Id.*

Regarding the first point, Defendants have argued, and would continue to argue, that Lead Plaintiffs failed to disaggregate confounding information in their damages analysis—which assumes that 100% of the price decline on each of the alleged corrective disclosure dates (after adjusting for industry-wide price movements) was attributable to the purported misstatements concerning the consolidation projects. ¶ 92. Specifically, Defendants argued and would continue to argue that nearly half of the stock price decline on both of the corrective disclosures dates was attributable to negative information concerning Spectrum's *other* business units, Pet and Home & Garden, and that in each of the corrective disclosures GAC and HHI accounted for 55% or less of the EBITDA shortfall. *Id.* Further, Defendants argued that, even within GAC and HHI, a portion of the EBITDA shortfall attributable to GAC and HHI were attributable to disclosed factors unrelated to the consolidation projects, such as competitive pressures, raw materials costs, and general market demand. *Id.* This adjustment alone would cut class-wide damages by more than 50%. *Id.*

Concerning Defendants' second point, Defendants would argue that Lead Plaintiffs' proposed 23-month Class Period was overbroad and should be limited to the first third of 2018. ¶ 93. Specifically, Defendants had contended that alleged misstatements about the consolidations

18

in 2017—when they had just been announced and were in their early planning stages—could not be proven false or misleading given the limited expectations for their progress during that time. *Id.* Defendants further argued that the Class Period would then have had to end with the alleged April 2018 corrective disclosure, when Spectrum and the Executive Defendants first disclosed serious problems with the consolidations and announced that Defendant CEO Rouvé was terminated. *Id.*

Finally, regarding Defendants' third point, Defendants had argued that the Class Period would be shortened for another reason. ¶ 94. The November 19, 2018 disclosure largely addressed issues with the GAC consolidation, rather than the HHI consolidation. *Id.* However, four days before the disclosure, Spectrum had announced the sale of GAC to Energizer. *Id.* Therefore, Defendants had argued that investors would have been aware that GAC's future financial performance would have no impact on the value of Spectrum as an ongoing financial enterprise. *Id.* Thus, Defendants would argue with some force that any resulting stock price decline could not be attributed to the alleged fraud and the Class Period must end in April 2018. *Id.*

There was a significant and credible risk that this Court or a jury—after many months of expensive discovery—could accept any one or all of these arguments, much less the numerous other challenges Defendants had posed to Lead Plaintiffs' damages model. ¶ 95. If certain of Defendants' arguments for disaggregation of damages were accepted—even if all other liability and damages issues were decided in the Class's favor—Lead Counsel's expert calculated that maximum recoverable damages would be approximately $300 million. *Id.* Under this scenario, the $32 million Settlement represents approximately 10.7% of the maximum recoverable damages for the Class—an excellent result for Class Members given the risks of the litigation.

Moreover, if the Court or a jury were to also accept certain of Defendants' additional strongest arguments concerning loss causation and damages detailed above, class-wide damages would have been reduced to as little $68.3 million, further highlighting the very favorable result achieved under the Settlement. *Id.*  Indeed, Defendants provided an expert analysis of class-wide damages in connection with the mediation that concluded that, even with a full jury liability verdict for Spectrum shareholders, damages would be as little as $6.2 million. *Id.*

In sum, even if Lead Plaintiffs successfully defeated Defendants' motion to dismiss, which was far from certain under the PSLRA's heightened pleading standard, the continued prosecution of the Action would have required Lead Plaintiffs to overcome similar arguments by Defendants to prevail at class certification, summary judgment, and trial, and on the inevitable appeals.  There is obviously no guarantee that they would have cleared each of these hurdles. *See Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 235 (5th Cir. 2009) ("To be successful, a securities class-action plaintiff must thread the eye of a needle made smaller and smaller over the years by judicial decree and congressional action.").[7]

In light of all of the above considerations, the $32 million recovery achieved by the Settlement represents a very favorable result for the Spectrum Class.

