## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| | ) | |
| | ) | |
| IN RE SPECTRUM BRANDS SECURITIES LITIGATION | ) | No. 19-cv-347-jdp |
| | ) | |
| | ) | |

---

## DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND LITIGATION EXPENSES

---

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 1

II.     PROSECUTION OF THE ACTION ..................................................................... 8

        A.      Background ................................................................................................ 8

        B.      Commencement of the Action and Organization of the Case.............................. 10

        C.      Lead Counsel's Investigation and Filing of the Class Action Complaint............. 11

        D.      Defendants' Motion to Dismiss the Class Action Complaint.............................. 13

        E.      Due Diligence Discovery ......................................................................... 16

III.    THE PARTIES REACH AN INITIAL SETTLEMENT THROUGH
        MEDIATION, AND THE COURT DECLINES TO APPROVE THE
        SETTLEMENT BASED ON THE COMPOSITION OF THE SETTLEMENT
        CLASS ................................................................................................................ 17

IV.     LEAD PLAINTIFFS AND DEFENDANTS REACH A SETTLEMENT OF
        CLAIMS OF THE SPECTRUM CLASS, AND THE COURT SEVERS THE
        CLAIMS OF THE SPECTRUM CLASS AND HRG CLASS ......................................... 21

V.      RISKS OF CONTINUED LITIGATION ......................................................... 23

        A.      The General Risks of Prosecuting Securities Actions ........................................ 24

        B.      The Substantial Risks in Proving Defendants' Liability..................................... 26

                1.      The Risks of Proving False or Misleading Statements or Omissions....... 26

                2.      The Risks of Proving Scienter ................................................. 28

                3.      The Risk of Proving Control................................................... 30

        C.      The Risks of Establishing Loss Causation and Damages ..................................... 31

        D.      The Risks of a Second-Phase Trial on Individual Class Members' Reliance....... 33

        E.      The Risk of Appeal ................................................................................. 34

VI.     LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY
        APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE..................................... 35

VII.    ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT................................. 38

VIII.   THE FEE AND LITIGATION EXPENSE APPLICATION ......................................... 40

A.      The Fee Application...................................................................................... 41

         1.      Lead Plaintiffs Support the Fee Application............................................ 42

         2.      The Work and Experience of Counsel ...................................................... 42

         3.      Standing and Caliber of Defendants' Counsel......................................... 44

         4.      The Need to Ensure the Availability of Competent Counsel in
                 High-Risk Contingent Securities Litigation............................................. 45

         5.      The Reaction of the Spectrum Class to the Fee Application ................... 46

B.      The Litigation Expense Application ...................................................................... 47

IX.    CONCLUSION.......................................................................................................... 50

ii

Katherine M. Sinderson declares as follows:

## I.    INTRODUCTION

1.    I am a member of the bars of the State of New York, the U.S. District Court for the Southern District of New York, and the U.S. Courts of Appeals for the Second and Third Circuits and am admitted *pro hac vice* in the above-captioned consolidated securities class action (the "Action").  I am a Member of the law firm of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G" or "Lead Counsel"), the Court-appointed Lead Counsel in the Action.[1] BLB&G represents the Court-appointed Lead Plaintiffs, the Public School Teachers' Pension and Retirement Fund of Chicago ("Chicago Teachers") and the Cambridge Retirement System ("Cambridge").  I have personal knowledge of the matters stated in this declaration based on my active supervision of and participation in the prosecution and settlement of the Action.

2.    I respectfully submit this declaration in support of Lead Plaintiffs' motion, under Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the proposed settlement of the Action (the "Settlement"), which the Court preliminarily approved by its Order dated November 17, 2021 (the "Preliminary Approval Order").  Dkt. 98.[2]

3.    I also respectfully submit this declaration in support of: (i) Lead Plaintiffs' motion for final approval of the proposed plan for allocating the Net Settlement Fund to eligible Spectrum Class Members (the "Plan of Allocation") and (ii) Lead Counsel's motion, on behalf of Plaintiffs' Counsel, for an award of attorneys' fees; payment of Plaintiffs' Counsel's Litigation Expenses in

---

[1] Unless otherwise defined in this declaration, all capitalized terms have the meanings defined in the Stipulation and Agreement of Settlement dated August 27, 2021 (the "Stipulation" or "Settlement Stipulation"), and previously filed with the Court. *See* dkt. 96-1.

[2] Unless otherwise defined, any citation to "Dkt. __" within this declaration is to the docket in *In re Spectrum Brands Securities Litigation*, No. 3:19-cv-347-jdp.

the amount of $326,558.70; and reimbursement of $7,706.95 to Chicago Teachers and $7,965.60 to Cambridge for their costs and expenses directly related to their representation of the Spectrum Class (the "Fee and Expense Application").[3]

4.      The proposed Settlement provides for the resolution of all claims in the Action in exchange for a cash payment of $32 million for the benefit of the Spectrum Class.[4]  This Settlement does not settle or release any claims arising out of purchases of common stock of HRG Group, Inc. ("HRG").  As the Court is aware, the claims asserted by purchasers of HRG common stock during the Class Period, which were once part of this Action and were included in the Prior Settlement that the Court declined to approve in February 2021, have been severed and are now asserted in *Jet Capital Master Fund, L.P. v. HRG Group Inc.*, No. 21-cv-552-jdp (W.D. Wis.) (the "HRG Action").  The parties to the HRG Action have proposed a settlement of that action for $7.25 million, which will be considered independently of this proposed Settlement for $32 million.

---

[3] Lead Plaintiffs and Lead Counsel are concurrently submitting the Memorandum of Law in Support of Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation (the "Settlement Memorandum") and the Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses (the "Fee Memorandum").

[4] The "Spectrum Class" or "Class" consists of all persons or entities that (i) purchased common stock of Old Spectrum from January 26, 2017 to July 13, 2018; and/or (ii) purchased common stock of Spectrum from July 13, 2018 to November 19, 2018 and were damaged thereby (the "Spectrum Class").  Excluded from the Spectrum Class are: (i) Defendants (including Spectrum); (ii) the Immediate Family members of the Individual Defendants; (iii) the Officers and directors of Old Spectrum, Spectrum, and HRG currently and during the period from January 26, 2017 to November 19, 2018 (the "Class Period") and their Immediate Family members; (iv) any entity in which any of the foregoing excluded persons or entities has or had a controlling interest; and (v) the legal representatives, heirs, successors, or assigns of any such excluded person or entity.  Also excluded from the Spectrum Class are any persons and entities that previously submitted a request for exclusion from the settlement class in connection with the Prior Settlement or that exclude themselves by submitting a request for exclusion in connection with this Settlement that is accepted by the Court.

5.      The proposed Settlement provides a considerable benefit to the Spectrum Class by conferring a substantial, certain, and immediate recovery while avoiding the significant risks and expense of continued litigation.  This beneficial Settlement was achieved as a direct result of Lead Plaintiffs' and Lead Counsel's efforts to investigate, prosecute, and aggressively negotiate a settlement of this Action against highly competent opposing counsel.

6.      The benefit that the proposed Settlement will provide to the Spectrum Class is particularly meaningful when considered against the substantial risk that the Spectrum Class might recover significantly less (or nothing) if litigation would have continued through dispositive motions, trial, and any appeals that would likely follow—a process that could last years.  To begin with, there is no guarantee that Lead Plaintiffs could establish Defendants' liability.  While Lead Plaintiffs believe the Action has merit, Defendants argued forcefully that the case should be dismissed at the pleading stage.

7.      Indeed, at the time that the Parties agreed in principle to settle the Action, the Court had not yet decided Defendants' motion to dismiss.  If Defendants' arguments on the motion to dismiss were accepted in all or in part it would have dramatically reduced, or eliminated altogether, the Spectrum Class's potential recovery.  For instance, Defendants argued with conviction that Lead Plaintiffs' allegations failed to give rise to a strong inference that Defendants acted with scienter.  In support of this argument, Defendants argued that (i) Lead Plaintiffs' allegations based on reports from Spectrum former employees did not demonstrate that Defendants were aware of the problems plaguing the consolidation projects and (ii) Defendants readily disclosed the "problems and delays the Company was encountered in implementing the [consolidation] projects."  Defendants had credible arguments that the Amended Class Action Complaint (the "CAC") failed to identify any culpable motive or intent of Defendants.  Had the Court accepted

3

these arguments, the entire case would have been dismissed at the pleading stage and the Class would have recovered nothing.

8.	Moreover, even if the Court sustained all of Lead Plaintiffs' claims at the motion to dismiss stage, there is no guarantee that Lead Plaintiffs or the Spectrum Class could establish Defendants' liability after additional dispositive motions, trial, and any appeals that would likely follow—a process that could last years.  As discussed in more detail below, if this case continued to be litigated, Defendants would have put forth powerful arguments, among other things, that Defendants' statements were not materially false and misleading or that Lead Plaintiffs could not prove that Defendants acted with scienter.

9.	Lead Plaintiffs and the Spectrum Class also faced substantial risk in establishing loss causation and damages.  Defendants put forth substantial arguments that the price declines on Lead Plaintiffs' alleged corrective disclosure dates were not caused solely—or even mostly— by the revelation of the alleged fraud.  Defendants argued that the alleged disclosures included the consolidations among multiple other negative pieces of information that were not attributable to fraudulent conduct.  Through these and other arguments, Defendants would have posed serious challenges to Lead Plaintiffs' ability to recover damages even if Lead Plaintiffs were successful in establishing liability.

10.	Defendants would hold Lead Plaintiffs to their burden of proof on each element of securities fraud, and establishing the Class's claims would involve mustering evidence on multiple complex and hotly contested issues.  There could be no guarantee that Lead Plaintiffs would prevail on these issues at summary judgment, at trial, or on appeal, even if Lead Plaintiffs' claims survived the motion to dismiss.

4

11.     As also discussed in more detail below, the Settlement was achieved as a direct result of extensive efforts by Lead Counsel.  Those efforts included:

i.     Conducting a wide-ranging investigation concerning the allegedly fraudulent misrepresentations and omissions made by Defendants during the Class Period, including reviewing the voluminous public record;

ii.     Drafting the 135-page Amended Class Action Complaint for Violations of the Federal Securities Laws, filed with the Court on July 12, 2019, which incorporated material from SEC filings, press releases, and other public statements issued by Spectrum, news articles and other publicly available sources of information concerning Spectrum, research reports by securities analysts, and transcripts of Spectrum investor calls;

iii.    Opposing Defendants' motion to dismiss the CAC, consisting of more than 250 pages of briefing and supporting documentation, by researching and drafting a 70-page opposition brief responding to Defendants' arguments, which Lead Plaintiffs filed with the Court on October 10, 2019; and

iv.     Consulting with experts and consultants regarding loss-causation and damages issues presented by this Action.