---

[7] *See also In re Northfield Labs., Inc. Sec. Litig.*, 267 F.R.D. 536, 549 (N.D. Ill. May 18, 2010) (denying class certification); *Levie v. Sears Roebuck & Co.*, 676 F. Supp. 2d 680, 689-90 (N.D. Ill. Dec. 18, 2009) (granting defendants' motion for summary judgment); *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 729-30 (11th Cir. 2012) (jury issued verdict on liability in favor of plaintiffs, but the Eleventh Circuit affirmed judgment as a matter of law against plaintiffs for lack of proof of loss causation); *Robbins v. Koger Props.*, 116 F.3d 1441, 1449 (11th Cir. 1997) (Eleventh Circuit reversed $81 million jury verdict for securities fraud); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 524, 533 (S.D.N.Y. 2011) (after a verdict for class plaintiffs, district court granted judgment for defendants following change in law).

## 2. The Complexity, Length, and Expense of Further Litigation Support Approval of the Settlement

In determining the fairness of a settlement, courts also consider the likely "complexity, length, and expense of further litigation." *Wong*, 773 F.3d at 863; *Isby,* 75 F.3d at 1199. There is no doubt that this securities class action—like virtually all others—involves complex factual and legal issues. *See Retsky Fam. Ltd. P'ship v. Price Waterhouse LLP*, 2001 WL 1568856, at *2 (N.D. Ill. Dec. 10, 2001) ("Securities fraud litigation is long, complex and uncertain"); *Great Neck Cap.,* 212 F.R.D. at 409 ("Shareholder class actions are difficult and unpredictable, and skepticism about optimistic forecasts of recovery is warranted."). Continued litigation would also have been lengthy and expensive. *See Strougo v. Bassini,* 258 F. Supp. 2d 254, 258 (S.D.N.Y. 2003) ("[i]t is beyond cavil that continued litigation in this multi-district securities class action would be complex, lengthy, and expensive, with no guarantee of recovery by the class members").

The claims asserted in this Action raise many complex issues, as evidenced by the 135-page, 321-paragraph CAC and the extensive briefing dedicated to Defendants' motion to dismiss. ¶¶ 36-47. Furthermore, to achieve a litigated verdict in the Action, Lead Plaintiffs would have needed to devote a substantial amount of additional time and expense to the case. As noted above, the Parties reached their agreement-in-principle to settle prior to the Court's decision on Defendants' motion to dismiss the Complaint and prior to fact discovery. ¶ 7. In the absence of the Settlement, continued litigation of the Action would have required extensive fact discovery, including interrogatories, depositions, and an enormous production of documents; substantial expert discovery on complicated issues pertaining to loss causation and damages; motion practice relating to fact and expert discovery; a litigated motion for class certification; a likely motion for summary judgment; pre-trial evidentiary motions, including concerning the admissibility of expert testimony; a trial; and appeals. *See Amgen*, 2016 WL 10571773, at *3 ("A trial of a

21

complex, fact-intensive case like this could have taken weeks, and the likely appeals of rulings on summary judgment and at trial could have added years to the litigation."). And, even with a verdict at trial affirmed on appeal, the Spectrum Class would have faced a potentially complex, lengthy, and (almost certainly) contested claims-administration process.[8] The foregoing would pose substantial expense for the Class and delay the Class's ability to recover—assuming, of course, that Lead Plaintiffs and the Spectrum Class were ultimately successful on their claims.

Thus, the risk, expense, complexity, and likely duration of further litigation support approval of the Settlement. The present value of a certain recovery now, as opposed to the mere chance for a possibly greater one years later, supports approval of a Settlement that eliminates the expense and delay of continued litigation and the risk that the Spectrum Class could receive no recovery.