12.     In addition, as part of the initial agreement to settle in 2020, Lead Counsel bargained for the right to conduct due diligence discovery regarding the strengths and weaknesses of the case.  As part of this discovery effort, Spectrum produced to Lead Plaintiffs 72 confidential documents, comprised of more than a thousand pages, that fell roughly into five categories: (1) monthly steering committee presentations and summaries on the progress of the Hardware and Home Improvement ("HHI") consolidation; (2) monthly "President's Reports" with consolidated and individual financial reporting for all of Spectrum's divisions; (3) Monthly Financial Reviews ("MFRs") with financial and status reporting for HHI and Global Auto Care ("GAC"); (4) Annualized Operations Plans ("AOPs") for GAC, which discussed the consolidation of GAC's four distribution centers to a single facility in Dayton, OH during the Class Period; and (5) revised operations plans for GAC during the Class Period, which demonstrated how

management's expectations for GAC's performance changed during the Class Period.  All documents were carefully reviewed by Lead Counsel.

13.    Lead Counsel also engaged in extensive, hard-fought settlement negotiations with Defendants.  These negotiations included participation in two formal mediation processes overseen by Jed D. Melnick, Esq. of JAMS ADR, an experienced and highly respected mediator.  The first of these mediations included the exchange of detailed mediation statements and an all-day formal mediation session on June 3, 2020, and ultimately led to the initial agreement to settle the claims of both the Spectrum Class and HRG Class for $39 million.  The second formal mediation with Mr. Melnick took place in July 2021, after the Court declined to approve the initial settlement and after a separate lead plaintiff was appointed for the HRG Class, but did not reach an agreement on allocation of $39 million among Spectrum and HRG claimants.  Finally, Lead Plaintiff and Defendants continued their arm's-length settlement negotiations and reached an agreement to settle the claims of the Spectrum Class in August 2021, which was based on a mediator's recommendation by Mr. Melnick.  Mr. Melnick has submitted a declaration describing the Parties' mediation efforts and his opinion that the Settlement "is the result of extended good-faith, arm's-length negotiations among the Parties" and is "fair, reasonable, and adequate under all of the circumstances." Declaration of Jed Melnick ("Melnick Decl."), attached hereto as Exhibit 1, at ¶ 12.

14.    The close attention paid, and oversight provided by, Lead Plaintiffs throughout this case is another factor in favor of the reasonableness of the Settlement.  In enacting the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Congress expressly intended to give control over securities class actions to sophisticated investors, and noted that increasing the role of institutional investors in class actions would ultimately benefit shareholders and assist courts

6

by improving the quality of representation in securities class actions. H.R. Conf. Rep. No. 104-369, at *34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733. Here, representatives of Chicago Teachers and Cambridge were actively involved in overseeing the litigation and settlement negotiations. *See* Declaration of Daniel Hurtado submitted by Chicago Teachers (the "Hurtado Decl."), attached as Exhibit 2, at ¶¶ 3-4; Declaration of Francis E. Murphy III submitted by Cambridge (the "Murphy Decl."), attached as Exhibit 3, at ¶¶ 3-4.

15.     In addition to seeking final approval of the Settlement, Lead Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable. As discussed in further detail below, Lead Counsel developed the Plan of Allocation with the assistance of Lead Plaintiffs' experienced damages expert, Chad Coffman of Global Economics Group. The Plan provides for the distribution of the Net Settlement Fund on a *pro rata* basis to Spectrum Class Members who submit Claim Forms that are approved for payment by the Court. Each claimant's share will be calculated based on his, her, their, or its losses attributable to the alleged fraud, similar to what would have been presented at trial if the Action had not been settled and had continued to trial following motions for class certification and summary judgment, and other pretrial motions.

16.     Plaintiffs' Counsel worked diligently and efficiently to achieve the proposed Settlement in the face of significant risk. Plaintiffs' Counsel prosecuted this case on a fully contingent basis and advanced all expenses, and thus bore all the risk of an unfavorable result. For their considerable efforts in prosecuting the case and negotiating the Settlement, Lead Counsel are applying for an award of attorneys' fees for Plaintiffs' Counsel of 15% of the Settlement Fund, net of Court-approved Litigation Expenses and estimated Notice and Administration Costs. The requested fee is well within the range of percentage awards granted by courts in this Circuit and across the country in securities class actions.

7

17.    Lead Counsel's Fee and Expense Application also seeks reimbursement of Lead Plaintiffs' costs and expenses under the PSLRA totaling $15,672.55 ($7,706.95 to Chicago Teachers and $7,965.60 to Cambridge).

18.    For all of the reasons discussed in this declaration and in the accompanying memoranda and declarations, including the quality of the result obtained and the numerous significant litigation risks discussed fully below, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are "fair, reasonable, and adequate" in all respects, and that the Court should approve them under Federal Rule of Civil Procedure 23(e). For similar reasons, and for the additional reasons discussed below, I respectfully submit that Lead Counsel's Fee and Expense Application is also fair and reasonable and should be approved.

## II.    PROSECUTION OF THE ACTION

### A.    Background

19.    This Action asserts claims arising under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") of behalf of investors who purchased Spectrum and Old Spectrum common stock during the period from January 26, 2017 to November 19, 2018 (the "Class Period").

20.    Spectrum is a consumer-goods company that provides products to consumers through retail partners such as Wal-Mart, Home Depot, and Lowe's.

21.    HRG was a holding company that "conduct[ed] its operations principally through its operating subsidiaries," which as of 2017 was primarily comprised of Old Spectrum.

22.    This securities class action involves alleged misrepresentations and omissions by Spectrum, its current and former senior executives, and the members of Spectrum's Board (collectively, "Defendants") concerning Spectrum's critical consolidation efforts, which were

supposed to reduce Spectrum's expenses and working capital, simplify its supply and distribution chains, and improve its customer service and therefore, enhance the Company's profitability.

23. In particular, Lead Plaintiffs allege that throughout the Class Period, Defendants made a series of materially false and misleading statements and omitted material information regarding the progress of Spectrum's consolidation of its supply chain operations. In 2016, Spectrum announced two major initiatives to improve and simplify its supply chain, manufacturing, and distribution: for two of its key business units, it adopted a plan to combine distribution facilities. These were significant efforts that (1) involved combining several facilities around the country in Spectrum's GAC unit into a brand-new location in Dayton, Ohio, and (2) for Spectrum's HHI unit, combining east coast and west coast distribution centers into a centrally located facility in Edgerton, Kansas. These initiatives, when completed, were projected to enhance the Company's efficiency, and thus its profitability.

24. Lead Plaintiffs allege that Spectrum and certain of its executive officers falsely assured investors that the consolidations were proceeding successfully and on schedule or, at most, that any minor issues affecting them were largely "transitory." However, Lead Plaintiffs allege that, in reality, the consolidations were a disaster from the start, and materially impacted the Company's financial performance, destroyed major customer relationships, and significantly harmed management's credibility. Lead Plaintiffs allege that Defendants' misrepresentations and omissions artificially inflated the prices of Spectrum Brand securities during the Class Period, which declined when the truth was revealed to the market through a series of partial corrective disclosures beginning on April 26, 2018 through and including November 19, 2018, the last day of the Class Period.

### B.    Commencement of the Action and Organization of the Case

25.    On March 7, 2019, Plaintiff Earl Wagner commenced the Action with the filing of the first initial complaint in this Court on March 7, 2019. *See In re Spectrum Brands Securities Litigation*, No. 3:19-cv-00178-jdp, dkt. 1. Plaintiff West Palm Beach Firefighters' Pension Fund filed another initial complaint in this Court on April 30, 2019. Dkt. 1.

26.    On May 6, 2019, Plaintiffs Chicago Teachers and Cambridge filed a joint motion for their appointment as lead plaintiffs and approval of their selection of BLB&G as lead counsel under the PSLRA. Dkt. 3. Locals 302 and 612 of the International Union of Operating Engineers-Employers Construction Industry Retirement Trust also filed a motion to serve as lead plaintiffs, but later withdrew that motion on May 10, 2019. *See In re Spectrum Brands Sec. Litig.*, No. 3:19-cv-00178, dkts. 15, 20.

27.    On June 12, 2019, the Court issued an order appointing Chicago Teachers and Cambridge as Lead Plaintiffs (henceforth, "Lead Plaintiffs"), approving their selection of BLB&G as Lead Counsel and Rathje Woodward LLC ("Rathje Woodward") as Liaison Counsel, and consolidating the two related actions.

28.    On June 20, 2019, Lead Plaintiffs and Defendants (collectively, "the Parties") entered a joint stipulated motion to enter a scheduling order for the amended complaint and responsive pleadings. Dkt. 12. The Parties proposed a July 12, 2019 deadline to file the amended complaint and an August 26, 2019 deadline for Defendants to answer or move to dismiss the amended complaint. *Id*.

29.    On June 21, 2019 the Court issued a text-only order largely granting the Parties' stipulated motion, instructing the Clerk of the Court to amend the caption of this Action to read "*In re Spectrum Brands Securities Litigation*," and accepting the Parties' proposed amended complaint and responsive pleading deadlines. Dkt. 13.

30.    The Court instructed the Parties to submit a joint Rule 26(f) report by July 26, 2019 detailing the remainder of the litigation schedule. *Id*.

C.    **Lead Counsel's Investigation and Filing of the Class Action Complaint**

31.    After the Court appointed Lead Plaintiffs and Lead Counsel, Lead Counsel accelerated its already ongoing investigation into their claims and began drafting an amended class action complaint, due on July 12, 2019.

32.    Pursuant to that investigation, Lead Counsel reviewed countless materials authored, issued, or presented by Spectrum, including Spectrum's financial reports, SEC filings, conference call transcripts, registration statements, prospectuses, press releases, investor presentations, and other communications issued publicly during the Class Period and beyond.  Lead Counsel also reviewed every available news article, securities analyst report, and item of market commentary concerning Spectrum issued before, during, and beyond the Class Period in order to gauge the impact of Spectrum's statements on the marketplace.  Given that Spectrum was followed by multiple analysts and that Spectrum's consolidation projected garnered significant analyst and media attention during the Class Period, the volume of these materials was substantial.  Further, Lead Counsel obtained and reviewed Spectrum's permit filings with local authorities concerning the construction of its two new distribution centers.  Lead Counsel also thoroughly researched the role of the supply chain and distribution centers in the consumer goods industry in which Spectrum operated.

33.    Lead Counsel also conducted interviews with dozens of potential witnesses with knowledge of the alleged wrongdoing, who were primarily former Spectrum employees, to form the allegations in the CAC.  The reports of 18 of such witnesses were relied upon in drafting the CAC.