### 3. All Other Factors Established by Rule 23(e)(2)(C) Support Approval of the Settlement

Rule 23(e)(2)(C) also instructs courts to consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims," "the terms of any proposed award of attorney's fees, including timing of payment," and "any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv). Each of these factors also supports approval of the Settlement or is neutral and does not suggest any basis for inadequacy of the Settlement.

---

[8] In other securities-fraud class actions that have gone to trial, the time from a verdict to a final judgment has been as long as seven years. *See Jaffe Pension Plan v. Household Int'l, Inc.*, No. 1:02-cv-05893, Verdict Form, ECF No. 1611 (N.D. Ill. May 7, 2009) & Final Judgment and Order of Dismissal with Prejudice, ECF No. 2267 (N.D. Ill. Nov. 10, 2016); *see also In re Vivendi Universal, S.A. Sec. Litig.*, Civ. No. 02-5571 (RJH/HBP), Verdict Form, ECF No. 998 (S.D.N.Y. Feb. 2, 2010) (jury verdict issued on Jan. 29, 2010) & Final Judgment Approving Class Action Settlement of All Remaining Claims, ECF No. 1317 (S.D.N.Y. May 9, 2017).

First, the procedures for processing Class Members' claims and distributing the proceeds of the Settlement to eligible claimants are well-established, effective methods that have been widely used in securities class action litigation.  Here, the proceeds of the Settlement will be distributed to Class Members who submit eligible Claim Forms with required documentation to the Court-approved Claims Administrator, JND Legal Administration ("JND").  Class Members were informed that they did not need to submit a claim if they had already submitted one in connection with the Initial Settlement, but were provided an additional opportunity to submit a claim if they had not done so.  ¶ 102.  JND, an independent company with extensive experience administering securities class actions, will review and process the claims under Lead Counsel's supervision, provide claimants with an opportunity to cure any deficiencies in their claims or request review of the denial of their claims by the Court, and then mail or wire claimants their *pro rata* share of the Net Settlement Fund (as calculated under the Plan of Allocation) upon approval of the Court.  This type of claims processing is standard in securities class actions and has long been used and found to be effective.  This claim procedure is necessary because neither Lead Plaintiffs nor Defendants possess individual investors' trading data that would allow the Parties to create a claims-free process to distribute Settlement funds.[9]

Second, the relief provided for the Spectrum Class in the Settlement is also adequate when the terms of the proposed award of attorneys' fees are taken into account.  As discussed in the accompanying Fee Memorandum, the proposed attorneys' fees of 15% of the Settlement Fund (net of Court-awarded Litigation Expenses and estimated Notice and Administration Costs), to be paid upon approval by the Court, are reasonable in light of the efforts of Plaintiffs' Counsel

---

[9] The Settlement is not a claims-made settlement.  If the Settlement is approved, Defendants will have no right to the return of any portion of the Settlement based on the number or value of claims submitted.  *See* Stipulation ¶ 13.

and the risks in the litigation. Most important with respect to the Court's consideration of the fairness of the Settlement is the fact that approval of the requested attorneys' fees is entirely separate from approval of the Settlement, and neither Lead Plaintiffs nor Lead Counsel may terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees. *See* Stipulation ¶ 16.

Lastly, Rule 23 asks the Court to consider the proposed Settlement's fairness in light of any agreements required to be identified under Rule 23(e)(3). *See* Fed. R. Civ. P. 23(e)(2)(C)(iv). Here, the only agreement so required to be identified (other than the Stipulation itself) is the confidential Supplemental Agreement entered into by Lead Plaintiffs and Spectrum, which establishes the conditions under which Spectrum would be able to terminate the Settlement if the number of Class Members who request exclusion from the Spectrum Class reaches a specified threshold. This type of agreement is a standard provision in securities class actions and has no negative impact on the fairness of the Settlement.