11

34. In addition, Lead Counsel retained Global Economics Group, a preeminent economic consulting firm, to provide analyses relating to loss causation and damages that aided Lead Counsel in drafting the complaint.

35. In addition to this factual research, Lead Counsel thoroughly researched Seventh Circuit law applicable to the claims asserted and Defendants' potential defenses thereto.

36. On July 12, 2019, Lead Plaintiffs filed the 135-page CAC. Dkt. 14. Among other things, the CAC alleged that Spectrum misled investors about the progress of two critical manufacturing and distribution consolidation projects, one for its Hardware and Home Improvement division ("HHI") and the other for its Global Auto Care ("GAC") division. During the Class Period, Defendants repeatedly assured the market that these consolidation projects were "on track" and "progressing smoothly." However, and unbeknownst to the market, these consolidations were, in reality, significantly delayed, which materially affected not only Spectrum's finances but its ability to satisfactorily serve its largest customers, such as Wal-Mart and Home Depot. The CAC alleged that even when Defendants belatedly disclosed some of the issues facing the consolidation projects, they misleadingly assured the market that these issues were merely "transitory" when, in fact, these issues continued to pose a material threat to the Company months after Defendants said they had resolved them. The CAC asserted claims on behalf of purchasers of Spectrum, Old Spectrum, and HRG common stock during the Class Period. The CAC alleged that Defendants' materially false and misleading statements artificially inflated the prices of Spectrum, Old Spectrum, and HRG common stock, which resulted in significant losses to investors when the truth was revealed to the public in a series of corrective disclosures from April 26, 2018 to November 19, 2018. In connection with those allegations, the CAC asserted violations of: (i) Section 10(b) of the Exchange Act, by Spectrum, Old Spectrum, and the

Executive Defendants[5]; and (ii) Section 20(a) of the Exchange Act by HRG and the Executive Defendants.

## D.    Defendants' Motion to Dismiss the Class Action Complaint

37.    On August 26, 2019, Defendants filed a detailed and voluminous motion to dismiss the CAC and supporting papers, consisting of more than 250 pages of briefing, exhibits, and appendix in support of the motion.  Dkts. 21, 22.  Defendants argued that the CAC should be dismissed on numerous grounds, including, among others, the following:

38.    *First,* Defendants argued that the CAC failed to plead scienter.  Defendants first argued that none of the allegations attributable to Lead Plaintiffs' confidential witnesses contain specific facts giving rise to a strong inference of scienter on the part of Spectrum or its officers. Specifically, Defendants argued that nothing in the CAC suggests that the information held by the confidential witnesses (who Defendants describe as "low-level" and "middle management") was in fact in the possession of senior management at the time they made the alleged false statements. Second, Defendants argued that even if Spectrum's officers were in possession of this information, the CAC fails to allege their statements (such as that the consolidation problems were "transitory") were not honestly believed.  Third, Defendants argued that Lead Plaintiffs' scienter allegations were undercut by Spectrum's decision to repurchase $250 million of its own shares in a share buyback during the Class Period.

39.    *Second*, Defendants argued that many of the challenged statements were protected as forward-looking under the "safe harbor" provision of the PSLRA.  Moreover, many of the statements concerned expectations of progress and future developments and were accompanied by

---

[5] The "Executive Defendants" or "Individual Defendants" are Andreas R. Rouvé, David M. Maura, and Douglas L. Martin.

meaningful cautionary language.   Further, Defendants argued that Lead Plaintiffs failed to demonstrate that Defendants had "actual knowledge" that any of their forward-looking statements were false at the time they were made, which would exempt them from the "safe harbor" rule.

40.     *Third*, Defendants argued that many of Lead Plaintiffs' alleged false statements were statements of opinion, which require the plaintiff to show that the opinion statement was both false and the speaker did not honestly believe the statement when he or she made it.

41.     *Fourth*, Defendants argued that many of the statements, such as those describing the Company as making "good" progress on the consolidations, were immaterial as a matter of law *i.e.*, they were "puffery," or the sort of expressions that courts have held that no reasonable investor could rely on them.

42.     *Finally*, Defendants argued that HRG shareholders lacked standing to pursue claims in this matter, as they did not purchase or sell Spectrum shares, and that Lead Plaintiffs did not have standing to pursue the claims of HRG shareholders because they never moved to represent them in accordance with the PSLRA.

43.     On October 10, 2019, Lead Plaintiffs filed a 70-page opposition brief responding to Defendants' motion to dismiss. Dkt. 26.  In their opposition brief, Lead Plaintiffs argued that Defendants fail to challenge Lead Plaintiffs' allegations that despite Defendants' repeated assurances that the consolidations were complete, Spectrum in fact never closed one of the distribution facilities, one which Defendants previously indicated would close pursuant to the HHI consolidation.  Further, Lead Plaintiffs alleged that this distribution center remained open precisely because Spectrum needed to keep it open due to the shortcomings of the consolidations and the Company's inability to successfully operate out of the new distribution centers.  Thus, Defendants'

various statements touting the completion of the consolidation projects were blatantly and plainly false.

44.    Further, the opposition brief argued that Defendants' other falsity-related arguments, such that almost all of Defendants' statements are future projections, opinions, or puffery, are implausible on their face as the consolidations were among the most important, complicated, and strategic initiatives the Company was undertaking during the Class Period.

45.    Regarding Defendants' argument that Lead Plaintiffs failed to sufficiently allege scienter, Lead Plaintiffs argued that the fact that Spectrum did not even complete its consolidations while Defendants repeatedly stated that it did indicated, at a bare minimum, recklessness.  Further, other allegations demonstrated that Defendants were aware of various problems caused by the consolidations which contradicted their public statements.  For example, Spectrum's largest clients fined Spectrum millions of dollars in fees because of late and/or incorrect shipments and even threatened to stop working with Spectrum altogether.  In fact, the consolidations posed such a threat to Spectrum that upon the first corrective disclosure in April 2018, Spectrum fired its long-time CEO (Defendant Rouvé) and GAC's president (Guy Andrysick), demonstrating that top executives were responsible for, and aware of, these problems that were concealed from investors.

46.    In response to Defendants' argument that HRG shareholders lacked standing to sue for false and misleading statements issued by Spectrum, Lead Plaintiffs argued that the Supreme Court has not limited liability to only the issuers of a stock, but to anyone who makes false statements in connection with a purchase or sale of securities.  Lead Plaintiffs asserted that purchasers of pre-Merger HRG stock could properly bring securities-fraud claims against Spectrum and the Executive Defendants (secondary actors as against HRG shareholders), based

15

on the false and misleading statements Defendants made in connection with those purchases. Lead Plaintiffs also argued that the PSLRA notices issued encompassed HRG shareholders.

47.    On November 6, 2019, Defendants filed their reply brief in further support of their motion to dismiss. Dkt. 30. In their reply submission, Defendants reinforced many of the same arguments presented in their opening brief, including that: (i) the CAC failed to allege facts giving rise to a strong inference of scienter; (ii) the CAC failed to allege that certain of Spectrum's statements about its consolidation projects were false; (iii) certain statements were protected by the PSLRA's safe harbor; and (iv) Defendants' statements are non-actionable opinions or vague and optimistic puffery.

48.    Defendants' motion to dismiss was denied without prejudice when Lead Plaintiffs and Defendants agreed to mediate the Action in early 2020 (dkt. 34) and remained in abeyance while Lead Plaintiffs and Defendants reached their initial settlement on behalf of both the Spectrum Class and HRG Class in June 2020 (the "Initial Settlement" or "Prior Settlement"), the approval of the Initial Settlement was considered, the claims of the Spectrum Class and HRG Class were ultimately severed, and separate settlements were reached for the respective classes in August and September 2021. Thus, the motion to dismiss was never adjudicated on its merits.

### E.    Due Diligence Discovery

49.    In connection with the Initial Settlement, Lead Plaintiffs negotiated for and received a selection of highly relevant document discovery from Spectrum, notwithstanding the mandatory PSLRA stay of discovery pending the resolution of the motion to dismiss. Lead Plaintiffs sought this due diligence discovery so that they could better analyze the strengths and weaknesses of the claims in the Action (and confirm the fairness, reasonableness, and adequacy of the proposed settlement) in light of that fact that Lead Plaintiffs had not received any formal

16

discovery from Defendants at time the agreement in principle was reached—although, as discussed above, Lead Plaintiffs had access to and reviewed extensive public materials.

50.     As part of this due diligence discovery, Spectrum produced over a thousand pages of internal Company documentation, including board and financial materials, which were reviewed by Lead Counsel.  The Company documents included (i) monthly steering committee presentations and summaries concerning Spectrum's consolidation of HHI; (ii) monthly "President's Reports" with consolidated and individual financial reporting for all of Spectrum's divisions; (iii) Monthly Financial Reviews ("MFRs") with financial and status reporting for HHI and GAC, including relevant information concerning the status of the consolidations; (iv) Annualized Operations Plans ("AOPs") for GAC, discussing the consolidation of GAC's four distribution centers to a single facility in Dayton, OH; and (v) revised operations plans ("Rev2s") for GAC, which documented management's ever-changing financial projections for GAC.  All documents produced were carefully reviewed by Lead Counsel and analyzed to assess their impact on Lead Plaintiffs' theory of liability and damages.  Lead Counsel concluded that these documents would have offered some support to Defendants' claims that management's views and projections concerning the consolidation projects were honestly held.

## III.    THE PARTIES REACH AN INITIAL SETTLEMENT THROUGH MEDIATION, AND THE COURT DECLINES TO APPROVE THE SETTLEMENT BASED ON THE COMPOSITION OF THE SETTLEMENT CLASS

51.     While Defendants' motion to dismiss the CAC was pending, Lead Counsel and Defendants' Counsel discussed exploring the possibility of settlement through mediation.  The Parties agreed to make the effort and selected Jed D. Melnick of JAMS ADR as mediator and planned for a full-day mediation session to attempt to resolve the Action.

52.     Accordingly, the Parties filed a joint letter with the Court on January 7, 2020, notifying the Court that the Parties had agreed to mediate the Action in March 2020, and

17

respectfully requested that the Court defer a decision on the pending motion to dismiss pending the Parties' mediation. Dkt. 33. In response, the Court denied the motion to dismiss without prejudice and requested that the Parties file a mediation status report with the Court no later than April 15, 2020. Dkt. 34.

53.     On April 9, 2020, the Parties notified the Court that, due to the COVID-19 pandemic, the Parties had postponed the mediation until June 3, 2020. Dkt. 37. Further, the Parties respectfully requested that the Court extend the mediation status report deadline to June 15, 2020. *Id*.