### D. The Settlement Treats Class Members Equitably Relative to Each Other

The proposed Settlement treats members of the Spectrum Class equitably relative to one another. As discussed below in Part II, under the Plan of Allocation, eligible claimants approved for payment by the Court will receive their *pro rata* share of the recovery based on their transactions in Spectrum securities. The Plan of Allocation does not contain a discount on any Class Members' claims on the basis of the merits of their claims. Lead Plaintiffs will receive precisely the same level of *pro rata* recovery (based on their Recognized Claims as calculated under the Plan of Allocation) as all other similarly situated Class Members.

**E.     The Amount of Opposition to the Settlement and Reaction of the Spectrum Class to the Settlement**

Two related final approval factors not included in Rule 23(e)(2) that should be considered in assessing the proposed Settlement's fairness and adequacy are "the amount of opposition to the settlement" and "the reaction of members of the class to the settlement." *See Wong*, 773 F.3d at 863.

In accordance with the Preliminary Approval Order, JND began mailing copies of the Notice Packet (consisting of the Notice and Claim Form) to potential Class Members and nominees on December 7, 2021. *See* Segura Decl. ¶ 5. Through February 4, 2022, JND mailed 90,589 Notice Packets to potential Spectrum Class Members and nominees. *See id*. ¶ 8. In addition, the Summary Notice was published in *Investor's Business Daily* and transmitted over the *PR Newswire*. *See id*. ¶ 9. The Notice states the essential terms of the Settlement and informs potential Spectrum Class Members of, among other things, their right to opt out of the Spectrum Class or object to the Settlement, the Plan of Allocation, or Lead Counsel's fee and expense application. *See* Segura Decl. at Ex. A. The deadline set by the Court for Class Members to exclude themselves or object is February 22, 2022. ¶ 101. To date, no objections and no additional requests for exclusion have been received. *See* Segura Decl. ¶ 12; Sinderson Decl. ¶ 107.[10] As provided in the Preliminary Approval Order, Lead Plaintiffs will file reply papers on or before March 4, 2022, after the deadline for requesting exclusion or objecting has passed, that will address any objections or any additional requests for exclusion that may be received.

---

[10] The three individuals who previously submitted two requests for exclusion from the settlement class in connection with the Initial Settlement are excluded from the Spectrum Class by the terms of the Stipulation. Stipulation ¶ 1(yy) (dkt. 96-1). As set forth in Lead Plaintiffs' previous submissions to the Court, none of these individuals submitted proof of membership in the Spectrum Class, but Lead Counsel determined to exclude them at their request regardless. Dkt. 63, at 5-6; dkt. 65-1.

* * *

In sum, all of factors to be considered under Rule 23(e)(2) support a finding that the Settlement is fair, reasonable, and adequate.

## II.  THE PLAN OF ALLOCATION IS FAIR AND REASONABLE

Lead Plaintiffs also seek approval of the proposed Plan of Allocation for the Settlement proceeds.  Approval of a plan of allocation in a class action is governed by the same standards of review applicable to the settlement as a whole—the plan must be "fair and reasonable."  *See Retsky*, 2001 WL 1568856, at *3; *Great Neck Cap.*, 212 F.R.D. at 410.  The plan of allocation need only have a reasonable basis, particularly if recommended by experienced class counsel. *See In re Heritage Bond Litig.*, 2005 WL 1594403, at *11 (C.D. Cal. June 10, 2005).  Generally, a plan of allocation that reimburses class members based on the relative strength and value of their claims is reasonable.  *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 192 (S.D.N.Y. 2012); *see also Shah v. Zimmer Biomet Holdings, Inc.*, 2020 WL 5627171, at *6 (N.D. Ind. September 18, 2020) (approving plan of allocation calculating a "recognized loss" for each class member that takes into account factors such as the date of purchase or sale of the shares, the type of shares purchased or sold, the price of the shares purchased or sold, as well as the "artificial inflation" in the price of the stock at the time of the trade).