54.     On June 3, 2020 the Parties participated in a full-day mediation session conducted by Mr. Melnick. Prior to the mediation, the Parties submitted detailed mediation statements, including an opening Mediation Statement from Lead Plaintiffs with detailed information about Lead Plaintiffs' class damages including analysis provided by Lead Plaintiffs' damages expert; a responsive mediation statement from Defendants, with Defendants' own expert analysis of class damages and critique of Lead Plaintiffs expert's analysis; and a reply mediation statement that responded to Defendants' arguments. The participants in the mediation, which was held by videoconference, included Lead Counsel; representatives from both Lead Plaintiffs; both the General Counsel and an additional in-house attorney for Spectrum; the outside counsel for Spectrum and the Executive Defendants, Paul Weiss Rifkind & Garland LLP ("Paul Weiss"); and representatives from Spectrum's directors' and officers' liability insurance carriers. During the mediation session, each side discussed liability and damages with the Mediator and with each other. Although the Parties engaged in significant discussions and negotiations, they were unable to reach agreement by the end of the mediation session.

18

55.    Over the course of the next few weeks, however, Mr. Melnick continued to explore the possibility of settlement through multiple follow-up discussions with the Parties.  In late June 2020, Mr. Melnick made a Mediator's recommendation that the Parties settle the Action for $39,000,000.    The Parties subsequently accepted the Mediator's recommendation and memorialized their agreement in a term sheet executed on June 24, 2020.

56.    On August 10, 2020, after Lead Counsel had completed the due diligence discovery discussed above, the Parties executed a Stipulation and Agreement of Settlement (dkt. 44-1), which embodied the final terms of the Prior Settlement.  The Prior Settlement provided for payment of $39 million on behalf of a settlement class that included purchasers of Spectrum, Old Spectrum, and HRG common stock during the Class Period.

57.    On the same day, Lead Plaintiffs filed their motion for preliminary approval of the Prior Settlement.  Dkt. 44.  The Court granted that motion on September 29, 2020 (dtk. 48) and Lead Plaintiffs thereafter filed their motion for final approval of the Prior Settlement on December 24, 2020.  Dkts. 49, 50, 53.  The proposed Plan of Allocation submitted by Lead Plaintiffs in connection with the Prior Settlement included provisions that provided for payment of portions of the settlement fund to purchasers of Spectrum, Old Spectrum, and HRG common stock, but included a 75% discount on the claims related to purchases of HRG common stock, which Lead Plaintiffs believed was appropriate to account for the comparatively higher risk of the HRG claims, including the risk that HRG purchasers might be found to lack standing.

58.    On January 8, 2021, Jet Capital Master Fund LP ("Jet Capital"), an investor that had purchased HRG common stock during the Class Period, and certain related entities, filed an objection to the Prior Settlement and a motion to intervene.  Dkts. 54, 55, 57. Jet Capital objected to the proposed Plan of Allocation that Lead Plaintiffs had put forward in connection with the

19

Prior Settlement and, specifically, to the 75% discount for HRG claims, arguing that the discount was arbitrary, unreasonable, and unfair to HRG claimants. Lead Plaintiffs responded to Jet Capital's objection (dkts. 63-64), and both Lead Plaintiffs and Jet Capital submitted further papers in connection with Jet Capital's objection and motion to intervene (dkts. 66-73).

59.    On February 6, 2021, the Court entered an Order denying without prejudice Lead Plaintiffs' motion for final approval of the Prior Settlement. Dkt. 74. The Court found that purchasers of HRG common stock had not received adequate notice of the Action because the notice published pursuant to the PSLRA at the outset of the case did not include the claims of HRG stock purchasers and that Lead Plaintiffs were not adequate representatives of HRG stock purchasers. *Id*. at 4-6. The Court provided Lead Plaintiffs with two options to cure these issues: either (a) publish a new PSLRA notice for the claims of the HRG class members, and the Court would then choose an additional lead plaintiff to represent the HRG purchasers under the PSLRA; or (b) exclude the claims of the HRG stock purchasers from the class and allow them to file a separate lawsuit if they wished. *Id*. at 7.

60.    Lead Plaintiffs recognized that if they decided to dismiss the claims on behalf of HRG shareholders at that time, HRG shareholders would be unable to assert class claims going forward due to the applicable two-year statute of limitations. Under those circumstances, the vast majority (or all) of HRG shareholders would be unable to recover any compensation for their Spectrum-related losses. If Lead Plaintiffs instead maintained the HRG Claims as a separate class and sought the appointment of separate lead plaintiffs, those class claims could be preserved for the benefit of HRG shareholders. Accordingly, on February 19, 2021, Lead Plaintiffs submitted a proposed plan to the Court to divide the putative class into separate subclasses of Spectrum

20

investors and HRG investors, and to provide a notice soliciting an additional lead plaintiff to represent the HRG Class.  Dkt. 75.

61.     On April 2, 2021, following approval by the Court (dkt. 76), Lead Plaintiffs issued the new PSLRA notice via the *PR Newswire* addressed to purchasers of HRG common stock during the Class Period.

62.     On May 26, 2021, Jet Capital filed an unopposed motion to serve as lead plaintiff for the HRG Class.  Dkts. 77-80.  On June 10, 2021, the Court granted the motion of Jet Capital to serve as lead plaintiff for the HRG Class.  Dkt. 85.

## IV.     LEAD PLAINTIFFS AND DEFENDANTS REACH A SETTLEMENT OF CLAIMS OF THE SPECTRUM CLASS, AND THE COURT SEVERS THE CLAIMS OF THE SPECTRUM CLASS AND HRG CLASS

63.     Lead Plaintiffs, Defendants, and Jet Capital engaged in mediation before Jed Melnick, Esq. in an effort to reach a settlement on behalf of both the Spectrum Class and the HRG Class, which included a formal mediation session on July 22, 2021.  In advance of the mediation, the Parties and Jet Capital exchanged mediation statements setting forth their views on relative risks of liability and damages as to the Spectrum Class and the HRG Class.  Participants in the mediation, which was held by videoconference, included Lead Counsel, representatives of both Lead Plaintiffs, Jet Capital's counsel, and Defendants' Counsel.  At the mediation, Lead Plaintiffs, Defendants, and Jet Capital sought to negotiate a mutually acceptable allocation of the $39,000,000 in settlement consideration that had previously been agreed.  They were unsuccessful that day.

64.     Thereafter, following additional settlement discussions between Lead Plaintiffs and Defendants overseen by Mr. Melnick, Mr. Melnick made a mediator's recommendation that Lead Plaintiffs and Defendants settle the Action for $32 million with respect to the Spectrum Class only (the "Settlement").  The Parties accepted this recommendation and their agreement

was memorialized in a term sheet executed on August 3, 2021. On August 4, 2021, Lead Plaintiffs and Defendants filed a Joint Status Report which advised the Court of their proposed Settlement. Dkt. 88.

65.    On August 6, 2021, the Court entered an Order asking the Parties to show cause why the claims of the Spectrum and HRG subclasses should not be severed in accordance with Federal Rule of Civil Procedure 42 so that the claims of each subclass could be resolved separately. Dkt. 89. On August 20, 2021, Lead Plaintiffs, Jet Capital, and Defendants filed a response to the Court's August 6, 2021 Order agreeing that severance of the claims of the Spectrum Class and HRG Class was appropriate. Dkt. 90. On August 23, 2021, the Court entered an Order requesting that the parties file a proposed severance order identifying the claims and parties to be included in each case (dkt. 93), which the parties submitted on August 25, 2021 (dkt. 94).

66.    On August 27, 2021, the Court entered an order severing the claims of the Spectrum Class from the claims of the HRG Class and allowing the two sets of claims to proceed independently. Dk. 95. The severance order provided that the claims on behalf of all persons and entities that (i) purchased common stock of Old Spectrum from January 26, 2017, through July 13, 2018; and/or (ii) purchased common stock of Spectrum from July 13, 2018, through November 19, 2018, which are led by Lead Plaintiffs, would proceed in the existing action, No. 19-cv-347-jdp (the "Action" or "Spectrum Action"). The claims of the persons or entities that purchased common stock of HRG Group, Inc. from January 26, 2017, through July 13, 2018, which are led by Jet Capital, were transferred to a separate action, *Jet Capital Master Fund, L.P. v. HRG Group Inc.*, No. 21-cv-552-jdp (W.D. Wis.) (the "HRG Action").

22

67.    Also on August 27, 2021, Lead Plaintiffs and Defendants entered into the Stipulation and Agreement of Settlement, which sets forth the terms and conditions of the $32 million Settlement for the Spectrum Class, which, if approved, will fully resolve the Spectrum Action.  Dkt. 96-1.  On August 30, 2021, Lead Plaintiffs filed an unopposed motion for preliminary approval of the Settlement.  Dkts. 96-97.

68.    On November 17, 2021, the Court preliminarily approved the Settlement, authorized that notice of the Settlement be disseminated to potential Spectrum Class Members, and scheduled the Settlement Fairness Hearing for March 18, 2022 to consider whether to grant final approval of the Settlement.  Dkt. 98.

69.    Separately, on September 20, 2021, Jet Capital and Defendants reached an agreement to settle the HRG Action on behalf of the HRG Class for $7.25 million (the "HRG Settlement").  On November 17, 2021, the Court also preliminarily approved the HRG Settlement and scheduled a hearing on approval of the HRG Settlement for the same date and time as the hearing on approval of the Settlement in this Action.

## V.    RISKS OF CONTINUED LITIGATION

70.    The Settlement provides an immediate and certain benefit to the Spectrum Class in the form of a $32 million cash payment.  While Lead Plaintiffs believe that their allegations are meritorious and that Lead Counsel have substantial arguments in response to Defendants' contentions, there was significant risk that either this Court at the motion to dismiss or summary judgment stage, or a jury at trial, could accept Defendants' arguments.  The benefit that the proposed Settlement will provide to the Spectrum Class is particularly meaningful when considered against the substantial risk that the Spectrum Class might recover significantly less (or nothing) if litigation would have continued through dispositive motions, trial, and any appeals that would likely follow—a process that could last years.

23

### A.   The General Risks of Prosecuting Securities Actions

71.     In recent years, securities class actions have become riskier and more difficult to prove, given changes in the law, including numerous United States Supreme Court decisions.  In fact, well-known economic consulting firm NERA noted that "dismissals [have] accounted for most of the case resolutions in [2019]" with "more than two-thirds of the cases resolved in favor of the defendant, with no payment made to plaintiffs." Janeen McIntosh, *et al.*, *Recent Trends in Securities Class Action Litigation: 2019 Full-Year Review*, NERA Economic Consulting (2020), at 10.