Lead Plaintiffs' damages expert developed the proposed Plan of Allocation (the "Plan"), which is set forth at pages 12 to 16 of the mailed Notice, with the assistance of Lead Counsel. ¶ 110.  The Plan provides for the distribution of the Net Settlement Fund to Class Members on a *pro rata* basis based on the extent of their injuries attributable to the alleged fraud.  *Id*.  In developing the Plan of Allocation, Lead Plaintiffs' damages expert calculated the estimated amount of artificial inflation in the per-share closing prices of Spectrum and Old Spectrum common stock during the Class Period that was allegedly caused by Defendants' alleged

26

materially false and misleading statements and omissions. ¶ 112.  To calculate the estimated artificial inflation, the expert considered the price changes in Spectrum and Old Spectrum common stock in reaction to the public disclosures that allegedly corrected the alleged misrepresentations and omissions, adjusting for price changes that were attributable to market or industry forces. *Id.*

Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each purchase or acquisition of Spectrum and Old Spectrum common stock during the Class Period that is listed in the Claim Form and for which adequate documentation is provided by the claimant. ¶ 113.  The calculation of Recognized Loss Amounts under the proposed Plan will depend on when the claimant purchased and/or sold the shares, the value of the shares when the claimant purchased or sold them, and whether the claimant held the shares through the statutory 90-day look-back period, *see* 15 U.S.C. § 78u-4(e).  *Id.*  In order to have a loss under the Plan of Allocation, shares purchased during the Class Period must have been held through at least one of the two alleged partial corrective disclosures.[11]  *Id.*  In contrast to the plan of allocation that had been proposed for the Initial Settlement, under the currently proposed Plan of Allocation, no category of claims is subject to a discount based on the merits of the claims.  *Id.*

Lead Plaintiffs and Lead Counsel believe that the proposed Plan of Allocation will result in a fair and equitable distribution of the Settlement proceeds among Spectrum Class Members who suffered losses as a result of the conduct alleged in the Complaint. ¶ 114.  Moreover, through February 4, 2022, more than 90,500 copies of the Notice, which contains the Plan of Allocation, and advises Spectrum Class Members of their right to object to the Plan if they wish to do so,

---

[11] Lead Plaintiffs allege that corrective information was released to the market on April 26, 2018 and November 19, 2018, which partially removed the artificial inflation from the price of the Spectrum and Old Spectrum common stock on those days.

have been mailed to potential Spectrum Class Members.  Segura Decl. ¶ 8.  To date, no objections to the Plan of Allocation have been received.  ¶ 115.  For all these reasons, Lead Plaintiffs respectfully request that the Court approve the proposed Plan of Allocation.

## III.    THE SPECTRUM CLASS SHOULD BE CERTIFIED

In connection with the Settlement, the Parties have stipulated to the certification of the Spectrum Class for purposes of the Settlement.  As set forth in detail in Lead Plaintiffs' memorandum of law in support of their motion for preliminary approval of the Settlement, the Spectrum Class satisfies all the requirements of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure. *See* dkt. 97 at 17-22; *see also* Preliminary Approval Order, dkt. 98 at ¶¶ 1-3 (finding that the Court will likely be able to certify the Spectrum Class at final approval).  None of the facts regarding certification of the Spectrum Class have changed since Lead Plaintiffs submitted their motion for preliminary approval, and there has been no objection to certification. Accordingly, Lead Plaintiffs respectfully request that the Court certify the Spectrum Class under Rules 23(a) and (b)(3) for the reasons set forth in their earlier memorandum.  *See* dkt. 97 at 17-22.

## IV.    NOTICE TO THE SPECTRUM CLASS SATISFIES THE REQUIREMENTS OF RULE 23 AND DUE PROCESS

The Notice provided to the Spectrum Class satisfies all the requirements of due process, the PSLRA, and Rule 23, which require that class members be given "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-75 (1974).  Notice of a class action settlement is satisfactory if it generally describes "the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard."  *See Luna v. Marvell Tech. Grp.*, 2018 WL 1900150, at *2 (N.D. Cal. Apr. 20, 2018).