72.     Even when they have survived motions to dismiss, securities class actions are increasingly dismissed at the class certification stage, in connection with *Daubert* motions or at summary judgment.  For example, class certification has been denied in several recent securities class actions.  *See, e.g., In re Northfield Labs., Inc. Sec. Litig.*, 267 F.R.D. 536, 549 (N.D. Ill. May 18, 2010); *Colman v. Theranos, Inc.*, 325 F.R.D. 629, 651 (N.D. Cal. 2018); *Gordon v. Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193 (S.D.N.Y. 2015).

73.     Further, multiple securities class actions also recently have been dismissed at the summary judgment stage.  *See, e.g., Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 735 F. Supp. 2d 856, 928 (N.D. Ill. Aug. 13, 2010) (granting in large part defendants' motion for summary judgment); *Levie v. Sears Roebuck & Co.*, 676 F. Supp. 2d 680, 689-90 (N.D. Ill. Dec. 18, 2009); *Fosbre v. Las Vegas Sands Corp.*, 2017 WL 55878 (D. Nev. Jan. 3, 2017), *aff'd sub nom. Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, 732 F. App'x 543 (9th Cir. 2018); *In re Barclays Bank PLC Sec. Litig.*, 2017 WL 4082305 (S.D.N.Y. Sep. 13, 2017), *aff'd* 756 F. App'x 41 (2d Cir. 2018).  And even cases that have survived summary judgment have been dismissed prior to trial in connection with *Daubert* motions.  *See Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston,* 853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd* 752

24

F.3d 82 (1st Cir. 2014) (granting summary judgment *sua sponte* in favor of defendants after finding that plaintiffs' expert was unreliable).

74.    Even when securities-class-action plaintiffs are successful in moving for class certification, prevailing at summary judgment, and overcoming *Daubert* motions and have gone to trial, there are still real risks that there will be no recovery or substantially less recovery for class members than in a settlement.  For example, in *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, a jury rendered a verdict in plaintiffs' favor on liability in 2010.  *See* 2011 WL 1585605, at \*6 (S.D. Fla. Apr. 25, 2011).  In 2011, the district court granted defendants' motion for judgment as a matter of law and entered judgment in favor of defendants on all claims.  *See id.* at \*38.  In 2012, the Eleventh Circuit affirmed the district court's ruling, finding that there was insufficient evidence to support a finding of loss causation.  *See Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 725 (11th Cir. 2012).

75.    There is also an increasing risk that an intervening change in the law can result in the dismissal of a case after significant effort has been expended.  The Supreme Court has heard several securities cases in recent years, often announcing holdings that dramatically changed the law in the midst of long-running cases.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014); *Comcast Corp. v Behrend*, 569 U.S. 27 (2013); *Janus Cap. Grp. v. First Derivative Traders*, 564 U.S. 135 (2011); *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010).  As a result, many cases have been lost after thousands of hours had been invested in briefing and discovery.  For example, in *In re Vivendi Universal, S.A. Securities Litigation*, after a verdict for class plaintiffs finding that Vivendi acted recklessly with respect to 57 statements, the district

25

court granted judgment for defendants following the change in the law announced in *Morrison*.
*See* 765 F. Supp. 2d 512, 524, 533 (S.D.N.Y. 2011).

76.    In sum, securities class actions face serious risks of dismissal and nonrecovery at all stages of the litigation.

**B.    The Substantial Risks in Proving Defendants' Liability**

77.    Here, Lead Plaintiffs faced substantial risks that the Court would find that they failed to establish Defendants' liability in this case, either at the motion to dismiss or, after substantial expensive discovery, at summary judgment.

**1.    The Risks of Proving False or Misleading Statements or Omissions**

78.    In their motion to dismiss the CAC, Defendants vigorously argued that Lead Plaintiffs did not adequately plead any actionable false or misleading statements or omissions. As discussed above, Lead Plaintiffs allege in the Action that the Company's statements were misleading because they failed to disclose that Spectrum's consolidations were suffering significant delays and setbacks which were having a material effect on the Company's finances and customer relationships.

79.    However, Defendants argued that the CAC failed to allege that many of Spectrum's statements were verifiably false. Notably, Defendants argued in their motion to dismiss that the CAC did not adequately plead that Lead Plaintiffs' key alleged false or misleading statements concerning the consolidations' progress and milestones, such as that the HHI distribution center was "receiving product" in early March 2017, were in fact untrue. Dkt. 21 at 25. Additionally, Defendants argued that the CAC failed to allege the falsity of a second group of Spectrum's alleged false statements: those concerning the challenges experienced at the Dayton and Edgerton distribution centers after the purported completion of the consolidations. Dkt. 21 at 26. Specifically, Defendants argued that the issues facing the consolidation projects were, in fact,

26

"temporary" and "transitory," as both facilities were running at normal capacity by the end of 2018, or the end of the Class Period. *Id.*

80.    Further, Defendants have argued that many of their purported affirmative misstatements were either (i) non-actionable opinions; (ii) forwarding-looking statements that fall within the PSLRA's safe harbor provision; and/or (iii) puffery. Dkt. 21 at 32-43. For example, Defendants argued that certain key alleged false statements, such as Defendants' statements describing the consolidation projects as "progressing smoothly," were optimistic opinions that Lead Plaintiffs failed to show were false under any of the three *Omnicare* prongs. *Id.* at 33-39. Similarly, Defendants argued that many of these same statements, alongside other alleged misstatements about the "transitory" nature of the problems facing the consolidations, constituted puffery, or statements that no reasonable investor would rely on. *Id.* at 39-43. For these reasons, there was a real risk here that, had the litigation continued, the Court or a jury could have found that Defendants' alleged misstatements and omissions did not trigger liability under the securities laws.

81.    Further, Defendants have argued, and would continue to argue, that discovery would significantly undermine Lead Plaintiffs' allegations. For example, Defendants would argue that Lead Plaintiffs significantly overstated the issues plaguing the HHI consolidation. More specifically, Defendants argued that a key factual allegation in the CAC, *i.e.*, that Spectrum never closed one of its distribution centers in Mira Loma, California, was based upon a factual misunderstanding. Defendants would argue and attempt to prove that Spectrum had exited the Mira Loma distribution center in December 2017 as originally planned. Defendants also alleged that many of Lead Plaintiffs' specific allegations, such as those concerning the specific shipping

27

lead times and backlogs, were materially overstated and would weigh against a Court or jury finding of falsity.

82.    Second, and similarly, Defendants would argue that Lead Plaintiffs failed to adequately allege that Defendants made false or misleading statements about the GAC consolidation or the Company's decision to sell the GAC Division.  Specifically, Defendants have argued that discovery would show that, despite Lead Plaintiffs' allegations that, among other things, Spectrum did not install "racking" (which Lead Plaintiffs alleged was key infrastructure for a distribution center) until very late or even after the Class Period, the Company had in fact installed the infrastructure necessary for a distribution center.  Defendants were therefore expected to argue that it was simply a dispute between the Parties as to how much infrastructure was foreseeably necessary to make their public statements not misleading.

83.    Moreover, Lead Counsel expected Defendants to dispute Lead Plaintiffs' allegation that the problems with the GAC consolidation were severe enough to cause Spectrum to sell the entire division.  Instead, Defendants have and would continue to argue that the decision to sell GAC was driven by the financial needs of the Company and a reevaluation of GAC's long-term financial prospects, rather than because of short-term issues with the consolidation.

### 2.    The Risks of Proving Scienter

84.    Even if Lead Plaintiffs were able to establish a material misrepresentation or omission, they faced significant hurdles in proving scienter, or intent to defraud.  Proving scienter in this case would have been difficult for several reasons.

85.    *First*, at the motion-to-dismiss stage, Defendants had significant challenges to the CAC's scienter allegations that relied on statements from former employees of Spectrum.  Lead Plaintiffs alleged that these employee statements established that the Executive Defendants were personally aware of the issues plaguing the consolidations and knew that their statements about

28

the Company's progress in executing the consolidations were misleading.  However, Defendants argued that these statements did not give rise to a strong inference of scienter because (i) Lead Plaintiffs failed to sufficiently allege that the information possessed by these "low-level and middle management" employees was also in the possession of senior management; and (ii) even if senior management was aware of these issues, the allegations did not raise an inference that senior management did not honestly believe that progress on the consolidations was "good" or that these issues were "short term" and "transitory." Defendants argued that even if Lead Plaintiffs' allegations were true and even if this information was communicated to Defendants, that still would not demonstrate that Defendants did not believe their statements about the progress of the consolidations as of the dates they made their statements.  Dkt. 30 at 6.

86.     *Second*, Defendants argued that many of the witness allegations did not support an inference of scienter because of their indefiniteness as to time.  Defendants stated that 38 such allegations were silent about when such events were to have occurred.  Dkt. 30 at 7.  Defendants cross referenced each confidential witness's allegations against Defendants' statements during the same period and argued that the confidential witness allegations did not demonstrate that Defendants were aware of underlying information.  Dkt. 30 at 7-12.

87.     *Finally*, Defendants contended that Spectrum's decision to repurchase more than $250 million of its own shares during the Class Period "completely refut[es] the notion it was attempting to mislead the market and improperly inflate its share price" as "it makes 'no economic sense for a company to buy back its stock at a price it knows to be inflated.'" Dkt. 21 at 2-3.  For these reasons, there was a real risk that had litigation continued, the Court or a jury could have found that the CAC failed to plead facts giving rise to a strong inference that the Executive Defendants acted with scienter, which would have resulted in the complete dismissal of the Action.

29

88.    During the Parties' mediations, Defendants had levied further forceful attacks on Lead Plaintiffs' scienter allegations and would have continued to do so through discovery and trial. For example, Defendants argued that discovery would indicate that the Executive Defendants' statements about the consolidation projects were honestly believed. More specifically, Defendants argued that Spectrum's internal documents accounting for the material effects of the consolidation projects setbacks demonstrate that management's views were honestly held and that the businesses simply performed more poorly than expected.

### 3.    The Risk of Proving Control

89.    Defendants further argued that Lead Plaintiffs would be unable to prove that HRG controlled Spectrum, which would defeat Lead Plaintiffs' claim against HRG. The CAC alleged that HRG, as the majority shareholder in Spectrum, exercised control over Spectrum Brands—and that this control was not only evident through Spectrum's own public disclosures, but also by the intertwinement of the companies' boards of directors and executive personnel. The CAC alleged that because HRG exercised control over Spectrum when Spectrum made many of its materially false and misleading statements, HRG was also liable as a control person of Spectrum under Section 20(a) of the Exchange Act.

90.    Defendants argued that control-person liability required Lead Plaintiffs to show that HRG both (i) actually participated in, that is, exercised control over Spectrum and (ii) possessed the power or ability to control the specific transaction or activity upon with the primary violation was predicated. Defendants argued that Lead Plaintiffs provided no non-conclusory evidence that HRG exercised any such control. Further, Defendants argued that Lead Plaintiffs would be unable to establish control-person liability because the CAC failed to plead a primary violation of Section 10(b). Dkt. 21 at 52.