In this case, both the substance of the Notice and the method of its dissemination to potential Class Members satisfy these standards. As noted above, in accordance with the Court's Preliminary Approval Order, JND, the Court-approved Claims Administrator, began mailing copies of the Notice Packet to potential Class Members and nominees on December 7, 2021. *See* Segura Decl. ¶ 5. JND mailed copies of the Notice Packet to the same group of potential settlement class members that had been identified in connection with the mailing of notice of the Initial Settlement. *Id.* In addition, JND also mailed a copy of the Notice Packet to any claimants whose claims submitted in connection with the Initial Settlement included purchases of Spectrum or Old Spectrum common stock during the Class Period and who were not already on JND's mailing list. *Id.* Through February 4, 2022, JND mailed 90,589 copies of the Notice Packet to potential Spectrum Class Members and nominees. *See id.* ¶ 8.

In addition, JND arranged for the Summary Notice to be published in *Investor's Business Daily* and transmitted over the *PR Newswire* on December 21, 2021. *See id.* ¶ 9. JND also updated the dedicated case website, www.SpectrumBrandsSecuritiesLitigation.com, to provide potential Class Members with information concerning the Settlement and access to copies of the Notice and Claim Form, as well as copies of other documents such as the Stipulation, Preliminary Approval Order, and Complaint. *Id.* ¶ 11. The website also allows for potential Class Members to submit their claim at the site instead of sending one via mail. *Id.*

This combination of individual first-class mail to all Spectrum Class Members who could be identified with reasonable effort, supplemented by notice in an appropriate publication, transmission over a newswire, and publication on internet websites, was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *Zimmer Biomet Holdings*, 2020 WL 5627171, at *6 (approving similar notice program which included physical

29

mailing of notice based on records from the company and nominees and publication of summary notice in *Investor's Business Daily* and over the *PR Newswire*); *Career Educ.*, 2008 WL 8666579, at *5 (approving similar notice program).

### CONCLUSION

For the reasons stated in this memorandum and in the Sinderson Declaration, Lead Plaintiffs respectfully request that the Court grant final approval of the proposed Settlement and approve the proposed Plan of Allocation.

Dated:  February 7, 2022                         Respectfully submitted,

*/s/ Katherine M. Sinderson*
**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
Katherine M. Sinderson, admitted *pro hac vice*
Jai Chandrasekhar, admitted *pro hac vice*
Matthew Traylor, admitted *pro hac vice*
1251 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 554-1400
Facsimile:  (212) 554-1444
KatieM@blbglaw.com
Jai@blbglaw.com
Matthew.Traylor@blbglaw.com

-and-

Avi Josefson
875 North Michigan Avenue, Suite 3100
Chicago, Illinois 60611
Telephone: (312) 373-3880
Facsimile: (312) 794-7801
avi@blbglaw.com

*Lead Counsel for Lead Plaintiffs the Public School Teachers' Pension & Retirement Fund of Chicago and the Cambridge Retirement System and the Spectrum Class*

**STAFFORD ROSENBAUM LLP**
Douglas M. Poland
State Bar No. 1055189
222 West Washington Avenue, Suite 900

P.O. Box 1784
Madison, WI 53701-1784
Telephone:  (608) 256-0226
Facsimile:  (608) 259-2600
dpoland@staffordlaw.com

*Liaison Counsel for Lead Plaintiffs the Public
School Teachers' Pension & Retirement Fund of
Chicago and the Cambridge Retirement System and
the Spectrum Class*

31

## CERTIFICATE OF SERVICE

I, Katherine M. Sinderson, an attorney, hereby certify that a copy of the foregoing **"Memorandum of Law in Support of Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation"** was served on counsel for all parties electronically via the CM/ECF system on February 7, 2022.

Dated:  February 7, 2022                    By:    */s/ Katherine M. Sinderson*
                                                        Katherine M. Sinderson


#3080733