30

C.    **The Risks of Establishing Loss Causation and Damages**

91.    Even if Lead Plaintiffs overcame each of the above-described risks and successfully established falsity, materiality, and scienter, they faced serious risks in proving that the revelation of the truth about Defendants' false and misleading statements caused the declines in the prices of Spectrum stock (*i.e.*, "loss causation"), and establishing the amount of class-wide damages. Lead Counsel expected to face multiple significant arguments challenging loss causation and damages in this case if the Court sustained the CAC. Specifically, Lead Counsel expected Defendants to argue, among other significant challenges, that (i) Lead Plaintiffs failed to account for the confounding information introduced to the market on the same day as the alleged corrective events; (ii) Lead Plaintiffs' putative class could not be certified as proposed; and (iii) under basic economic principles, certain of the alleged corrective events could not have driven the stock price down.

92.    *First*, Defendants have argued, and would continue to argue, that Lead Plaintiffs failed to account for confounding information in their damages analysis—which assumed that 100% of the price decline on each of the alleged corrective disclosure dates was attributable to the purported misstatements concerning the consolidation projects. Specifically, Defendants argued, and would continue to argue, that nearly half of the stock price decline on both of the corrective disclosures dates was attributable to negative information concerning Spectrum's *other* business units, Pet and Home & Garden. Defendants further argued the stock price decline was attributable to Spectrum's EBITDA (Earnings Before Interest, Tax, Depreciation, and Amortization) shortfall (relative to prior estimates), and that in each of the corrective disclosures GAC and HHI accounted for 55% or less of the EBITDA shortfall. Defendants also argued that, even within GAC and HHI, a portion of the EBITDA shortfall attributable to GAC and HHI were attributable to disclosed factors unrelated to the consolidation projects, such as competitive pressures, raw materials costs,

31

and general market demand.  If Defendants were successful on this disaggregation argument alone, class-wide damages would be cut by more than 50%.

93.    *Second*, Defendants would argue that Lead Plaintiffs' proposed 23-month Class Period was overbroad and would be limited to the first third of 2018.  Specifically, Defendants had contended that alleged misstatements about the consolidations in 2017—when they had just been announced and were in their early planning stages—could not be proven false or misleading given the limited expectations for their progress during that time.  Defendants further argued that the Class Period would have had to end with the alleged April 2018 corrective disclosure, when Spectrum and the Executive Defendants first disclosed serious problems with the consolidations and announced the termination of Defendant CEO Rouvé.

94.    *Finally*, Defendants had argued that the Class Period would be shortened for another reason.  The November 19, 2018 disclosure largely addressed issues with the GAC consolidation, rather than the HHI consolidation.  However, four days before the disclosure, Spectrum had announced the sale of GAC to Energizer.  Therefore, Defendants argued that investors would have been aware that GAC's future financial performance would have no impact on the value of Spectrum as an ongoing financial enterprise.  Thus, Defendants would argue with some force that any resulting stock price decline could not be attributed to the alleged fraud and the Class Period must end in April 2018.

95.    There was a significant and credible risk that this Court or a jury—after many months of expensive discovery—could accept any one or all of these arguments, much less the numerous other challenges Defendants had posed to Lead Plaintiffs' damages model, which as discussed above posed a serious risk in this case.  If Defendants' arguments for disaggregation of damages were accepted—even if all other liability and damages issues were decided in the Class's

32

favor—Lead Counsel's expert calculated that maximum recoverable damages for the Spectrum Class would be approximately $300 million. If the Court or a jury were to also accept certain of Defendants' additional arguments concerning loss causation and damages detailed above, damages for the Spectrum Class would have been reduced to as little as $68.3 million. Defendants submitted an expert analysis in conjunction with the Parties' mediation presenting additional methodological critiques of Lead Plaintiffs' damages model in addition to those detailed above. Defendants' expert analysis concluded that, even assuming a full Plaintiffs' victory on liability for Spectrum shareholders, recoverable damages for the Spectrum Class would be as low as $6.2 million.

### D. The Risks of a Second-Phase Trial on Individual Class Members' Reliance

96.    Complex securities-class-action trials are almost always bifurcated into two phases: a first phase adjudicating class-wide issues of liability, class-wide reliance, and damages per share, followed by a second phase, in which Defendants may attempt to rebut the presumption of reliance on their statements with respect to individual Class Members. *See, e.g.*, *Vivendi*, 765 F. Supp. 2d at 584-85 & n.63 (collecting cases); *Jaffe Pension Plan v. Household Int'l, Inc.*, 756 F. Supp. 2d 928, 930 (N.D. Ill. 2010); *In re JDS Uniphase Sec. Litig.*, No. 02 Civ. 1486 (Dkt.1504) (N.D. Cal. Sept. 25, 2007); *In re WorldCom Inc. Sec. Litig.*, 2005 WL 408137, at *2 (S.D.N.Y. Feb. 22, 2005). Thus, even if Lead Plaintiffs overcame the motion to dismiss and then prevailed in the first phase of a trial in this Action, the Class would still face significant risks and certain delay with respect to second-phase proceedings. As part of these proceedings, Defendants are typically entitled to take discovery with respect to individual Class Members' decisions to transact in Spectrum securities—a process which, in itself, is time-consuming and burdensome. *See, e.g.*, *Jaffe*, 756 F. Supp. 2d at 930 (Phase II reserved for "defendant's rebuttal of the presumption of reliance as to particular individuals as well as the calculation of damages as to each plaintiff").

33

Defendants may then attempt to reduce the judgment by arguing that some individual Spectrum Class Members failed to rely on their false statements.

97.    The plaintiff class's experience in *Vivendi* highlights the risks inherent in post-liability phase proceedings.  In January 2010, a jury returned a verdict for the plaintiff class, finding that *Vivendi* had acted recklessly in making 57 false or misleading statements that omitted the company's liquidity risk.  *See* 765 F. Supp. 2d at 520-21, 524.  In subsequent proceedings, five years after the jury verdict, Defendants successfully challenged reliance on the part of several large institutional investors.  For example, the *Vivendi* defendants reduced just one class member's $53 million recovery to zero through post-trial proceedings focused on reliance.  *See In re Vivendi, S.A. Sec. Litig.*, 123 F. Supp. 3d 424, 438 (S.D.N.Y. 2015).

**E.    The Risk of Appeal**

98.    Even if Lead Plaintiffs prevailed on the motion to dismiss the Complaint, and then after continued prosecution of their claims at summary judgment and at trial, Defendants would likely have appealed a favorable judgment for Lead Plaintiffs, leading to many additional months, if not years, of further litigation.  On appeal, Defendants would have renewed their host of arguments as to why Lead Plaintiffs failed to establish liability, loss causation, and damages, thereby exposing Lead Plaintiffs to the risk of having any favorable judgment reversed or reduced below the Settlement Amount.

99.    The risk that even a successful trial verdict could be overturned on a post-trial motion or appeal is real in securities-fraud class actions.  *See, e.g.*, *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) (reversing and remanding jury verdict of $2.46 billion after 13 years of litigation); *In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050 (N.D. Cal. June 19, 2008)(granting summary judgment to defendants after eight years of litigation), *aff'd*, 627 F.3d 376 (9th Cir. 2010); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997)

34

(reversing $81 million jury verdict after 19-day trial and dismissing case with prejudice); *Anixter v. Home-Stake Prod. Co*., 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *In re Apple Comput. Sec. Litig*., 1991 WL 238298 (N.D. Cal. Sept. 6, 1991) (vacating $100 million jury verdict on post-trial motions).

*    *    *

100.    Based on all the factors summarized above, Lead Plaintiffs and Lead Counsel respectfully submit that it was in the best interest of the Spectrum Class to accept the immediate and substantial benefit conferred by the $32 million Settlement, instead of incurring the significant risk that the Spectrum Class would recover a lesser amount, or nothing at all, after several additional years of arduous litigation, even assuming that they obtained a favorable ruling on the motion to dismiss. Indeed, the Parties were deeply divided on several key factual issues central to the litigation, and there was no guarantee that Lead Plaintiffs' positions on these issues would prevail on the motion to dismiss or, later, at class certification, summary judgment, or trial. If Defendants had succeeded on any of their substantial defenses, Lead Plaintiffs and the Spectrum Class would have recovered nothing at all or, at best, might have recovered far less than the Settlement Amount.

## VI.    LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

101.    The Court's Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Litigation Expenses (the "Notice") and Proof of Claim and Release Form ("Claim Form") be disseminated to the Spectrum Class. The Preliminary Approval Order also set a February 22, 2022 deadline for Spectrum Class Members to submit objections to

the Settlement, the Plan of Allocation, or the Fee and Expense Application, or to request exclusion from the Spectrum Class, and set the Settlement Fairness Hearing for March 18, 2022.

102.    In accordance with the Preliminary Approval Order, Lead Counsel instructed JND Legal Administration ("JND"), the Court-approved Claims Administrator, to disseminate copies of the Notice and the Claim Form by mail and to publish the Summary Notice.  The Notice contains, among other things, (i) a description of the Action and the Settlement; (ii) the terms of the proposed Plan of Allocation; (iii) an explanation of Spectrum Class Members' right to participate in the Settlement; and (iv) an explanation of Spectrum Class Members' rights to object to the Settlement, the Plan of Allocation, or the Fee and Expense Application, or exclude themselves from the Spectrum Class.  *See* Declaration of Luiggy Segura Regarding (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date and Estimated Notice and Administration Costs (the "Segura Decl."), attached as Exhibit 4.  The Notice also informs Spectrum Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 15% of the Settlement Fund and for payment of Litigation Expenses in an amount not to exceed $400,000. Segura Decl., Ex. A. at ¶¶ 5, 79.[6] The Notice also informed Spectrum Class Members of an additional opportunity to submit claims to participate in the Settlement by January 25, 2022, but informed them that they did not need to submit a claim if they had already submitted one in connection with the Prior Settlement.

103.    JND mailed copies of the Notice and Claim Form (the "Notice Packet") to the same group of potential settlement class members that had been identified in connection with the mailing

---

[6] For the sake of brevity, going forward this declaration will refer to the Notice as a standalone document (*i.e.*, "Notice ¶ __").

of notice of the Prior Settlement. Segura Decl. ¶¶ 2-3, 5. In addition, JND also mailed a copy of the Notice Packet to any claimants whose claims submitted in connection with the Prior Settlement included purchases of Spectrum or Old Spectrum common stock during the Class Period and who were not already on JND's mailing list. *Id.* ¶ 5.

104.    On December 9, 2021, JND disseminated 85,663 copies of the Notice Packet to potential Spectrum Class Members and nominees by first-class mail. *See* Segura Decl. ¶ 5. Through February 4, 2022, JND disseminated a total of 90,589 copies of the Notice Packet. *Id.* ¶ 8.

105.    On December 21, 2021, in accordance with the Preliminary Approval Order, JND caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted over the *PR Newswire*. *Id.* ¶ 9.

106.    Lead Counsel also caused JND to update the dedicated Settlement website, www.SpectrumBrandsSecuritiesLitigation.com, with information concerning the new Settlement and to provide potential Spectrum Class Members with access to downloadable copies of the Notice and Claim Form, as well as copies of the Settlement Stipulation, Preliminary Approval Order, and Complaint. *Id.* ¶ 11. The Settlement website also allowed for Spectrum Class Members to submit their claim at the site instead of sending one via mail. *Id.*

107.    As noted above, the deadline for Spectrum Class Members to file objections to the Settlement, the Plan of Allocation, and the Fee and Expense Application, or to request exclusion from the Spectrum Class, is February 22, 2022. To date, no objections to the Settlement, the Plan of Allocation, or Fee and Expense Application have been received, and no additional requests for exclusion have been received. *See* Segura Decl. ¶ 12. Lead Counsel will file reply papers on or

before March 4, 2022, after the deadline for submitting objections and requests for exclusion has passed, which will address any objections or requests for exclusion received.

## VII.    ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

108.    In accordance with the Preliminary Approval Order, and as described in the Notice, all Spectrum Class Members who want to participate in the distribution of the Net Settlement Fund (i.e., the Settlement Fund less (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court; (iv) any attorneys' fees awarded by the Court; and (v) any other costs or fees approved by the Court) must submit a valid Claim Form with all required information postmarked or submitted online no later than January 25, 2022.  Class Members were also informed that if they had previously submitted a Claim Form in connection with the earlier proposed settlement, they did need to do so again, and that their earlier Claim Form would be considered for participation in the Settlement.

109.    As described in the Notice, the Net Settlement Fund will be distributed among eligible Spectrum Class Members according to a plan of allocation approved by the Court.

110.    Lead Plaintiffs' damages expert developed the proposed plan of allocation (the "Plan of Allocation") in consultation with Lead Counsel.  Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Spectrum Class Members who suffered losses as a result of the conduct alleged in the CAC.

111.    The Plan of Allocation is set forth in the mailed Notice.  *See* Notice ¶¶ 57-78.  As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Class Members might have been able to recover at trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. Notice ¶ 57.  Instead, the calculations under the Plan are only a method to weigh the claims of

38

Claimants against one another for the purposes of making an equitable allocation of the Net Settlement Fund. *Id.*

112. In developing the Plan of Allocation, Lead Plaintiffs' damages expert calculated the estimated amount of artificial inflation in the per share closing prices of Spectrum and Old Spectrum common stock allegedly caused by Defendants' alleged false and misleading statements and material omissions. Notice ¶ 58. In calculating the estimated artificial inflation allegedly caused by Defendants' alleged misrepresentations and omissions, Lead Plaintiffs' damages expert considered price changes in the stock in reaction to the public disclosures allegedly revealing the truth concerning Defendants' alleged misrepresentations and material omissions, adjusting for price changes that were attributable to market or industry forces. *Id.*

113. The Plan calculates a "Recognized Loss Amount" for each purchase or acquisition of Spectrum and Old Spectrum common stock during the Class Period that is listed in the Claim Form and for which adequate documentation is provided by the claimant. Notice ¶¶ 61-64. The calculation of Recognized Loss Amounts under the proposed Plan will depend on when the claimant purchased and/or sold the shares, the value of the shares when the claimant purchased or sold them, and whether the claimant held the shares through the statutory 90-day look-back period, *see* 15 U.S.C. § 78u-4(e). *Id.* Under the Plan of Allocation, claimants who purchased shares during the Class Period but did not hold those shares through at least one of the two partial corrective disclosures[7] will have no Recognized Loss Amount as to those transactions because any loss suffered on those transactions would not be the result of the alleged misstatements in the Action. *Id.* ¶¶ 59-60. In contrast to the plan of allocation that had been proposed for the Prior

---

[7] Lead Plaintiffs allege that corrective information was released to the market on April 26, 2018 and November 19, 2018, which partially removed the artificial inflation from the price of the Spectrum Brands common stock on those days. Notice ¶ 59.

Settlement, under the currently proposed Plan of Allocation, no category of claims is subject to a discount based on the merits of the claims.

114.    In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Spectrum Class Members based on damages they suffered on transactions in Spectrum and Old Spectrum that were attributable to the misconduct alleged in the Complaint similarly to what would happen if Lead Plaintiffs prevailed at trial. Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

115.    As noted above, through February 4, 2022, 90,589 copies of the Notice, which contains the Plan of Allocation and advises Spectrum Class Members of their right to object to the proposed Plan of Allocation, have been sent to potential Spectrum Class Members and nominees. *See* Segura Decl. ¶ 8.  To date, no objection to the proposed Plan of Allocation has been received.

## VIII.    THE FEE AND LITIGATION EXPENSE APPLICATION

116.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel are applying to the Court for an award of attorneys' fees and payment of Litigation Expenses on behalf of Plaintiffs' Counsel.[8]

117.    Specifically, Lead Counsel is applying for a fee award of 15% of the Settlement Fund, net of Court-approved Litigation Expenses and estimated Notice and Administration Costs, and for payment of $326,558.70 in Plaintiffs' Counsel's Litigation Expenses.  The amount of Plaintiffs' Counsel's incurred expenses for which Lead Counsel seeks payment, together with the

---

[8] "Plaintiffs' Counsel" consists of Lead Counsel BLB&G and Liaison Counsel Stafford Rosenbaum LLP. No firms or attorneys other than BLB&G and Stafford Rosenbaum LLP will receive any portion of the attorneys' fees awarded in this Action.

amount of the award requested by Lead Plaintiffs pursuant to the PSLRA, is well below the maximum expense amount of $400,000 stated in the Notice.  Notice ¶¶ 5, 75.

118.    Based on the factors discussed below, and on the legal authorities discussed in the accompanying Fee Memorandum, we respectfully submit that Lead Counsel's motion for fees and expenses should be granted.  As discussed in the separate motion filed in the HRG Action, Lead Counsel is also applying for a portion of the attorneys' fees awarded in HRG Action in recognition of the fact that Lead Counsel asserted and vigorously litigated the claims of the HRG Class through its extensive investigation of those claims, its inclusion of those claims in CAC, its opposition to Defendants' motion to dismiss those claims from the CAC, and its preservation of those claims from being time-barred by the statute of limitations.

### A.    The Fee Application

119.    Lead Counsel is applying for a fee award to be paid from the Settlement Fund on a percentage basis.  As discussed in the accompanying Fee Memorandum, the percentage method is the preferred method of fee recovery for common-fund cases in the Seventh Circuit.

120.    Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is reasonable and should be approved.  As discussed in the Fee Memorandum, a fee award of 15% of the Settlement Fund, net of Court-approved Litigation Expenses and estimated Notice and Administration Costs, is fair and reasonable for attorneys' fees in common-fund cases like this and is well within the range of percentages awarded in class actions in this Circuit and elsewhere for comparable settlements.

41

### 1.    Lead Plaintiffs Support the Fee Application

121.    Both Chicago Teachers and Cambridge are sophisticated investors that closely supervised and monitored the prosecution and settlement of this Action.  *See* Hurtado Decl. ¶¶ 2-4; Murphy Decl. ¶¶ 2-4.  Chicago Teachers and Cambridge were able to directly observe the high quality of work performed by Lead Counsel throughout this litigation.  *See id.*  Chicago Teachers and Cambridge both believe that the requested fee is fair and reasonable in light of the work counsel performed and the risks of the litigation.  *See* Hurtado Decl. ¶¶ 6-7; Murphy Decl. ¶¶ 6-7. Lead Plaintiffs' endorsement of the requested fee demonstrates its reasonableness and should be given weight in the Court's consideration of the fee award.

### 2.    The Work and Experience of Counsel

122.    Attached as Exhibit 5A and 5B, respectively, are declarations from BLB&G and Stafford Rosenbaum[9] in support of an award of attorneys' fees and litigation expenses.  The first page of Exhibit 5 contains a summary chart of the hours expended and lodestar amounts for each firm, as well as a summary of each firm's Litigation Expenses.  Included in the supporting declarations are schedules summarizing the hours and lodestar of both firms from the inception of the case through January 31, 2022; a summary of Litigation Expenses from inception of the case through January 31, 2022, by category; and a firm resume which includes biographies of the attorneys involved in the Action.

---

[9] From approximately April 2019 through and including July 31, 2020, Rathje Woodward acted as Liaison Counsel for Lead Plaintiffs and the Class, and from August 1, 2020 to the present, Stafford Rosenbaum has acted in that role.  Stafford Rosenbaum acted as successor counsel to Rathje Woodward when acting liaison counsel, Douglas Poland, changed firms to Stafford Rosenbaum.  The Stafford Rosenbaum declaration includes time and expenses incurred by Rathje Woodward personnel through July 31, 2020, and time and expenses incurred by Stafford Rosenbaum personnel from August 1, 2020 through January 31, 2022.

123.    Time devoted by Plaintiffs' Counsel that could specifically be identified as relating *only* to the claims for the HRG Class has been removed from the lodestar of Plaintiffs' Counsel presented in support of Plaintiffs' Counsel motion for attorneys' fees in this Action.  However, it should be noted that there is a substantial amount of time that Plaintiffs' Counsel dedicated to the Action, including time spent in researching and preparing the CAC and in opposing Defendants' motion to dismiss, that contributed to the advancement of both the claims of the Spectrum Class and the HRG Class.  That time is included in the lodestar presented for this application.

124.    In addition, as noted in Plaintiffs' Counsel's declarations, no time expended in preparing the application for fees and expenses has been included.  Lead Counsel has and will continue to invest substantial time and effort in this case after the January 31, 2022 cut-off imposed for their lodestar submissions on this application.

125.    As shown in Exhibit 5, Plaintiffs' Counsel collectively expended a total of 5,127.75 hours in the investigation, prosecution, and settlement of the Spectrum Action from its inception through January 31, 2022.  The resulting lodestar is $3,123,961.25.  The requested fee of 15% of the Settlement Fund, net of the requested Litigation Expenses and estimated Notice and Administration Costs,[10] represents $4,688,665.31 (plus interest accrued at the same rate as the Settlement Fund), and therefore represents a multiplier of approximately 1.5 on Plaintiffs Counsel's lodestar.  As discussed in further detail in the Fee Memorandum, the requested multiplier cross-check is within the range of multipliers typically awarded in comparable securities class actions and in other class actions involving significant contingency-fee risk in this Circuit and elsewhere.

---

[10] The Claims Administrator, JND, estimates that Notice and Administration Costs will be approximately $400,000.  *See* Segura Decl. ¶ 15.

43

126.    As detailed above, throughout this case, Lead Counsel devoted substantial time to the prosecution of the Action.  I maintained control of and monitored the work performed by other lawyers at BLB&G on this case.  While I personally devoted substantial time to this case, liasoned with the Lead Plaintiffs, participated in the mediation, reviewed and edited all pleadings, motions, and correspondence prepared on behalf of Lead Plaintiffs, other experienced attorneys at my firm were involved in the litigation and settlement negotiations.  More junior attorneys and paralegals also worked on matters appropriate to their skill and experience level.  Throughout the litigation, Plaintiffs' Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

127.    As demonstrated by the firm resume included as Exhibit 3 to Exhibit 5A to this declaration, BLB&G is among the most experienced and skilled law firms in the securities-litigation field, with a long and successful track record representing investors in cases of this kind, and is consistently ranked among the top plaintiffs' firms in the country.  Further, BLB&G has taken complex cases like this to trial, and it is among the few firms with experience doing so on behalf of plaintiffs in securities class actions.

128.    BLB&G's litigation efforts in this case included drafting the detailed amended complaint asserting violations of the federal securities laws against Defendants; drafting Lead Plaintiffs' opposition to Defendants' motion to dismiss; engaging in extensive due diligence discovery; working extensively with experts to present strong counterarguments to Defendants' positions on loss causation and damages; and conducting settlement negotiations with Defendants.

### 3.    Standing and Caliber of Defendants' Counsel

129.    The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition.  Here, Defendants were represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP, one of the country's most

prestigious and experienced defense firms, which vigorously represented its clients.  In the face of this experienced, formidable, and well-financed opposition from some of the nation's top defense firms, Lead Counsel was nonetheless able to persuade Defendants to settle the case on terms that are favorable to the Spectrum Class.

### 4.  The Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Litigation

130.    This prosecution was undertaken by Lead Counsel entirely on a contingent-fee basis.  The risks assumed by Lead Counsel in bringing these claims to a successful conclusion are described above.  Those risks are also relevant to an award of attorneys' fees.

131.    From the outset, Lead Counsel understood that it was embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable litigation costs that a case like this requires.  With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Plaintiffs' Counsel received no compensation during the course of the Action and have collectively incurred over $300,000 in Litigation Expenses in prosecuting the Action for the benefit of the Spectrum Class.

132.    Lead Counsel also bore the risk that no recovery would be achieved.  As discussed above, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever.  Despite the most vigorous and competent of efforts, success in contingent-fee litigation like this Action is never assured.

133.   Lead Counsel knows from experience that the commencement of a class action does not guarantee a settlement.  To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

134.   Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies.  As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors, particularly institutional investors, take an active role in protecting the interests of shareholders.  To carry out important public policy, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

135.   Lead Counsel's extensive and persistent efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Spectrum Class.  In these circumstances, and in consideration of the hard work performed and the excellent result achieved, I believe the requested fee is reasonable and should be approved.

### 5.   The Reaction of the Spectrum Class to the Fee Application

136.   As noted above, through February 4, 2022, 90,589 Notice Packets have been mailed to potential Spectrum Class Members and nominees advising them that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 15% of the Settlement Fund.  *See* Segura Decl. ¶ 8.  In addition, the Court-approved Summary Notice has been published in *Investor's Business Daily* and transmitted over the *PR Newswire*.  *Id.* ¶ 9.  To date, no objection to the attorneys' fees stated in the Notice has been received.  Should any objections be received, they

46

will be addressed in Lead Counsel's reply papers to be filed on or before March 4, 2022, after the deadline for submitting objections has passed.

137.    In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the favorable result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submit that a fee award of 15% of the net Settlement Fund, resulting in a lodestar multiplier of approximately 1.5, is fair and reasonable and is supported by the fee awards courts have granted in other comparable cases.

## B.    The Litigation Expense Application

138.    Lead Counsel also seeks payment from the Settlement Fund of $326,558.70 in Litigation Expenses that were reasonably incurred by Plaintiffs' Counsel in commencing, litigating, and settling the claims asserted in the Action.

139.    From the outset of the Action, Plaintiffs' Counsel have been cognizant of the fact that they might not recover any of their expenses, and, further, if there were to be reimbursement of expenses, it would not occur until the Action was successfully resolved, often a period lasting several years.  Lead Counsel also understood that, even assuming that the case was ultimately successful, reimbursement of expenses would not necessarily compensate them for the lost use of funds advanced by them to prosecute the Action.  Accordingly, Plaintiffs' Counsel were motivated to and did take appropriate steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the case.

140.    As shown in Exhibit 6 to this declaration, Plaintiffs' Counsel have incurred a total of $326,558.70 in Litigation Expenses in prosecuting the Action.  The expenses are summarized in Exhibit 6, which was prepared based on the declarations submitted by each firm and identifies each category of expense, *e.g.*, expert fees, online research charges, mediation fees, and copying

charges, and the amount incurred for each category. These expense items are incurred separately by Plaintiffs' Counsel, and these charges are not duplicated in Plaintiffs' Counsel's hourly rates.

141.    Of the total amount of counsel's expenses, Lead Counsel incurred $203,183.75, or approximately 62%, for the retention of an expert in the field of loss causation and damages during its investigation and the preparation of the CAC, and consulted further with that expert during the settlement negotiations with Defendants and the development of the proposed Plan of Allocation.

142.    Another large component of the Litigation Expenses was for online legal and factual research, which was necessary to prepare the complaints, research the law pertaining to the claims asserted in the Action, oppose Defendants' motion to dismiss the CAC, and research issues related to the severance of the Spectrum and HRG Claims. The total charges for online legal and factual research amount to $80,924.63, or approximately 25% of the total amount of counsel's expenses.

143.    Plaintiffs' Counsel have also incurred expenses totaling $31,415.52 (approximately 10% of total expenses) for mediation fees charged by the Mediator.

144.    The other expenses for which Lead Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, court fees and copying costs.

145.    All of the Litigation Expenses incurred by Plaintiffs' Counsel were reasonable and necessary to the successful litigation of the Action and have been approved by Lead Plaintiffs. *See* Hurtado Decl. ¶ 7; Murphy Decl. ¶ 7.

146.    Additionally, in accordance with the PSLRA, Chicago Teachers and Cambridge seek reimbursement of their reasonable costs and expenses incurred directly in connection with

their representation of the Spectrum Class, in the amount of $7,706.95 and $7,965.60, respectively, for a total of $15,672.55. *See* Hurtado Decl. ¶¶ 8-11; Murphy Decl. ¶¶ 8-11.

147. The Notice informed potential Spectrum Class Members that Lead Counsel would seek payment of Litigation Expenses in an amount not to exceed $400,000. The total amount requested, $342,231.25, which includes $326,558.70 for expenses incurred by Plaintiffs' Counsel and $15,672.55 for costs and expenses incurred by Lead Plaintiffs, is significantly below the $400,000 that Spectrum Class Members were notified could be sought. To date, no Spectrum Class Member has objected to the maximum amount of expenses disclosed in the Notice. Lead Counsel will address any such objections in its reply papers.

148. The expenses incurred by Plaintiffs' Counsel and Lead Plaintiffs were reasonable and necessary to represent the Spectrum Class and achieve the Settlement. Accordingly, Lead Counsel respectfully submits that the Litigation Expenses should be paid in full from the Settlement Fund.

149. Attached to this declaration are true and correct copies of the following documents previously cited in this declaration:

Exhibit 1:  Declaration of Jed D. Melnick in Support of Final Approval of Class Action Settlement

Exhibit 2:  Declaration of Daniel Hurtado, Chief Legal Officer for The Public School Teachers' Pension & Retirement Fund of Chicago, in Support of (I) Lead Plaintiffs' Motion For Final Approval of Settlement and Plan Of Allocation and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses.

Exhibit 3:  Declaration of Francis E. Murphy III, Board Chairman of The Cambridge Retirement System, in Support of (I) Lead Plaintiffs' Motion For Final Approval of Settlement and Plan Of Allocation and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses.

Exhibit 4:  Declaration of Luiggy Segura Regarding (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on

49

Requests for Exclusion Received to Date and Estimated Notice and Administration Costs.

Exhibit 5:     Summary of Plaintiffs' Counsel's Lodestar and Expenses.

Exhibit 5A:    Declaration of Katherine M. Sinderson in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses, filed on Behalf of Bernstein Litowitz Berger & Grossmann LLP.

Exhibit 5B:    Declaration of Douglas M. Poland in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses, filed on Behalf of Stafford Rosenbaum LLP.

Exhibit 6:     Breakdown of Plaintiffs' Counsel's Expenses by Category

150.    Also attached to this declaration are true and correct copies of the following documents cited in the Fee Memorandum:

Exhibit 7:     *City of Sterling Heights Gen. Emps.'Ret. Sys. v. Hospira, Inc.*, No. 1:11-cv-08332 (N.D. Ill. Aug. 5, 2014), dkt. 207.

Exhibit 8:     *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, No. 1:09-cv-07666 (N.D. Ill. Jan. 22, 2014), dkt. 693.

Exhibit 9:     *Roth v. Aon Corp.*, No. 1:04-cv-06835 (N.D. Ill. Nov. 18, 2009), dkt. 220.

Exhibit 10:    *Plymouth Cnty. Ret. Ass'n v. Spectrum Brands Holdings, Inc., et al.*, Case No. 2019-CV-000982 (Dane County Cir. Ct. Aug. 20, 2020), dkt. 143.

Exhibit 11:    *Duncan v. Joy Glob. Inc.*, No. 2:16-cv-01229-PP (E.D. Wis. Dec. 27, 2018), dkt. 79.

## IX.    CONCLUSION

151.    For all the reasons discussed above, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. Lead Counsel further submits that the requested fee in the amount of 15% of the Settlement Fund, net of Court-approved Litigation Expenses and estimated Notice and Administration Costs, should be approved as fair and reasonable, and the request for payment of total Litigation Expenses in the amount of $342,231.25 should also be approved.

I declare, under penalty of perjury under the laws of the United States, that the foregoing is true and correct.

Dated: February 7, 2022                              */s/ Katherine M. Sinderson*
                                                     Katherine M. Sinderson

## CERTIFICATE OF SERVICE

I, Katherine M. Sinderson, an attorney, hereby certify that a copy of the foregoing **"Declaration of Katherine M. Sinderson in Support of (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses"** and its exhibits was served on counsel for all parties electronically via the CM/ECF system on February 7, 2022.

Dated:  February 7, 2022                                    By:     */s/ Katherine M. Sinderson*
                                                                          Katherine M. Sinderson

#3080733

52